UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

BECK CHEVROLET CO., INC.,

                          **Plaintiff,**

      -against-

GENERAL MOTORS LLC,

                          **Defendant.**

------------------------------------------------------------------X

                      ***PROPOSED*** **SECOND
AMENDED COMPLAINT
~~AND~~WITH JURY DEMAND**

                  **11 Civ 2856 (AKH)**

       Plaintiff Beck Chevrolet Co., Inc. ("Beck"), by its attorneys Robinson Brog Leinwand

Greene Genovese & Gluck P.C., as and for its **Second** Amended Complaint against General

Motors LLC ("GM"), alleges as follows:

## NATURE OF THE ACTION

      1.     Beck is a Chevrolet dealer located in the City of Yonkers, New York.  This action

arises out of GM's numerous violations of New York's Franchised Motor Vehicle Dealer Act,

Veh. & Tr. L. § 460 *et. seq.* (the "Dealer Act") and GM's breaches of its contractual and fiduciary

obligations owed to Beck .

      2.     As remedies, Beck seeks:  (a) ~~preliminary and permanent~~ injunctive relief; (b)

money damages; and (c) ~~attorney's~~**attorneys'** fees and costs incurred in prosecuting this action, all

as provided for in the Dealer Act and at common law.

## PARTIES

      3.     Plaintiff Beck is a corporation organized and existing under the laws of the State of

New York with its principal place of business in Westchester County, New York.  Beck has been a

Chevrolet dealer since 1966, and its predecessors have operated a Chevrolet dealership at Beck's

location since the 1930's.  Beck is a "franchised motor vehicle dealer" as defined in section 462(7)

of the Dealer Act.

4. Defendant GM is a limited liability company organized and existing under the laws of the State of Delaware and is authorized to do business in the State of New York. GM is a "franchisor" as defined in section 462(8) of the Dealer Act.

## JURISDICTION

5. This action was originally commenced on April 27, 2011 in the Supreme Court of the State of New York in the County of Westchester. **On April 28, 2011.** GM removed this action **pursuant to 28 U.S.C. § 1441(a)** to this Court on ~~April 28, 2011.~~ **the ground that this** Court has subject matter jurisdiction pursuant to 28 U.S.C. § **1332.**

6. ~~This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 and was removed by GM pursuant to 28 U.S.C. §§ 1441(a), 1446(a) and 1446(b) because the citizenship of the parties is diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs.~~

## NEW YORK'S FRANCHISED
## MOTOR VEHICLE DEALER ACT

6. The Dealer Act is a comprehensive regulatory scheme governing the relationship between automobile manufacturers and their New York dealers.

7. ~~The~~**Section 463 of the** Dealer Act defines numerous practices by **motor vehicle** manufacturers as "unlawful" and "unfair trade practices" and prohibits such conduct "notwithstanding the term of any franchise contract." ~~Veh. & Tr. L. § 463.~~ In pertinent part, this proscribed conduct includes:

> ~~To directly or indirectly coerce or attempt to coerce any…dealer to enter into any agreement with such franchisor…or to do any act prejudicial to the monetary interests or property rights of said dealer by threatening to cancel any unexpired contractual agreement existing between such franchisor and dealer.~~

*~~Id~~*~~. at § 463(2)(b).~~

> To terminate, cancel or refuse to renew the franchise of any…dealer except for due cause, regardless of the terms of the franchise.

*Id.* at § 463(2)(d)(1).

> To modify the franchise of any…dealer, unless the franchisor notifies the…dealer, in writing, of its intention to modify the franchise of such dealer at least ninety days before the effective date thereof, stating the specific grounds for such modification.

*Id.* at § 463(2)(ff).

**a.** ~~To use~~**Using** an unreasonable~~, arbitrary~~ or unfair sales or other performance standard in determining a~~…~~ dealer's compliance with a~~~~**the** franchise agreement~~.~~**:**

*Id.* at § 463(2)(gg).

**b.** ~~To condition~~**Conditioning** the renewal or extension of a franchise on a ~~…dealer's substantial renovation of the dealer's place of business…[where the manufacturer does not] demonstrate[] the need for such change in the place of business and the reasonableness of such demand in view of the need to service the public and the economic conditions existing in the automobile industry….~~**an unreasonable renovation of the dealership's facilities;**

*Id.* at § 463(2)(e).

> To refuse to deliver in reasonable quantity and within a reasonable time after receipt of dealer's order…any vehicle covered by such franchise….

*Id.* at § 463(2)(u).

> [T]o directly or indirectly coerce or attempt to coerce any franchised motor vehicle dealer…[t]o order or accept delivery of any motor vehicle or vehicles…which shall not have been voluntarily ordered by said…dealer.

*Id.* at § 463(1)(a).

> To sell or offer to sell any new motor vehicle to any…dealer at a lower actual price therefor than the actual price offered to any other…dealer for the same model vehicle similarly equipped or to

3

~~utilize any device including, but not limited to, sales promotion plans or programs which result in such lesser actual price….~~

~~*Id.* at § 463(2)(g).~~

~~9.      The Dealer Act also makes it "unlawful" for manufacturers to place unreasonable restrictions on dealers:~~

~~**c.**~~      ~~It shall be unlawful for a franchisor directly or indirectly to impose~~**Imposing** unreasonable restrictions on ~~the …~~**a** dealer relative to~~… [ the] right to renew or~~ termination **or renewal** of ~~a~~**its** franchise~~…, compliance with subjective standards~~ and **relative to the** assertion of legal or equitable rights with respect to its franchise ~~or dealership~~**:**

~~*Id.* at § 466(1).~~

~~10.      For violations of the foregoing provisions, the Dealer Act provides for a private right of action and for remedies including injunctive relief, money damages, and the award of attorneys fees, costs and disbursements:~~

**d.      Engaging in price discrimination in the sale of motor vehicles to dealers;**

**e.      Failing to deliver reasonable quantities of motor vehicles ordered by a dealer;**

**f.      Terminating a franchise agreement without due cause or in bad faith.**

**g.      Implementing a modification to a franchise that is unfair by reason that it is not undertaken in good faith, is not undertaken for good cause or would adversely and substantially affect the dealer's right or obligations.**

**8.**      ~~A franchised motor vehicle~~**Section 469 of the Dealer Act creates** a private right of action **for "any** dealer who is or may be **may be** aggrieved by a violation ~~of this article~~ **" and such dealer "**shall be entitled to **…**sue for, and have, injunctive relief and damages ~~in any court of the state having jurisdiction over the parties.  In any such action or proceeding, the court may award~~**"**

**as well as an "award [of]** necessary costs and disbursements plus a reasonable attorney**'**s fee to

any party**…"**

*Id.* at § 469.

## FACTUAL ALLEGATIONS

A.      **GM Purchases Substantially All of the Operating
        Assets of Old GM in Bankruptcy and Assumes Beck's
        Dealer Agreement Subject to a Wind-Down Agreement**

9.      On June 1, 2009, General Motors Corporation ("Old GM") filed a petition for relief

under Chapter 11 of the Bankruptcy Code (the "Old GM Bankruptcy").

10.     As part of the Old GM Bankruptcy, Old GM sold substantially all of its operating

assets pursuant to section 363 of the Bankruptcy Code to GM (the "363 Sale").

11.     As part of the 363 Sale, **almost** all of Old GM's existing dealer sales and service

agreements were assumed by Old GM and assigned to GM.  **However, each dealer agreement**

**was assumed and assigned subject to either a participation agreement or a wind-down**

**agreement.**

12.     Old GM assumed **and assigned** most dealers'**dealer** sales and service agreements

subject to amendments called participation agreements, which allowed those dealers to continue

their franchises with GM.

13.     However, Old GM assumed **and assigned** some dealers'**dealer** sales and service

agreements and assigned them to GM subject to amendments called wind-down agreements,

pursuant to which **permitted** those dealers received a small payment and were permitted to stay in

business only long enough to sell down their inventory and wind-up their franchises in an orderly

fashion **in exchange for a small payment**.

14.     Beck's Dealer Sales and Service Agreement (the "Dealer Agreement") was assumed by Old GM and assigned to GM subject to a wind-down agreement.

**15.     During the period that Beck was subject to the wind-down agreement, Beck was not permitted to place orders for new inventory but only received deliveries of vehicles ordered prior to the commencement of the Old GM Bankruptcy.**

**B.     GM Rescinds Beck's Wind-Down Agreement**
**        And Issues Beck a Participation Agreement**

16.     After the closing of the 363 Sale, and following discussions between Beck and GM, GM agreed to rescind Beck's wind-down agreement and issued Beck a participation agreement dated September 4, 2009 and effective September 11, 2009 (the "Participation Agreement").  The Participation Agreement operated as an amendment to Beck's Dealer Agreement and allowed Beck to continue, rather than wind-down, its Chevrolet franchise.  ~~A copy of the Participation Agreement is annexed hereto as Exhibit "1".~~

17.     The Participation Agreement contained the following pertinent terms:

    (a)     Sales **Performance** Standard:  Beck is required to meet certain new vehicle sales ~~benchmarks~~**performance objectives** in the years 2010 through 2012.  Specifically, the Participation Agreement requires Beck to attain a Retail Sales Index ("RSI") of 70 for 2010, 85 for 2011 and 100 for 2012.  ~~In simple terms, a dealer~~**Beck**'s RSI is ~~its actual sales versus its expected sales calculated as a percentage against a benchmark.   Here, Beck's RSI benchmark was the~~**calculated by applying Chevrolet's** New York State average **segmented** market share ~~in~~**("NYS Average") to** Beck's assigned market area ~~adjusted for segment popularity.  To illustrate, in order to attain an RSI of 100, Beck would have to sell the number of vehicles equal to the Chevrolet brand's New York State average market share in Beck's assigned market area.~~  **RSI is a fraction, expressed as a percentage, where the numerator is a dealer's actual sales and the denominator is a dealer's expected sales based on NYS Average**.

    (b)     Customer Service Standard:  Beck is required to achieve an annual customer service index ("CSI") equal to the regional average CSI through 2012.

(c)    Facility Standard:  Beck is required to ~~comply with~~**enroll in** GM's new ~~facility image~~ ~~requirements which would require Beck to~~**program, known as the EBE Program, and** substantially renovate its existing facility **in accordance with the program. The EBE Program places dealers in difference facility size categories.  Beck's facility size is determined by the same NYS Average used to calculate RSI**.

(d)    Working Capital Standard:  Beck is required to meet net working capital standards set by GM.

(The Sales **Performance** Standard, Customer Service Standard, Facility Standard and Working Capital Standard are hereinafter collectively referred to as the "~~Added~~ Performance Requirements").

**C.      NYS Average is an Unfair and Unreasonable Performance Standard Used to Determine Beck's Compliance with**

~~19.     Paragraph 9(e) of the Participation Agreement states that "[t]o provide Dealer an opportunity to perform the [Added Performance Requirements], subject to Dealer's compliance with the terms of [the Participation Agreement], including but not limited to its continuing compliance with the [Added Performance Requirements], Dealer and GM will cause the Dealer Agreement to be renewed, extended or replaced as of October 31, 2010 to a date not later than April 30, 2013."~~**the Dealer Agreement and the Participation Agreement**

**18.     GM's use of NYS Average to calculate Beck's expected sales is fundamentally unfair and unreasonable because the Chevrolet brand dramatically underperforms in the downstate metropolitan area compared to the rest of New York State.**

**19.     According to an expert report commissioned by Beck, there exists a consumer bias against domestic brands in the New York metropolitan area, and a particular consumer bias against Chevrolet.  In fact, Chevrolet's market share in New York's nine downstate counties is less than half of what it is in New York State as a whole.  Put another way, Chevrolet's market share in the 53 upstate counties is triple its market share in nine downstate counties.  To illustrate in yet another way, approximately one-half of all cars and**

**light trucks registered in New York State are registered in the nine downstate counties; however, only one-quarter of all Chevrolets are registered in the 9 downstate counties.**

20. ~~Paragraph 9(e) of the Participation Agreement also provides that Beck's failure to attain the Added Performance Requirements would constitute a breach of the Participation Agreement.~~ **These results are the same for any other localized geography, such as, for example, a 30-mile ring around Beck.  GM's own internal data reveals that 21 out of the 23 Chevrolet dealers in the nine downstate counties failed to attain GM's contractual standard of an RSI of 100.  Beck's RSI is at the median of all Chevrolet dealers in New York's nine downstate counties.**

21. ~~Paragraph 8 of the Participation Agreement further provides that in the event of any breach of the Participation Agreement, GM would have such remedies as set forth in the Dealer Agreement.~~  **In other words, Beck is performing exactly like an average Chevrolet dealer in the New York metro area could reasonably be expected to perform.  However, when compared to all dealers in New York State, Beck, like almost all other downstate dealers, appears artificially to be underperforming.**

22. ~~The relevant remedy provision of the Dealer Agreement provides as follows:~~**Accordingly, GM's use of NYS Average to calculate RSI and evaluate Beck's performance under the Dealer Agreement and the Participation Agreement is unfair and unreasonable, and a violation of the Dealer Act.**

> ~~If General Motors determines…that Dealer has failed to adequately perform its sales or service responsibilities, including those responsibilities relating to customer satisfaction and training, General Motors will review such failure with Dealer.~~
>
> ~~As soon as practical thereafter, General Motors will notify Dealer in writing of the nature of Dealer's failure and of the period of time (which shall not be~~

~~less than six months) during which Dealer will have the opportunity to correct the failure.~~

~~If Dealer does correct the failure by the expiration of the period, General Motors will so advise the Dealer in writing.  If, however, Dealer remains in material breach of its obligations at the expiration of the period, General Motors may terminate this Agreement by giving Dealer 90 days advance written notice.~~

**D.    GM's Use of NYS Average to Determine Beck's**
**      Proper Facility Size Imposes Unreasonable**
**      Facility Renovation Requirements on Beck            **

~~Dealer Agreement, Standard Provisions, at Art. 13.2.  A copy of the Standard Provisions of the Dealer Agreement is annexed hereto as Exhibit "2".~~

~~23.    However, the Dealer Act Provides that "[i]t should be unlawful for any franchisor,~~ ~~*notwithstanding the terms of any franchise contract*…[t]o terminate, cancel or refuse to renew the franchise of any franchised motor vehicle dealer except for due cause, *regardless of the terms of the franchise*."   Dealer Act § 463(2)(d)(1) (emphasis added).~~**In addition to evaluating sales performance, GM uses NYS Average to determine the nature and extent of the facility renovations required under the Facility Standard of** the Participation Agreement**.  When used for facility planning purposes, the RSI denominator is called the Facility Planning Guide.  In simple terms, the higher Beck's Facility Planning Guide, the more onerous and expensive the required facility renovations become.**

~~**C.    GM Unilaterally Amends the Participation Agreement**~~
~~**      and Unilaterally Implements a Special Allocation Process     **~~

**24.    The Facility Standard in the Participation Agreement requires that Beck enroll in GM's facility image program, called the Essential Brand Elements Program ("EBE Program").**

**25.     The EBE Program divides dealer facilities into 8 size categories based on their Facility Planning Guide.**

**26.     According to GM, based on Beck's Facility Planning Guide of 670 vehicles, Beck must satisfy the requirement of a "medium-small" facility.**

**27.     However, if Beck's Facility Planning Guide were to be calculated using a more localized geographical benchmark (i.e. nine downstate counties, or 30-mile ring), Beck would be in the "small" facility category, and its renovation requirements would be significantly less onerous and less expensive.**

**28.     This is illustrated by the following chart showing numerous differences between the "small" and "medium-small" facility sizes under the EBE Program:**

| **"Small"** | **"Medium-Small"** | **Difference** |
|---|---|---|
| **15,579 sq. ft. sales/service facility** | **21,301 sq. ft. sales and service facility** | **5,723 sq. ft.** |
| **74,320 sq. ft outdoor storage/parking** | **110,320 outdoor storage/parking** | **36,000 sq. ft.** |
| **2,316 sq. ft. showroom** | **3,020 sq. ft. showroom** | **704 sq. ft.** |
| **4,595 sq. ft. service dept.** | **6,570 sq. ft. service dept.** | **1,975 sq. ft.** |
| **9 service stalls** | **13 service stalls** | **4 service stalls** |
| **2 service reception stalls** | **3 service reception stalls** | **1 service reception stall** |
| **No children's area** | **1 children's area** | **1 children's area** |
| **No customer workstation** | **2 customer workstations** | **2 customer workstations** |
| **75 outdoor new vehicle storage spots** | **117 outdoor new vehicle storage spots** | **42 outdoor new vehicle storage spots** |
| **45 outdoor used vehicle display** | **70 used vehicle display** | **25 outdoor used vehicle display** |

29.     In addition, Beck's Saab franchise is currently located in the same sales and service facility as its Chevrolet franchise.  Saab is in bankruptcy in Sweden and its American distributor has been forced into involuntary bankruptcy.

30.     If Beck is required to meet the requirements of a "medium-small" facility, there will not be enough excess space to replace the Saab franchise with another franchise.

31.     On the other hand, if Beck is required only to meet the requirements of a "small" facility, there will be enough excess space for Beck to continue to operate another franchise and still comply with the requirements of the EBE Program

32.     GM's EBE Program generally permits additional franchises (called "dualling" in industry parlance) so long as there is a complete separation of customer-facing areas (i.e. the second franchise cannot share the same showroom, service write-up, waiting areas, entrances, etc.).

33.     The ability to replace Saab with another franchise would have a substantial affect on Beck's revenue and profitability, and Beck's ability to do so is entirely dependent on whether Beck need only comply with the "small" facility of the EBE Program, and that, in turn, is entirely dependent on whether GM may hold Beck to sales expectations based on NYS Average.

34.     In short, GM's use of NYS Average to determine Beck's facility size under the EBE Program results in Beck having to undertake unnecessary and unreasonable facility renovations and forecloses Beck from replacing its Saab franchise.

E.     **GM Failed to Deliver Sufficient
       Inventory to Beck to Allow Beck to
       Meet the 2010 Sales Performance Standard**

35.     As set forth above, during the period that Beck's franchise was subject to a wind-down agreement, Beck was not allowed to place orders for new vehicle inventory.

36.     As a result, by the time GM issued Beck its Participation Agreement, and for several months thereafter, Beck had diminished and inadequate inventory, and this affected sales volume in the remainder of 2009 and throughout 2010.

37.     Because of the dislocation caused by the Old GM Bankruptcy and Beck's initial status as a wind-down dealer, Beck was seriously disadvantaged in its ability to earn inventory in 2010 necessary to meet the 2010 Sales Performance Standard.  This is because GM allocates new vehicle inventory according to a strict formula, known in the industry as "turn-and-earn".

38.     Under a turn-and-earn allocation system, the more vehicles that a dealer sells (or turns), the more new inventory that dealer is allocated (or earns).  The allocation system takes into account a dealer's sales history inventory and then allocates enough additional vehicles so that the dealer maintains approximately a 60-days' supply of each model.

39.     Because the allocation that a dealer earns is necessarily limited by what it has sold in the immediate past, it is difficult for a dealer to increase its sales volume quickly without an injection of extra inventory outside of the normal turn-and-earn system.

40.     Thus, in 2010 Beck only had an unreasonably limited ability to quickly and significantly increase its sales volume within the "turn-and-earn" system.   This phenomenon also impacted other GM dealers that, like Beck, were initially wind-down dealers but were later offered participation agreements.

41.     The Dealer Agreement obligates GM to provide sufficient inventory to Beck to enable Beck to meet its contractual sales obligations.

42.    In addition, in the Participation Agreement, GM represented that sales opportunities for participating dealers like Beck would increase significantly as a result of the consolidation of GM's dealer network in the aftermath of the bankruptcy.  GM further agreed to provide sufficient inventory to meet that increased sales opportunity.

43.    In reliance upon those representations, Beck agreed to the Sales Performance Standard in the Participation Agreement.

44.    Accordingly, Beck's obligation to achieve the Sales Performance Standard is contingent on: (a) the represented increased sales opportunity actually materializing; and (b) GM providing sufficient inventory to take advantage of such opportunity.  Neither condition was fulfilled.

45.    According to GM, Beck needed to sell 577 vehicles in 2010 to attain an RSI of 100; therefore, in order to attain the 2010 Sales Performance Standard of 70 RSI, Beck needed to sell 404 vehicles.  During calendar year 2010, GM delivered only 358 vehicles to Beck for retail sale.

46.    GM thereby breached the Participation Agreement by failing to provide enough inventory in late 2009 and throughout 2010 to enable Beck to attain the 2010 Sales Performance Standard.

47.    This breach resulted in Beck suffering pecuniary losses in the form of lost profits Beck otherwise would have earned on the vehicles GM wrongfully failed to deliver.

48.    Due to the failure of GM to allocate and deliver sufficient inventory in 2010, Beck sold only 289 vehicles at retail that year.  The 358 vehicles that GM actually delivered in 2010 were barely enough for Beck to cover those sales and still maintain adequate

inventory on the ground.  Obviously, this left no cushion to significantly grow Beck's business as projected by the Participation Agreement.

49.     In 2010, Beck's average profit per new vehicle sold was $1,200. Accordingly, in 2010, Beck suffered damages totaling $138,000 in lost profits on the 115 vehicle difference between the 404 vehicles necessary to attain an RSI of 70 and the 259 sales made by Beck.  Even if Beck's lost profits are calculated more conservatively based on the 46 vehicle difference between 404 expected sales and 358 deliveries, the measure of damages is at least $55,200.

**F.      GM Unlawfully Attempted to**
**        Coerce Beck into Accepting**
**        Unnecessary Amounts of Inventory**

50.    ~~By~~**Belatedly, by the end of 2010, GM finally recognized the inventory shortfall faced by Beck and other similarly situated dealers and, by** letter dated October 1, ~~2010 from Jim Bunnell, GM's General Manager of U.S. Sales Operations (the "Bunnell Letter"), GM unilaterally~~**2010, GM** implemented two modifications to **the affected franchises, including** Beck's ~~franchise.  A copy of the Bunnell Letter is annexed hereto as Exhibit "3"~~.

51.    First, ~~without explanation,~~ GM "decided not to enforce the [Participation Agreement's] performance requirements for the 2010 calendar year."  **GM did this because, as set forth above, GM had failed to allocate enough vehicles to dealers like Beck that were subject to sales performance requirements.**

**52.      However, GM left the Sales Performance Standards for 2011 and 2012 intact, thereby unilaterally and unlawfully decreasing a three-year sales improvement process into a two-year improvement period.  This constituted a breach of the Participation Agreement.**

53.    Second, GM implemented a ~~four-month long~~ **"**special ~~vehicle~~ allocation process**"** **intended to provide additional inventory to Beck and other similarly situated dealers**. Essentially, GM artificially adjusted the variables inputted into GM's vehicle allocation formula for Beck ~~Chevrolet.  The result was that Beck was allocated an entire year's worth of inventory in a four (4) month period.~~**and other dealers subject to performance requirements so that those dealers were offered additional inventory.**

~~27.      By letter dated October 11, 2010, Beck objected to~~

**54.      However,** the special allocation process ~~outlined in the Bunnell Letter on several grounds.  A copy of Beck's October 11, 2010 letter is annexed hereto as Exhibit "4".~~

15

28.     ~~First,~~ GM's expected sales calculation (which is effectively GM's projection of the number of sales it will take to attain an RSI of 100 for the following calendar year) for Beck for the 2011 calendar year was grossly inflated.

29.     ~~Second,~~ the delivery of an entire year's worth of inventory (especially when based upon a grossly inflated expected sales calculation) in a compressed four (4) month period would have placed a fatal financial strain on Beck's finances.   **was ill-conceived and poorly implemented.**

**55.     The result of the special allocation process** was that Beck was allocated an entire year's worth of inventory **(calculated on GM's already inflated calculation of Beck's expected sales based on NYS Average)** in a four (4) month period.

**56.     In other words, not only was the special allocation inflated due to the application of NYS Average, but that already inflated special allocation was compressed into four short months in the middle of winter – the slowest selling season.  Acceptance of all or even most of the special allocation would have been disastrous for Beck.**

57.     Among other things, Beck did not have inventory floor plan financing to purchase such large numbers of vehicles; Beck would not have been able to pay the debt service on such large inventory especially during the slower winter months; and Beck did not have the physical lot space to even store such large numbers of vehicles.

58.     In other words, the special allocation process would result in the delivery of too many vehicles too quickly.  Rather than offer this additional allocation naturally over the course of the year, GM's special allocation process front-loaded the deliveries into four months.

59.     Had Beck accepted all, or even most, of the special allocation, the floor plan financing costs for such inventory would have quickly drained Beck's cash position and

financially crippled Beck.  In short order, Beck would have been forced into a breach of the Working Capital Standard portion of the Added Performance Requirements.

33.    Because a large part of the problem was GM's calculation of Beck's expected sales, the next day, October 12, 2010, Beck sent another letter to GM amplifying its concerns about GM's expected sales calculations.  A copy of Beck's October 12, 2010 letter is annexed hereto as Exhibit "5".

34.    Beck requested documentation demonstrating how Beck's market area (called, in GM's jargon, an Area of Geographic Sales and Service Advantage, or "AGSSA") was determined.

35.    More importantly, Beck requested a detailed explanation of how GM calculated Beck's expected sales, including the supporting data used to make that calculation.  In other words, Beck demanded not just the formula, but the data GM input into the formula to reach the expected sales number.

36.    Although GM has provided an explanation how Beck's AGSSA is determined and an explanation of the formulas by which Beck's RSI and expected sales are calculated, GM steadfastly refuses to provide the actual data upon which the calculations were made.

37.    The particulars of how GM calculates Beck's expected sales is critical for several reasons.

38.    First, although expected sales is a projected number, ultimately, the calculation relies on the same formula by which Beck's RSI will be calculated at the end of the year.  Thus, because GM's calculation of expected sales is so inflated, Beck fully expects GM's ultimate calculation of Beck's RSI to be artificially low.

39.    For example, in late 2009, GM projected that Beck would have to sell 830 vehicles in order to attain an RSI of 100 for calendar year 2010.  However, at the end of 2010, GM

calculated that Beck actually only had sell 577 vehicles in order to attain an RSI of 100.  In other words, GM's expected sales projection was off by 44%. Furthermore, as set forth herein, the figure of 577 vehicles was still inflated.

40.    Second, GM's facility image standards (which are incorporated into the Participation Agreement as the Facility Standard portion of the Added Performance Requirements) vary depending on a dealership's expected sales. The higher a dealer's expected sales, the bigger and more extravagant the facility must be to meet the standard.  Thus, an inflated expected sales figure will result in Beck overbuilding its facility.

41.    Third, as set forth above, the special vehicle allocation process announced in the Bunnell Letter was based on GM's calculation of Beck's expected sales.  Because GM inflated Beck's expected sales, Beck would be allocated many more vehicles than it could reasonably handle.

42.    Fourth, the special allocation process would wreak havoc on Beck's inventory flow.  After four months of excessive allocation, Beck would be over-inventoried and, upon the reversion to normal allocation, Beck's allocation going forward would precipitously drop.  This would result in Beck being whipsawed between high and low inventory allocations making it impossible to adequately plan for the peak summer selling season.

43.    Due to the special allocation process, Beck's October 2010 allocation was 205 vehicles. By way of comparison, in 2008, Beck made 273 retail sales for the entire year.  In its best recent year, 2001, Beck made 470 retail sales.

44.    To expect Beck to absorb 205 vehicles in one month, in winter, in a still very questionable automotive retail market, was absurd.  To expect Beck to continue absorbing similar numbers of vehicles for an additional 3 straight months was ludicrous.  Beck's inventory floor plan

~~financing permits financing for a maximum of 160 vehicles at any one time.  The October 2010~~

~~allocation alone would have maxed out Beck's financing.~~

**60.    As set forth above, growing sales volume quickly under a turn-and-earn allocation system requires an injection of additional inventory – but not, unreasonably and precipitously,  all at once.**

61.    Naturally, Beck declined this poison pill and instead ordered vehicles based on its rational business judgment and customer needs.

~~46.    The result of the special allocation process was that:  (a) in October 2010, GM offered 205 vehicles, Beck ordered 46 vehicles and ultimately was allocated 46 vehicles; (b) in November 2010, GM offered 185 vehicles, Beck ordered 45 vehicles and GM ultimately allocated Beck 41 vehicles; (c) in December 2010, GM offered 196 vehicles, Beck ordered 18 vehicles and GM ultimately allocated Beck 13 vehicles; and (d) in January 2011, GM offered 177 vehicles, Beck ordered 31 vehicles and GM ultimately allocated Beck 30 vehicles.~~

~~**D.    GM Attempts to Coerce Beck into**~~
     ~~**Accepting Unreasonable Amounts of Inventory and**~~
     ~~**Later Refuses to Deliver Vehicles Ordered by Beck**~~
62.    ~~Notwithstanding that GM continued to refuse to substantiate its expected sales calculation (and, ultimately, its RSI calculation), following~~**Following** Beck's October 2010 order, GM began issuing a string of veiled threats that if Beck did not accept all of the vehicles offered by the special allocation process, Beck would not be able to meet the Sales ~~Standard portion of the~~ Performance ~~Requirements~~**Standard** and, therefore, its franchise would ultimately be terminated.  For example:

> (a)    "Candidly, I am extremely surprised that you feel your dealership has been allocated "too much" product when the dealership has agreed to substantially increase its sales from past levels."  (**GM** November 4, 2010 ~~William Flook~~ Letter~~, copy annexed hereto as Exhibit "6"~~).

(b)     "It appears that during the October and/or November, 2010 consensus cycles, your dealership has elected to decline the allocation totals listed on the attached sheets.  As a result, I am concerned with your ability to meet the stated 2011 RSI performance criteria."  (**GM** November 24, 2010 ~~William Flook~~ Letter~~, copy annexed hereto as Exhibit "7"~~)**.**

(c)     "Your dealership elected to decline a portion of your new vehicle allocation during the October 2010 through January 2011 consensus cycles….It is clearly Dealer's decision to accept or decline allocation, however, Dealer's decision to decline this special allocation may seriously jeopardize Dealer's ability to meet the 2011 RSI performance criteria for increased sales performance by limiting Dealer's available new product."  (**GM** February 8, 2011 ~~William Flook~~ Letter~~, copy annexed hereto as Exhibit "8"~~).

**63.**    **Notwithstanding these threats, Beck continued to order inventory according to its business judgment.**

**G.**    **Throughout 2011 and Continuing Today**
        **GM Failed to Deliver Reasonable**
        **Amounts of Inventory Ordered by Beck**

64.    ~~As~~**However, as** Beck expected, after the special allocation process ended, ~~GM~~**Beck**'s ~~offered~~ allocation of vehicles dropped dramatically.  Whereas during the special allocation process GM attempted to coerce Beck to accept too many vehicles, after the special allocation process **ended,** GM refused to deliver vehicles that Beck ordered.

65.    ~~Following the four~~ **In fact, in the 11 months following the end of the 4-**month special allocation process ~~in which GM offered an average of over 190 vehicles per month, in February 2011, GM initially offered only 30 vehicles, Beck ordered 67 vehicles but GM ultimately allocated only 18 vehicles; in March 2011, GM initially offered 67 vehicles, Beck ordered 84 vehicles, but GM ultimately allocated Beck 67 vehicles; and in April 2011, GM initially offered 29 vehicles, Beck ordered 29 vehicles, but GM ultimately allocated Beck 25 vehicles.~~**, GM refused to deliver a total of 218 vehicles ordered by Beck:**

**E.      GM            Extends            the            Facility            Standard**

| MONTH | OFFERED BY GM | ORDERED BY BECK | SHIPPED BY GM | DIFFERENCE |
|---|---|---|---|---|
| February 2011 | 20 | 67 | 18 | (49) |
| March 2011 | 67 | 84 | 67 | (17) |
| April 2011 | 42 | 29 | 25 | (4) |
| May 2011 | 30 | 22 | 8 | (14) |
| June 2011 | 31 | 28 | 6 | (22) |
| July 2011 | 37 | 61 | 32 | (29) |
| August 2011 | 34 | 72 | 31 | (41) |
| September 2011 | 44 | 58 | 46 | (12) |
| October 2011 | 23 | 43 | 24 | (19) |
| November 2011 | 23 | 31 | 22 | (9) |
| December 2011 | 27 | 36 | 34 | (2) |
| Totals | 378 | 531 | 313 | (218) |

**66.    In 2011, Beck's average profit per new vehicle sales retail was $1,185. Accordingly, Beck suffered lost profits totaling $258,330 as a result of GM's refusal to deliver vehicles ordered by Beck during 2011 after the special allocation process ended.**

~~Deadline and~~H.    **GM Makes its First Attempt ~~To~~ to Coerce ~~a Modification to~~an Unlawful Modification of Beck's Franchise by Conditioning the Extension of the Facility Standard on Beck's Agreement To Lower the Standard for Terminating Beck's Franchise**

67.    By letter dated January 24, 2011, GM offered to extend Beck's time to comply with the Facility Standard portion of the Performance Requirements to April 30, 2014. ~~A copy of GM's January 24, 2011 proposed letter agreement is annexed hereto as Exhibit "9".~~

68.    However, ~~GM conditioned its offer to extend the Facility Standard deadline on Beck's agreement that GM could terminate or non-renew Beck's franchise if Beck failed to meet the other Performance Requirements.  The proposed January 24, 2011 letter agreement contained~~

~~the following clause:~~**in violation of the Dealer Act, GM unlawfully conditioned its offer to extend the Facility Standard deadline on Beck's agreement that GM could more easily terminate or non-renew Beck's franchise if Beck failed to meet the other Performance Requirements.**

> ~~GM and Dealer hereby agree to extend the Compliance Deadline to April 30, 2014 and extend the effectiveness of the Reinstatement Agreement through the Expiration Date; *provided, however, that Dealer acknowledges and agrees* that if Dealer (1) fails to complete the Facility-Related Improvements and fully comply with the Facility Image Requirements on or before the Compliance Deadline, as extended herein, or (2) fails to fully perform all of the other Executory Covenants on or before the date(s) established in the Reinstatement Agreement, GM shall have no obligation to extend the term of the Dealer Agreement or enter into any further Dealer Sales and Service Agreement with respect to the Reinstatement Line with Dealer.~~

> ~~52.   By letter dated February 8, 2011 (a copy of which is annexed hereto as Exhibit "10"), Beck refused GM's conditioned extension, refused to countersign and instead demanded a "clean" extension without precondition:~~

> ~~Because the January Letter contains terms inconsistent with the Participation Agreement and seeks to impose other unacceptable terms, Beck Chevrolet does not agree to the proposed amendment and will not countersign the January Letter…[W]ith respect to further extensions or renewals of Beck Chevrolet's Dealer Agreement, the Dealer Agreement, as modified by the Participation Agreement, already provides for rights and remedies and no further modification or clarification is necessary or acceptable…[U]ltimately the reasonableness of the performance benchmarks in the Participation Agreement and any attempted termination or non-renewal of Beck Chevrolet's Dealer Agreement would be governed by New York's Franchised Motor Vehicle Dealer Act.  If GM is truly interested in allowing Beck Chevrolet "to better focus its efforts in meeting" benchmarks in the Participation Agreement, it should waive the compliance deadline for facility-related improvements without pre-condition and without attempting to extract contractual concessions from Beck Chevrolet.~~

> ~~53.   GM responded by letter dated March 2, 2011 (the "March 2 Letter") and claimed that it was "not asking for any concessions in granting [Beck] the benefit of this extension, contrary to what [Beck] stated in [its] letter."  The March 2 Letter is annexed hereto as Exhibit "11".~~

54.    Beck accepted GM's statement in the March 2 Letter at face value.   Beck replied by letter dated March 4, 2011, which included a proposed clean extension of the deadline for facility-related improvements that Beck was willing to execute.  A copy of Beck's March 4, 2011 letter and attached draft letter agreement is annexed hereto as Exhibit "12".

55.    However, notwithstanding GM's previous assurance that it was "not asking for any concessions," GM ignored Beck's proposed "clean" extension and by email dated March 17, 2011 again offered an extension still conditioned on Beck's agreement that if Beck "fails to fully perform all of the other Executory Covenants . . . GM has no obligation to extend the term of the Dealer Agreement or enter into any further Dealer Sales and Service Agreement with respect to Chevrolet with Dealer."  GM's March 17, 2011 email and attached proposed March 17, 2011 letter agreement is annexed hereto as Exhibit "13".  In fact, GM's March 17 proposed letter agreement added additional language whereby Beck would have agreed to "ratify and affirm" the Performance Requirements.  *Id*.

56.    The same day, by email Beck rejected GM's revised proposal:

We have reviewed GM's second proposed modification letter.   We are disappointed to see that, contrary to the representations made in your March 2 letter, GM is indeed seeking to extract concessions in exchange for an extension of the time to complete facility related improvements.  If anything, this version is even less acceptable than the original.  Beck Chevrolet is not going to agree to any terms, however couched, that might in any way affect Beck's substantive rights under the existing Dealer Agreement and under New York law.

We are willing to execute a clean extension like the one we sent you on March 4.  If, in fact, GM is not seeking concessions, we fail to understand why GM will not simply provide a clean extension.

A copy of Beck's March 17, 2011 email is annexed hereto as Exhibit "14".

69.    Finally, on March 24, 2011 (and only after several rounds of correspondence over the course of nearly two (2)**Beck repeatedly rejected GM's demands and, after two** months

detailed above)**of negotiations**, GM ~~relented~~**capitulated** and offered a clean extension of the facility improvement deadline. ~~A copy of GM's March 24, 2011 email with attached form of letter agreement is annexed hereto as Exhibit "15".~~ **Beck executed the clean facility extension on March 29, 2011.**

58.   ~~After GM corrected certain typographical errors, on March 29, 2011, Beck executed and delivered the March 24 Letter Agreement. A copy of the fully executed March 24 Letter Agreement is annexed hereto as Exhibit "16".~~

**70.   However, GM was not deterred in its attempt to impose a modification to Beck's franchise that would make it easier for GM to terminate Beck's franchise in the future.**

**~~F~~I.   GM Makes Its Second Attempt to Coerce
      ~~Beck to Agree to a~~An Unlawful Modification of ~~its~~Beck's Franchise
      by Threatening to Non-Renew Beck's Franchise**

71.   ~~However, just~~**Just** eight (8) days after Beck ~~signed and returned the March 24 Letter~~**executed the facility extension and twenty-four (24) days before Beck's Dealer** Agreement **was set to renew**, GM issued another letter seeking to impose the very same modifications previously rejected **by Beck** several times ~~by Beck~~ in connection with the ~~March 24 Letter Agreement~~**facility extension**. This time, however, GM did so under the threat of non-renewal or termination of Beck's franchise. ~~Having failed to secure Beck's affirmative agreement to these modifications in connection with the March 24 Letter Agreement, now Beck would be deemed to accept the terms of the extension of its franchise merely by opening for business on May 1, 2011.~~

72.   Beck's Dealer Agreement ~~came~~**was** up for renewal on April 30, 2011. ~~The renewal~~**Beck's** Dealer Agreement ~~that had been entered into as of November 1, 2010~~ provides

that: "This Agreement shall expire April 30, 2011, unless sooner terminated.  Dealer is assured of an opportunity to enter into a new Agreement at the expiration date if General Motors LLC determines that Dealer has fulfilled its obligations under this Agreement." A copy of the November 1, 2010 Dealer Agreement is annexed hereto as Exhibit "17".  Moreover, section 463(2)(d)(1) of the Dealer Act severely restricts GM's ability to refuse to renew Beck's franchise regardless of the terms of the Dealer Agreement.

**73.**     **In addition**, section 463(2)(d)(1) of the Dealer Act **only allows GM** to refuse to renew Beck's franchise **under very limited circumstances.**

74.     Notwithstanding**Therefore, notwithstanding** Beck's contractual and statutory right**rights** to have its franchise renewed, by letter dated April 6, 2011 (the "April 6 Letter"), GM informed Beck that its Dealer Agreement would <u>not</u> be renewed unless Beck agreed to the same modifications that GM previously attempted to extract **from Beck** in connection with the extension of Beck's time to comply with the Facility Standard.  A copy of GM's April 6 Letter is annexed hereto as Exhibit "18".

75.     Specifically, GM**'s April 6 Letter** stated that Beck's Chevrolet franchise would not be renewed unless Beck agreed that any future failure to attain the Performance Requirements would give GM the right to terminate or non-renew Beck's franchise at that time:

> …it is now necessary that we extend the term of the Dealer Agreement to correspond with Dealer's 2011 [Performance Requirements].  By this letter, GM is offering to extend the Dealer Agreement until April 30, 2012 to correspond with Dealer's year-end 2011 [Performance Requirements].  If Dealer meets its year-end 2011 [Performance Requirements] under the Participation Agreement, and if Dealer is otherwise in compliance with its obligations under the Dealer Agreement, GM will then further extend the Dealer Agreement to April 30, 2013 to correspond with Dealer's year end 2012 [Participation Requirements].  *However, should Dealer not meet its 2011 Performance Requirements, or should Dealer not otherwise be in compliance with its obligations*

> *under the Dealer Agreement, GM shall have no obligations to extend the Dealer Agreement beyond April 30, 2012.*

~~April 6 Letter, Ex. 18 (emphasis added).~~

76.     The April 6 Letter then stated that Beck's continued operation after April 30, 2011 would constitute its acceptance of the modification to its franchise:

> *GM will consider the Dealer's continued operation as a Chevrolet dealership after April 30, 2011 as its acceptance of the terms of this extension* through April 30, 2012. If Dealer does not desire to extend the Dealer Agreement beyond April 30, 2011, please advise me as soon as possible.  Of course, this would mean that the Dealer Agreement would expire by its terms on April 30, 2011.

77.     Following the commencement of this lawsuit and the institution of an automatic stay pursuant to sections 463(2)(e)(1) and (ff)(3) of the Dealer Act, GM **recognized that it had breached the Dealer Agreement and violated the Dealer Act and** quickly attempted to re-cast ~~its prior actions~~**that April 6 Letter**.

**78.**     By letter dated April 28, 2011 (the "April 28 Letter"), GM falsely asserted that the April 6 Letter was not intended to modify or conditionally non-renew Beck's franchise.

79.     ~~By letter dated April 28, 2011 (the "April 28 Letter"), GM falsely asserted that the April 6 Letter was not intended to modify or conditionally non-renew Beck's franchise.  A copy of the April 28 Letter is annexed hereto as Exhibit "19".   Notwithstanding the plain~~**Notwithstanding the blatant** terms of the April 6 Letter, GM falsely asserted that it ~~was~~ only intended ~~as~~ a clean extension and that Beck ~~has~~**had** misunderstood the April 6 Letter. ~~*See* April 28 Letter, Ex. 19.~~  The April 28 Letter neither withdraws nor rescinds the April 6 Letter and could not, in any event, undo GM's prior ~~violations~~**violation** of the Dealer Act.

**80.     Because GM did not have good cause to terminate or modify Beck's franchise in the first instance, Beck is entitled to an award of its attorneys' fees and costs pursuant to section 469 of the Dealer Act.**

**G.J.    GM ~~Has Been Sabotaging~~Sabotaged Beck's Business by Publishing Inflated**
~~**Publishing**~~
**Monthly Sales Objectives ~~Based on Inflated~~**
~~**Expected Sales Calculations, Holding Beck to**~~
~~**Different Standards than other Chevrolet Dealers and**~~
~~**Refusing to Assist Beck in Implementing Action Plans to**~~
~~**Improve Sales and other Areas of Dealership Operations**~~**Creating a False and Misleading**
**Perception of Beck's Performance and Viability**

81.     In addition to ~~attempting to bury Beck in~~**applying an unfair sales performance standard, imposing unreasonable facility requirements, failing to deliver sufficient** inventory **in 2010, refusing to deliver inventory in 2011 ordered by Beck**, threatening to terminate Beck's franchise, **and** attempting to unilaterally re-write **and modify** Beck's Dealer Agreement ~~and refusing to deliver vehicles Beck actually ordered~~, GM has engaged in ~~still yet~~ other unfair business practices prohibited by the Dealer Act.

82.     According to GM, Beck's ~~expected sales for calendar years~~ 2011 ~~is~~**Net Planning Volume was** 917 vehicles.  By comparison, ~~GM's expected sales for calendar year 2011~~**the Net Planning Volumes** for the three surrounding Chevrolet dealerships ~~are~~**were** as follows:  942 vehicles for New Rochelle Chevrolet; 1,265 vehicles for LaSorsa Chevrolet in the Bronx; and 1,269 vehicles for Curry Chevrolet in Scarsdale.

83.     However, notwithstanding that each of these surrounding dealers has a <u>higher</u> number of expected sales than Beck, their monthly sales objectives**,** published by GM **to all dealers in Beck's Zone,** are each dramatically <u>lower</u> than Beck's.

69.   ~~Beck's 2011 expected sales are 917 vehicles and its March 2011 monthly sales objective was a proportional 71 vehicles.~~

84.   <u>Beck's 2011 expected sales are 917 vehicles and its March 2011 monthly sales objective was a proportional 71 vehicles.</u>   By contrast, LaSorsa Chevrolet's March 2011 sales objective was only 36 vehicles, even though its 2011 expected sales are 1,265 vehicles. New Rochelle Chevrolet's March 2011 sales objective was only 44 vehicles, even though its 2011 expected sales are 942 vehicles.

85.   ~~In other words, Beck's published monthly sales objective is tied directly to GM's inflated expected sales calculation.  By contrast, the monthly sales objectives published for other Chevrolet dealers are much lower, notwithstanding that in each instance their expected sales exceed that of Beck.  This disparity is unlawful because all dealers are supposed to be held to the same contractual standard.~~**<u>Beck's monthly sales objectives are so inexplicably higher than other dealers relative to planning volume because the other dealers'</u>** <u>monthly sales objectives</u> **<u>are tied to an entirely different formula</u>**

> ~~Satisfactory performance of Dealer's sales obligation under Article 5.1 requires Dealer to achieve a Retail Sales Index equal to or greater than 100.~~

~~Dealer Agreement, Standard Provisions, at Art. 9, Ex. 2.~~

72.   ~~There exists no lawful reason for the three Chevrolet dealers surrounding Beck, each of whom has~~ <u>~~higher~~</u> ~~annual expected sales for calendar year 2011 than Beck, to have~~ <u>~~lower~~</u> ~~monthly sales objectives than Beck, when they are all supposedly subject to the same contractual performance standard of an RSI of 100.  As a result, Beck is unlawfully being judged by an arbitrary and unfair sales performance standard in violation of the Dealer Act.~~

86.    ~~Reports~~**Daily sales reports** showing monthly sales objectives of each dealer versus their actual sales are published to all dealers in ~~the markets of which Beck is a member~~**Beck's Zone**.  Similar reports are sent to all dealers concerning parts and accessory sales versus objectives.  **These reports create the false impression that Beck is a poorly performing dealer.**

87.    ~~Upon information and belief, competitor~~**Competing Chevrolet** dealers have used these reports with cross-shopping customers in an effort to show that Beck is an underperforming dealer, is not likely to survive, and, therefore, the customer should not purchase from Beck.

**88.    These reports are seen by personnel in other dealership, making it difficult for Beck to attract top talent.**

89.    ~~Similarly~~**Worse**, these reports are seen by Beck's **own managers and** employees**,** who then question **Beck's viability and** whether Beck will remain in business **and begin looking for opportunities elsewhere**.

90.    Following Beck's complaints to GM, GM simply removed Beck from all published reports.  However, Beck's unexplained absence from these reports is nearly as damaging as an artificial and improper portrayal of underperformance ~~and affects both customer and employee perception of Beck~~.

**91.    Beck's unexplained absence from the sales report has hampered Beck's ability to hire and retain talented sales personnel.**

**92.    Most recently, in January 2012, Beck's sales manager, Michael Perna, resigned, citing his uncertainty about Beck's future due to such things as the impossibly high sales performance standards, Beck's omission from the daily sales reports, and**

**inventory problems created by the special allocation processes. Mr. Perna stated that**

**uncertainty over Beck's viability led him to question his personal financial future.**

93. **Mr. Perna's false perception of Beck's viability was created solely by GM's actions consisting of: (1) publishing false and misleading data concerning Beck's sales performance in the Daily Sales Reports and (2) implementing special allocation processes that were divorced from reality.**

94. **The loss of Mr. Perna was felt immediately and dramatically. Beck's sales volume plummeted, causing Beck to suffer damages in the form of lost profits and damage to its business reputation.**

**K.   GM Instituted Two Incentive Programs that
      Resulted in Unlawful Price Discrimination**

95.    In  addition,  GM  has  implemented ~~an~~  incentive  ~~program~~**programs**  that  ~~results~~**result** in dealers paying a lower actual price for new vehicles that ~~is~~**are** not available to Beck on a proportionately equal basis with other Chevrolet dealers.

96.    Specifically, GM instituted ~~an Accessories Spring Bonus Program for the second quarter of 2011.  Qualified dealers receive a monetary incentive per new vehicle sold retail, effectively lowering the price paid for each vehicle by qualifying dealers.~~**two incentive programs in which dealers earn per-vehicle bonuses based on meeting certain accessory sales objectives.  Those accessory sales objectives are tied directly to the same discriminatory monthly sales objectives described above.**

~~79.    However, in order to qualify for full benefits under the Accessories Spring Bonus Program a dealership must attain a quarterly accessory sales objective the same monthly vehicle sales objective that is applied unequally and discriminatorily against Beck.~~

80.    Furthermore, GM has excluded Beck entirely from a non-monetary incentive program known as the Run to the Hills Program.

81.    In addition, GM has expressly refused to assist Beck in developing and implementing action plans to improve sales performance in violation of GM's contractual and fiduciary obligations to Beck.

82.    As a result of the foregoing, GM is intentionally and malevolently attempting to sabotage Beck's business in violation of GM's contractual, statutory and fiduciary obligations to Beck.  Furthermore, GM is engaged in unlawful price discrimination by tying incentive money to the achievement of sales objectives that are unequally applied.

**97.    Thus, because Beck's monthly sales objectives were inflated, its accessory sales objectives were inflated as well.  As a result, Beck was unable to earn this incentive money.**

**98.    Just recently, GM effectively conceded these programs were discriminatory by paying Beck the price difference on 140 vehicles for which there was a price difference created by the discriminatory programs.**

**99.    Beck remains entitled to an award of attorneys' fees and costs for successfully prosecuting this claim.**

**~~H~~L.    GM's Revision to Beck's AGSSA is an
Unfair Modification of Beck's Franchise**

100.    GM assigns each Chevrolet dealer in a given multiple dealer area (such as Westchester County) an Area of Geographic Sales and Service Advantage ("AGSSA").  A dealer's AGSSA consists of those census tracts that are closer to that dealer's location than other dealers of the same line-make, subject to adjustment for such additional factors as traffic flows and natural barriers (*i.e.* the Hudson River).

101.    By letter dated April 22, 2011 (the "April 22 Letter"), GM notified Beck of its intent to revise Beck's AGSSA.  The April 22 Letter expressly states it constitutes notice under section 463(2)(ff) of the Dealer Act.  ~~A copy of the April 22 Letter is annexed hereto as Exhibit "20".~~

102.    However, GM's modification to Beck's AGSSA improperly assigns **four (4) Westchester Court** census tracts to ~~the northern, eastern and southeastern borders of~~ Beck's AGSSA that are ~~either: (a)~~ closer ~~by air miles~~ to other ~~surrounding dealers; and/or (b) closer by drive time and or drive miles to other surrounding dealers~~**dealers.  In addition, GM assigned several census tracts to Beck's AGSSA that should be assigned to the Chevrolet dealer located in the Bronx.**

103.    ~~This~~**At set forth in the expert report commissioned by Beck, this** improper assignment of census tracts will artificially <u>inflate</u> Beck's expected sales and, ultimately, artificially <u>deflate</u> Beck's RSI, the standard by which GM purports to evaluate Beck's sales performance.  It will also result in Beck being required to overbuild its facility in order to comply with the Facility Standard ~~portion of the Additional Performance Requirements~~.

104.    This constitutes an unfair and unlawful modification of Beck's franchise and also results in Beck being judged by an arbitrary**, unreasonable** and unfair sales performance standard, all in violation of the Dealer Act.

## FIRST CAUSE OF ACTION
### (~~Money Damages for~~ Violations of the Dealer Act **– Injunctive Relief**)

105.    Beck repeats and realleges paragraphs 1 through ~~87~~**104** as if set forth fully herein.

106.    GM has violated the Dealer ~~Act's prohibition of unfair business practices in numerous ways including, but not limited to,~~ by:

(a)   ~~Attempting to conditionally terminate Beck's Dealer Agreement without due cause and in bad faith and failing to give proper notice of the proposed termination (Dealer Act § 463(2)(d)(1)):~~**Using an arbitrary and unfair performance standard in determining Beck's compliance with its Dealer Agreement** (Dealer Act § 463(2)(gg));

(b)   ~~Attempting numerous times to modify Beck's Dealer Agreement without good cause and in bad faith and failing to give proper notice of the proposed modification (Dealer Act § 463(2)(ff)):~~Conditioning the renewal of Beck's franchise on the completion of unnecessary and excessive renovations and improvements to Beck's dealership facility based on inflated sales **performance required (Dealer Act § 463(2)(c) and (gg)):**

(c)   ~~Attempting numerous times to impose~~**Imposing** unreasonable restrictions on Beck relative to its right to the renew its franchise, its compliance with subjective standards, and its assertion of legal or equitable rights with respect to its franchise (Dealer Act § 466(1));

(d)   Attempting to ~~coerce Beck to agree to adverse modifications to its franchise by threatening to cancel Beck's franchise agreement (Dealer Act § 463(2)(b)) ;~~

(e)   ~~Modifying Beck's assigned market area~~**terminate, non-renew or modify Beck's franchise** without good cause and in bad faith **and without proper notice under the Dealer Act.** (Dealer Act ~~§~~**§§** 463(2)**(d), (e) and** (ff));

(f)   ~~Judging Beck by an arbitrary and unfair sales performance standard that GM does not enforce against or apply to other dealers (Dealer Act § 463(2)(gg));~~

(g)   ~~Conditioning the renewal of Beck's franchise on the completion of unnecessary and excessive renovations and improvements to Beck's dealership facility based on inflated sales expectations (Dealer Act § 463(2)(c)).~~

(h)   ~~Coercing Beck to order or accept unwanted vehicles (Dealer Act § 463(1)(a)) ;~~

(e)   Refusing to deliver **reasonable quantities of** vehicles ordered by Beck (Dealer Act § 463(2)(~~u~~**a**)); and

(f)   Instituting incentive programs that result in a lower actual price for new motor vehicles, but are not available to Beck on a

proportionately equal basis with other dealers. (Dealer Act § 463(2)(g))

90.     By means of the foregoing acts, GM has violated the Dealer Act.

107.    Beck has been ~~damaged~~**or may be injured or aggrieved** by ~~each of~~ the ~~foregoing~~**forgoing** violations of the Dealer Act.

92.     By reason of the foregoing, Beck is entitled to the award of money damages in an amount to be determined at trial, but not less than $500,000.00.

**108.    As result of the foregoing violations of the Dealer Act, Beck seeks and is entitled to permanent injunctive relief as follows:**

> **(a)     Enjoining GM from using NYS Average to calculate Beck's RSI, the measure by which GM measures Beck's sales performance;**

> **(b)     Mandating that GM utilize a localized benchmark to calculate Beck's RSI, the measure by which GM measures Beck's sales performance ;**

> **(c)     Enjoining GM from using NYS Average to determine Beck's appropriate facility size and renovation requirements under the EBE Program;**

> **(d)     Mandating that GM use a localized benchmark to determine Beck's appropriate facility size and renovation requirements under the EBE Program;**

> **(e)     Enjoining GM from imposing** unreasonable restrictions on **Beck relative to its right to renew its franchise, in the form of using NYS Average to, directly or indirectly, determine Beck's sales performance and facility requirements and Beck's compliance with the Dealer Agreement and Participation Agreement;**

> **(f)     Mandating that GM deliver reasonable quantities of vehicles ordered by Beck and necessary for Beck to meet its obligations under the Dealer Agreement and the Participation Agreement;**

> **(g)     Enjoining GM from instituting any incentive programs in which Beck, directly or indirectly, is held to a different**

**standard necessary to earn monetary benefits or awards under the programs; and**

(h)    **Enjoining GM from terminating or attempting to terminate or non-renew Beck's franchise without complying with all of the requirements of the Dealer Act, the Dealer Agreement and the Participation Agreement.**

(i)    **Mandating that GM renew Beck's franchise without condition as of April 30, 2012 to a date not earlier than April 31, 2013.**

## SECOND CAUSE OF ACTION
~~(Declaratory Judgment and Injunctive Relief~~
**(Violations of the Dealer Act – Money Damages)**

**109.    Beck repeats and realleges paragraphs 1 through 108 as if set forth fully herein.**

**110.    Beck has been injured by GM's violations of the Dealer Act.**

**111.    Beck has suffered monetary damages as a result of GM's refusal to deliver reasonable quantities of vehicles ordered by Beck beginning in February 2011, in violation of section 463(2)(a) of the Dealer Act.**

**112.    Beck has also been injured and has suffered monetary damages as a result of GM instituting incentive programs that result in a lower actual price for new motor vehicles, but are not available to Beck on a proportionately equal basis with other dealers, in violation of section 463(2)(g) of the Dealer Act.**

**113.    As a result of said violation, Beck has suffered damages in the form of lost profits on the vehicles GM failed to deliver and will suffer additional damages in an amount to be determined at trial, but no less than $258,330.**

## THIRD CAUSE OF ACTION
~~as to Modifications~~ **(Violation of the Dealer Act - Injunctive Relief as to Modification to Beck's AGSSA)**

114.    Beck repeats and realleges paragraphs 1 through ~~92~~**113** as if set forth fully herein.

115.    By the April 22 Letter, GM ~~seeks to impose an unfair modification to~~**notified Beck that it intended to modify** Beck's franchise by ~~improperly revising~~**modifying** Beck's assigned market area, or AGSSA~~, to add census tracts to the northern, eastern and southeastern boundaries of Beck's current AGSSA that should instead remain assigned to the other surrounding dealers~~.

116.    The April 22 Letter expressly ~~stated~~**states** that it constitutes notice under section ~~462~~**463**(2)(ff) of the Dealer Act.

117.    Section 463(2)(ff) of the Dealer Act establishes a private right of action permitting automobile dealers to challenge a~~a~~**any** threatened unfair ~~or bad faith~~ modification of their franchise and provides for an automatic stay of a threatened modification until a final judgment is entered in such action.

~~97.~~

**118.**    GM's proposed modification of Beck's AGSSA constitutes ~~a modification of Beck's franchise that~~**an unfair modification of Beck's franchise because GM is not acting in good faith, GM does not have good cause for the modification, and the modification** would adversely and substantially alter Beck's rights, obligations, investment, and return on investment under the ~~Dealer Agreement, by, *inter alia,* artificially increasing the number of vehicle sales necessary to attain an RSI of 100.~~

~~98.    A justiciable controversy exists whether GM's threatened modification of Beck's Chevrolet franchise is made in good faith, undertaken for good cause, or would adversely and substantially alter Beck's rights, obligations, investment, or return on investment under its~~ Dealer Agreement.

99.    ~~By reason of the foregoing, Beck is entitled to declaration that the modification by adding census tracts to the northern, eastern and southeastern boundaries of Beck's existing assigned market area, or AGSSA, as stated in GM's April 22 Letter, is unfair within the meaning of section 462(2)(ff) of the Dealer Act.~~

**119.    GM's proposed AGSSA assigns census tracts to Beck's that are closer to other surrounding dealers, or that should otherwise be assigned to other surrounding dealers.**

**120.    The improper assignment of census tracts to Beck's AGSSA results in inflated, unfair, and unreasonable sales performance and facility requirements being imposed on Beck.**

121.    As a result of the foregoing, Beck is ~~also~~ entitled to ~~preliminary and~~**a** permanent ~~injunctive relief~~**injunction** enjoining GM from ~~improperly~~ assigning census tracts to Beck's AGSSA~~, as provided in GM's April 22 Letter~~ **that are closer to other dealers, or that should otherwise be assigned to other dealers.**

**~~THIRD~~FOURTH CAUSE OF ACTION**
**(~~Attorney~~Attorneys's Fees, Costs & ~~Expenses~~Disbursements Pursuant to the Dealer Act)**

122.    Beck repeats and realleges paragraphs 1 through ~~100~~**121** as if set forth fully herein.

123.    Section 469 of the Dealer Act establishes a private right of action for violations of the Dealer Act, and entitles **dealers that are or may be** aggrieved ~~dealers~~**by such violations** to an award of reasonable attorneys' fees, costs**,** and disbursements.

124.    By reason of the foregoing, Beck is entitled to an award of the reasonable attorneys' fees, costs**,** and disbursements **it has** incurred in connection with this action, in ~~amounts~~**an amount** to be determined **at trial**.

**~~FOURTH~~FIFTH CAUSE OF ACTION**
**(Breach of Contract)**

125.     Beck repeats and realleges paragraphs 1 through ~~103~~**124** as if set forth fully herein.

126.     The Participation Agreement is an addendum to the Dealer Agreement, and thus the Dealer Agreement and the Participation Agreement constitute one unified contract.

127.     The Dealer Agreement ~~is~~**and the Participation Agreement are** a valid and enforceable contract that ~~gives~~**give** rise to certain obligations on the part of GM with respect to Beck.

128.     Beck has duly performed all ~~of the conditions and duties~~**material obligations** imposed on it under the Dealer **Agreement and the Participation** Agreement and at all times has remained ready, willing and able to continue doing so.

129.     By ~~its willful misconduct described above~~**means of the forgoing acts**, including, without limitation, **failing to allocate and deliver to Beck sufficient inventory to allow Beck to attain the 2010 Sales Performance Standard and refusing to deliver reasonable quantities of vehicles ordered by Beck beginning in February 2011 and continuing to this day**, GM has, without justification or excuse, breached its **express and implied** contractual obligations to Beck under the Dealer Agreement~~, including, without limitation, the implied covenant of good faith and fair dealing~~ **and the Participation Agreement.**

**130.     GM has also breached the Participation Agreement by improperly converting the three-year sales improvement process provided for in that agreement into a two-year process**.

131.     GM's ~~actions~~**breaches have** fundamentally ~~alter~~**altered** the nature of the parties' bargain**,** which~~, unless barred, would deprive~~ **deprives** Beck of a significant portion of the value of its franchise **and the benefit of its bargain with GM**.

132.     GM's breaches are material.

133.    As a result of said breaches, Beck has suffered damages **in the form of lost profits on the vehicles GM failed to allocate and/or deliver** and will suffer additional damages in an amount to be determined at trial, but not less than $~~500,000.00.~~**313,530.**

~~FIFTH~~**SIXTH** CAUSE OF ACTION
**(Breach of Fiduciary Duty)**

134.    Beck repeats and realleges paragraphs 1 through ~~111~~**133** as if set forth fully herein.

135.    The terms of the Dealer Agreement ~~and~~**combined with** the inherent ~~inequality~~**disparity** in bargaining power between ~~a manufacturer~~**GM** and ~~dealer~~**Beck** gives GM the power of life and death over Beck.

136.    Under the terms of the Dealer Agreement and other agreements and obligations incorporated therein, Beck is obligated to share confidential information with GM and GM exercises granular control over Beck's business operations.

137.    ~~As such~~**Accordingly**, circumstances are present that establish a fiduciary relationship whereby GM owes Beck certain fiduciary duties.

138.    By means of the foregoing acts, GM has ~~willfully breached its fiduciary duties to~~**injured Beck by knowingly and purposefully sabotaged Beck's business and reputation by publishing false and misleading monthly sales objectives for** Beck.

139.    As a direct and proximate cause of GM's willful misconduct and ~~breaches~~**breach** of fiduciary duty, Beck has suffered damages and will suffer additional damages in an amount to be proven at trial~~, but not less than $500,000.00~~ **in the form of injury to its business reputation and lost profits on lost sales resulting from GM's attack on Beck's reputation.**

140.    Because GM committed these acts and omissions maliciously, wantonly and oppressively, Beck is **also** entitled to recover punitive damages.

**WHEREFORE**, Beck demands judgment against GM:

(A)     on the First Cause of Action pursuant to the Dealer Act, for ~~an award of compensatory damages in an amount to be determined at trial, but not less than $500,000.00;~~injunctive relief enjoining **continuing violations of the Dealer Act.**

(B)     on the Second Cause of Action pursuant to the Dealer Act, for ~~a declaration that GM's threatened modification to Beck's franchise by improperly adding census tracts to Beck's AGSSA are unfair and for permanent injunctive relief enjoining and restraining GM from improperly modifying Beck's Chevrolet franchise~~**an award of compensatory damages in an amount to be determined at trial but not less than $258,330**;

(C)     on the Third Cause of Action pursuant to the Dealer Act, for an award of the reasonable attorneys' fees, costs and disbursements incurred in connection with this action, in amounts to be determined ~~by this Court~~**at trial**; ~~and~~

(D)     ~~on the Fourth Cause of Action for breach of contract, for an award of compensatory damages in an amount to be determined at trial, but not less than $500,000.00;~~

(D)     ~~on the Fifth Cause of Action for breach of fiduciary duty~~on the Fourth Cause of Action for breach of contract, for an award of compensatory damages in an amount to be determined at trial, but not less than $~~500,000.00~~**313,530;**

**(E)     on the Fifth Cause of Action for breach of fiduciary duty, for an award of compensatory damages in an amount to be determined at trial** and an award of punitive damages in an amount to be determined at trial;

(F)     for pre-judgment and post-judgment interest; and

(G)     for such other and further relief that the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a jury trial on all issues in this action.

Dated:  New York, New York
~~July 8, 2011~~_____, **2012**


**ROBINSON BROG LEINWAND GREENE
GENOVESE & GLUCK, P.C.**


By:_____
           Russell P. McRory
           David C. Burger
           ~~Thomas Filardo~~
875 Third Avenue, 9th Floor
New York, New York 10022
(212) 603-6300
*Attorneys for* **_Plaintiff_** *Beck Chevrolet Co., Inc.*

Document comparison by Workshare Professional on Wednesday, March 28, 2012 11:53:26 AM

| Input: | |
|---|---|
| Document 1 ID | file://X:\CLIDOCS\004314\0001\00531263.DOC |
| Description | 00531263 |
| Document 2 ID | file://X:\CLIDOCS\004314\0001\00568059.DOC |
| Description | 00568059 |
| Rendering set | Standard no color |

| Legend: | |
|---|---|
| **<u>Insertion</u>** | |
| ~~Deletion~~ | |
| ~~Moved from~~ | |
| <u>Moved to</u> | |
| Style change | |
| Format change | |
| ~~Moved deletion~~ | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 473 |
| Deletions | 282 |
| Moved from | 17 |
| Moved to | 17 |
| Style change | 0 |
| Format changed | 5 |
| Total changes | 794 |