# Exhibit 8

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   BECK CHEVROLET CO., INC.,

 4                 Plaintiff,

 5            v.                           11 CV 2856(AKH)

 6   GENERAL MOTORS, LLC,

 7                 Defendant.

 8   ------------------------------x

 9                                         July 11, 2012

10                                         11:46 a.m.

11
     Before:
12
                     HON. ALVIN K. HELLERSTEIN,
13
                                           District Judge
14
                         APPEARANCES
15
     ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK
16        Attorneys for Plaintiff
     BY:  RUSSELL P. MCRORY
17        DAVID C. BURGER

18   BINGHAM MCCUTCHEN
          Attorneys for Defendant
19   BY:  JAMES McGRATH
          TREVOR WILMIT
20
```

1  cancel.
2         Five, modifying Beck's assigned market area without
3  good cause and in bad faith.  Go ahead.
4         MR. MCGRATH:  Who would you like to address that
5  first?
6         THE COURT:  Mr. McRory.
7         MR. MCRORY:  Your Honor, this is another modification
8  claim under (ff).  Now, this letter is the April 22nd letter.
9  It's Exhibit 20 to the amended complaint.  As you'll notice, it
10 states that on the bottom, April 26th.  So it was only received
11 by Beck the day before we filed this lawsuit.
12        THE COURT:  What exhibit is it?
13        MR. MCRORY:  Exhibit 20.
14        THE COURT:  Yes.
15        MR. MCRORY:  It's dated April 22nd.  It was received
16 by Beck April 26th, which is the day before this action was
17 filed.  It was considered too late in the day to revamp the
18 complaint at that point to add the claim under this, and that's
19 why it appears in the amended complaint and not the original
20 complaint in this action.
21        Now, if you go down to the bottom of the letter, the
22 second line, single line from the bottom, it says, this notice
23 is provided pursuant to New York Vehicle & Traffic Law,
24 Section 463.2(ff)(1).  So the letter itself invokes the
25 modification provision, says there's notice under the

1  modification provision. And I think really that's the end of
2  the analysis at this point. Beck did precisely what it's
3  entitled to do under subdivision (ff), which is to file an
4  action, commence an action. That's what it did. And I think
5  really that's the end of the analysis on this claim. But I'd
6  be happy to --
7             THE COURT: Mr. McGrath?
8             MR. MCGRATH: I mean, that provision was included in
9  there out of an abundance of caution, your Honor. And it's
10 because the Dealer Act is so broad. But I think the critical
11 issue for the Court that we presented is: Does it constitute a
12 modification of a dealer agreement to do exactly what the
13 contract permits you to do? And I can walk you through the
14 relevant provisions, your Honor, to show that this was not a
15 modification.
16            THE COURT: Let me reread the letter.
17            (Pause)
18            THE COURT: All right. So what you tell Beck here is
19 that General Motors has made a final decision concluding a
20 period of negotiations, changing the area of primary
21 responsibility. And why is that not in my --
22            MR. MCGRATH: What GM is doing is issuing a new notice
23 of area of primary responsibility. And that's defined in the
24 dealer agreement, Exhibit 2 that we looked at before, area of
25 primary responsibility is identified as the geographic area

1  designated by General Motors from time to time in the notice of
2  area of primary responsibility. So the dealer agreement itself
3  expressly contemplates that this will change from time to time.
4  Then that's in the glossary on the last page of Exhibit 2, your
5  Honor.
6      THE COURT: So, Mr. McRory, if General Motors has
7  reserved the right to change from time to time, then a mere
8  change would not be a modification. It might be a modification
9  if the change were arbitrary and unreasonable.
10     MR. MCGRATH: Just one more provision I would like to
11 point the Court to. I'm sorry to interrupt, your Honor.
12     THE COURT: You're okay.
13     MR. MCGRATH: But in Article 4.2 of the same exhibit,
14 it expressly states General Motors retains the right to revise
15 dealer's area of primary responsibility at General Motors' sole
16 discretion, consistent with dealer network planning objectives.
17 So that sole discretion right is right in there. And there's
18 very important reasons for that I can go into, but that's why
19 it's not a modification. We're doing exactly what the
20 contract --
21     THE COURT: Look, I can understand. It's a function
22 of how many cars you could make, how many cars you feel you
23 want to make, if it's a function of national responsibility,
24 international responsibility and so on. But the point is, was
25 it a modification?

1     MR. MCGRATH: And we just --

2     THE COURT: And that's the question. So I want to ask

3  Mr. McRory, if General Motors has reserved the right and

4  there's no proof of arbitrariness or discriminatory purpose,

5  what's the modification?

6     MR. MCRORY: Your Honor, first of all, we just

7  discussed in the context of what we talked about before is that

8  the Dealer Act governs, notwithstanding the terms of any

9  franchise agreement, and it trumps the terms of the franchise

10 agreement. So whether or not the franchise agreement gives GM

11 discretion to change a market area, frankly, that doesn't

12 matter. The Dealer Act is what governs here.

13    THE COURT: Was there anything in the Dealer Act that

14 says something about market area?

15    MR. MCRORY: Not in this precise context, but it

16 defines --

17    THE COURT: Says in terms of modification.

18    MR. MCRORY: It defines modification very broadly,

19 your Honor.

20    THE COURT: What is a modification?

21    MR. MCRORY: It means any change or replacement of any

22 franchise, if such change or replacement may substantially and

23 adversely affect a new motor vehicle dealer's rights,

24 obligations investments or run on investments.

25    Now, this issue, your Honor, not too long ago came up

```
 1    in the Wisconsin Supreme Court in the Racine Harley-Davidson
 2    case, which is cited in our brief.  And the issue was, is a
 3    manufacturer's assignment of a market territory an essential
 4    element of the franchise, such that under Wisconsin statute
 5    that the manufacturer had to comply with the Wisconsin Dealer
 6    Act in order to modify it?  And the Wisconsin Supreme Court
 7    said, yes, it's an essential element to the franchise, and,
 8    yes, the manufacturer has to comply with Wisconsin's Dealer Act
 9    if they're going to change the assigned mark area.
10              And the reason why this is, in fact, a substantial
11    part of the franchise is exactly the issue that's underlying
12    this entire case, which is the sales performance standard.  One
13    of the inputs into the sales performance standard is the amount
14    of sales that is -- that GM says is available within an
15    assigned market area.  So the smaller a market area, the less
16    sales a dealer would be responsible for.  So the size of a
17    market area directly affects whether or not what a dealer's
18    expected sales are.  In other words, more --
19              THE COURT:  It can affect.  I understand it can
20    affect.
21              MR. MCRORY:  Moreover, and this discovery from GM has
22    shown that GM's own internal analysis agreed with Beck, that
23    there were census tracks assigned to Beck in the new proposed
24    market area that were closer to other dealers.  And the fact
25    that --
```

```
 1          THE COURT:  What I don't understand from reading this,
 2   if Beck can sell anywhere, and if anyone else can sell in
 3   Beck's territory, what's the function of the market area?
 4          MR. MCRORY:  Because even though that's the case, your
 5   Honor, GM determines Beck's -- or any dealer's expected sales
 6   based on its assigned market area.  So even though Beck can
 7   sell in New York, it can sell on Long Island, it can sell
 8   upstate, it can sell in California for all that matters, its
 9   expected sales, its sales objective is determined by the amount
10   of sales available in its assigned market area.  That becomes
11   the denominator of the RSI calculation.  So it directly affects
12   Beck's ability to meet its sales objective.
13          And as outlined in our papers, this is not a
14   de minimis amount.  The census tracks that are added in the
15   proposed new --
16          THE COURT:  It would seem to me that -- I'm sorry.  Go
17   ahead.
18          MR. MCRORY:  The census tracks that are added in the
19   proposed new AGSSA or market area equal 15 percent of Beck's
20   expected sales.  That's not de minimis.
21          THE COURT:  What does that mean?
22          MR. MCRORY:  In other words, it inflates Beck's sales
23   objective by 15 percent, by approximately I think 80-something
24   vehicles.  These are GM's numbers --
25          THE COURT:  How does it do that?
```

```
 1              MR. MCRORY:  I'm sorry, your Honor?
 2              THE COURT:  How does it do that?  Is the market area
 3    enlarged?
 4              MR. MCRORY:  Yes.  It adds -- everything is by census
 5    tracks.  That's what they decided to do.
 6              THE COURT:  So it enlarges the area?
 7              MR. MCRORY:  Yes.  So they took census tracks from
 8    other dealers, reassigned them to Beck.
 9              THE COURT:  In terms of overall consolidation?
10              MR. MCRORY:  Right.
11              THE COURT:  So shouldn't Beck look at this as a
12    greater opportunity?
13              MR. MCRORY:  No, because it's being held responsible
14    for sales in territory that's closer to other dealers.
15              THE COURT:  So you're saying that it's, in effect, an
16    increase to the quota?
17              MR. MCRORY:  Right.
18              THE COURT:  Has to sell more cars?
19              MR. MCRORY:  Right.  And it's not justified, because
20    under their own standard, and GM's internal analysis agreed
21    with us, those census tracks should have been assigned to other
22    dealers.
23              THE COURT:  Did it affect the 2011 quota?
24              MR. MCRORY:  It didn't affect it because, your Honor,
25    when we filed this lawsuit, the automatic stay went into
```

```
 1   effect, so that while this case is pending, that new market
 2   territory is not -- the proposed amendment doesn't take place
 3   because of the automatic stay of (ff).
 4           THE COURT:  So when the stay is lifted, if it's
 5   lifted, that means that General Motors can change the area?
 6           MR. MCRORY:  Well, under (ff) it's an automatic stay
 7   until the final judgment is entered in the Act.  So there would
 8   have to be a final determination whether or not it's --
 9           THE COURT:  That means all appeals, too?
10           MR. MCRORY:  Right.
11           THE COURT:  What about the 2011 quota set by the
12   participation agreement?
13           MR. MCRORY:  Well, with the participation agreement,
14   it just speaks generally of Beck's RSI in its assigned market
15   territory, but that assigned market territory was different
16   when Beck signed the agreement than what GM is trying to impose
17   now going forward.
18           THE COURT:  But in terms of cars sold, is that already
19   fixed in the participation agreement, or is it now going to be
20   changed?
21           MR. MCRORY:  It would change because the Chevrolet
22   market share changes.  You know, Chevrolet may do better one
23   year less another year.
24           THE COURT:  So what Beck wrote -- when General Motors
25   wrote in its April 6th letter, you have to satisfy the 2011
```

1  quota in order for the expiration date to be pushed off a year,
2  it did not refer to a fixed number of cars but it referred to a
3  changing quota?
4        MR. MCRORY:  Right, because as of April of any given
5  year, you're not going to know what the yearend sales
6  expectancy was.  You have to wait for the year to end, see how
7  New York -- see how Chevy did in New York as a whole and then
8  apply that market share to each dealer's assigned market area.
9        THE COURT:  What's your gloss on this, Mr. McGrath?
10       MR. MCGRATH:  Well, a couple of points, your Honor.
11       First, I think Mr. McRory misspoke, because Beck was
12 advised that GM was going to hold its market area constant for
13 purposes of assessing its performance under the participation
14 agreement and was not going to change.
15       THE COURT:  When did you say that?
16       MR. MCGRATH:  All participation agreement dealers were
17 notified of that.
18       THE COURT:  Is there a letter?
19       MR. MCGRATH:  I don't know if there's a letter in the
20 record, but that's not a point that I thought was in dispute,
21 your Honor.  That's been the way --
22       THE COURT:  Do you challenge that statement?
23       MR. MCRORY:  I question the timing of it.  When this
24 letter came out, April 22, 2011, I don't think that GM had
25 taken that position yet.  If it came at all, it came

```
 1  afterwards.  And I know of no document in the record either
 2  that supports that timeline.
 3          MR. MCGRATH:  Second point is, your Honor --
 4          THE COURT:  When?  What was the timing?
 5          MR. MCGRATH:  I think the evaluations that they've
 6  been receiving all along, your Honor, have been under the
 7  existing geography as it existed at the time the participation
 8  agreements were executed.
 9          THE COURT:  Second point?
10          MR. MCGRATH:  Second point is Mr. McRory's only really
11  told you half the story, because in addition to adding some
12  census tracks to Beck's area of primary responsibility, GM also
13  removed some.  So the net change we're talking about here are
14  three census tracks.  And it really is a very de minimis
15  approach.  You can see that even in Beck's expert report, that
16  it's in that total of three.
17          But it goes back to the fundamental point we're
18  seeking summary judgment on, your Honor.  The Dealer Act only
19  prohibits modifications that constitute a change or replacement
20  of the franchise.  And franchise is defined as the dealer
21  agreement.  Here again, we're doing what the dealer agreement
22  allows us to do.  So it can't be a modification to do what it
23  allows us to do.
24          The Wisconsin Supreme Court case that Mr. McRory
25  mentions talked about whether the notice of area of primary
```

1  responsibility or market area was part of the agreement. We're
2  not arguing that it's not part of the agreement. We're simply
3  saying that the agreement allows us to change it from time to
4  time in our sole discretion. So exercising that pre-existing
5  right can't constitute a modification.
6         THE COURT: All right. Let me suspend here. It's
7  five after 1:00. We will come back at 2:20 and pick it up from
8  there. Thank you.
9         (Luncheon recess)

```
 1                    AFTERNOON SESSION
 2                        2:30 p.m.
 3          THE COURT:  Okay.  So we're up to the question whether
 4   assigning market area allegedly without good cause and
 5   allegedly in bad faith constituted a modification.
 6          So assuming that General Motors had good reason to do
 7   what it did, and that seems to be a consequence of its decision
 8   to consolidate dealers and to create an efficient and logical
 9   distribution network, which is part of a competitive
10   manufacturer's responsibilities and privileges, if it's not
11   against the specific terms of an agreement, and assuming there
12   was no discrimination or other intent to injure Beck, I find
13   that there was no modification.
14          As to the issue whether there was discrimination or
15   malice or ill will or motive to punish against Beck, there's
16   not a shred of indication in the record that this was so.  So
17   what we have is a manufacturer or franchisor acting consistent
18   with prerogatives reserved to the manufacturer and the dealer
19   agreement creating a logical market area different from that
20   which had been there previously, but not illogically so.  And
21   that, to me, is not a modification as the word is defined in
22   (ff).
23          Furthermore, there's a question of proof of damages.
24   What would be the proof that your client suffered damage,
25   Mr. McRory?
```

1    MR. MCRORY: Your Honor, we're not seeking money
2    damages on this claim. We're seeking injunctive relief. And I
3    think candidly, your Honor, you're misstating the standard for
4    the modification under the statute.
5        To back up a second, the only evidence in the record
6    is Beck's expert report on the AGSSA modification. There's no
7    right, evidence in the record at all from the other side as to
8    the propriety of this change to the AGSSA. So I'm not sure how
9    your Honor is coming to that conclusion, since the only
10   evidence in the record is Beck's expert report.
11       THE COURT: Well, I think that what has happened is
12   the franchisor has come forward to show the relationship of the
13   definition of the market area as it relates to the powers
14   preserved to the franchisor in the agreement. And there's no
15   indication of discrimination.
16       MR. MCRORY: Your Honor, it doesn't require
17   discrimination. This is not a subjective test. It's an
18   objective test.
19       THE COURT: I understand.
20       MR. MCRORY: And moreover --
21       THE COURT: I hold there is no modification. The
22   franchise agreement and the franchise status is not changed.
23       MR. MCRORY: Your Honor --
24       THE COURT: For purposes of this paragraph, the term
25   modified or modification means any change or replacement of any

1  franchise. There have been no change or replacement to the
2  franchise, if such change or replacement may substantially and
3  adversely affect the new motor vehicle dealer's rights,
4  obligations, investment or return on investment.
5      MR. MCRORY: Your Honor, this change does affect
6  Beck's rights because what it does, it affects the market area
7  assigned to Beck. And it increases the amount of sales
8  necessary to meet the necessary sales objective.
9      THE COURT: And it creates more opportunity to make
10 those sales.
11     MR. MCRORY: No, it doesn't. That's not true, your
12 Honor, because, as your Honor has pointed out, a dealer can
13 sell anywhere. The only effect of an assigned market area is
14 to affect the metric against which that dealer is judged,
15 metric against which the dealer is judged. It doesn't affect
16 where Beck can sell sales or any dealer can sell.
17     THE COURT: There's a function of an area of primary
18 responsibility. That's where the dealer operates. That's
19 where there is no other dealer. That's where the dealer can
20 consolidate and focus his activities, not to the exclusion of
21 other sales, but as an incentive for the dealer to explore his
22 own territory.
23     So I think that it has both positive and negative
24 effects, negative in the way you suggest and positive in the
25 way I suggest. In any sense, it says that if the change of a

1  franchise or the replacement of a franchise substantially and
2  adversely affects the investment, then it happens.  First you
3  have to see the change.  And since the agreement gave the
4  franchisor the prerogatives that it exercised, I hold there's
5  no change.
6          MR. MCRORY:  Your Honor, except the Dealer Act
7  overrides the dealer agreement.
8          THE COURT:  I'm reading the Dealer Act.  I think we've
9  had enough of this.
10         Next question, can you prove damages?  If --
11         MR. MCRORY:  We're not seeking damages on this claim,
12 your Honor.
13         THE COURT:  So there is no damage, and I hold that
14 there's no reason for an injunction in this area, since there's
15 no violation of any right.
16         We're up to number six.  Judging Beck by an arbitrary
17 and unfair sales performance standard, citing Section
18 463.2(gg).  (gg) provides the use and unreasonable, arbitrary
19 or unfair sales or other performance standard in determining a
20 franchise motor vehicle dealer's compliance with a franchise
21 agreement.
22         So tell me how it's unreasonable, arbitrary or unfair.
23         MR. MCRORY:  Your Honor, again, this is another issue
24 upon which GM has offered no evidence whatsoever.  The only
25 evidence in the record is Beck's expert report, which stands