# **<u>TAB 1</u>**

**STATE OF FLORIDA**
**DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES**

**FINAL ORDER #: HSMV-04-396-FOF-DMV**

GENERAL MOTORS CORPORATION AND
MCNAMARA PONTIAC, INC., d/b/a
MCNAMARA PONTIAC BUICK-GMC,

      Petitioners,

vs.                                    **Case No. 03-1319**

FOUNTAIN OLDSMOBILE-GMC TRUCK,

      Respondent,

_____/

GENERAL MOTORS CORPORATION AND
MCNAMARA PONTIAC, INC., d/b/a
MCNAMARA PONTIAC BUICK-GMC,

      Petitioners,

vs.                                      **Case No. 03-1320**

COURTESY PONTIAC-GMC (GMC
DEALERSHIP),

      Respondent.

_____/

GENERAL MOTORS CORPORATION AND
MCNAMARA PONTIAC, INC., d/b/a
MCNAMARA PONTIAC BUICK-GMC,

      Petitioners,

vs.                                      **Case No. 03-1321**

COURTESY PONTIAC-GMC (PONTIAC
DEALERSHIP),

      Respondent.

_____/

**GENERAL MOTORS CORPORATION AND
MCNAMARA PONTIAC, INC., d/b/a
MCNAMARA PONTIAC BUICK-GMC,**

      **Petitioners,**

vs.



**Case No. 13-1322**

**COURTESY BUICK,**

      **Respondent.**
_____/

**GENERAL MOTORS CORPORATION AND
MCNAMARA PONTIAC, INC., d/b/a
MCNAMARA PONTIAC BUICK-GMC,**

      **Petitioners,**

vs.

                                     **Case No. 03-1323**

**ORANGE BUICK-GMC,**

      **Respondent.**
_____/

## FINAL ORDER

This matter came before the Department for entry of a Final Order upon submission of a

Recommended Order by Carolyn S. Holified, an Administrative Law Judge of the Division of

Administrative Hearings, a copy of which is attached and incorporated by reference in this

order[1]. The Department hereby adopts the Recommended Order as its Final Order in this matter.

Accordingly, it is

ORDERED and ADJUDGED that Petitioner, McNamara Pontiac, Inc., d/b/a McNamara

Pontiac Buick-GMC, be granted a license as a franchised Pontiac, Buick and GMC dealer at

---

[1] Respondents, Fountain Oldsmobile GMC, Orange Buick GMC, Courtesy Buick and Courtesy Pontiac-GMC , filed exceptions to the Recommended Order.  These exceptions are ruled on in the Appendix to this Order.

11500 East Colonial Boulevard, Orlando, (Orange County), Florida, upon compliance with all applicable requirements of Section 320.27, Florida Statutes, and all applicable Department rules.

DONE AND ORDERED this _15th_ day of July, 2004, in Tallahassee, Leon County, Florida.

CARL A. FORD, Director
Division of Motor Vehicles
Department of Highway Safety
and Motor Vehicles
Neil Kirkman Building
Tallahassee, Florida 32399

Filed with the Clerk of the
Division of Motor Vehicles
this _15th_ day of July, 2004.

### NOTICE OF APPEAL RIGHTS

Judicial review of this order may be had pursuant to section 120.68, Florida Statutes, in the District Court of Appeal for the First District, State of Florida, or in any other district court of appeal of this state in an appellate district where a party resides. In order to initiate such review, one copy of the notice of appeal must be filed with the Department and the other copy of the notice of appeal, together with the filing fee, must be filed with the court within thirty days of the filing date of this order as set out above, pursuant to Rules of Appellate Procedure.

Copies furnished:

Fred J. Lotterhos, III, Esquire
Holland & Knight, LLP
50 North Laura Street, Suite 3900
Jacksonville, Florida 32202

3

James D. Adams, Esquire
Adams & Quinton, P.A.
80 S.W. 8th Street, Suite 2150
Miami, Florida 33130

Daniel Myers, Esquire
J. Martin Hayes, Esquire
Myers & Fuller, P.A.
2822 Remington Green Circle
Tallahassee, Florida 32308

Michael J. Alderman, Esquire
Department of Highway Safety
and Motor Vehicles
Neil Kirkman Building, Rm. A-432
Tallahassee, Florida 32399-0504

Carolyn S. Holifield
Administrative Law Judge
Division of Administrative Hearings
The DeSoto Building
1230 Apalachee Parkway
Tallahassee, Florida 32399-1550

Ronald Reynolds
Dealer License Administrator

Florida Administrative Law Reports
Post Office Box 385
Gainesville, Florida 32602

**GENERAL MOTORS CORPORATION AND**
**MCNAMARA PONTIAC, INC., d/b/a**
**MCNAMARA PONTIAC BUICK-GMC,**

      Petitioners,

vs.                                                               Case No. 03-1322

**COURTESY BUICK,**

      Respondent.

_____/

**GENERAL MOTORS CORPORATION AND**
**MCNAMARA PONTIAC, INC., d/b/a**
**MCNAMARA PONTIAC BUICK-GMC,**

      Petitioners,

vs.                                                               Case No. 03-1323

**ORANGE BUICK-GMC,**

      Respondent.

_____/

## APPENDIX TO FINAL ORDER
## RULING ON RESPONDENT'S EXCEPTIONS TO RECOMMENDED ORDER

### Ruling on Exceptions to Findings of Fact

19.    Rejected.  The finding is based on competent substantial evidence.

23.    Rejected.  The finding is based on competent substantial evidence.

24.    Rejected. The finding is based on competent substantial evidence.

25.    Rejected. The finding is based on competent substantial evidence.

26.    Rejected. The finding is based on competent substantial evidence.

27.    Rejected. The finding is based on competent substantial evidence.

28.    Rejected. The finding is based on competent substantial evidence.

29.    Rejected. The finding is based on competent substantial evidence.

40.     Rejected. The finding is based on competent substantial evidence.

46.     Rejected. The finding is based on competent substantial evidence.

61.     Rejected. The finding is based on competent substantial evidence.

### Ruling on Exception to Conclusions of Law

125.    Rejected. The conclusion of law is legally correct.

STATE OF FLORIDA
DIVISION OF ADMINISTRATIVE HEARINGS


GENERAL MOTORS CORPORATION AND    )
MCNAMARA PONTIAC, INC., d/b/a      )
MCNAMARA PONTIAC BUICK-GMC,        )
                                   )
    Petitioners,             )
                                   )
vs.                                )   Case No. 03-1319
                                   )
FOUNTAIN OLDSMOBILE-GMC TRUCK,     )
                                   )
    Respondent.              )
                                   )
_____)
GENERAL MOTORS CORPORATION AND    )
MCNAMARA PONTIAC, INC., d/b/a      )
MCNAMARA PONTIAC BUICK-GMC,        )
                                   )
    Petitioners,             )
                                   )
vs.                                )   Case No. 03-1320
                                   )
COURTESY PONTIAC-GMC (GMC          )
DEALERSHIP),                       )
                                   )
    Respondent.              )
                                   )
_____)
GENERAL MOTORS CORPORATION AND    )
MCNAMARA PONTIAC, INC., d/b/a      )
MCNAMARA PONTIAC BUICK-GMC,        )
                                   )
    Petitioners,             )
                                   )
vs.                                )   Case No. 03-1321
                                   )
COURTESY PONTIAC-GMC (PONTIAC      )
DEALERSHIP),                       )
                                   )
    Respondent.              )
_____)

```
GENERAL MOTORS CORPORATION AND    )
MCNAMARA PONTIAC, INC., d/b/a     )
MCNAMARA PONTIAC BUICK-GMC,       )
                                  )
      Petitioners,                )
                                  )
vs.                               )    Case No. 03-1322
                                  )
COURTESY BUICK,                   )
                                  )
      Respondent.                 )
_____ )
GENERAL MOTORS CORPORATION AND    )
MCNAMARA PONTIAC, INC., d/b/a     )
MCNAMARA PONTIAC BUICK-GMC,       )
                                  )
      Petitioners,                )
                                  )
vs.                               )    Case No. 03-1323
                                  )
ORANGE BUICK-GMC,                 )
                                  )
      Respondent.                 )
_____ )
```

## RECOMMENDED ORDER

    Pursuant to notice, a formal hearing was held before

Carolyn S. Holifield, the duly-designated Administrative Law

Judge of the Division of Administrative Hearings, on December 8

through 11, 2003, in Tallahassee, Florida.

    For General Motors Corporation:

                    Fred J. Lotterhos, III, Esquire
                    Holland & Knight, LLP
                    50 North Laura Street, Suite 3900
                    Jacksonville, Florida  32202

For Orange Buick GMC and Fountain Oldsmobile-GMC Truck:

>       Daniel Myers, Esquire
>       J. Martin Hayes, Esquire
>       Myers & Fuller, P.A.
>       402 Office Plaza Drive
>       Tallahassee, Florida  32301

For Courtesy Pontiac-GMC and Courtesy Buick:

>       James D. Adams, Esquire
>       Adams & Quinton, P.A.
>       Camino Real Centre
>       7300 West Camino Real
>       Boca Raton, Florida  33433

<u>STATEMENT OF THE ISSUES</u>

The issue for determination is whether Petitioner, General Motors Corporation, should be permitted to establish the proposed new dealership, McNamara Pontiac, Inc., d/b/a McNamara Pontiac Buick-GMC, in Orlando, Orange County, Florida.

<u>PRELIMINARY STATEMENT</u>

By publication in the March 14, 2003, issue of the Florida Administrative Weekly, Petitioner, General Motors Corporation (GM), provided notice of its intention to establish the new dealership, McNamara Pontiac, Inc., d/b/a McNamara Pontiac Buick-GMC (proposed McNamara dealership or proposed dealership), to sell three line-make vehicles--Buick, Pontiac, and GMC--at 11500 East Colonial Boulevard, Orlando, Florida.  Respondents Orange Buick-GMC (Orange), Fountain Oldsmobile-GMC Truck (Fountain), the Courtesy GMC dealership, the Courtesy Pontiac dealership, and Courtesy Buick (collectively referred to as

3

"Courtesy," unless otherwise indicated)[1] filed their protests against the establishment of the proposed McNamara dealership with the Department of Highway Safety and Motor Vehicles (Department) pursuant to Section 320.642, Florida Statutes (2003).  The Department referred the matter to the Division of Administrative Hearings.  By Order issued April 28, 2003, the five separately-filed cases were consolidated.

At the hearing, GM offered the testimony of two witnesses: Sharif Farhat, director of Dealer Analysis for North America Operations for Urban Science Applications Inc., accepted as an expert in dealer network analysis; and Victor D. Nelawake, CPA, of the firm of Victor D. Nelawake, accepted as an expert in accounting.  GM also offered and had received into the record the deposition transcripts of:  (1) Clay King, president of Fountain; (2) Raj Lally, vice-president and general manager of Orange; (3) Cynthia Ritchie, GM area manager, Dealer Network Development for the Central and South Florida Area; (4) Hal McNamara, dealer-operator of the proposed McNamara dealership; and (5) Marvin Beaupre, GM regional manager for Dealer Network Development for the Southeast Region.  Additionally, GM offered Exhibits 1 through 15, which were received into evidence.  Petitioner, the proposed McNamara dealership, adopted the witnesses and exhibits offered by GM.[2]

Respondents offered the testimony of Dr. Ernest Manuel, accepted as an expert in econometrics and dealer network analysis.  Fountain offered the testimony of Clay King, president of Fountain Motor and dealer-operator of Fountain. Orange offered the testimony of Raj Lally, general manager and vice-president of Orange.  Courtesy did not offer the testimony of any officer, employee, or other dealership representative. Fountain and Orange offered Exhibits 1 through 17, which were received into evidence.  Courtesy adopted the exhibits offered by Fountain and Orange.

The seven-volume Transcript[3] of the final hearing was filed with the Division of Administrative Hearings on January 5, 2004, and the parties timely filed Proposed Recommended Orders on February 18, 2004, after the requested deadline extension was granted.  The parties' Proposed Recommended Orders have been carefully considered in the preparation of this Recommended Order.

<u>FINDINGS OF FACT</u>

Based on the evidence presented at the formal hearing and on the record as a whole, the following findings of fact are made:

Stipulated Background

1.   GM is a "licensee" and a "manufacturer" as defined respectively, by Subsections 320.60(8) and (9), Florida Statutes (2003).

2.   The proposed McNamara dealership and all Respondents are "motor vehicle dealers" as defined by Subsection 320.60(11)(a)(1), Florida Statutes (2003).

3.   Respondent Fountain is an existing franchised GMC dealer and has standing to protest the establishment of GMC representation at the proposed McNamara dealership.

4.   Respondent Courtesy Pontiac-GMC is an existing franchised Pontiac and GMC dealer and has standing to protest the establishment of Pontiac and GMC representation at the proposed McNamara dealership.

5.   Respondent Courtesy Buick is an existing franchised Buick dealer and has standing to protest the establishment of Buick representation at the proposed McNamara dealership.

6.   Respondent Orange is an existing franchised Buick and GMC dealer and has standing to protest the establishment of Buick and GMC representation at the proposed McNamara dealership.

7.   The community or territory (community/territory), which is relevant in this proceeding, is the Orlando Metropolitan Dealer Area as defined by GM.  Respondents' dealerships are

located in this community/territory and the location of the proposed McNamara dealership is also in this community/territory.

<u>The Proposed McNamara Dealership</u>

8.  GM and the proposed McNamara dealership seek to establish a dealership offering the Buick, Pontiac, and GMC line-makes.  The combination of Buick, Pontiac, and GMC at a single dealership is consistent with GM's national "channeling" strategy, which calls for this combination of line-makes, where feasible, in a single dealership.

9.  One of the anticipated benefits of the Buick, Pontiac, and GMC channeling strategy is that with the combined models offered by these three brands, the Buick, Pontiac, and GMC dealer will be able to offer consumers a much wider variety of vehicle styles and prices than any stand-alone Pontiac, Buick, or GMC dealer.  Therefore, the Buick, Pontiac, and GMC dealer would be more competitive against inter-brand rivals.[4]

10.  There are currently two existing Buick, Pontiac, and GMC dealers in the community/territory, Courtesy and Coggin Pontiac (Coggin).  Under the current channeling strategy, the other community/territory dealers, Fountain and Orange, have the potential to become Buick, Pontiac, and GMC dealers by, if feasible, adding Pontiac, Buick, or GMC representation to their existing franchises.

11.   The proposed McNamara dealership location at 11500
East Colonial Drive is approximately two and a half to three
miles east of the intersection of East Colonial Drive (State
Road 50) and the Greenway Expressway.  Ford and Chrysler-Jeep
have recently opened large dealerships at that intersection.

12.   The owners of the proposed McNamara dealership
purchased the property on which the proposed McNamara dealership
is to be located for $3.3 million by contract dated January 30,
2003.  They also intend to build a new, state-of-the-art
dealership facility comprising 40,909 square feet of dealership
buildings, including a 4,817 square-foot showroom; a 13,159
square-foot service facility with 29 service stalls; and a 6,971
square-foot parts department at a cost of approximately $5 to $6
million.  The proposed new facility meets and exceeds GM's
guidelines for facility size.

13.   Construction of the new dealership facility is
expected to take approximately eight to nine months.  Once
operational, the new dealership is expected to employ
approximately 80 to 100 people.  The dealership facility will be
subject to ad valorem taxes in Orange County, Florida.

Geographic Definitions

14.   All GM dealers have a contractually defined geographic
Area of Primary Responsibility (APR).  In metropolitan markets
such as Orlando, two or more same line-make dealers share the

8

same APR, called a Multiple Dealer Area (MDA).  MDA dealers are
contractually obligated to serve the entire MDA market.  In
areas with only a single dealer, that dealer is uniquely
assigned the APR, which is referred to as a Single Dealer Area
(SDA).

15.  MDAs are further subdivided into an Area of Geographic
Sales and Service Advantage (AGSSA) for each same line-make
dealer.  The AGSSA boundaries are created by assigning census
tracts to the dealership offering consumers in those census
tracts the most convenient shopping outlet.  An AGSSA is not a
dealer's contractual APR; rather, it is that portion of the APR
in which that dealer enjoys a competitive advantage over all
other same line-make or brand dealers due solely to that
dealer's geographic location.

16.  The Orlando metro area is an MDA for the Buick,
Pontiac, and GMC line-makes.  There are currently three Buick
dealers in the MDA (Courtesy, Orange, and Coggin in Kissimmee);
four GMC dealers (Courtesy, Orange, Fountain, and Coggin); and
two Pontiac dealers (Courtesy and the McNamara dealership).[5]

17.  Section 320.642, Florida Statutes (2003), does not
define the term "community or territory."  However, the parties
stipulated that the relevant communities or territories for
Buick, Pontiac, and GMC are the communities or territories
defined by GM's expert.[6]

18.   For purposes of analysis in these cases, GM's expert created an AGSSA for the proposed McNamara dealership in East Orlando, referred to as AGSSA 50.   In addition to AGSSA 50, the community/territory comprises AGSSA 1 (Orange); AGSSA 2 (Courtesy); AGSSA 3 (Fountain); and AGSSA 4 (Coggin).   AGSSA 50 is an identifiable plot within the larger Orlando community/territory for all three brands under study.

An Objective, Reasonable Standard

19.   In order to assess the adequacy of representation afforded by the existing dealer network in the Orlando community/territory and to measure the level of opportunity available in the market, it is necessary to develop an objective, reasonable standard against which to compare the actual market penetration achieved by the existing dealer network.

20.   A standard is a measure of the level of performance a brand can reasonably expect to achieve in the market with an adequately performing dealer network; that is, an adequate number of dealers performing competitively.

21.   The most objective data available for measuring the performance of a dealer network is market penetration data. Market penetration is the ratio of a brand's performance against the competitive industry.   Market penetration is a direct measure of both inter-brand and intra-brand competition.   Intra-

10

brand competition is competition between competitors of the same brand.  Intra-brand refers to competitors of different brands.

22.  Buick, Pontiac, and GMC vehicles are separate line-makes as defined in Subsection 320.60(14), Florida Statutes (2003), and each line-make must be analyzed separately to determine whether there exists adequate representation for each line-make.

23.  The first step in developing a reasonable standard is to select a suitable comparison area.  When choosing a comparison area, it is essential to select an area that is itself adequately represented.

24.  In determining whether a proposed comparison area is adequately represented, national average market penetration is an extremely conservative benchmark, because it includes all of the adequately represented, inadequately represented, and unrepresented areas within the United States.

25.  The State of Florida is not an appropriate standard comparison area against which to judge the performance of Buick, Pontiac, and GMC in the Orlando community/territory and in AGSSA 50, because all three brands perform significantly below national average in Florida.

26.  The performance of the Buick, Pontiac, and GMC networks in Florida was among the worst in the United States in 2002.  GMC's retail penetration in Florida in 2002 ranked 48th

worst out of 50 states.  Buick penetration in Florida ranked 43rd worst in the nation in 2002.  Pontiac's retail penetration in Florida was the 41st worst in the country in 2002.

27.  The reason for the shortfall in Florida's penetration rate compared to national average is that the Buick, Pontiac, and GMC dealer networks in Florida have an inadequate number of dealers.  There is a strong statistical correlation between share of franchises[7] and a brand's performance in the market.  In Florida, Buick, Pontiac, and GMC's share of franchises is below their national average share of franchises.

28.  National average market penetration, which includes all adequately represented, inadequately represented, and unrepresented markets in the United States, is the appropriate starting point for developing a reasonable standard for all three brands.  The national average must be adjusted, however, to take into account unique consumer preferences over which the dealer network has no control, which can affect market share.

29.  This is determined by applying a "segmentation analysis," which recognizes that certain vehicle types or "segments" may be more or less popular in Florida than they are nationally.  Segmentation analysis adjusts for local consumer preferences by applying a line-make's national average penetration rate for each vehicle segment in which that line-make has a vehicle entry, weighted by the actual number of

industry registrations occurring in that segment in the study area. The resulting penetration rate may be higher or lower than the national average based on the particular preferences of consumers in the study area.

30. The segment adjustment process is an adjustment for size-class preference and product popularity and takes into account demographic factors affecting consumer sales and retail lease transactions--age, income, and education--as well as factors such as the state of the economy, product availability, and product quality and design.

31. The national average performance for Buick, Pontiac, and GMC adjusted for local consumer preferences in the Orlando community/territory (the "expected" standard), is the appropriate standard for measuring the adequacy of representation being provided by existing Buick, Pontiac, and GMC dealer networks and for establishing the level of opportunity available to Buick, Pontiac, and GMC dealers in the Orlando community/territory.

32. National average penetration, adjusted for local consumer preferences, produces an expected penetration standard in the Orlando community/territory of 5.94 percent for GMC; 1.79 percent for Buick; and 2.64 percent for Pontiac.

33. The reasonableness of the expected penetration standard is confirmed by the fact that all three brands have

13

achieved or exceeded the standard in the recent past or are currently achieving or exceeding the standard in several markets in Florida and in the Orlando community/territory.

34.   In 2002, 14 markets in Florida exceeded the expected standard for GMC; 13 markets exceeded the expected standard for Buick; and 9 markets exceeded the expected standard for Pontiac.

35.   In the Orlando community/territory, GMC significantly exceeded the expected penetration standard from 1988 to 1990, from 1992 through 1995, and again in 1997 and achieved nearly 100 percent of the expected penetration standard in 1998 and 1999.  Buick exceeded the expected penetration standard in 1988, 1990, and 1991, and Buick achieved at least 90 percent of the expected standard from 1992 through 1995.  Pontiac exceeded the expected standard in the Orlando community/territory from 1989 through 1993.

36.   A significant number of census tracts within the Orlando community/territory exceeded the expected penetration standard in 2002 for all three brands--Buick, Pontiac, and GMC.

37.   The AGSSA assigned to Orange met or exceeded the expected standard for Buick in 1995 and for GMC in 2000.

38.   The fact that these brands met or exceeded the expected standard in the recent past demonstrates that the expected standard is reasonable and achievable.

39.  Respondents' expert contends that Buick, Pontiac, and GMC dealers cannot meet the expected standard because Orlando consumers are "import biased."  This theory is disproven by the real-world experience of these brands' meeting or exceeding the expected penetration standard in the Orlando community/territory.

40.  Furthermore, the segment adjustment process already accounts for "import bias" by assigning to each segment the actual market share achieved by that brand in that segment.

41.  Those MDAs in which Buick, Pontiac, and GMC have an adequate number of dealers to address the inter-brand competition, can and do meet, or exceed, national average in those MDAs.

42.  GMC's national share of franchises in 2002 was 6.3 percent.  In the MDAs in the United States, in which GMC had at least a six-percent share of the competitive franchises, GMC performed at 102.4 percent of national average.  Buick's national share of franchises in 2002 was 7.3 percent.  In MDAs. in which Buick enjoyed at least a 6-percent share of the competitive franchises, Buick performed at 116.4 percent of national average, which essentially left GM's evidence concerning Pontiac's inadequate market penetration unrefuted.

43.  The data confirmed that the expected standard can be, and is being, achieved in MDAs when the Buick, Pontiac, and GMC brands are adequately represented.

44.  Respondents proposed a standard based on the average penetration in just the Florida MDAs, segment adjusted for local consumer preferences for each of the three brands at issue. This standard is rejected as unreasonable because it is based on a comparison area, Florida MDAs, that is not adequately represented and that excluded large areas of the State of Florida.

45.  The Florida MDAs are large markets with an insufficient number of dealers to adequately represent the brands in those markets.  All of the Florida MDAs have a below-average share of franchises, and some of them have among the lowest share of franchises for Buick, Pontiac, or GMC of any MDA in the United States.  Inter-brand competitors, however, have been adding dealerships aggressively in the Florida MDAs.  With its inadequate dealer networks, Florida ranks as one of the worst states in the United States in penetration rates for the Buick, Pontiac, and GMC brands.

46.  For these reasons, national average, adjusted for local consumer preferences, is the appropriate standard by which to judge the adequacy of representation being provided by the

existing Buick, Pontiac, and GMC dealer network and the level of opportunity available in the Orlando community/territory.

<u>Current Inadequate Representation</u>

47.   Once the standard is developed and tested for reasonableness, the next step is to measure the actual penetration achieved by the existing Buick, Pontiac, and GMC dealer networks against the expected standard in the Orlando community/territory and in AGSSA 50.   Any shortfall below the expected standard reflects inadequate representation; the greater the shortfall, the more severe the inadequacy.

48.   Buick, Pontiac, and GMC all performed significantly below the expected standard in the Orlando community/territory in 2002.   The expected penetration standard in the Orlando community/territory for GMC in 2002 was 5.94 percent, while GMC's actual penetration standard was only 4.17 percent.   Buick had an expected penetration in the Orlando community/territory of 1.79 percent, while actual penetration was only 1.17 percent. For Pontiac, the expected penetration in the Orlando community/territory was 2.64 percent, but Pontiac only achieved a penetration of 1.39 percent.

49.   Out of 48 markets in Florida, GMC's performance in the Orlando community/territory in 2002 was 36th worst, and its performance in AGSSA 50 was 46th worst in the state.

50.  Buick's performance in the Orlando community/territory in 2002 was 48th worst out of 55 Buick markets in Florida, while Buick's performance in AGSSA 50 was 50th worst in the state.

51.  Pontiac's performance in the Orlando community/territory in 2002 was 50th worst out of 52 markets in Florida, and its performance in AGSSA 50 was the 51st worst market in the state.

52.  Buick, Pontiac, and GMC's representation in the Orlando community/territory and in AGSSA 50 is inadequate now and has been sharply declining over the last three and a half years.

53.  In AGSSA 50, GMC achieved 82.2 percent of the expected penetration standard in the year 2000, but declined to 56.9 percent in 2001, 54.5 percent in 2002, and 51.3 percent as of June 2003.  Similarly, in the Orlando community/territory, GMC achieved 91.6 percent of the expected penetration standard in 2000, but declined to 78.8 percent in 2001, 70.1 percent in 2002, and 64.6 percent as of June 2003.

54.  Buick achieved only 68.3 percent of the expected penetration standard in AGSSA 50 in the year 2000, 67.6 percent in 2001, 56.8 percent in 2002, and 63.4 percent as of June 2003. In the Orlando community/territory, Buick achieved only 72.4 percent of the expected penetration standard in the year 2000,

72.7 percent in 2001, 65.3 percent in 2002, and 71.7 percent as of June 2003.

55.  In AGSSA 50, Pontiac achieved only 62.5 percent of the expected penetration standard in 2000, 54.2 percent in 2001, 47.9 percent in 2002, and 49.5 percent in June of 2003.  In the Orlando community/territory, Pontiac achieved only 63.5 percent of the expected penetration standard in 2000, 59.4 percent in 2001, 52.6 percent in 2002, and 52.3 percent in June of 2003.

56.  Even if the lower State of Florida's average penetration for Buick, Pontiac, and GMC, adjusted for local consumer preferences, is selected as the standard of comparison, Buick, Pontiac, and GMC's representation in the Orlando community/territory and in AGSSA 50 is inadequate now and has been declining for at least the last three and a half years.

57.  In AGSSA 50, GMC achieved 94.4 percent of the Florida average in 2000, but declined to 71.3 percent in 2001, 72.3 percent in 2002, and 71.7 percent as of June 2003.  In the Orlando community/territory, GMC achieved 105 percent of the Florida average in 2000, 98.2 percent in 2001, 92.4 percent in 2002, and 88.4 percent as of June 2003.

58.  In AGSSA 50, Buick achieved only 75.7 percent of the Florida average in 2000, 77.2 percent in 2001, 67.7 percent in 2002, and 77.6 percent as of June 2003.  In the Orlando community/territory, Buick achieved 81.8 percent of the Florida

19

average in 2000, 83.8 percent in 2001, 79.5 percent in 2002, and 89.1 percent as of June 2003.

59.  In AGSSA 50, Pontiac achieved only 84 percent of Florida average in 2000, 77.4 percent in 2001, 70.4 percent in 2002, and 72.6 percent as of June 2003.  In the Orlando community/territory, Pontiac achieved 85.8 percent of Florida average in 2000, 85.1 percent in 2001, 77.9 percent in 2002, and 77.3 percent as of June 2003.

60.  Thus, whether measured against the conservative national or Florida standards, the performance of the existing Buick, Pontiac, and GMC dealer networks in the Orlando community/territory and AGSSA 50 is inadequate.

61.  The poor market penetration performance of Buick, Pontiac, and GMC in the Orlando community/territory and in AGSSA 50 from 2000 to June 2003, under both the national standard and the state standard, indicates that the existing dealer networks for all three brands are providing insufficient convenience, inadequate inter-brand and intra-brand competition, and inadequate representation of those brands in the Orlando community/territory and in AGSSA 50.

Reasons For Inadequate Representation

62.  The Orlando community/territory is a large and growing market with abundant opportunity for existing dealers and the proposed dealership in East Orlando.  The problem is that Buick,

Pontiac, and GMC do not have a sufficient number of dealers in the Orlando community/territory to be able to adequately compete for all of the opportunity available in the market.

63.  The entire Orlando community/territory, including AGSSA 50 and the protesting dealers' AGSSAs, has experienced more than a decade of tremendous growth in total population, driving age population, and households, all key measures of opportunity for motor vehicle dealers.  This growth is projected to continue into the future.

64.  In AGSSA 50, total population increased from 188,760 in 1990 to 303,767 in 2002, and is projected to grow to 353,199 by 2007.  Driving age population increased from 150,565 in 1990 to 237,190 in 2002, with projected growth to 277,371 in 2007.

65.  Households are an even better measure of opportunity for motor vehicle dealers than total population, because each household is likely to own one or more vehicles, while each person composing the population may not.  Households in AGSSA 50 increased from 67,728 in 1990 to 111,221 in 2002, with projected growth to 128,634 in 2007.

66.  This growth in population and households is a positive factor in favor of the location selected for the proposed McNamara dealership.

21

67.   Much of the current density in total population and households in the Orlando community/territory is concentrated in AGSSA 50 surrounding the proposed McNamara dealership location.

68.   Household income levels in AGSSA 50 and throughout the Orlando community/territory are sufficient to support a competitive dealer network.

69.   Employment growth is another measure of opportunity for motor vehicle dealers.  The average annual employment in the tri-county area of Orange, Osceola, and Seminole counties has increased from 578,767 in 1991 to 809,825 in 2003.

70.   Retail industry registrations are the best measure of opportunity for new vehicle sales in the market.  In AGSSA 50, retail industry truck registrations, composed of segments in which GMC has offerings, grew from 5,874 in 1997 to an annualized 9,290 in 2003.  Retail industry registrations in segments in which Buick had offerings increased in AGSSA 50 from 14,073 in 1997 to an annualized 18,432 in 2003.  Registrations in segments in which Pontiac had offerings increased in AGSSA 50 from 12,243 in 1997 to an annualized 16,664 in 2003.  Similarly, retail industry car and light-truck registrations in the Orlando community/territory increased from 74,799 in 1977 to an annualized 95,184 in 2003.

71.  Much of the current vehicle registration density in the Orlando community/territory is concentrated in AGSSA 50 in the vicinity of the proposed McNamara dealership.

72.  New vehicle registrations are a good measure of opportunity per dealer.  The existing Buick, Pontiac, and GMC dealers in the Orlando community/territory currently have among the highest levels of opportunity, per dealer, in the State of Florida.

73.  In 2002, the existing GMC dealers in the Orlando community/territory had the fifth highest level of opportunity in terms of retail registrations, per dealer, among the 48 GMC markets in Florida.  With the proposed McNamara dealership, GMC dealers in the Orlando community/territory will still have the seventh-highest level of opportunity in the state.

74.  Existing Buick dealers in the Orlando community/territory currently enjoy the third-highest level of opportunity, per dealer, out of the 55 Florida markets.  With the proposed McNamara dealership, Buick dealers in the Orlando community/territory would still enjoy the fifth highest level of opportunity in Florida.

75.  The existing Pontiac dealers in the Orlando community/territory currently have the highest level of opportunity, per dealer, of any of the 52 Pontiac markets in the State of Florida.  Even with the proposed McNamara dealership,

existing Pontiac dealers in the Orlando community/territory
would enjoy the fifth highest level of opportunity in the state.

76.   In spite of more than a decade of growth and
tremendous opportunity available in the Orlando
community/territory, no new Buick, Pontiac, or GMC dealers have
been added to the dealer network in Orlando during this time.
On the other hand, competitors of these brands have been
aggressively adding dealers to their networks.  As a result, the
existing Buick, Pontiac, and GMC dealer network is not providing
sufficient inter-brand competition in the market.

77.   From 1988 through June of 2003, the GMC dealer network
declined from five to four dealers in the Orlando
community/territory, while the number of competitive franchises
increased from 73 to 91.  From 1988 through June 2003, Buick had
only three dealers in the Orlando community/territory, while the
number of competitive franchises increased from 26 to 100.
Pontiac has had only three dealers in the Orlando
community/territory from 1988 through June 2003, while the
number of competitive franchises increased from 27 to 103 during
the same time period.

78.   The last time either Pontiac, Buick, or GMC added
representation in the Orlando community/territory was 1987, or
earlier.  By contrast, Chrysler, Jeep and Dodge, which typically
have about the same number of dealers as Buick, Pontiac, or GMC

in a market, have approved seven and eight dealership locations, respectively, for the Orlando community/territory.

79.    In the Orlando community/territory, GMC would need to increase current dealer count, assuming average performing dealers, from four to six to reach its national average share of franchises.  Buick would need to increase its dealer count from three to eight to reach its national average share of franchises.  Pontiac would need to increase its dealer count from three to eight to achieve its national share of franchises in the Orlando community/territory.

80.    With the level of opportunity available in the Orlando community/territory, the current proposal to add McNamara as a Buick, Pontiac, and GMC dealer is a reasonable strategy for addressing the current inadequate number of Buick, Pontiac, and GMC dealers in the community/territory.

81.    Without additional representation, the current Buick, Pontiac, and GMC dealers in the Orlando community/territory are unable to adequately penetrate the market at distances beyond a few miles from their existing dealerships.

82.    Penetration profiles measure how far existing dealers are able to penetrate the market and how far consumers are willing to travel to purchase a vehicle.

83.    At distances of 12 to 15 miles, which is the approximate distance between the proposed McNamara dealership

and the protesting dealers, the protesting dealers are able to capture only a fraction of the Buick, Pontiac and GMC opportunity available in the market.  Orange is only able to capture at best 26.6 percent of the expected registrations for GMC and 28.7 percent for Buick.  At those distances, Courtesy is unable to capture more than 11.7 percent of expected registrations for GMC, 13.9 percent for Buick, and 10.9 percent for Pontiac.  Fountain's penetration rate for the GMC brand at 12 to 15 miles is, at best, 3.9 percent of expected registrations.  The Coggin dealership in Kissimmee, some 25 miles from the proposed McNamara dealership location, is able to achieve only marginal penetration at that distance.

84.  Congested traffic conditions require that motor vehicle dealer networks offer consumers increased levels of convenience, or sales will suffer.  The explosive growth in the Orlando community/territory has created traffic congestion, making travel more difficult for consumers when shopping for vehicles.

85.  In addition, East Colonial Drive, including the location of the proposed McNamara dealership in AGSSA 50, is one of the most congested areas in Orlando.  According to the December 18, 2002, report entitled, "Mobility 20/20, The Orange County Mobility Initiative," East Colonial Drive is "one of the fastest growing areas in Orange County"; "generates a great deal

of congestion during the peak hours"; has "levels of service already unacceptable"; and, is, therefore, "the most important controlled access arterial in the three-county area in need of funding."

86.  The Orlando community/territory has outgrown the ability of the existing Buick, Pontiac, and GMC dealer networks to offer consumers a sufficient level of convenience.

87.  On the other hand, the proposed McNamara dealership is optimally located in the community/territory to provide a higher level of customer convenience possible, when measured by proximity to retail new vehicle consumers in 2002.  The addition of the proposed McNamara dealership will improve customer convenience for GMC in AGSSA 50 from 11.8 miles to five miles, for Buick from 11.9 miles to 5.1 miles, and for Pontiac from 11.1. miles to 4.9 miles.

88.  The proposed McNamara dealership site is also optimal in that it is located in a population growth area, enjoys an existing traffic count of 50,000 vehicles per day with expected growth to 70,000 vehicles per day, and is near retail shopping, all of which create favorable conditions for vehicle sales.

89.  East Colonial Drive is a developing auto row.  Like a regional mall, an auto row will draw consumers to the area to shop for vehicles, benefiting all of the dealers in the auto row.

<u>Potential Impact on Protesting Dealers</u>

90.  The potential impact of the proposed dealership on the protesting dealers is determined, in part, by whether there is sufficient opportunity in the market for the proposed dealer to gain sales from sources other than the protesting dealers.

91.  Gross registration loss measures lost opportunity within the market.  As it relates to these cases, gross registration loss is a measure of the opportunity Buick, Pontiac, and GMC have lost to inter-brand competitors, as measured by the number of additional registrations Buick, Pontiac, and GMC would need to make in order to achieve the expected penetration standard in each census tract within the community/territory that is presently below the expected penetration standard.

92.  In contrast, net registration loss offsets losses within the market against gains within the market.  Net registration loss is a far less reliable measure of opportunity for dealers in the market, because it ignores losses within the market.

93.  In-sell measures losses to intra-brand competitors by counting the number of Buicks, Pontiacs, and GMCs registered within the Orlando community/territory and sold by dealers outside the community/territory.  Moreover, in-sell represents lost opportunity to dealers within the market because while

those dealers were more convenient to the customers who bought
those vehicles, the more convenient dealers failed to offer the
price, selection, service, or selling approach necessary to make
the sales.

94.   In 2002, the gross registration loss in the Orlando
community/territory for GMC was 927 units.   In-sell in the
Orlando community/territory for GMC was 247 units.   This
produces for GMC a total level of opportunity of 1,174 units
available to the proposed McNamara dealership that are not
presently being captured by the existing GMC dealers in the
market.

95.   If the proposed McNamara dealership penetrates the GMC
market like the average of all existing GMC dealers in the
market, it can be expected to make 396 GMC sales within the
community/territory.   This level of sales would represent only
33.73 percent of the available opportunity that already exists
in the market.   Even if the proposed dealership performs as well
as Orange, the best performing GMC dealer in the market, the
proposed McNamara dealership will make 573 GMC sales within the
community/territory, which represents only 48.8 percent of the
available GMC opportunity.

96.   In 2002, the gross registration loss in the Orlando
community/territory for Buick was 633 units.   In-sell in the
Orlando community/territory for Buick totaled 113 units.   This

results in 746 Buick sales available to the proposed McNamara dealership that are not presently being captured by the existing Buick dealers in the market.  If McNamara penetrates the market at the average of all existing Buick dealers in the market, the new dealership can be expected to make 305 Buick sales within the community/territory.  This level of sales would represent only 40.9 percent of the available opportunity that already exists in the market.

97.  In 2002, Pontiac's gross registration loss in the Orlando community/territory for Pontiac was 1,143 units. In-sell in the Orlando community/territory for Pontiac was 150 units.  This produces a total opportunity of 1,293 units for the proposed dealership that are not presently being captured by the existing dealers in the market.  If the proposed McNamara dealership penetrates the market like the average of all existing dealers in the market, the new dealership can be expected to make 354 sales within the community/territory.  This level of sales would represent only 27.4 percent of the existing market opportunity.  Even if the proposed McNamara dealership performs as well as the best performing Pontiac dealer in the market, Coggin, the proposed dealership will make 399 Pontiac sales within the community/territory, representing only 30.9 percent of the available Pontiac opportunity.

98.   The level of opportunity available in the Orlando community/territory is sufficient to allow the proposed McNamara dealership to go into business and perform as well as the best-selling dealers in the market without negatively impacting sales of the existing dealers.  Given that the proposed dealer is projected to capture only a fraction of the lost opportunity available in the market, the protesting dealers have the opportunity to gain sales by capturing some of the remaining lost opportunity.  Moreover, all three protesting dealers have significant lost opportunity within their own AGSSAs.

99.   Stimulated competitive response is the process by which existing dealers benefit from the introduction of new competition, when they respond positively to that competition. Dealers can increase sales by taking advantage of the increased advertising, brand awareness, inventory, and customer traffic that the new dealership will bring to the market.

100.  Finances are no impediment to the ability of Fountain, Orange, and Courtesy to compete for the opportunity available to them, if they choose to do so.  All three are earning tremendous profits with their existing dealership operations, and all are well-capitalized businesses that are fully capable of competing in the marketplace.

101.  In the two years since it purchased Orange, the Lally family has earned dealership profits of $2,435,959 in 2002 and

31

$576,709 through April of 2003.  These profits, earned in what Mr. Lally called a "down" economy, exceed the highest profits ever earned by the previous Orange dealership owner.

102.  Fountain has been extremely profitable for years. Fountain earned $2,577,019 in 1999; $1,074,658 in 2000; $2,433,095 in 2001; $2,661,231 in 2002; and $397,220 through March 2003.

103.  Courtesy also earns tremendous profits.  The combined Courtesy Buick, Pontiac, and GMC operations earned over $1.9 million in 1999, over $2.6 million in 2000, more than $1.8 million in 2001, more than $2.1 million in 2002, and over $700,000 through April 2003.

104.  The protesting dealers are also well capitalized. Fountain has a current capitalization or stockholders' equity of approximately $8 million, when the LIFO (last in, first out) reserve is properly considered as part of its equity and cash assets of $1.6 million.  Orange has capital of approximately $8.4 million and cash of $304,953.  Courtesy Buick and Courtesy Pontiac-GMC combined have capital of approximately $12.4 million and cash of $890,000.

105.  This combination of capital and cash will give the protesting dealers the financial resources to compete effectively with the proposed new dealership and to withstand cyclical economic downturns.

106.  All the existing dealers, Fountain, Orange, and Courtesy, are ideally located to allow them to compete for sales in the Orlando community/territory.

107.  With the levels of opportunity available in the Orlando community/territory, if the existing dealers respond positively to the introduction of new competition, both the proposed dealer and the existing dealers can increase sales; and the Buick, Pontiac, and GMC brands can reverse the declining penetration trends in this market.

108.  Respondents' impact model predicted that a reduction in a dealer's AGSSA size, and hence in the number of its expected registrations, would lead to a corresponding reduction in its sales volume.  However, dealer sales' volume is not necessarily related to the AGSSA size or expected registration levels for that dealer.

109.  Respondents' expert assumes that the protesting dealers will lose 100 percent of sales made in areas where the proposed McNamara dealership would have a geographic advantage.  However, that assumption is unwarranted.  First, even as Respondents' expert admits, it is unrealistic to expect that the proposed McNamara dealership would capture 100 percent of those sales.  Second, there are more units of net loss opportunity available in the protesting dealers' respective AGSSAs than there are units for which the proposed dealer would gain

geographic advantage over Respondents.  If Respondents simply respond positively to the competition and compete for the lost opportunity in their respective AGSSAs, they should be able to gain sales, not lose them.

110.  It is an accepted principle of marketing that success in the market is directly related to the amount of effort put into the market.

Overall Benefit of the Proposed Dealership

111.  The addition of the proposed dealership will benefit consumers in the Orlando community/territory by providing them more convenient access to Buick, Pontiac, and GMC products, a more competitive environment leading to lower prices, a better inventory selection from which to choose, a large new service center, and a new state-of-the-art showroom in which to shop.

112.  The public will benefit from the employment created by construction and operation of the new dealership, from taxes paid by the new dealership, and from greater competition in the market.

113.  The licensee, GM, will benefit from the new dealership by improving its chances of achieving the minimum level of expected market share in the Orlando community/territory and in AGSSA 50 through enhanced sales from the new dealership.

114.   On the other hand, if representation is not added to the Orlando community/territory, the Buick, Pontiac, and GMC brands will continue to experience a downward spiral in which their share of franchises in the Orlando market decreases even further.  This would cause diminishing exposure in the market relative to other brands, worsening levels of customer convenience, and deteriorating competitiveness, all of which will lead to sales losses for the existing dealers and a decreasing market share for the brands.

<u>CONCLUSIONS OF LAW</u>

115.   The Division of Administrative Hearings has jurisdiction over the parties and the subject matter of this proceeding pursuant to Sections 120.569 and 120.57 and Subsection 320.642(2)(a), Florida Statutes (2003).

116.   Section 320.642, Florida Statutes (2003), which governs Petitioners' request to establish a new dealership, provides, in pertinent part, the following:

> (2)(a)  An application for a motor vehicle dealer license in any community or territory shall be denied when:
>
> 1.   A timely protest is filed by a presently existing franchised motor vehicle dealer with standing to protest as defined in subsection (3); and
>
> 2.   The licensee fails to show that the existing franchised dealer or dealers who register new motor vehicle retail sales or retail leases of the same line-make in the

community or territory of the proposed
dealership are not providing adequate
representation of such line-make motor
vehicles in such community or territory.
The burden of proof in establishing
inadequate representation shall be on the
licensee.

\*     \*     \*

(3)  An existing franchised motor vehicle
dealer or dealers shall have standing to
protest a proposed additional or relocated
motor vehicle dealer where the existing
motor vehicle dealer or dealers have a
franchise agreement for the same line-make
vehicle to be sold or serviced by the
proposed additional or relocated motor
vehicle dealer and are physically located so
as to meet or satisfy any of the following
requirements or conditions:

\*     \*     \*

(b)  If the proposed additional or
relocated motor vehicle dealer is to be
located in a county with a population of
more than 300,000 according to the most
recent data of the United States Census
Bureau or the data of the Bureau of Economic
and Business Research of the University of
Florida:

1.  Any existing motor vehicle dealer or
dealers of the same line-make have a
licensed franchise location within a radius
of 12.5 miles of the location of the
proposed additional or relocated motor
vehicle dealer; or

2.  Any existing motor vehicle dealer or
dealers of the same line-make can establish
that during any 12-month period of the 36-
month period preceding the filing of the
licensee's application for the proposed
dealership, such dealer or its predecessor
made 25 percent of its retail sales of new

> motor vehicles to persons whose registered
> household addresses were located within a
> radius of 12.5 miles of the location of the
> proposed additional or relocated motor
> vehicle dealer; provided such existing
> dealer is located in the same county or any
> county contiguous to the county where the
> additional or relocated dealer is proposed
> to be located.

117.   Respondents have standing to protest the proposed

dealership within the meaning of Subsection 320.642(3)(b),

Florida Statutes (2003).

118.   Petitioner, GM, has the burden of proof in this

proceeding as the licensee.  See § 320.642(2)(a)2., Fla. Stat.

(2003).  In order to prevail, Petitioners must establish by a

preponderance of the evidence that the existing franchised

dealers for Buick, Pontiac, and GMC are not providing adequate

representation of the same line-make motor vehicles in the

Orlando community/territory.

119.   The scope of inquiry to determine whether existing

dealers are providing adequate representation is set forth in

Subsection 320.642(2)(b), Florida Statutes (2003), which

provides the following:

> (b)  In determining whether the existing
> franchised motor vehicle dealer or dealers
> are providing adequate representation in the
> community or territory for the line-make,
> the department may consider evidence which
> may include, but is not limited to:
>
> 1.  The impact of the establishment of the
> proposed or relocated dealer on the

consumers, public interest, existing
dealers, and the licensee; provided,
however, that financial impact may only be
considered with respect to the protesting
dealer or dealers.

2.   The size and permanency of investment
reasonably made and reasonable obligations
incurred by the existing dealer or dealers
to perform their obligations under the
dealer agreement.

3.   The reasonably expected market
penetration of the line-make motor vehicle
for the community or territory involved,
after consideration of all factors which may
affect said penetration, including, but not
limited to, demographic factors such as age,
income, education, size class preference,
product popularity, retail lease
transactions, or other factors affecting
sales to consumers of the community or
territory.

4.   Any actions by the licensees in
denying its existing dealer or dealers of
the same line-make the opportunity for
reasonable growth, market expansion, or
relocation, including the availability of
line-make vehicles in keeping with the
reasonable expectations of the licensee in
providing an adequate number of dealers in
the community or territory.

5.   Any attempts by the licensee to coerce
the existing dealer or dealers into
consenting to additional or relocated
franchises of the same line-make in the
community or territory.

6.   Distance, travel time, traffic
patterns, and accessibility between the
existing dealer or dealers of the same line-
make and the location of the proposed
additional or relocated dealer.

7.   Whether benefits to consumers will likely occur from the establishment or relocation of the dealership which cannot be obtained by other geographic or demographic changes or expected changes in the community or territory.

8.   Whether the protesting dealer or dealers are in substantial compliance with their dealer agreement.

9.   Whether there is adequate interbrand and intrabrand competition with respect to said line-make in the community or territory and adequately convenient consumer care for the motor vehicles of the line-make, including the adequacy of sales and service facilities.

10.   Whether the establishment or relocation of the proposed dealership appears to be warranted and justified based on economic and marketing conditions pertinent to dealers competing in the community or territory, including anticipated future changes.

11.   The volume of registrations and service business transacted by the existing dealer or dealers of the same line-make in the relevant community or territory of the proposed dealership.

120.   The 11 factors set forth in Subsection 320.642(2)(b)1. through 11., Florida Statutes (2003), may be considered to determine if the existing dealer is providing adequate representation.

121.   Factor 1 addresses the impact a new dealership will have on consumers, the public interest, existing dealers and the licensee.   See § 320.642(2)(b)1., Fla. Stat. (2003).   With

39

regard to Factor 1, the evidence established that the proposed dealership will benefit consumers and the Buick, Pontiac, and GMC brands, and will be in the public interest.  Consumers will benefit from the presence of a new convenient, combined Buick, Pontiac, and GMC dealership with service facilities. Additionally, the proposed McNamara dealership will stimulate both inter-brand and intra-brand competition, which is in the public interest.  The Buick, Pontiac, and GMC brands will benefit through increased exposure, market penetration, and sales and service capacity in the Orlando community/territory where they are not being adequately represented.

122.  With regard to the impact of the proposed dealer on existing dealerships, there will not necessarily be a negative impact to existing dealerships.  There is a large untapped market potential opportunity in the Orlando community/territory in AGSSA 50 and Respondents' respective AGSSAs.  Therefore, if the existing dealers respond positively and offer competitive value, they will capture some of the increased sales opportunity generated by the presence of the new proposed dealership.

123.  In addition to the foregoing, Factor 1 allows consideration of the financial impact on the protesting dealers. This impact must be analyzed as it relates to determining adequacy of representation.  Here, the evidence established that there is no reason to expect the existing dealerships to lose

40

sales as a result of the addition of the proposed dealership.
Respondents are profitable and have substantial capital and cash
assets with which to compete in the marketplace.  However, even
if some sales are lost, the manufacturer is not statutorily
required to prove an absence of any financial impact on the
protesting dealer.  See Chevrolet Motor Division, General Motors
Corporation, et al. v. Fred Bondesen Chevrolet, DOAH Case
No. 98-1559 (DOAH February 1, 1999); and Kawasaki Motors Corp.,
et al. v. Cycle Sports Center, Inc., Case No. 95-3852 (DOAH
January 5, 1996).

124.  Factor 2 relates to the size and permanency of the
dealers' investments and obligations they have incurred to
comply with their respective dealer agreements.  See
§ 320.642(2)(b)2., Fla. Stat. (2003).  Here, there is no dispute
that the protesting dealers have made substantial and permanent
investments in their dealerships.  Moreover, there is no
evidence that they will suffer a loss or impairment of those
investments if the proposed dealership is approved.

125.  Factor 3 relates to the reasonably expected market
penetration of the line-make motor vehicle for the
community/territory.  See § 320.642(2)(b)3., Fla. Stat. (2003).
In these cases, the reasonably expected market penetration is
the national average, after adjustments for segment popularity
and demographic factors of the Orlando community/territory.

126.   Factor 4 relates to the actions of the licensee to deny existing dealer opportunities for growth, expansion, or relocation.   See § 320.642(2)(b)4., Fla. Stat. (2003).   Here, there is no evidence that the GM prevented the protesting dealers from expanding or relocating to meet the needs of the Orlando territory or community.

127.   Factor 5 addresses attempts of the licensee to coerce existing dealers into consenting to the additional franchise. See § 320.642(2)(b)5., Fla. Stat. (2003).   In these cases, there is no evidence that GM made attempts to coerce the protesting dealers into consenting to the proposed dealership.

128.   Factor 6 concerns the distance, travel time, traffic patterns, and accessibility between the existing dealers and the proposed dealers.   See § 320.642(2)(b)6., Fla. Stat. (2003). The evidence established that the distance and travel time between the proposed dealership site and the protesting dealers sites indicates that the proposed new dealership is appropriate. The area in which the proposed dealership will be located is one of the fastest growing and most heavily traveled areas in the country.   Also, East Colonial Drive, including the portion of that street adjacent to the site of the proposed dealership, experiences traffic counts of 50,000 vehicles per day.

129.   Factor 7 addresses the benefits to the consumer from the proposed dealership, which can not be obtained by other

42

geographic or demographic changes.  See § 320.642(2)(b)7., Fla. Stat. (2003).  Here, the evidence established that the proposed dealership will benefit the consumers by providing a location with the combined Buick, Pontiac, and GMC brands in the eastern part of the Orlando community/territory, where there is currently no such dealership.

130.  Factor 8 concerns the compliance of the protesting dealers with their respective dealer agreements.  See § 320.642(2)(b)8., Fla. Stat. (2003).  Here, there is no evidence that the protesting dealers are not in compliance with their dealer agreements.

131.  Factor 9 addresses the issue of adequacy of inter-brand and intra-brand competition with respect to the subject line-make(s) in the community/territory and the convenience of consumer care.  See § 320.642(2)(b)9., Fla. Stat. (2003).  The evidence established that the performance of Buick, Pontiac, and GMC in the Orlando community/territory is well below reasonable levels of performance.  As noted in the findings above, the national average is a reasonable standard.  However, in all the subject line-makes, there is a substantial shortfall when compared to the national average or even the more conservative Florida average, thereby reflecting inadequacy of inter-brand and intra-brand competition.  With regard to consumer convenience, there is no Buick, Pontiac, or GMC dealership in

the eastern part of the Orlando community/territory to provide adequate sales or service facilities.

132.  Factor 10 considers the justification of the proposed dealership based on the economic and marketing condition pertinent to dealers competing in the community/territory.  See § 320.642(2)(b)10., Fla. Stat. (2003).  In these cases, the evidence established that the proposed dealership is justified based on economic and marketing conditions, including future changes.  Buick, Pontiac, and GMC are not adequately represented in the Orlando community/territory or in the AGSSA 50, in which the proposed dealer will be located.  Both areas continue to grow at a rapid rate in terms of population, households, registrations, and sales opportunity.

133.  Factor 11 considers the volume of registrations and service business transacted by the existing dealers of the same line-makes in the Orlando community/territory or AGSSA 50.  See § 320.642(2)(b)11., Fla. Stat. (2003).  The evidence established that the volume of registrations and service business is hindered by the size of the community/territory and the distances of consumers.  The level of sales of the existing dealers is not the problem.  Rather, the area of the community/territory is simply too large for the existing dealers to adequately represent the subject line-makes.

44

134.  Having weighed the statutory criteria enumerated in Subsection 320.642(2)(b), Florida Statutes (2003), and in light of the facts found herein, Petitioners have met their burden of proving by a preponderance of the evidence that the existing dealers are not providing adequate representation to the Orlando community/territory.  A balancing of the statutory factors supports the conclusion that the benefits of establishing the proposed McNamara dealership outweigh any negative impact on the existing dealerships.

135.  Respondents contend that if the proposed McNamara dealership is established, there will be a reduction in their respective AGSSAs, the number of registrations, and a corresponding loss in sales and profits.  This argument, with respect to the financial input the proposed dealer will have on Respondents, is rejected.

136.  Section 320.642, Florida Statutes (2003), does not guarantee success to a dealer, but affords a protesting dealer the opportunity to assert that a manufacturer is establishing more dealerships than the market can support.  Plantation Datsun, Inc. v. Calvin, 275 So. 2d 26 (Fla. 1st DCA 1973).  Moreover, this provision was not enacted "to foster combinations to prevent the introduction of dealer competition which is reasonably justified in terms of market potential."  Bill Kelly

45

Chevrolet, Inc. v. Calvin, 322 So. 2d 50, 52 (Fla. 1st DCA 1975), cert. denied, 336 So. 2d 1180 (Fla. 1976).

137.  The Legislature expressed its intent when it enacted the 1988 version of Section 320.642, Florida Statutes (2003). The goals established therein include protecting the welfare of Florida citizens by (1) maintaining competition and (2) providing consumer protection and fair trade.  See § 320.605, Fla. Stat. (2003).  In light of these goals, the establishment of the McNamara Buick, Pontiac, and GMC dealership has been shown to be consistent with the purposes of Section 320.642, Florida Statutes (2003).

<u>RECOMMENDATION</u>

Based on the foregoing Findings of Fact and Conclusions of Law, it is

RECOMMENDED that the Department of Highway Safety and Motor Vehicles issue a final order approving Petitioner, General Motors Corporation's, application to establish the proposed new dealership, McNamara Pontiac, Inc., d/b/a McNamara Pontiac Buick-GMC, in Orlando, Orange County, Florida.

DONE AND ENTERED this 27th day of May, 2004, in

Tallahassee, Leon County, Florida.

**S**
_____
CAROLYN S. HOLIFIELD
Administrative Law Judge
Division of Administrative Hearings
The DeSoto Building
1230 Apalachee Parkway
Tallahassee, Florida  32399-3060
(850) 488-9675   SUNCOM 278-9675
Fax Filing (850) 921-6847
www.doah.state.fl.us

Filed with the Clerk of the
Division of Administrative Hearings
this 27th day of May, 2004.


ENDNOTES

1/  Courtesy Pontiac-GMC (Pontiac and GMC dealerships) and
Courtesy Buick have the same owners and are located at the same
physical address.

2/  Hal McNamara, dealer-operator of the proposed McNamara
dealership, was present at the hearing, but was not represented
by counsel and did not actively participate in the proceedings.

3/  Both Volumes 4 and 5 of the Transcript use the page
numbers 351 through 443, Volume 4 uses pages 348 through 443,
and Volume 5 uses pages 349 through 546.

4/  For example, while Honda and Toyota outsell either Buick,
Pontiac, or GMC nationally, if the national sales of Buick,
Pontiac and GMC are combined, those Buick, Pontiac, and GMC
sales would nearly equal the Honda or Toyota sales.

5/  The Coggin dealership in Kissimmee also has a Pontiac
franchise, but Kissimmee is not part of the GM-defined Orlando
MDA for the Pontiac brand.  The Coggin dealership is, however,
included in the relevant community/territory in these cases.

6/   Because there are no material differences in the
community/territory boundaries for the Buick, Pontiac, and GMC
line-makes in these cases, all references to
"community/territory" are intended to apply to each brand unless
otherwise stated.

7/   Share of franchises is a measure of the number of dealers a
brand has in a market compared with the number of inter-brand
competitors in that market.


COPIES FURNISHED:

Michael J. Alderman, Esquire
Department of Highway Safety
  and Motor Vehicles
Neil Kirkman Building, Room A432
2900 Apalachee Parkway
Tallahassee, Florida  32399

Fred J. Lotterhos, III, Esquire
Holland & Knight, LLP
50 North Laura Street, Suite 3900
Jacksonville, Florida  32202

James D. Adams, Esquire
Adams & Quinton, P.A.
Camino Real Centre
7300 West Camino Real
Boca Raton, Florida  33433

Daniel Myers, Esquire
J. Martin Hayes, Esquire
Myers & Fuller, P.A.
402 Office Plaza Drive
Tallahassee, Florida  32301

Carl A. Ford, Director
Division of Motor Vehicles
Department of Highway Safety and
  Motor Vehicles
Neil Kirkman Building, Room B-439
2900 Apalachee Parkway
Tallahassee, Florida  32399-0600

Enoch Jon Whitney, General Counsel
Division of Motor Vehicles
Department of Highway Safety and
  Motor Vehicles
Neil Kirkman Building
2900 Apalachee Parkway
Tallahassee, Florida  32399-0500


### NOTICE OF RIGHT TO SUBMIT EXCEPTIONS

All parties have the right to submit written exceptions within
15 days from the date of this Recommended Order.  Any exceptions
to this Recommended Order should be filed with the agency that
will issue the final order in these cases.