# **<u>TAB 2</u>**

**STATE OF NEW YORK**
**DEPARTMENT OF MOTOR VEHICLES**
**DIVISION OF SAFETY AND BUSINESS HEARINGS**

---

HARTLEY BUICK GMC TRUCK, INC.,
DBA HARTLEY HONDA,
      Dealer/ Franchisee,

        v.

AMERICAN HONDA MOTOR CO., INC.,
      Franchisor

Case No. FMD 2010-05
Administrative Law Judge:
Paul V. Crapsi, Jr.

---

**FINDINGS**:

      This Adjudicatory Hearing was convened in accordance with Vehicle and Traffic Law Section 471-a, and 15 N.Y.C.R.R., part 127.13, and scheduled between the above parties before the assigned presiding Administrative Law Judge. In this action, Hartley Buick GMC Truck, Inc., dba Hartley Honda ("Hartley") seeks to challenge a Notice of Termination of its Honda franchise by American Honda Motor Co., Inc., ("American Honda"), based upon the statutory language contained in Article 17-A of the Vehicle and Traffic Law ("VTL"), the Franchised Motor Vehicle Dealer Act ("The Act"). After considering all testimony, evidence, and written submissions of counsel, I make the following findings of fact and conclusions of law:

      1. Hartley commenced this proceeding by way of a Request For Adjudicatory Proceeding on December 20, 2010, challenging a September 17, 2010 Notice of Termination of its Honda Franchise. American Honda filed an Answering Statement on February 9, 2011. Hartley filed a Reply Statement on March 1, 2011. An Adjudicatory Hearing was held on consecutive dates from June 20th – June 23rd, 2011, in Buffalo New York. Hartley was represented by Hodgson Russ, LLP, offices located at 140 Pearl Street, Suite 100, Buffalo, New York 14202-4040, with Ryan K. Cummings, Esq., and Kyle C. Reeb, Esq., appearing. American Honda was represented by Hogan Lovells, US LLP, offices located at 875 Third

-2-

Avenue, New York, New York, 10022, with John J. Sullivan, Esq., and Kyle M. Sawa, Esq., appearing. The matter was assigned to Administrative Law Judge Paul V. Crapsi, Jr.

2. American Honda bears the burden of proving that its termination of Hartley was done in good faith and for good cause, as required under VTL Section 463(2) (e) (2). "The issues to be determined in an action commenced pursuant to subparagraph one of this paragraph are whether the franchisor's notice of termination was issued with due cause and in good faith. The burden of proof shall be upon the franchisor to prove that due cause and good faith exist. The franchisor shall also have the burden of proving that all portions of its current or proposed sales and service requirements for the protesting franchised new motor vehicle dealer are reasonable." As such, American Honda presented its case in chief first.

3. American Honda called the following witnesses: Mr. William Green, National Manager of Market Planning; Ms. Erica Weber, District Sales Manager for District 9A; Mr. Frank Beniche, Assistant Vice President of Market Representation; Mr. Sharif Farhat of Urban Science Applications, Inc.; and Herbert Walter, an independent consultant. Hartley presented two witnesses in its case in chief: Mr. Bill Hartley, General Manager and minority owner of Hartley; and Mr. Richard Neville of Neville Associates. American Honda presented one rebuttal witness, Mr. David Hendley, who was its Zone Sales Manager in Zone 9 from 2006 through August 2009. American Honda offered Exhibits 1 through 52, all of which were admitted into evidence. Hartley offered Exhibits A and B, both of which were admitted into evidence.

4. Hartley is a New York corporation which sells Buick, GMC, and Honda vehicles. In 1975, Hartley entered into an Automobile Dealer Sales and Service Agreement ("Dealer Agreement") with Honda to operate the Honda automobile dealership at their Jamestown location. Hartley has been an authorized Honda dealer since this time, with the Dealer Agreement being continuously renewed. The most recent extension of the Dealer Agreement was executed in 2008 and expires in 2014.

-3-

5. American Honda is a California corporation and the distributor of Honda motor vehicles in the United States. American Honda does not make sales directly to the public. Rather, all sales are made through independent, authorized Honda dealers.

6. There are approximately 1,040 licensed Honda dealers across all 50 states. This dealer network is divided into regions, zones, and districts. Hartley is located in Zone 9, which includes approximately 90 dealers in the greater New England area and New York State, but does not include New York City, Westchester County, Long Island, Rockland County, and other areas in southeastern New York.

7. Hartley is an authorized Honda dealer pursuant to the terms of the Dealer Agreement, fully executed as of May 1, 2003. Hartley is referred to in the Dealer Agreement as "Dealer". Section 1 of the Dealer Agreement, entitled "Purpose of the Dealer Agreement," provides in part that "Dealer and American Honda seek to effectively promote, sell and service Honda Products, enhance the Honda Image and satisfy Honda customers."

8. In Section 12.1 of the Dealer Agreement, Hartley agrees to "effectively promote and sell, at retail to the end user, Honda Products" and to "provide sales and service of Honda Products within the Dealer's Area of Statistical Analysis ("ASA") at levels as reasonable determined by American Honda." Section 24.2 of the Dealer Agreement defines an ASA as "the geographical area used by American Honda and modified in its sole discretion from time to time for analyzing the representation provided by Dealer, in which Dealer's advertising, sales and service performance is evaluated by American Honda. Dealer has no proprietary interest in the Areas of Statistical Analysis or any portion thereof." Section 12.2 of the Dealer Agreement further provides that "Dealer's performance of its sales and/or service obligations for Honda Products will be evaluated by American Honda on the basis of such Policies and Procedures containing such reasonable criteria as American Honda may develop from time to time. Such criteria may include, but are not limited to, such reasonable sales and/or service objectives as American Honda may establish, as well

-4-

as a comparison of Dealer's retail sales and/or service performance with reasonable groupings of other authorized Dealers of Honda Products."

9. American Honda adopted the "Dealer Sales Performance Evaluation Policy" ("Policy") in December 2007. Under the Policy, American Honda evaluates whether a Dealer is effectively promoting and selling new Honda vehicles based on the Dealer's "Sales Effectiveness." Under the Policy, the Dealer's "Sales Effectiveness" is determined by comparing the Dealer's "Expected Retail Sales" to its "Retail Sales". American Honda determines Dealer's Expected Retail Sales for each "Competitive Segment" by multiplying the number of "Retail Industry Registrations" in that Competitive Segment, which are registered to addresses within the ASA in which Dealer is located, by the Market Share that Honda achieves in that Competitive Segment in the "Represented Markets" for the state in which Dealer is located. The Expected Retail Sales in each Competitive Segment are combined to determine Dealer's total Expected Retail Sales. Dealer's total Expected Retail Sales are then compared to its actual Retail Sales to determine Dealer's Sales Effectiveness. American Honda includes any Retail Sale made by Dealer to any customer residing in the 50 United States and the District of Columbia, provided the vehicle has been registered with the state by the customer. Dealer is "Sales Effective" if its Retail Sales are not less than its Expected Retail Sales.

10. ASA's are created to evaluate the performance of the dealer. American Honda uses census tracts to construct its ASA's. ASA's in rural areas are typically much larger than in urban areas due to numerous factors, including fewer vehicle registrations, less competition, and less traffic congestion. American Honda uses proximity as the principal basis for assigning ASA's, based on the concept that the Honda dealer who is closest to the customer generally has a competitive advantage over any other Honda dealer. American Honda generally assigns to each Honda dealer those census tracts closest to that dealer than to any other dealer. Adjustments are made on the outside edges of the ASA based on

-5-

customer preferences. If actual registrations in such a tract show that its sales are dominated by another Honda dealer, the tract may be assigned to that other dealer.

11. In December 2007, American Honda sent Hartley a letter containing a copy of the Policy and advising: "you will be receiving periodic evaluations and communications from American Honda advising of your dealership's sales performance, and whether your dealership's sales performance is meeting expected levels. It is imperative that you and your management pay close attention to these evaluations and communications, and that you and your management focus on maximizing sales in order to meet your sales performance obligations."

12. American Honda thereafter provided Hartley, on a monthly basis, with its "Dealer Sales Performance Summary" (the "DSPS"), a report card that provided Hartley with calendar year to date figures on (i) the number of competitive industry retail registrations in each vehicle segment in its ASA; (ii) Honda's State Represented Market Share in each segment; (iii) Hartley's expected sales in each segment; (iv) Hartley's actual sales in each segment; (v) the number of units by which Hartley was above or below expected sales in each segment; (vi) Hartley's RSE in each segment; and (vii) Hartley's overall RSE.

13. From January 2008 through June 2010, Hartley's overall RSE ranged from a high of -77.27% to a low of -82.45%. American Honda sent Hartley a series of letters, based on this poor performance, notifying Hartley that it was in breach of its sales performance obligations and needed to cure.

14. American Honda issued a "Deficient Sales Performance-Cautionary Letter" ("Cautionary Letter") to Hartley for each of the seven calendar quarters following adoption of the Policy, beginning with the first quarter of 2008. These letters were dated June 23, 2008, October 7, 2008, December 22, 2008, March 19, 2009, June 22, 2009, September 11, 2009, and December 1, 2009. Each Cautionary Letter advised Hartley of its prior year-end and current year-to-date expected sales, actual sales, and sales effectiveness percentages.

-6-

Each Cautionary Letter advised Hartley, among other things, that it "was failing to meet its sales performance obligations"; that its "sales performance . . . is among the worst in [the] state"; that "[f]urther action by American Honda will be necessary if substantial and immediate improvement is not demonstrated"; and "it is incumbent upon [Hartley] to take the necessary actions to improve the dealership's sales performance."

15. Hartley's sales performance did not improve, but rather continued to decline.

16. On or about December 17, 2009, American Honda sent Hartley a formal "Notice of Default and Opportunity to Cure" letter (the "NOD").

17. The NOD was sent in compliance with Section 463 (2) (e) (3) of the Act. The applicable provisions are as follows: "[t]he franchisor shall provide notification in writing to the dealer that the dealer has one hundred eighty days to correct [the] deficiencies or breaches and that the franchise is subject to termination if the dealer does not correct those deficiencies or breaches. If the termination is based upon performance of the dealer in sales and service then there shall be no due cause if the dealer substantially complies with the reasonable performance provisions of the franchise during such cure period and, no due cause if the failure to demonstrate such substantial compliance was due to factors which were beyond the control of such dealer."

18. The NOD also complied with Section 20.4 (O) of the dealer Agreement, which states "[f]ailure of Dealer to perform adequately as to its sales...responsibilities" is grounds for termination and that American Honda must first provide Dealer with notice "of the nature and extent of such failure(s) and how Dealer's performance may be made acceptable" and "a reasonable opportunity to cure of not less than six (6) months."

19. The NOD advised Hartley that it would have from January 1, 2010 through June 30, 2010 to either (i) sell 595 new Hondas, which was the number of Hartley's expected sales for the first six months of 2009; or (ii) be sales effective for the January – June 2010

-7-

period. The NOD also asked Hartley to promptly submit a detailed action plan for curing its sales deficiencies.

20. Hartley responded to the NOD over two months later, by submitting a one-page letter on February 26, 2010, to American Honda. This letter did not contain a detailed action plan for improving sales. Nor did it address numerous factors which were directly related to their deficient performance. The letter did address advertising, but failed to address personnel, pricing, inventory, investment, or other related sales related issues.

21. Hartley failed to "substantially comply" with the reasonable performance provisions of the franchise during the 180-day statutory period. On the contrary, its RSE declined for the six months ending on June 30, 2010.

22. By letter dated September 17, 2010, and in compliance with VTL Section 463 (2) (d) (1), American Honda issued a 90-day, written Notice of Termination to Hartley, stating the specific grounds for termination: Hartley's failure to become Sales Effective. "[Hartley] is among the worst performing dealers in the state, and has not demonstrated any substantial and sustained improvement toward becoming Sales Effective, despite the fact that American Honda representatives have reviewed Hartley Honda's sales performance obligations and deficiencies with management of Hartley Honda on numerous occasions."

23. In issuing its Notice of Termination, American Honda took the position that Hartley's poor sales performance was not due to factors beyond its control, but rather due to business decisions made by Hartley, including but not limited to the following: vehicle pricing; staffing; compensation to salespersons; advertising; dealership profit; and profit re-investment. The evidence received supports American Honda's position.

24. Hartley failed to cure its breach as required under VTL Section 463 (2) (e) (2) "…within a reasonable time after notice of the breach has been received from the manufacturer or distributor."

-8-

25. After receiving its first Cautionary Letter in June 2008, Hartley took little or no action to improve sales between June 2008 and June 2010. Indeed, evidence received establishes that Hartley's advertising expenditures decreased significantly from 2008 to 2009, and their sales performance lengthwise decreased during this time frame.

26. The evidence received establishes that Hartley failed to "substantially compl[y] with the reasonable performance provisions of the franchise during [the statutory 180 day] cure period under VTL Section 463 (2) (e) (3). In light of Hartley's failure to take any serious action to improve sales performance, their position that they could not improve sales cannot be accepted.

27. Pursuant to Vehicle and Traffic Law Section 471 – a (4), the following determinations are based upon the preponderance of the evidence after review of all evidence and arguments received:

28. Regarding the charges contained in Hartley's Request paragraphs 18 through 35, specifically that "Honda's sales standard is unreasonable, arbitrary, and unfair in light of Hartley's historical sales performance, the current economic state of the United States in general and Hartley's area of statistical analysis in particular", I find that charge to be unsubstantiated. Sales performance is clearly a reasonable and material element of the dealership agreement, and under any reasonable measure, Hartley's performance has been substandard.

29. After considering all expert testimony as well as the evidence in its entirety, I find that Hartley's sales performance requirements were reasonable. Additionally, I find that there exists a material breach by Hartley of an essential provision of the Agreement that Hartley did not cure within a reasonable time after written notice of the breach had been received by Hartley from American Honda.

30. Hartley argued that American Honda's sales goals were patently unreasonable, arbitrary, and unfair. This argument is without merit. I find that American Honda did have

-9-

the contractual right to adopt the retail sales effectiveness ("RSE") standard under Section 12.2 of the Dealer Agreement. Although not a perfect system, I find sales effectiveness standards similar to this RSE to be utilized by most manufactures, including American Honda's principal competitors, Toyota and Nissan.

31. Regarding the charges contained in Request paragraphs 36 – 41, specifically that Honda violated its Agreement with Hartley by "Honda's failure to provide Hartley with Honda Products in a fair and reasonable manner, and then interfering with its efforts to obtain a more desirable inventory mix that would increase its sales numbers, contributed to the situation that Honda now uses as justification for terminating the contract", I find this charge to be without merit. Hartley did offer some evidence regarding Honda's failure to provide Hartley with Hartley's preferred amount and type of Honda product. However, American Honda detailed their system of product distribution which was based upon numerous factors. To say that Honda's system for product distribution to individual dealers was unfair, simply because this system did not meet with Hartley's approval, is a false conclusion. Hartley's preference of amount and type of product provided, and failure of American Honda to adhere to this preference, in and of itself, is neither unfair nor unreasonable. American Honda did not violate its Dealer Agreement with Hartley, nor did it violate any provision of the Act, with respect to matters related to the supply and allocation of Honda motor vehicle inventory to Hartley.

32. Regarding the charges contained in Request paragraphs 42 – 45, specifically that "Honda is estopped from terminating Hartley because of the representations its employees made to Hartley", I find this claim to be without merit. Hartley did offer some evidence regarding Honda's zone manager downplaying the importance of Hartley's poor DSPS report card, but even if this evidence is given full credence, this does not justify Hartley's failure to take reasonable steps to improve its RSE. As such, American Honda is not stopped from

-10-

terminating Hartley due to any representations allegedly made or implied by American Honda's representatives.

33. As such, based on the record, I find that American Honda acted in good faith and had good cause for issuing a Notice of Termination of the Hartley Dealership Agreement under New York State Vehicle and Traffic Law Article 17-A, Franchised Motor Vehicle Dealer Act. I find that American Honda has met its burden of proof under New York State Vehicle and Traffic Law Section 463 (2) (e) (2). Further, I find that Hartley's claims under New York State Vehicle and Traffic Law Article 17-A, Franchised Motor Vehicle Dealer Act, are without merit and accordingly denied and dismissed, with prejudice.

Dated: November 1, 2011

Paul V. Crapsi, Jr.
Administrative Law Judge

ADMINISTRATIVE APPEALS BOARD

DECISION OF APPEAL

RE:  Hartley Buick GMC Truck, Inc.
d/b/a Hartley Honda
1505 Washington Street
Jamestown, NY 14701
Case #FMD 2010-05
Franchise Dealer

Docket #28447
Agenda Date:      February 28, 2012

Pursuant to Vehicle and Traffic Law Section 471-a, appellant filed a Request for Adjudicatory Proceeding with the Department, seeking review of a September 17, 2010 Notice of Termination issued by American Honda Motor Co., Inc. (American Honda).  Pursuant to Article 17-A of the Vehicle and Traffic Law (VTL) and after a hearing, an Administrative Law Judge found that American Honda acted in good faith and had good cause for issuing the Notice of Termination of appellant's Honda Automobile Dealership Sales and Service Agreement (Dealer Agreement).

A transcript was submitted for review.  The proposed termination was stayed.

## APPEAL ARGUMENTS

1.    American Honda failed to meet its burden of proof in this action.

2.    The Notice of Termination should have been set aside on the ground of equitable estoppel.    The appellant relied on American Honda's assurance that its dealership was not in danger of termination for failing to meet American Honda's Retail Sales Effectiveness (RSE) goals.

3.    (A)  The American Honda RSE used as justification to terminate the agreement was not fair or reasonable.

3.    (B)  The RSE was used as a pretext to terminate Hartley.  It is clear that American Honda's real motive is its dissatisfaction with Hartley's higher-than-average resell price and profit.

## TESTIMONY/EVIDENCE

The National Manager of Market Planning for American Honda testified that American Honda is the sales and distribution arm for Honda automobiles

Hartley Buick GMC Truck, Inc.        -2-

in the United States. (Tr. 33) All sales are made through franchise dealers. No sales are made directly to the public. (Tr. 33-34)  American Honda's closest competitors are Toyota and Nissan, with Hyundai and Kia growing quickly.    American Honda entered into a standard sales and service agreement (Dealer Agreement) with its dealers and with appellant. (Tr. 36-37)  Paragraph 12.1 of this Dealer Agreement provides that, "dealers shall provide sales and service of Honda products within the dealer's area of statistical analysis at levels as reasonably determined by American Honda." (Exhibit 1; Tr. 37-38)  An area of statistical analysis (ASA) is a geographic territory around a dealership where the dealer should have a sales advantage.    The ASA is created by combining census tracts (geographic regions with a population of approximately 4,000 people). (Tr. 38)  Census tracts are generally assigned to the ASA of the closest dealer unless another dealer appears to have a significant advantage based upon prior customer behavior.    (Tr. 39, 47)  A single-point dealer like appellant will typically control more of the sales in their ASA than a metropolitan area dealer, because there are no in-brand competitors in close geographic proximity. (Tr. 48)

     The National Manager of Market Planning further testified that paragraph 12.2 of the Dealer Agreement provides, "Dealer's performance of its sales and/or service obligations for Honda products will be evaluated by American Honda on the basis of such policies and procedures containing such reasonable criteria as American Honda may develop from time to time. Such criteria may include, but are not limited to, such reasonable sales and/or service objectives as American Honda may establish, as well as a comparison of Dealer's retail sales and/or service performance with reasonable groupings of other authorized dealers of Honda products." (Tr. 49-50)  Honda has created a retail sales effectiveness (RSE) policy to evaluate dealers.  This policy sets a sales goal for the number of vehicles a dealer should sell.   This policy is based upon the number of actual Hondas registered in an area, compared to the number of competition set registrations (registrations of all vehicles made by both Honda and any of its competitors with similar vehicle models). The dealer's RSE is a multiplication of the statewide average by the competition set registration in the dealer's ASA. Because the number is based on a percentage of actual registrations, it is not affected by population or economy decline. (Tr. 50-55)  Beginning in December 2007, dealers received a monthly performance summary. (Tr. 65) From December 2007 until the issuance of the Termination Notice in 2010, appellant was consistently 70 to 80 percent below the sales goal, making it the worst performing dealer in the State. (Tr. 70-71, 117)  In fact, appellant only accounted for approximately 40 percent of the new

Hartley Buick GMC Truck, Inc.     -3-

Hondas registered in its own ASA.  The rest were purchased from dealers outside the ASA.   Even compared to the Pennsylvania State average (a portion of the appellant's ASA is in Pennsylvania), the appellant was still the worst dealer in both states.  (Tr. 127)  Based upon the poor performance, the appellant was sent quarterly cautionary letters beginning in March 2008, advising that Honda make take further action if the performance did not improve.  (Tr. 75)  Many dealerships have received such cautionary letters and avoided termination by restructuring sales staff, hiring new management, increasing advertising, etc.  The appellant took no significant action to improve sales.  (Tr. 79)

American Honda's District Sales Manager for Western and Central New York testified that she assumed the position in January 2008.  During her time in the position, no one ever advised appellant not to take retail sales effectiveness seriously.  (Tr. 146)  The witness routinely met with appellant's representatives, dealing primarily with Bill Hartley or Marvin Hartley.   (Tr. 145)   In 2008, the witness advised the appellant that its performance was in the bottom of the State.   (Tr. 146)   During the meetings, the appellant raised issues concerning obtaining more inventory and the makeup of the ASA. (Tr. 151; 177)  With respect to obtaining more vehicles, the witness advised the appellant that vehicles are allotted based upon a "turn and earn" policy applied to every dealer across the country, so the best way to obtain more vehicles was to improve sales of existing inventory.  (Tr. 151)  The witness also advised appellant of a trade system to obtain other vehicles.  The appellant never used the system and, in fact, never attended training for it.  (Tr. 152, 154)  With respect to the ASA concern, appellant was advised that a letter must be sent to Honda identifying the particular census tracks in dispute and the reason they were not appropriately assigned.  (Tr. 177)  The appellant did send a letter, but it did not clearly identify the tracks at issue or provide any supporting data for why they were not appropriately assigned.  (Tr. 179)

The District Sales Manager further testified that appellant was not taking proper actions to increase sales.  The average Honda dealership has six to seven Honda trained salespeople.  Appellant had only one.  The next lowest in the State had four.   (Tr. 157-158)   No representative of the appellant attended sales training for vehicle leasing.  (Tr. 160)  From 2008 until the Termination Notice, no representative for the appellant had attended any zone or national training meetings.   No other dealer in the witness's district had failed to attend these meetings.  (Tr. 165)  The witness suggested that appellant increase the pursuit of Internet leads, but appellant did not think it would be a growth area.  (Tr. 161)

Hartley Buick GMC Truck, Inc.      -4-

The District Sales Manager further testified that the Zone Manager met with appellant in 2009 to advise appellant that it would be receiving a notice of default. (Tr. 168)  Appellant would be given from January until June of 2010 to improve sales.  Appellant was also told to submit a marketing plan to the zone, so the zone could help improve sales.  Such a plan might also allow appellant to receive additional discretionary vehicles usually allotted for new dealers. (Tr. 171-173)  Appellant did not submit a plan.  Sales did not improve.    In September 2010, the appellant was given a Notice of Termination. (Tr. 184)

The Vice President of Expert Services for Urban Science Application testified on behalf of American Honda.   The witness utilized math and statistics to advise the automotive industry regarding where dealers should be located and how to best capture opportunities for new car sales. (Tr. 224-225)   Urban Science consults with every manufacturer and distributor of automobiles in the United States. (Tr. 227)  The witness has been conducting dealer network analysis and evaluating dealer sales performance for 20 years. (Tr. 234)  The witness was asked by Honda to assess whether appellant was effectively selling vehicles and whether Honda's conclusion that appellant was not adequately selling, was reasonable.  The witness was also asked to determine if something beyond the appellant's control could be causing the poor performance. (Tr. 244) The analytic process is as follows:  (1) identify the appropriate geographic area for analysis, (2) identify the expected market share standard, and (3) measure how appellant performs to the market share standard, looking for likely causes for underperformance.   The witness uses a registration effectiveness method involving vehicle registration and census data.   This type of data is objective and does not need to be estimated.   The data analyzed included:   vehicle registration statistics for each manufacturer, retail delivery records, sales information, demographic data, road network in the geographic area, and the location of other new vehicle dealerships. (Tr. 242)

The witness testified that appellant has the Jamestown, New York ASA, established by Honda.  (Tr. 250)  Customers generally want to shop at the nearest location and so, throughout the country, there is a highly correlated relationship between the number of competitive group registrations in the ASA and the number of sales a dealer makes in its ASA.   (Tr. 254) Generally, the only appropriate way to remove a portion of an ASA is to add representation (i.e., another Honda dealer), who would then compete directly with appellant in the remaining ASA. (Tr. 267)  With respect to the

geographic size of the ASA, the witness analyzed State and zone data and found the geographic size of an ASA does not normally hinder sales. (Tr. 310)  The witness ran mathematical models to revise the appellant's ASA by air distance, drive distance, and drive time.  In every instance, the appellant remained a below average dealer.  (Tr. 315)  Appellant even won sales in census tracks in Pennsylvania, indicating that the inclusion of some Pennsylvania tracks in appellant's ASA was not a prohibition to sales. (Tr. 318)  The witness's conclusion was that "it does not appear to be a misaligned or inappropriately defined ASA."  (Tr. 315)

The witness also testified that he analyzed the appellant's expected dealer sales as determined by Honda's average market share in the State of New York.  (Tr. 268)  The data analyzed only compared sales to comparable competitor vehicles and included lease vehicles.  (Tr. 268, 271-280)  The witness looked at data from 2007 to 2010 and found that through the period analyzed, appellant was "78 percent" below average "and then through the first six months of 2010, it actually declined . . . to a negative 82" percent below average.  "Essentially they've been last (in the State) . . . for the whole three and a half year period."  (Tr. 283-284)  During the same time, the Honda brand was achieving 40 percent of the Statewide average in the appellant's ASA, showing that the dealer was rejected more often than the brand.  The witness concluded, "it's poorly performing on an absolute basis, losing essentially a thousand units of Hondas a year.  And it's also very poorly performing on a relative basis to the dealers within the State of New York, indicating again, at least at this point, that Honda's decision that this was a poor performing dealer and is poor performing at a level that warrants termination appears reasonable."  (Tr. 295)

The witness also analyzed the economic conditions in the ASA. "There's nothing that's shown through this demographic information that would indicate this being a bad market for Honda sales."  (Tr. 332)  Rather, appellant is outsold by other Honda dealers within its own ASA, indicating that appellant is a weak intra-brand competitor."  (Tr. 344)  The witness found appellant averaged $1,619 in gross profit per vehicle, which is $400 higher than the district average.  "This is an indicator of a dealer not willing to perhaps . . . consider less profit at the sake of making a sale, or maybe the reputation . . . you can get a better deal at another Honda dealer." Appellant also spent $250 per vehicle less than the average on advertising. Appellant did not have adequate sales staff to capture available opportunities.   Taken together, these establish "a pattern that indicates operational deficiencies that are under the control of the dealership and not caused by the market or other factors."  (Tr. 354)

Hartley Buick GMC Truck, Inc.      -6-

The witness ran models for the zone; New York State; New York State excluding New York City, Long Island, and Westchester; removing all domestic lines from analysis, and using a reduced ASA size advocated by the appellant. In every case, the appellant was the worst performer. (Tr. 502-539)

A Certified Public Accountant testified on behalf of American Honda that he analyzed appellant's monthly financial statements against averages for dealers in the district and zone. (Tr. 558-561) He found that over a 42-month period from 2007 until 2010, the appellant consistently sold 20 to 30 vehicles per month, with a slight down-sloping over the 42 months. (Tr. 570) Appellant's inventory was consistently between 50 and 60 units. (Tr. 571) The witness found that "Hartley is almost always, across the 42-month period, including very importantly in that late '09 and during the cure period into the first six months of 2010, selling its product . . . by 5 and 10 percent lower (sales pace) than the average dealer." (Tr. 591) Appellant was also consistently charging more for vehicles than the average dealer. "The consistency of the pricing is very indicative of the consistency of the slower sales pace and the less effective management of the inventory. (Tr. 610) The appellant consistently paid its sales force less per unit than the district and zone average. (Tr. 611) The district and zone averages for advertising spending were consistently 2.5 to 3 times that of the appellant. (Tr. 615) "It's showing me a consistent management philosophy . . . of higher prices and lower expenses . . . at some extreme or some point, that becomes disadvantageous rather than advantageous." (Tr. 615-616) The witness concluded that "they had the inventory, they had the opportunity, they had the flexibility and margin to spend more in advertising, spend more in compensation, to perhaps lower their prices to make more deals with customers, and they haven't balanced that." (Tr. 616)

The appellant's General Manager testified that the appellant started receiving sales performance summaries in December 2006. He spoke with the Zone Manager at the time. "The substance of the conversation was that I didn't like being labeled as 70 percent deficient in my sales. He told me, 'Don't worry about that, every dealer gets one of these summaries whether they're deficient or not. The numbers are based or calculated out of the big metropolitan areas. They do not necessarily reflect your sales performance or really accurate in terms of your sales performance.'" (Tr. 720) When the District Manager brought up sales performance, appellant told her he did not believe in the report, and neither did the Zone Manager. The District Manager brought up the subject on every subsequent visit. "My address to

Hartley Buick GMC Truck, Inc.      -7-

her was, you know, I don't think I'm getting enough cars; I'm going to go out and try to buy some more cars. We'll pursue heavier advertising." (Tr. 723) The appellant attempted to acquire cars. "There weren't really any cars to buy." The witness also told the District Manager that the ASA was not realistic. A substantial portion is in Pennsylvania and it has far reaching areas along back country roads. (Tr. 728) In January 2009, the appellant sent a letter to Honda requesting a review of the ASA. "They told me that I wrote the letter incorrectly, that I did not use census track information and apparently they weren't concerned with the letter." (Tr. 732) The appellant's ASA was not modified. (Tr. 733) The appellant did not take additional action to improve sales "because this situation just continued to have no response from Honda. They – they didn't want to talk about looking at the ASA. They – they basically went mute on this whole issue other than handing me a sales deficiency report every month." (Tr. 737) The appellant's representative felt that appellant was not getting cars to sell. "We don't have the proper model mix a lot of times. Honda has some slow-moving vehicles. Honda has some fast-moving vehicles. It's been an ongoing issue with a lot of Honda dealers about having a proper and timely model mix." (Tr. 740) The witness also testified that appellant has "the best compensation plan in the area." (Tr. 748)

An expert in calculating dealer performance (Tr. 817) testified on behalf of the appellant that because of varying population density, New York State was an incorrect standard for evaluation. (Tr. 825) Rather, the witness created a Western New York standard consisting of the area west of Oswego, Oneida, Madison, Chenango, and Broome Counties. (Tr. 826) The witness also determined that the appellant has the geographically largest ASA in Western New York, with outer distances of 62 air miles or 93 road miles. (Tr. 831) "In my experience I have not run into a situation where a dealer . . . was expected to bring in customers from distances of 60 or 90 miles." (Tr. 832) The average ASA has a radius of 16 miles. (Tr. 839) The witness then calculated a sales effectiveness goal using the Western New York State standard and an ASA of 16 mile radius from the facility, and found that the appellant's sales were consistently at or about this standard. (Tr. 839-844) The witness concluded that no Honda dealer could serve the assigned territory effectively. (Tr. 844)

In rebuttal, American Honda called the Zone Manager from 2006 through 2009, who testified that he never told the appellant not to worry about the sales deficiency notices. The witness advised the appellant, "I would like to see consistent improvement." (Tr. 875-876)

Hartley Buick GMC Truck, Inc.      -8-

## DISCUSSION

The appellant commenced this matter by filing a Request for Adjudicatory Proceeding pursuant to Article 17-A of the Vehicle and Traffic Law, challenging a Notice of Termination of its Honda franchise dated 9/17/10.  Pursuant to VTL Section 463(2)(e)(2), the issues to be determined in such Adjudicatory Proceedings are "whether the franchisor's notice of termination was issued with due cause and in good faith.  The burden of proof shall be upon the franchisor to prove that due cause and good faith exist.  The franchisor shall also have the burden of proving that all portions of its current or proposed sales and service requirements for the protesting franchise motor vehicle dealer are reasonable."   The Administrative Law Judge found that American Honda acted in good faith and had good cause for issuing a Notice of Termination of the appellant's Dealership Agreement and that American Honda had met its burden of proof.  A review of the record establishes there was sufficient evidence to support the findings.

The evidence established that appellant entered into a standard sales and service agreement with American Honda (Dealer Agreement) which states that "dealers shall provide sales and service of Honda products within the dealer's area of statistical analysis at levels as reasonably determined by American Honda."  (See, Exhibit 1, paragraph 12.1)  The Dealer Agreement further provides that "dealer's performance of its sales and/or service obligations for Honda products will be evaluated by American Honda on the basis of such policies and procedures containing such reasonable criteria as American Honda may develop from time to time."    (See, Exhibit 1, paragraph 12.2)  Pursuant to these provisions, American Honda created a retail sales effectiveness policy (RSE) to evaluate dealer sales performance.  This policy utilized objective data, including actual vehicle registration data, and geographic tracks established by the United States Census Bureau, to compare the appellant's sales to the statewide average and to project expected sales for the appellant within its area of statistical analysis (ASA).  This same policy is applied to all Honda dealers across the country.

Beginning in December 2007, dealers received a monthly performance summary.    From December 2007 until the issuance of the Termination Notice in September 2010, appellant was consistently 70 to 80 percent below its sales goal, making it the worst performing dealer in the State.  In 2009, the appellant was issued a notice of default.  The appellant was given from January until June 2010 to improve sales.  The sales did not improve, and so in September 2010, the appellant was issued a Notice of Termination.

Hartley Buick GMC Truck, Inc.     -9-

Throughout the proceeding, the appellant maintained that the poor sales performance was due to factors outside its control.   The appellant contended that the assigned area of statistical analysis, and the use of a New York State average in calculating the RSE were not appropriate.   The evidence, however, established that even when the data was analyzed to control for these factors, the appellant was still the worst performer in the State.     (See, Tr. 502-539)     Rather, the evidence suggested that the appellant's management philosophy led to the poor sales performance.  The appellant consistently sold its vehicles to consumers at a higher price than other Honda dealers.   It spent substantially less on advertising and sales staff than other Honda dealers.   No representatives of the appellant attended the Honda training for vehicle leasing.     From 2008 until the Notice of Termination was issued, no representative for the appellant had attended any zone or national training meetings.   No other dealer in the appellant's district had failed to attend these meetings.

The appellant's contention of equitable estoppel is also unpersuasive. The American Honda Zone Manager denied ever advising the appellant that its  RSE  performance  was  not  important.     Even  so,  the  appellant acknowledged that beginning in 2008, the District Manager brought up the appellant's poor sales at every monthly meeting.  Given the circumstances, no reasonable person could believe the RSE performance statistics were something to be ignored.

Given all of the foregoing, there was sufficient evidence to support the findings of the Administrative Law Judge.   To the extent that testimony or other evidence presented by the appellant differed from that of American Honda, a question of credibility was raised.   The Administrative Law Judge who saw and heard the witnesses was in the best position to determine credibility, and there is no reason to disturb the assessment of credibility in this case.   (Matter of Berenhaus v Ward, 70 NY2d 436; Matter of Liuzzo v State of New York DMV Appeals Board, 209 AD2d 618; Segal v McDaniel Ford, Inc., 201 AD2d 717; Matter of Morina v Passidomo, 109  AD2d 783)

DECISION

The determination appealed is affirmed.  The original decision remains. Vacate the stay previously issued pending appeal.

cch

Hartley Buick GMC Truck, Inc.       -10-

DECISION

The determination appealed is affirmed.  The original decision remains.
Vacate the stay previously issued pending appeal.

BY THE BOARD

I Concur                                            I Dissent

_____                _____

_____                _____

_____                _____

DATED:       February 28, 2012