# **<u>TAB 3</u>**

Before the
N.H. Motor Vehicle Industry Board
Concord, N.H. 03305

In the Matter of:

Lakes Subaru, Ltd.                                    Docket No. 0080
(Non-Renewal)

DECISION AND ORDER

By: Julia Brown, *Chairperson*; Archie Burnett, Robert Copeland, William
Fenollosa, and Frank Yanco, *Board Members.*
Not participating: Kenneth Cox and  Walter McCarthy, Board Members.
Appearances: Gregory Holmes, Esq., Robert  McNamara, Esq., and Stephanie
Bray, Esq., for Lakes Subaru, Ltd.
Howard M. Cooper, Esq., Kathleen M. Genova, Esq, Michael C. Harvell, Esq.,
and James F. Ogorchock, Esq. for Subaru of New England

Procedural History

This proceeding began on February 4, 1999 when Lakes Subaru, Ltd.

("Lakes") filed a protest with the New Hampshire Motor Vehicle Industry Board

("Board") pursuant to RSA 357-C: 3, I; III (c); III (n); and  RSA 357-C: 7.

Lakes alleged that, Subaru of New England, Inc. ("SNE") was refusing to renew

its dealer agreement without good cause.  The filing of the complaint resulted in

an automatic stay of the non-renewal pursuant to RSA 357-C:7, I (d) (1).

SNE responded to the protest by contesting the Boards jurisdiction.  SNE

contends it is a "distributor" and not subject to RSA 357-C:7, because that statute

does not cover  "non-renewals"  by a distributor.  SNE further argues that the

Board has no jurisdiction because the Dealership Agreement predated the

adoption of RSA 357-C:7 and the 1996 amendments to RSA 357-C are unconstitutional.

Shortly before the protest was filed, SNE petitioned the United States District Court for the District of Massachusetts to declare that the Board lacked jurisdiction over its dispute with Lakes.  Subaru of New England Inc. v. Lakes Subaru, Ltd. Civil no. 99-10175. The Massachusetts court dismissed the complaint.  Memorandum and order dated April 26, 1999.

SNE then filed a petition, in New Hampshire Merrimack County Superior Court for Declaratory and Injunctive Relief. Subaru of New England, Inc. v. Richard M. Flynn et al, Docket No. 99-E-0164. The initial request, for a preliminary injunction to enjoin the Board from exercising jurisdiction was denied. Id. Order dated April 23, 1999.  The Superior Court subsequently dismissed SNE's petition on July 29, 1999 after ruling that RSA 357-C contemplates the Board be given the opportunity to address SNE's arguments in the first instance. [1]

Pre-hearing conferences were conducted by the Board on March 18, 1999 and April 30, 1999.  At the second conference the parties were given the

---

[1]  In granting the motion to dismiss, the court reasoned that,:

> The Petitioner (SNE) has failed to demonstrate that
> exceptional circumstances exist which justify a departure from
> the basic policy of  postponing judicial review until after an
> administrative agency enters a final judgment.  In this case, as
> a matter of  judicial economy and in order to utilize the Board's
> administrative expertise, it is more appropriate for the Board to
> issue a final order as the instant dispute is within specialized
> knowledge of the Board and the Board circumstances exist
> which justify a departure from the basic policy of postponing is
> the statutory agency responsible for enforcing RSA 357-C.

opportunity to argue jurisdictional issues and they elected to waive argument on the discovery matters and represented that they would fully cooperate with each other's pending requests.

The Board's May 10, 1999 Pre-Hearing Order made a preliminary ruling that it had jurisdiction to hear the protest, set dates for the submission of exhibits and witness lists and scheduled the evidentiary hearing for August 10, 1999. The parties were specifically directed to address the factual issue of whether SNE is controlled by Fuji or is an assembler within the meaning of RSA 357-C:1 for the purpose of a non-renewal dispute.

SNE appealed the Board's May 10, 1999 jurisdictional ruling to the Merrimack County Superior Court pursuant to RSA 357-C:12, VII. Subaru of New England, Inc. v. Richard M. Flynn, et al Docket No. 99-E-0278.[2]

The parties failed to cooperate with each other in discovery matters, which resulted in the filing of voluminous and repetitive motions pertaining to discovery. Parties also requested a continuance of the evidentiary hearing which was granted, resulting in again directing the parties to accommodate each others discovery requests and a new hearing was set for November 1, 1999.

The evidentiary hearing was held on November 1, 1999, November 2, 1999, November 29, 1999, November 30, 1999 and December 10, 1999 before a quorum of the Board at which both parties appeared with counsel. The parties presented documentary and testamentary evidence, as well as legal argument.

Testimony was received from the following witnesses: Henry J. Burbank, SNE Vice President Market Development,  Spiro Karathanasis, former Lakes Sales Manager,  Phillip J. Lustbader,  SNE Vice President of Operations and Dealer Relations, Joseph F. Roesner,  the Fontana Group, Inc. market analysis expert , John Frith,  Urban Science Applications market analysis expert,  Alan W. Silberberg Lakes owner,  Barry Brooks, Lakes employee.

The following Exhibits were admitted into evidence SNE: A-VVV excluding OOO, LLL and RRR;   Deposition Alan W. Silberberg and SNE Affidavits (1-14) have been designated as exhibits WWW and XXX.  Lakes: 1-28, the Lakes Opening Statement Summary, the Deposition of Ernest Boch with attachments 1-9, the Deposition of Henry Burbank with attachments 1-10, and the Report of Joseph F. Roesner have been designated as exhibits 29-32.

<u>Background Information</u>

<u>Description of the Parties:</u> Lakes is a New Hampshire corporation, owned entirely by Alan W. Silberberg ("Silberberg") and his wife, Valerie L. Silberberg. Silberberg is the controlling owner with a 90% beneficial interest.

SNE is a corporation owned entirely by Ernest Boch. SNE contracts with Subaru of America ('SOA") to distribute Subaru motor vehicles, manufactured by Fuji Heavy Industries, Ltd. ("Fuji"), in the six New England States.

<u>Position of  SNE:</u>  SNE alleges that it has good cause for not renewing the Lake's Dealership Agreement, because of poor performance and because Lakes failed to use it's "best efforts" to promote and sell Subaru products, despite

---

2  The merits hearing is currently scheduled to be heard in the Merrimack County

being given notice, and a reasonable opportunity to cure it's poor performance. In particular, SNE alleges that Lakes is losing too many sales to Subaru dealer's outside Lakes' Area of Responsibility ("AOR") and to other competitive make dealers.  SNE argues that the Dealership Agreement and correspondence with the dealer clearly indicated that Lakes would be judged, on its own performance, as well as on new Subaru vehicles registered in the AOR as a percentage of the "competitive set."

Position of Lakes: Lakes contends it has met SNE's performance standard and believes nonrenewal is unfair.  Lakes argues that the written performance standard is ambiguous and that SNE's construction of the language creates an unreasonable standard.  Under Lakes interpretation of the Dealership Agreement performance is to be measured by total Subaru registrations in the AOR as a percent of total retail competition registrations and under this standard of performance Lakes is above the state average when compared to other dealers. Lakes also argues the Laconia market has special characteristics which make comparisons with other markets unfair.  Finally, Lakes contends better performance is not possible because SNE does not allocate enough vehicles to Lakes and the vehicles it does get are difficult to sell because of already installed unwanted accessories which it was pressured to purchase and because a high percentage are white in color.

Findings of Facts

The parties have filed Proposed Findings of Facts and Rulings of Law. The Board has ruled on each of these requests in the appendix attached to this

Superior Court on May 9, 2000.

decision and order.  To the extent that there may be any inconsistencies between those findings and rulings and the following, the latter are intended to be controlling.[3]

Fuji manufacturers Subaru vehicles in Japan.

SOA is a wholly owned subsidiary of Fuji which imports Subaru vehicles to the United States.  Fuji requires SOA to import Subaru vehicles, parts and accessories to the United States and to establish a dealer network which will assure profitable penetration of the American retail market with Subaru products.

To accomplish market penetration in the six New England states (the New England Region"), SOA entered into a contract with SNE on January 14, 1971, which appointed SNE as the exclusive New England wholesale distributor, ("SOA/SNE Agreement").  Under this agreement, SNE appoints new Subaru dealers, renews contracts and monitors dealer performance within the region, subject to the terms and conditions of the agreement.

The New England Region is one of only  two regions in the United States in which SOA does not directly contract with individual dealers. The other region is the New York/New Jersey Region, in which SOA has contracted with Subaru Distributors Corporation ("SDC") to perform distribution functions.  These two regions are referred to by SOA as " Independent Regions".  SOA sells the Subaru product in all other areas of the United States without the use of a "go between" distributor.

---

[3] Rulings on proposed Findings of Facts and Rulings of Law are attached as an appendix.  Board received Supplemental Submissions dated January 7, 2000 from SNE.  "Motion to Strike Supplement Post Trial Materials" dated January 18, 2000 was

Toyota is the only other importer besides Subaru that contracts with an independent corporation to perform regional distribution services.  Toyota has one distributor in a southern area of the United States.  In all other parts of the country Toyotas are sold by a wholly owned subsidiary of the manufacturer. Independent regional distribution agreements are an oddity and not the norm in the industry.

There are no common owners, managers or employees between SNE on the one hand and either SOA or Fuji, on the other.  Any control is created by the 1971 SOA/SNE agreement.

SNE does not act as a general agent for SOA or Fuji, but does act as a special agent in that it is required to accomplish the promotion and sale of the Subaru product in accordance with SOA specifications.  In this sense, Lakes is also a special agent for SOA and Fuji for the same purposes pursuant to the Dealership Agreement between Lakes and SNE.

SNE has established approximately 56 retail dealers in the New England Region.  Of the 56 retail dealers, currently,  12 are New Hampshire retail dealers. Lakes became one of these dealers on April 1, 1995 by entering into a 3 year Dealership Agreement with SNE dated March 27, 1995.

Numerous terms and conditions in the SOA/SNE contract and in the SNE/Lakes Dealership Agreement give Fuji/SOA the right to control, direct and influence both SNE and Lakes in the operation of their businesses, even though SNE and Lakes both are in business on their own behalf and for their own profit.

_____

filed by Lakes.  Objection dated January 18, 2000 filed by SNE .  Reply to Objection dated January 24, 2000 filed by Lakes.

The SOA/SNE Agreement requires SNE to:

> Conduct its business in a manner that promotes the reputation of Fuji, SOA and Subaru products; use business forms conforming to SOA directives ; adhere to SOA and Fuji's restrictions regarding use of the trademark; participate in exhibitions, rallies, fairs, etc. as directed by SOA and furnish a written report; use best efforts to promote the product through advertising contracts between SNE and the retail dealer ; submit written documentation to SOA to prove that a particular retail dealer is not failing to satisfy requirements of SOA; use it's best efforts to correct a dealers failure; satisfy minimum inventory requirements established by SOA; sell only parts supplied or approved by SOA; not change the corporate ownership without written consent of SOA and may not transfer the SOA agreement without consent; follow warranty procedures establish by SOA; make available records and accounts for SOA inspection; prepare monthly reports regarding sales and stock of products for SOA.

The SOA/SNE Agreement contains a lengthy appendix entitled

"Dealership Agreement and Standard Provisions" which imposes SOA policies

and directives upon Lakes. These directives include:

> Safeguarding and promoting the reputation of Subaru products and of Fuji, SOA, SNE and other Subaru distributors and dealers; to comply with Subaru Dealership National Minimum Standards; to not change location of dealership without permission of SNE and SOA; adhering to restrictions regarding the use of the Subaru "Marks" and allow SOA and SNE representatives to inspect the place of business to assure merchandising and inventory protects the goodwill associated with the Marks; restricting the sale of any parts or accessories that SNE or SOA does not approve of; incorporating SOA warranty terms into all sales; and permitting persons acting for SOA to have full right of examination and audit of dealers business records.

SNE sells accessorized Subaru vehicles to its dealers. Many of the

accessories or special equipment were not on the vehicles when SNE

purchased the vehicle from SOA.

SNE's district sales managers are encouraged with commission incentives

to sell accessorized vehicles to dealers.

SNE receives vehicles from SOA at the Port of Rhode Island. Transfer of title occurs immediately. Thereafter, SNE releases vehicles to North Atlantic Distributor's, Inc. ("NORAD"). NORAD is an independent company specializing in vehicle preparation and accessorization.

Boston Port Service, Inc. ("BPS") is a wholly owned affiliate of SNE. BPS contracts with NORAD for the "processing, handling, storage and preparation" of SNE's vehicles. NORAD moves SNE vehicles from the SOA discharge point and provides a safe haven storage facility. NORAD also does that which is necessary to prepare the vehicle for dealer showroom display, which includes installation of accessories.

Accessories installed on vehicles by NORAD include: leather upholstery; sound equipment; spoilers; alloy wheel package; roof racks; brush guards, stripes; carpet mats, side trim molding, mud flaps, wheel covers, wind deflectors, cruise control; moon roof deflector; keyless entry system; cup holder; trailer hitch. Installation occurs on vehicles that are dealer cars, which are vehicles a dealer gets in his allocation.

Accessories are installed on both categories of vehicles, dealer cars and discretionary vehicles. Dealer cars are those vehicles earned and allocated to the specific dealers. Discretionary vehicles are those retained by SNE which are used as executive cars, new dealer actions or are eventually given to a dealer under special circumstances as SNE deems equitable.

Under SNE's the Fair Share II Allocation System the number of vehicles withheld from the SNE's allocation of vehicles, for discretionary purposes is 15%

Legacy model; 10% Forester Model and 10% all other models.  On an average the percent of discretionary vehicles out of a total model mix  is approximately 13%.

Accessorization is performed on a large scale. SNE wholesales to dealers approximately 20,000  vehicles per year with a wholesale value of  installed accessories at approximately $550.00 per vehicle or $11,000,000.00 worth of accessories annually.  Of the number of  wholesale vehicles about 2,600 are discretionary. The wholesale value of accessories installed on these discretionary vehicles would total approximately $1,430,000.00 annually, although could be greater.  SNE, by its own admission, highly accessorizes discretionary vehicles especially when the auto industry is experiencing an upswing.

Since 1990, Silberberg has owned and operated a Jeep dealership on State Route 3 in Belmont, New Hampshire, which is adjacent to Lakes Subaru, Ltd. facility.  The Subaru dealership began operation in 1977 and was purchased in 1995 by Silberberg when it was known as "Coleman-Brough Subaru" and was an existing business known as Coleman-Brough.

Lakes AOR is known as the Laconia or Belmont area consisting of 34 zip code areas, including but not limited to, Laconia, Belmont, Plymouth, Bristol, Wolfeboro, Alton, Tilton, Center Harbour, Salisbury, etc.

GM, Chrysler, Ford, Toyota, Isuzu, Mitsubishi and Mazda among other motor vehicle manufacturers have established dealers serving the Laconia area.

Section 4 of the "Dealership Agreement " provides that Lakes: "assumes responsibility for the promotion, sale, and service of Subaru products within the AOR".

Section 8.1 of the "Dealership Agreement and Standards Provisions" requires Lakes, to "use its best efforts to aggressively, actively, and effectively promote the sale of Subaru Products".

Addendum 1, Section 1 of the "Dealership Agreement and Standard Provisions", establishes that the dealer shall be judged on its own sales performance and the factors considered in the process of evaluation shall include the criteria under 8.4.

Paragraph 8.4 Addendum 1 of the "Dealership Agreement and Standard Provisions" establishes that SNE expects Subaru penetration of the AOR. The language of the Addendum makes it clear that the Dealer (Lakes) shall achieve such penetration and, further, sales and registrations shall be considered in evaluating performance. "Subaru Registrations" as a percentage of "Total Competition Registrations" are compared to the average of all New Hampshire Subaru Dealers. This is a measure of overall Subaru penetration based on all registrations in the AOR whether the sale was made by the Lakes or by any other Subaru Dealer outside of the AOR. Registrations attained in the AOR by dealers outside the AOR are referred to as "pump-ins".

The last paragraph of Addendum 1 Section 1 of the "Dealership Agreement and Standard Provisions" requires SNE to notify the dealer of unacceptable performance and provides the dealer with a 180 day period to

improve. During the cure period the dealer must attain 80% of the state average of Subaru penetration of competitive make automobiles.

SNE has traditionally used the following measures of performance:

- Dealer Sales as a percent of Retail Competition Registrations in the AOR.
- Dealer Lost Sales.
- Subaru Registrations as a percent of Retail Competition Registrations in the AOR.
- Dealer Sales as a percent of Subaru Registrations in the AOR.
- Dealer Sales Ranking among NH Dealers.
- Dealer Sales as a percent of Subaru Sales in the AOR.

Lakes received letters describing the various methods used by SNE to determine performance including letters dated September 21, 1995 and January 7, 1998 which stated that Lakes would be judged on its own performance.

Over the years Lakes also received sales performance "feedback" in the form of statements about it's actual performance based on it's own sales and registrations percentages compared to other dealers in the state.

Lakes, prior to filing of the protest, did not dispute these various measures as being contrary to the Dealership Agreement.

Lakes knew it would be judged on its own sales and registration performance as well as on total Subaru Market Penetration.

SNE issued the "Letter of Poor Performance" on July 30, 1998. The 180 day cure period ran through January 31, 1999.

Relevant Lakes performance figures are as follows:

Lakes Sales/Retail Competition Registrations:

1. January through June 1995 – Lakes 6.0% (NH average 7.4%)

2. August 1998 – Lakes 3.64% (NH average 10.51%)

3. September 1998 – Lakes 2.87% (NH average 7.68%)

4. October  1998 – Lakes 2.85% (NH average 9.26%)

5. August 1, 1998 through January 31, 1999 Lakes 2.81% (NH average

    4.28%)

Lakes Lost Sales: Given the State average of Dealer Sales

AOR/Registrations Retail Competition:

1. January 1995 through June 1995, Lakes lost 16 sales to competition.

2. August 1, 1998 through January 31, 1999,  Lakes lost 18 vehicle sales

    to competition.

Subaru Registrations/Retail Competition Registrations AOR:

1. 1995 Lakes – 8.05% (NH average 6.34%).

2. 1996 Lakes – 7.46% (NH average 5.87%).

3. 1997 Lakes – 10.98% (NH average 8.02%).

4. January 1998 through August 1998 Lakes – 10.32% (NH average

    7.57%)

5. January 1999 through March 1999 Lakes – 10.44% (NH average

    8.07%)

Lakes Sales/Subaru Registrations AOR:

1. 1995: 70.41%

2. 1996: 75.12%

3.  1997: 67.02%

4.  January  1998 through May 1998: 56.25%

5.  August  (month) 1998: 38.10%

6.  September (month) 1998: 33.33%

7.  October (month) 1998: 26.09%

Lakes Sales rank in NH:

1.  1995 138 sales, 8th out of 10

2.  1996 157 sales, 11th out of 12

3.  1997 189 sales, 12th out of 12th

4.  January 1998 through August 1998 99 sales, 12th out of 12

5.  January 1999 through October 31, 1999 113 sales, 12th out of 12.

Lakes Sales/Total Subaru Sales AOR:  (Also called "Cross-Sell" a

measure of what percent of sales Lakes is making in its AOR as well as

what percent other Subaru dealers are selling into the AOR):

1.  1995: Lakes 49.48%

2.  1996: Lakes 49.75%

3.  1997: Lakes 39.30%

4.  January 1998 through June 1998: Lakes 35.8%

5.  January 1998 through October 1998: Lakes 34.83%

6.  August 1, 1998 through December 31, 1998: Lakes 30.10%

7.  August 1, 1998 through January 31, 1999: Lakes 27.90%

8.  January 1, 1999 through March 31, 1999: Lakes 16.9%

Lakes performance figures among other things indicates that Lakes experienced

the largest decrease of sales from 1997 to 1998 of all New Hampshire and New

England dealers. Lakes sold 54 less units in 1998 (135 sales) than it sold in

1997 (189 sales). Also most dealers achieve 40%-50% of the sales in their AOR,

Lakes is very much below these averages. SNE New England dealers generally

achieve above. The Subaru dealer located outside Lakes AOR with the greatest

percent of Lakes AOR registration is Reilly of Concord. Reilly's share of sales in

Lake's AOR is as follows:

1.  1995 – Reilly  15.10%

2.  1996 – Reilly  18.72%

3.  1997 -  Reilly  24.56%

4.  January  1998 through October 31, 1998 – Reilly 26.37%

5.  August 1, 1998 through January 31, 1999 – Reilly 25.6%

6.  January 1, 1999 through March 31, 1999 - Reilly  44.1%

Lakes had ten different sales managers between 1995 and the present.

After the July 31, 1998 letter of poor performance was issued, sales

manager Arthur Winston resigned because the pace at Lakes was too slow.

After August 15, 1998 and during the remaining cure period, Barry Brook

was sales manager. Barry Brook had no prior experience as a sales manager

and little knowledge of the Subaru line.

Lakes employed only one person as a salesperson during the cure period

although the Dealership Agreement required three at all times.

16

Silberberg typically devoted approximately 20 hours per week to his Subaru dealership and concentrated his efforts in his Jeep dealership.

Accessorized vehicles available to Lakes were not the cause of poor performance. Lakes moved its vehicles more slowly than other dealers. Lesser accessorized vehicles valued at $0-$500 sold slowly for Lakes in comparison to the rate at which other dealers turned over similar vehicles.

Lakes did not always follow-up on lost sales by inquiring why the buyer went to another dealership.

Lakes established salesperson commission payment plan usually resulted in only a $100.00 new vehicle sales commission. Sales commissions were significantly higher on used vehicles.

Lakes complained to SNE about difficulties in attracting "floor traffic." As early as 1995 SNE recommended different vehicle displays as a means of addressing this problem. In 1996 SNE suggested that Lakes vehicles not be displayed in a cluster and later proposed an outside front line display closer to the building. Lakes did not always comply with this suggestion.

In April of 1997 SNE advised Lakes that its place of business was messy and needed cleaning and painting. A February 8, 1999 Dealer Contact Report written by a SNE Dealer Representative again recommended the showroom be cleaned and the vehicles repositioned.

Lakes failed, after a recommendation by SNE, to display vehicles on a hill area which had been represented by Silberberg in the Dealership Agreement as a vehicle display area.

Lakes failed, after a recommendation by SNE, to continually clear overgrown weeds and brush from an area in front of the Subaru building which obscured the view of the Dealership to people passing by the dealership.

Lakes participated in the Subaru "Loyalty Program". Customers that purchased vehicles completed a survey about their experience at the dealership. Categories of the questionnaire are Professionalism, Stress, Convenience, Product Knowledge and Delivery. Lakes typically ranked low in New Hampshire and in the New England Region. Scores declined during the cure period.

Sales manager Spiro Karathanasis did increase Subaru sales during his employ March 1997-January 1998, but Silberberg turned the focus from new vehicle sales to used vehicle sales during the later part of Karathanasis employment.

Advertising spent per new vehicle sold decreased beginning in 1997 and continued to do so during the cure period. In 1995 & 1996 Lakes spent approximately 52% of it advertising on new vehicles. In 1997 that was reduced to 47%, in 1998 before the cure period it was down to 39.42% and in 1998 during the cure period it was 38.5%. Accordingly, during the cure period more advertising expense was allocated to used rather than new sales.

SNE tried to help Lakes perform by providing Lakes with a list of Subaru owners residing in the AOR, but who purchased their vehicles outside of the AOR. SNE suggested contact with these owners could result in future sales.

Lakes during the cure period complained that it had too many white vehicles. Lakes had 44%, but SNE itself received 40% of its allocation as white

vehicles. Lakes was not treated differently in this regard. Lakes made 9 documented swaps for white vehicles between October 1997 and October 1998.

Accessory sales were a SNE priority.

SNE Dealer Sales Representatives were instructed aggressively to sell accessories to all of it's Dealers.

SNE Sales Representatives received commissions for accessories they sold. Lakes never gave notice to SNE of any sales tactics as a violation of the Dealership Agreement until this protest was initiated.

Silberberg stated in regards to accessories that no one ever threatens him and he never reported or complained about unfair or unlawful practices by SNE representatives until the current protest. Lakes was not treated any differently from other Subaru dealers concerning the purchase of accessories from SNE. Lakes was entitled to refuse accessories. There is no evidence to support a finding that Silberberg was treated any differently than other dealers regarding SNE's efforts to merchandise accessories.

### Discussion and Conclusions

The Board reiterates the holding in its May 10, 1999 Order concerning the constitutionality of the 1996 amendments to RSA 357-C:7. When SNE extended the termination date of the agreement after the amendments to RSA 357-C:7 took effect, a novation occurred, therefore, no retrospective law issue is present. Nor does the Legislatures grant of quasi adjudicative authority to the Board violate the separation of powers requirements of the New Hampshire Constitution.

The Board also ruled that although RSA 357-C:7 I does not include the term "distributor", to exempt distributors from that statute in situations where no "manufacturer contracts directly with dealers" would be unfair especially since RSA 357-C:7, VI and VII expressly refer to "distributors." [4]

The evidence now before the Board reinforces its belief that the current protest is within the scope of RSA 357-C:7. Any interpretation of the statute which excluded SNE's conduct in the present situation would be absurd. Fuji has only two independent distributors in the United States, one is SNE which distributes in the New England area and SDC which distributes in the New York/New Jersey region. To exempt SNE from the requirements of RSA 357-C:7 would leave the 12 New Hampshire Subaru dealers, without the protections given to all other motor vehicle dealers under RSA 357-C:7. The Board concludes the legislature did not intend to create an exclusive exemption from RSA 357-C:7, I (d) for SNE.

RSA 357-C:1 II defines a "Manufacturer" as one " who assembles vehicles" or is" controlled" by the Manufacturer.[5] In this instance, SNE is both an assembler and controlled by the manufacturer.

As an assembler SNE installs prior to delivery to dealers, at least $11,000,000.00 of accessories annually on 20,000 vehicles. The accessories change the character of the vehicle, they always increase vehicle values, some accessories change appearance significantly, and others increase the usefulness

---

[4] These paragraphs of RSA 357-C:7 explain the remedies and party obligations in the event of a termination or nonrenewal.

or utility of the vehicle to the owner. Accessorizing transforms a raw product, a "stripped vehicle" to a finished product known as a "loaded or fully equipped vehicle" which is economically and functionally different from the initial product. Accessorizing is a means commonly used in the industry to create variations of a particular model that are marketed as different, new, or desirable.

SNE is controlled contractually by Fuji through Fuji's wholly owned subsidiary, SOA. The SOA/SNE agreement directs SNE to take actions that will assure that the public has a positive perception of Subaru. SNE must use certain Subaru forms, participate in different types of advertising, require dealers to submit certain information, help dealers, use the trademark with restrictions, file monthly reports, allow SOA inspections and do other things all to promote and sell the Subaru product. SNE acts on it's own behalf for profit but in so acting it is required meet business standards of Fuji/SOA. Failure to do so could result in the manufacturer terminating the relationship with SNE.

Fuji exercises the ultimate control over all matters relevant to the purpose of RSA 357-C:7. The Board concludes, therefore that SNE does meet the definition of Manufacturer under RSA 357-C:I for the purposes of RSA 357-C:7, I (d).

Sales performance is clearly a reasonable and material element of the dealership agreement, and under any reasonable measure, Lakes performance has been substandard.

---

[5]RSA 357-C:1 II. "Manufacturer" means any person who manufactures or assembles new motor vehicles or any partnership, firm, association, joint venture, corporation or trust which is controlled by the manufacturer.

In order to assure an effective network of dealers to successfully penetrate the New Hampshire market with Subaru vehicles, each dealer is required by the Dealership Agreement to generate interest and sell the Subaru product in the designated AOR, although free also to compete outside of the AOR.  SNE has single point AOR's of significant size which give the dealer a reasonable opportunity to operate a profitable business.  Although Lakes opined some of the sales performance clauses in the Dealership Agreement are confusing, the Board concludes that when the agreement is read as a whole it is apparent that  the Dealer (Lakes)  is responsible for selling sufficient vehicles to contribute significantly to Subaru penetration of it's AOR.  When evaluated by the criterion of Subaru Registrations as a percent of Retail Competition Registration the Laconia AOR is performing above the state dealer average, but the Dealer (Lakes) is not.  This criterion measures total brand penetration rather than actual dealers penetration because it includes pump-in vehicles registered in the Laconia AOR.  It is expected that other dealers will sell into the Laconia  AOR, but not to the degree it has occurred in Lakes case.  The Dealership Agreement expressly states that the dealer's sales shall be a factor in evaluating performance.  SNE reasonably and appropriately, given the unusually high number of pump-ins, examined additional areas of performance to evaluate Lakes actual performance. These included Lakes sales as a percent of total Subaru Dealer sales in the AOR, known as Cross Sell and Lakes sales as a percent of Total Competition Registrations in the AOR.

During the cure period of August 1, 1998 through January 31, 1999: Lakes sales percentage of Retail Competition Registrations in the AOR and Lakes sales as a percent of total Subaru dealer sales in the AOR continued to decrease. The NH dealer average of Lakes Sales/Retail Competition Registrations is 4.28% compared to Lakes 2.81% below the 80% average or cure requirement of 3.42%. The average NH dealer sales as a percent of total Subaru Sales in the AOR is 50.47% and is compared to Lakes attainment of 27.90% below the 80% average cure requirement of 40.37%.

It is noteworthy that during the cure period the Concord, New Hampshire dealer, Reilly was selling 25.6% of the Subarus in Lakes AOR. Reilly's share of Lakes AOR has become greater each year since 1995. Moreover Lakes ranked last in sales out of the 12 New Hampshire dealers during the cure period and its performance has generally been declining since inception of the dealership.

The requirement that a dealer during the cure period attain 80% of the New Hampshire average of these measures is a reasonable standard and reasonably attainable in this instance. A dealer is expected to sell vehicles in its own AOR and not rely on outside dealers to make sales which result in registrations.

A strong showing of individual dealer sales stimulates competition among AOR's which benefits all dealers, as well as the consumers and manufacturers. Competition stimulates more sales through increased public awareness of the product and increases the likelihood of continued existence and profit for each entity in the business chain.

The record reveals that Lakes failed in many ways to use it's "best efforts" to promote and sell the Subaru product and this significantly contributed the lack of sales. Silberberg's lack of attention to the dealership meant that he wasn't there to help train salespeople, to assure customers were treated courteously or to handle day to day business problems. Presence of the owner often builds customer confidence and loyalty. Lakes hired sales managers who lacked experience. In addition, commissions paid for selling new vehicles were lower than commissions paid for selling used vehicle, so the incentive to sell new vehicles was also low.

The generation of floor traffic requires that the dealership be appealing to the eye of the passer-by. Lakes apparently did not display vehicles attractively and the showroom was unclean. SNE suggested merchandising techniques that were inexpensive to draw attention. Lakes did not follow through with SNE suggestions. SNE wanted Lakes to try to display the four-wheel drive Subarus on a hill visible to passing by traffic, and cut and clear overgrown brush in front of the dealership. Lakes failed to employ the number of sales people under the Dealership Agreement, which meant there was a lack of follow-up resources available regarding potential customers. In contrast to Lakes Subaru facility Mr. Silberberg's adjacent Jeep dealership features an attractive building and well groomed outside lot.

SNE did try to help Lakes improve their sales by providing customer contact lists, an infusion of 40 additional vehicles over and above allocation immediately prior to the cure period, getting Lakes to participate in Cable TV

advertising, consummating trades with other dealers and making many merchandising suggestions.

If Lakes used its best efforts to promote and sell Subaru products, Lakes would have been reasonably able to cure its performance. In 1995, 1996, and in 1997 cross sell figures indicate Lakes was obtaining approximately 40% penetration of the total Subaru sales in the AOR. With aggressive "best efforts" Lakes should have been able to recover its share of the market.

SNE had actual knowledge of Lakes inability to perform as required by the Dealer Agreement not more than 180 days prior to the issuance of the 90 day Nonrenewal Notice dated January 29, 1999.

Lakes argued that the AOR was undesirable however the Board notes other competitive make manufacturers establish dealers in the AOR as did Chrysler with respect to Mr. Silberberg's Jeep Dealership.   As evidence suggests, residents in the AOR purchased Subarus from other dealers not because they worked outside of the Laconia area,  but because Lakes was unable to attract customers. The record also reveals that a lack of sales can not be blamed on the lack of acceptance of the Subaru product , Lakes AOR residents were buying from other Dealers outside the AOR as evidenced by pump-ins. Silberberg admitted that the top of the line/loaded Jeep sales price was above that of the top of the line Subaru. Silberberg's Jeep dealership outsold the Subaru dealership, so those residing in the AOR could afford to purchase these vehicles. Accessories can not be blamed for low sales. Buyers were willing to purchase Jeeps with accessories as well as Subarus with

accessories. Lakes was unable to sell Subarus with the least amount of accessories ($0-$500) as quickly as other Dealers. All dealers were pushed to purchase accessorized vehicles. Silberberg was entitled to not purchase accessorized vehicles. All Subaru dealers had accessorized vehicles. Silberberg was never told there would be repercussions for his dealership if he did not buy accessories. 40% of the vehicles allocated by SOA to SNE were white, Lakes allocation was 44% white, clearly this allocation was not the direct cause of unacceptable selling or registration performance.

Based on the record, the Board finds that SNE acted in good faith and had good cause for nonrenewal of the Lakes Dealership Agreement under RSA 357-C:7. Further the Board finds that Lake's claims under RSA 357-C:3 are without merit and accordingly denied.

THEREFORE, IT IS ORDERED that the" Motion to Strike Supplemental Post-Trial Materials" dated January 18, 2000 is denied; and

IT IS FURTHER ORDERED, that the February 4, 1999 protest is denied; and

IT IS FURTHER ORDERED, that SNE shall provide Lakes with the payment required under RSA 357-C:7 VI within 90 days from the date of this order.

By Order of the Board

*Patricia A. Smith*
Patricia A. Smith

Dated May 1, 2000

**APPENDIX TO DECISION**
**DOCKET NO. 0080**
**RULINGS ON PROPOSED FINDINGS**
**OF FACT AND RULINGS OF LAW**

I. Lakes Proposed Findings
   A.  Findings of Fact

   1.  Granted

   2.  Granted

   3.  Granted

   4.  Granted

   5.  Granted

   6.  Granted

   7.  Granted

   8.  Granted, if modified to stated "was drafted" instead of is drafted

   9.  Granted

   10.  Granted, if modified changed to modifies and adds to

   11.  Granted – accept statement – no authority to modify k

   12.  Denied

   13.  Granted

   14.  Granted

   15.  Granted

   16.  Granted

   17.  Granted

   18.  Denied

   19.  Granted

20. Denied

21. Granted his opinion

22. Granted his opinion

23. Granted his opinion.

24. Granted

25. Granted

26. Granted

27. Granted

28. Granted

29. Granted – if elete from every allocation of dealer

30. Denied

31. Denied

32. Denied

33. Granted

34. Denied – insufficient evidence

35. Denied – insufficient evidence

36. Denied – insufficient evidence

37. Granted

38. Granted

39. Denied – insufficient evidence

40. Denied

41. Granted

42. Granted

43. Granted

44. Granted

45. Granted

46. Granted

47. Denied

48. Denied

49. Granted

50. Granted

51. Irrelevant

52. Irrelevant

53. Denied

54. Granted – if delete and thus more difficult to sell vehicles

55. Granted

56. Granted

57. Denied – insufficient evidence

58. Granted

59. Granted

60. Granted

61. Granted

62. Granted

63. Granted

64. Granted

65. Granted

66. Granted

67. Granted

68. Granted

69. Granted

70. Denied

71. Denied – insufficient evidence

72. Denied

73. Granted

74. Granted – if only quoted language, delete other language

75. Granted

76. Granted

77. Granted

78. Granted

79. Granted

80. Granted

81. Granted

82. Granted

83. Granted

84. Granted

85. Denied – no evidence

86. Granted

87. Granted

88. Denied

89. Granted

90. Granted

91. Granted

92. Granted

93. Granted

94. Granted

95. Granted

96. Granted

97. Granted

98. Granted

99. Granted

100. Granted

101. Granted

102. Granted

B. Rulings of Law

103. Granted

104. Granted

105. Granted

106. Granted

107. Granted

108. Granted

109. Granted

110. Granted

111. Denied

112. Denied

113. Denied

114. Denied

115. Granted

116. Granted

117. Denied.

118. Granted

119. Denied

120. Denied

121.   a. Denied
       b. Denied
       c. Denied
       e. Denied
122. Denied

123. Denied

124. Granted

125. Denied – insufficient evidence

126. Denied – insufficient evidence

127. Denied – insufficient evidence

128. Denied

129. Denied

130. Denied

131. Denied

132. Denied

133. Granted

134. Granted

135. Granted

136. Denied

137. Granted

138. Granted

139. Denied

140. Denied

141. Denied

142. Denied

143. Denied

144. Denied

II. SNE Proposed Findings
   A. Findings of Fact

1. Granted

2. Denied

3. Granted

4. Granted

5. Granted

6. Granted

7. Granted

8. Denied

9. Denied

10. Denied

11. Denied

12. Denied

13. Granted

14. Denied

15. Denied – insufficient evidence

16. Denied

17. Denied

18. Granted

19. Denied – insufficient evidence

20. Denied

21. Denied

22. Granted

23. Granted

24. Denied

25. Denied

26. Denied

27. Denied

28. Granted

29. Denied - irrelevant

30. Granted

31. Granted

32. Granted

33. Granted

34. Granted

35. Granted

36. Denied – change 1979 to 1977

37. Granted

38. Granted

39. Granted

40. Granted

41. Granted

42. Granted

43. Granted

44. Granted

45. Granted

46. Granted

47. Granted

48. Granted

49. Granted

50. Granted

51. Granted

52. Granted

53. Granted

54. Granted

55. Denied

56. Granted

57. Granted

58. Granted

59. Granted

60. Granted

61. Granted

62. Granted

63. Granted

64. Granted

65. Granted

66. Granted

67. Granted

68. Granted

69. Granted

70. Granted

71. Granted

72. Granted

73. Denied

74. Granted

75. Granted

76. Granted

77. Granted

78. Granted

79. Granted

80. Granted

81. Granted

82. Granted

83. Granted

84. Granted

85. Granted

86. Granted

87. Granted

88. Granted

89. Granted

90. Granted

91. Granted

92. Granted

93. Granted

94. Granted

95. Granted

96. Granted

97. Granted

98. Granted

99. Granted

100. Granted

101. Granted

102. Granted

11

103. Granted

104. Granted – if delete e

105. Granted

106. Granted

107. Granted

108. Granted – if best changed to useful

109. Granted – if delete the word effective

110. Granted

111. Granted

112. Granted

113. Granted

114. Granted

115. Granted

116. Granted

117. Granted

118. Granted

119. Granted

120. Granted

121. Granted

122. Granted

123. Granted – if rejected change to impliment

124. Granted

125. Granted

126. Granted

127. Granted

128. Granted

129. Granted

130. Denied

131. Granted

132. Granted

133. Denied – insufficient evidence

134. Denied – insufficient evidence

135. Granted

136. Granted

137. Denied

138. Granted

139. Granted

140. Granted

141. Granted

142. Granted

143. Granted – learned changed to concluded

144. Granted

145. Granted

146. Granted

147. Granted

148. Granted

149. Granted

150. Granted

151. Granted

152. Granted

153. Granted

154. Granted

155. Granted – if delete deteriorated even further

156. Granted

157. Granted

158. Granted

159. Granted

160. Granted

161. Granted

162. Granted

163. Granted

164. Granted

165. Granted – if delete understand what was not going on at dealership

166. Granted

167. Granted

168. Granted

169. Granted

170. Granted

171. Granted

172. Denied

173. Granted

174. Denied

175. Denied

176. Granted

177. Granted.

178. Granted – if changed to read performance is poor or below average

179. Granted

180. Granted

181. Granted

182. Granted

183. Granted

184. Granted

185. Granted

186. Granted

187. Granted

188. Granted

189. Granted

190. Granted

191. Denied - insufficient evidence

192. Denied

193. Denied

194. Denied

195. Denied – lack insufficient evidence

196. Granted

197. Granted

198. Granted

199. Granted – delete Board credits, add testimony was to second part of sentence

200. Granted

201. Granted

202. Granted

203. Denied

204. Denied

205. Denied

206. Granted

207. Denied - speculative

208. Granted

209. Granted

210. Granted

211. Granted

212. Granted

213. Granted

214. Granted

215. Granted

216. Granted

217.  Granted

218.  Denied – insufficient evidence

219.  Granted

220.  Granted

221.  Granted

222.  Granted

223.  Granted

224.  Granted

225.  Granted

226.  Granted

227.  Granted

228.  Granted – Delete abysmal and bogus

229.  Granted

230.  Granted

231.  Granted

232.  Granted

233.  Granted

234.  Granted

235.  Granted

236.  Denied – insufficient evidence

237.  Granted

238.  Granted

239.  Denied conjecture

240. Denied conjecture

241. Granted

242. Granted

243. Granted

244. Granted

245. Granted

246. Granted

247. Granted

248. Granted

249. Granted

250. Granted

251. Granted

252. Granted

253. Granted

254. Granted

255. Granted

256. Granted

257. Granted

258. Granted

259. Granted

260. Granted

261. Granted

262. Denied – insufficient evidence

18

263. Granted

264. Granted

265. Granted

266. Denied

267. Granted

268. Granted

269. Denied – insufficient evidence

270. Denied

271. Denied

272. Granted

273. Granted

274. Granted

275. Granted

276. Granted

277. Granted

278. Granted

279. Denied - irrelevant

280. Denied

281. Granted

282. Granted

283. Granted

284. Granted

285. Denied

286. Granted

287. Granted

288. Denied

289. Denied

290. Denied

291. Denied

292. Granted

B. Supplemental Request for Findings of Facts

293. Denied

294. Granted

295. Granted

296. Granted

297. Granted

298. Denied – no evidence

299. Granted

300. Granted

301. Granted

302. Granted

C. Rulings of Law

1. Denied.

2. Granted

3. Denied

4. Denied

5.  Granted

6.  Denied

7.  Granted

8.  Denied

9.  Denied

10.  Denied

11.  Granted

12.  Granted

13.  Board finds notice justified

14.  Granted

15.  Granted

16.  Granted – as to first sentence  – denied as to remainder

17.  Granted

18.  Granted

19.  Granted – incorrect reference

20.  Denied – incorrect reference

21.  Granted

22.  Granted

23.  Denied

24.  Denied – not found cohercion, therefore irrelevent

25.  Denied – same as above

26.  Denied – same as above

27.  Denied – same as above

28. Denied – same as above

29. Granted

30. Denied – not found cohercion, therefore, irrelevant

31. Granted

32. Denied - irrelevant

33. Denied

34. Denied

35. Denied

36. Granted

37. Granted

38. Granted

39. Granted

40. Granted

41. Granted

42. Granted

43. Granted

44. Granted

45. Granted

46. Granted

47. Granted

48. Denied

49. Granted – if delete moreover and very

50. Granted –if modified to say authorized primarily to order

51. Granted

52. Denied

53. Granted

54. Granted

55. Granted

56. Denied

D. Supplemental Request for Findings of Fact

57. Denied

58. Denied

59. Denied.

60. Denied

61. Denied

62. Denied