# **TAB 4**



**Before The**
**State Of Wisconsin**
**DIVISION OF HEARINGS AND APPEALS**

---

In the Matter of Ralph Gentile, Inc., d/b/a Gentile
Nissan,

Complainant

                                                     Case No. TR-07-0001

v.

Nissan North America, Inc.,

Respondent

---

### FINAL DECISION

     Ralph Gentile, Inc., d/b/a Gentile Nissan, (Gentile Nissan) is a franchised Nissan dealer. On January 3, 2007, Nissan North America, Inc., (Nissan NA) served a termination notice on Gentile Nissan. In the termination notice Nissan NA informed Gentile Nissan that it intended to cancel Gentile Nissan's Nissan franchise. On January 11, 2007, Gentile Nissan filed with the Division of Hearings and Appeals a complaint pursuant to Wis. Stat. § 218.0114(7)(d). The complaint seeks a determination that the proposed termination violates Wis. Stat. § 218.0116(1)(i). A hearing in this matter commenced on April 14 and 15, 2008. After two days of hearing, the parties informed the administrative law judge assigned to hear this matter that they had reached a tentative settlement of the disputed issues and requested that the hearing be suspended to give them an opportunity to finalize the settlement.

     The hearing was suspended at that time because of the possibility of a settlement agreement. However, the complainant never executed the settlement agreement. On July 24, 2008, Nissan NA filed a motion to enforce the settlement agreement. After an opportunity for briefing, a ruling denying the motion was issued on November 26, 2008. The hearing was then completed on February 18, 19, and 20, 2009. All five days of hearing were conducted in Madison, Wisconsin. Mark J. Kaiser, Administrative Law Judge (ALJ), presiding. After completion of the hearing, the parties filed post-hearing briefs. The respondent filed its initial brief on April 28, 2009; the complainant filed its response brief on June 17, 2009; and, the respondent filed a reply brief on July 17, 2009.

In accordance with Wis. Stat. §§ 227.47 and 227.53(1)(c), the PARTIES to this proceeding are certified as follows:

Ralph Gentile, Inc., by

        Attorney Paul R. Norman
        Boardman Law Firm
        P. O. Box 927
        Madison, WI  53707-0927

Nissan North America, Inc., by

        Attorney Steven J. Wells
        Attorney John Rock
        Dorsey & Whitney, LLP
        50 South Sixth Street, Suite 1500
        Minneapolis, MN  55402

The ALJ issued a Proposed Decision in this matter on December 15, 2009. The respondent filed a brief in support of the Proposed Decision on December 30, 2009. The complainant filed objections to the Proposed Decision on December 30, 2009. The respondent requested an opportunity to file a response to the complainant's comments. The request was granted and the respondent filed a response to the complainant's objections on January 12, 2010. In its brief in support of the Proposed Decision, the respondent identified three mistakes in the Findings of fact. None of these mistakes are material to the determination of the relevant findings in this matter. The corrections to the findings in paragraphs number three, nine, and 26 requested by the respondent have been made in the Final Decision.

The complainant primarily objects to two findings in the Proposed Decision. One objection is to the use of sales effectiveness to judge the sales performance of Gentile Nissan. The most common standards manufacturers use to measure their dealers' sales performance are sales effectiveness and registration effectiveness. Logical reasons exist to use either of the standards. Nissan NA, like most manufacturers, has chosen to use sales effectiveness to measure the sales performance of its dealers. The complainant argues that using sales effectiveness is contrary to the terms of the Dealer Agreement because under the provisions of the Dealer Agreement, Nissan dealers are to be evaluated upon their sales performance within their PMA.

As discussed in the Proposed Decision, Nissan NA's Standard Sales and Service Agreement gives Nissan wide latitude to decide how to evaluate the sales performance of its dealers and Nissan NA made it clear to Gentile Nissan that it would be judged on a sales effectiveness standard. It should also be noted that even if registration effectiveness was used, Gentile Nissan would still not be achieving the regional average. In an effort to circumvent this fact, Gentile Nissan advocates the use of a newly created standard. Gentile Nissan argues that it should be judged on the percentage of its sales within its PMA. This standard says nothing about

Case No. TR-07-0001
Page 3

the number of vehicles a dealer sells, but only looks at where the sales the dealer does make are made.

In its objections to the Proposed Decision, the complainant also renews the arguments it raised in the posthearing briefs that under the provisions of the Term Agreement, it was only obligated to use its "best efforts" to achieve regional averages, not actually achieve them. This argument is adequately addressed in the Proposed Decision and for the reasons set forth in the Proposed Decision Gentile Nissan is obligated to meet regional averages. Sales effectiveness is a reasonable standard for Nissan NA to evaluate Gentile Nissan's sales performance and based on this standard, Gentile Nissan breached the Dealer Agreement.

Gentile Nissan's other primary objection to the Proposed Decision is to the finding of an absence of discrimination by Nissan NA against Gentile Nissan compared to its treatment of "similarly situated" dealers. The complainant argues that the Proposed Decision does not properly address the issue of whether Nissan's termination of Gentile Nissan's Dealer Agreement was discriminatory. The question for this issue is what constitutes "similarly situated dealers." As discussed in the Proposed Decision, the phrase "similarly situated dealers" is not defined in the statute. The undersigned administrator is persuaded that the respondent has satisfied its burden to show that the non-Wisconsin Nissan dealers that the complainant has identified as having lower sales effectiveness numbers than Gentile Nissan and who have not had their franchises terminated do not constitute "similarly situated dealers" for purposes of Wis. Stat. § 218.0116(1)(i)1.

The complainant also objects to findings in paragraphs number 22, 25, 27, 29, 30, and 39 as well as statements about Gentile Nissan's advertising expenditures in paragraphs 32 through 34. The objection to paragraph 22 is that the statement "[f]or a lower volume manufacturer like Nissan, it is mathematically possible for all its dealers to be at or above 100% sales effectiveness" is not documented by any demonstration in the record. The statement in the Proposed Decision is based on the testimony of Nissan NA's expert. However, to avoid any confusion paragraph 22 has been amended to limit the statement to Mr. Farhat's actual testimony.

The complainant objects to a statement in paragraph 27. The complainant alleges that paragraph 27 of the Proposed Decision finds that "the 'economies of scale' were the same for two Rosen dealerships as for the Gentile dealerships selling different brands." The Proposed Decision does not contain such a finding. Paragraph 27 of the Proposed Decision only finds that as part of the Gentile Automotive Group Gentile Nissan "also benefits from economies of scale" and identifies some examples of economies of scale enjoyed by Gentile Nissan. The Proposed Decision does not find that the economies of scale enjoyed by Gentile Nissan are the same as those enjoyed by the Rosen Nissan dealerships.

The complainant also objects to findings regarding Gentile Nissan's advertising expenditures included in paragraphs 32 through 34. The complainant objects to these findings because they do not compare Gentile Nissan's advertising expenditures per expected sale compared to other Nissan dealer's advertising per expected sale. The primary purpose of the findings in these paragraphs is to compare Gentile Nissan's advertising expenditures to Nissan

NA's guidelines, not to the advertising expenditures of other Nissan dealers. The remaining objections of the complainant are adequately rebutted by the respondent in its response to the complainant's objections. As demonstrated by the respondent, those findings are supported by evidence in the record. Other than the amendments listed above, the Proposed Decision is adopted as the Final Decision in this matter.

Issue to be decided

The issue to be decided is whether the respondent has cancelled the Dealer Agreement it entered into with the complainant unfairly, without due regard to the equities, and without just provocation in violation of Wis. Stat. § 218.0116(1)(i).

Applicable law

Wisconsin Stat. § 218.0116(1)(i) provides in relevant part:

    1. in this paragraph:

    a. "Due regard to the equities" means treatment in enforcing an agreement that is fair and equitable to a motor vehicle dealer or distributor and that is not discriminatory compared to similarly situated dealers or distributors.

    b. "Just provocation" means a material breach by a motor vehicle dealer or distributor, due to matters within the dealer's or distributor's control, of a reasonable and necessary provision of an agreement and the breach is not cured within a reasonable time after written notice of the breach has been received from the manufacturer, importer or distributor.

    2. Subject to s. 218.0132, being a manufacturer, importer or distributor who has unfairly, without due regard to the equities or without just provocation, directly or indirectly canceled or failed to renew the franchise of any motor vehicle dealer; or being a manufacturer or importer, who has unfairly, without due regard to the equities or without just provocation, directly or indirectly canceled or failed to renew the franchise of any distributor.

Findings of Fact

The administrator finds:

    1.    Ralph Gentile, Inc., d/b/a Gentile Nissan (Gentile Nissan or the complainant) is a motor vehicle dealer licensed by the Wisconsin Department of Transportation (WisDOT). Gentile Nissan holds a franchise from Nissan North America, Inc., (Nissan NA or the

respondent) granting Gentile Nissan the right to buy, sell, and service Nissan automobiles and light duty trucks.

2.      Nissan NA is a California corporation with principal offices located in Nashville, Tennessee. Nissan NA is licensed by WisDOT to engage in business as a motor vehicle manufacturer or distributor in Wisconsin. Nissan NA distributes Nissan automobiles and light duty trucks and parts through a network of dealers in the United States.

3.      Gentile Nissan is part of the Gentile Automotive Group. The Gentile Automotive Group operates franchises for various motor vehicle manufacturers. The franchises Gentile Automotive Group currently operates in addition to Nissan include Honda, Toyota, Scion, Subaru, and Hyundai. The principal for the Gentile Automotive Group is Ralph Gentile. Frank Gentile, Inc., was the corporate entity that operated Gentile Nissan until the summer of 2006. At that time Ralph Gentile, Inc., was formed and ownership of Gentile Nissan and Gentile Hyundai was transferred to it. Ralph Gentile also remains the owner of Frank Gentile, Inc.

4.      The Gentile Automotive Group purchased the Nissan franchise from Kenosha Nissan for $800,000 in July of 2002. The dealership facilities of Kenosha Nissan had been located at the intersection of Interstate 94 and State Highway 50 in Kenosha. After purchasing the franchise, the Gentile Automotive Group relocated the dealership facilities to Racine. The Gentile Automotive Group consolidated the Nissan franchise with its other automotive franchises at facilities located at 6802 Washington Avenue in Racine. At that time the Gentile Automotive Group operated Honda, Toyota, Subaru, Oldsmobile, and GMC franchises from that location. Nissan NA approved both the acquisition of the Nissan franchise by the Gentile Automotive Group and the relocation of the dealership facilities to Racine.

5.      Nissan NA assigns a primary market area (PMA) to each of its dealers. A PMA is designated as a set of census tracts. Gentile Nissan's PMA is primarily Racine and Kenosha Counties (exh. 11). This is essentially the same PMA that had been assigned to Kenosha Nissan.

6.      Gentile Nissan is geographically located in what Nissan NA has delineated as District 4 in the North Central Region. The North Central Region consists of the part of the United States bordered on the east by the Ohio/Pennsylvania border, Kentucky on the south, on the west to parts of Missouri, Iowa, and South and North Dakota, and the Canadian border on the north (testimony of Scott Compton Tr. p. 45). The headquarters for Nissan NA, North Central Region is located in the western suburbs of Chicago. District 4 primarily consists of the Nissan dealers in Wisconsin.

7.      On July 24, 2002, Gentile Nissan and Nissan NA executed a term agreement authorizing Frank Gentile, Inc., to operate a Nissan franchise (exh. 204). A term agreement differs from the standard agreement that Nissan NA enters into with its dealers (the standard dealer agreement is referred to as a Nissan Sales and Service Agreement, see exh. 277) in that it has an expiration date. A term agreement also typically includes conditions that the dealer must meet before it will be offered the standard Nissan Sales and Service Agreement (SSA). For purposes of this decision the various term agreements executed by Gentile Nissan and Nissan

NA and the incorporated terms from the SSA will be referred to as the "Dealer Agreement." The initial term agreement executed by Gentile Nissan expired on January 1, 2005.

8.     Article Twelfth of the Term Agreement sets forth the conditions which Gentile Nissan must meet before Nissan NA would offer Gentile Nissan a SSA.  The initial term agreement also included an Exhibit "A" which amended Article Twelfth paragraph (d).  Exhibit "A" provided that Gentile Nissan could operate the Nissan franchise from its dealership facilities at 6801 Washington Avenue along with its Honda, Toyota, Subaru, GMC, and Oldsmobile franchises until December 1, 2004.  Exhibit "A" also included a timetable by which Gentile Nissan agreed to construct a stand alone facility for its Nissan franchise.  The deadline for the completion of the stand alone facility was December 1, 2004.

9.     Gentile Nissan purchased property at 9501 Washington Avenue in Racine for the construction of a stand alone Nissan facility.  The property is approximately two miles from the Gentile Automotive Group's other dealership facilities.  The design of the dealership facility constructed by Gentile Nissan is one developed by Nissan NA and is referred to as a National Retail Environmental Initiative (NREDI) facility.  The Gentile Automotive Group also constructed a standalone Hyundai facility adjacent to the NREDI facility at 9503 Washington Avenue in Racine.  Gentile Nissan Properties, LLC, which is not a subsidiary of Gentile Nissan, invested approximately $3,000,000 for the land and construction of the NREDI facility and the adjoining Hyundai dealership facility.  The NREDI facility was completed in November of 2004 and Gentile Nissan moved the Nissan franchise into the NREDI facility in January of 2005.  Nissan NA contributed $500,000 toward the cost of Gentile Nissan's NREDI facility.

10.     Effective April 1, 2004, Nissan NA and Gentile Nissan executed Amendment No. 1 to the Term Agreement (exh. 217).  Amendment No. 1 to the Term Agreement extended the expiration of the term agreement to January 1, 2005.  The reason for the extension was to give Gentile Nissan additional time to complete construction of the NREDI facility.

11.     Effective June 24, 2005, Nissan NA and Gentile Nissan executed Amendment No. 2 to the Term Agreement (exh. 244).  In this amendment, the expiration of the term agreement was extended to July 1, 2006   The reason for this extension is that Nissan NA was unwilling to enter into a standard SSA with Gentile Nissan because of its unsatisfactory sales performance.  The amended term agreement extended the expiration of the term agreement to give Gentile Nissan additional time to "cure [its] substandard performance." (exh. 237)  Exhibit A of Amendment No. 2 to the Term Agreement contains two performance standards Gentile Nissan must meet, a sales performance standard and a customer satisfaction index performance standard.

12.     The sales performance standard in Article Twelfth of Amendment No. 2 to the Term Agreement provides that Gentile Nissan "agrees that it will use its best efforts to meet or exceed the North Central Region average sales penetration for the Nissan total competitive car and truck segment on or before July 1, 2006 based on data available at that time and at all times thereafter."  The customer satisfaction index performance standard provides that Gentile Nissan "agrees to use its best efforts to achieve regional average NSI and NPI levels on or before July 1, 2006 and on an ongoing basis."

13.     The "best effort" standards used in Article Twelfth of Amendment No. 2 to the Term Agreement were proposed by Ralph Gentile.  The language originally drafted by Nissan NA for the performance standards required Gentile Nissan to meet or exceed regional averages for sales penetration and customer satisfaction scores.  After some negotiation, Nissan NA accepted Ralph Gentile's language.  However, in the letter accepting the language, Peter DiPersia, Nissan NA's Assistant Regional Manager, indicated that "Nissan's decision to use [Gentile's] proposed language in no way waives its rights to pursue any remedies or actions as set forth by the Nissan Dealer Sales and Service Agreement. . . . Gentile Nissan's continued inability to improve its sales penetration could lead to a breach of the Agreement and would then be subject to all subsequent procedures." (exh. 114)

14.     Article Second, paragraph (b) of the various Term Agreements entered into between Gentile Nissan and Nissan NA provides that it is the Dealer's responsibility to "actively and effectively promot[e] the sale at retail of Nissan Vehicles within Dealer's Primary Market Area in accordance with Section 3 of the Standard Provisions."  Nissan NA interprets Section 3 of the Standard Provisions to require Gentile Nissan to sell the number of new vehicles that would be required to meet the regional average for Nissan's sale penetration based on the number of competitive registrations in its PMA.  This standard is referred to as regional sales effectiveness and is a common performance standard in the motor vehicle retail industry.

15.     A dealer's sales effectiveness is calculated by multiplying the market share a particular line-make achieves in a geographical area by the total number of new vehicles registered in that dealer's assigned market area.  This calculation produces a number that equals the expected sales the dealer should achieve.  The dealer's actual sales are then compared to the expected sales and the result is expressed as a percentage.  A dealer that is selling the number of vehicles it is expected to sell is considered 100% sales effective.  A dealer that is selling more new vehicles than expected is more than 100% sales effective and one selling fewer vehicles than expected is considered not sales effective.

16.     On June 26, 2006, Gentile Nissan and Nissan NA executed another Term Agreement (exh. 275).  The expiration of this Term Agreement remained July 1, 2006.  The purpose of this new term agreement was to recognize the change in corporate ownership from Frank Gentile, Inc., to Ralph Gentile, Inc.  In all other respects, this Term Agreement was identical to Amendment No. 2 to the Term Agreement.

17.     In the three years preceding the sale of its Nissan franchise to Gentile Nissan, Kenosha Nissan's sales and the respective sales effectiveness percentages were:

| Year | Sales | Sales effectiveness |
|------|-------|---------------------|
| 1999 | 286   | 79.4                |
| 2000 | 321   | 81.7                |
| 2001 | 426   | 110.6               |

(exh. 73, R-10)

Case No. TR-07-0001
Page 8

In summary, in the last three years that it was a Nissan dealer, Kenosha Nissan's sales were increasing and it achieved sales effectiveness in the final year.

18.     In 2003, Gentile Nissan's first full year of operation as a Nissan dealership, the number of sales it was expected to make to achieve the regional average was 410. The number of vehicles it actually sold was 273. This calculates to 58.3% sales effectiveness.

19.     Nissan's sales penetration ratios for the North Central region and District 4 were:

| Year | North Central Regional Average | District 4 Average |
|---|---|---|
| 2003 | 3.1% | 2.6% |
| 2004 | 4.0% | 4.1% |
| 2005 | 4.5% | 4.6% |
| 2006 | 4.4% | 4.8% |
| June 2007 CYTD | 5.0% | 4.8% |

(exh. 72, A-12)

20.     Gentile Nissan's expected sales at the regional average, actual sales, and sales effectiveness for the time period 2003 – 2007 are:

| Year | expected sales | actual sales | sales effectiveness |
|---|---|---|---|
| 2003 | 410 | 239 | 58.3% |
| 2004 | 493 | 271 | 54.5% |
| 2005 | 523 | 273 | 52.2% |
| 2006 | 447 | 213 | 47.6% |
| 2007 | 506 | 206 | 40.7% |

These figures demonstrate that Gentile Nissan was not sales effective during any year that it has been a Nissan dealer. Additionally, after peaking in 2005, Gentile Nissan's Nissan sales declined in 2006 and 2007. Nissan NA repeatedly warned Gentile Nissan both in writing and orally that its sales performance was unacceptable. (See for example, exhs. 20, 28, 32, 38, and 106).

21.     By letter dated June 30, 2006, Nissan NA issued a Notice of Default to Gentile Nissan (exh. 52). The Notice of Default alleged that the Gentile Nissan breached Sections 3 and 5 of the Standard Provisions of the Dealer Agreement by failing to achieve regional averages for sales penetration and to meet or exceed average CSI scores for the region. Nissan NA gave Gentile Nissan 180 days to cure the breach.

22.     The industry considers a dealer that is 100% sales effective to be an average dealer. Nissan NA expects all its dealers to achieve sales effectiveness at the regional market penetration. For Nissan dealers particularly, this is a conservative standard because Nissan NA does not assign all territory to a dealer. A dealer's expected sales are calculated by the number of new vehicle registrations in its PMA; however, all its sales, including those made in

unassigned territory, are counted in determining whether the dealer is sales effective. In 2006 for example, the average sales effectiveness of Nissan dealers in the North Central Region was 117.9% and 69.6% of the Nissan dealers in the region exceeded the region average (testimony of Sharif Farhat, Tr. p. 703).

23.    While Gentile Nissan's sales of Nissan vehicles were declining, Nissan sales nationally, in the North Central region and in Wisconsin were increasing. During the time period from 2003 until 2006, Gentile Nissan's Nissan sales decreased by 10.9% (239 vehicles to 213 vehicles). During that same time period Nissan's sales nationally, in the North Central Region, and in Wisconsin increased by 31.5%, 17.3%, and 49.5% respectively (exh. 73, R-11.1). It should also be noted that the local economy in southeastern Wisconsin is not a factor in evaluating Gentile Nissan's sales performance because Gentile Nissan's expected sales was calculated as a percentage of total sales in the Gentile Nissan's PMA. In other words, Gentile is only expected to get Nissan's average share of sales in the PMA. If for some reason new vehicle sales were depressed in southeastern Wisconsin, Gentile Nissan's expected sales would be reduced proportionately.

24.    Gentile Nissan offered several reasons that it claims explains its poor sales. These reasons include the fact that the Racine PMA has bimodal population centers (the cities of Racine and Kenosha), is located between two high volume Nissan dealers, Rosen in South Milwaukee and Rosen in northern Illinois, the commuting nature of Racine and Kenosha residents, and the existence of a Chrysler engine plant in Kenosha.

25.    Gentile Nissan's expert, Professor John Matthews, presented data and articles establishing the existence of the factors he claimed were extenuating circumstances that prevented Gentile Nissan from achieving sales effectiveness. However, he did not conduct any study or analysis demonstrating that any of the factors actually had any effect on Gentile Nissan's Nissan sales. Although one cannot summarily dismiss the factors Gentile Nissan claims are extenuating circumstances, with one exception Kenosha Nissan faced all the same circumstances and was able to achieve sales effectiveness in its final year of operation. These factors would also not explain the decline in Gentile Nissan's Nissan sales over time. Additionally, Gentile Nissan was successful selling Hyundai from essentially the same location as its Nissan dealership and under the same conditions.[1]

26.    The one factor that did change after Gentile Nissan purchased the Nissan franchise from Kenosha Nissan was the level of competition Gentile Nissan faced from two Nissan dealerships owned by Saul Rosen. Rosen is the Nissan dealer in South Milwaukee, which is the closest Nissan dealer to the north of Gentile Nissan. In 2004, Rosen constructed an NREDI facility in South Milwaukee and substantially increased its Nissan advertising around the same time (testimony of Scott Compton). In 2005, Rosen acquired the Nissan dealership in northern Illinois and relocated it from Waukegan to Gurnee, Illinois. Gurnee, Illinois is closer to

---

[1] Gentile Nissan's problem selling Nissans has nothing to do with the Nissan brand. As noted above, Nissan's sales overall were increasing during the time period that Gentile Nissan's sales were declining. Also, in 2005 and 2007, Nissan was registration effective in Racine County (exhs 73, R-10 and 325).

Gentile Nissan than was the dealership in Waukegan. These changes likely increased the level of intrabrand competition Gentile Nissan faced.

27.     The complainant argues that because of the volume of Nissans the two Rosen dealerships sell, they enjoy some economies of scale. However, Gentile Nissan is part of the Gentile Automotive Group and as such also benefits from economies of scale. For example, all the dealerships in the Gentile Automotive Group have the same executive manager, most of the expense of advertising used vehicles is borne by the Toyota, Honda, and Subaru franchises, and, although they have separate facilities, Gentile Nissan and Gentile Hyundai are constructed on the same parcel.

28.     Gentile Nissan also alleges that Nissan NA has assigned it an improperly drawn PMA. Specifically, Gentile Nissan alleges that its PMA should be only the census tracts it is currently assigned in Racine County. The impact of reducing the size of the PMA would be that Gentile Nissan's expected sales would be fewer. If one assumes that Gentile Nissan would sell the same number of vehicles if its PMA was reduced to just Racine County, it would have been sales effective in 2006 (Matthews preliminary report, exh. 320, p. 3).[2] The number of its expected sales would have been reduced to 210. Gentile Nissan's 2006 sales were 213.

28.     Nissan NA's sets forth numerous reasons that it alleges are the cause of Gentile Nissan's poor sales performance. These reasons include the lack of a dedicated sales staff, inadequate advertising, and no dedicated executive manager.

29     Although the Gentile Automotive Group hired sales people for each of its dealerships, the sales staffs for Gentile Nissan and Gentile Hyundai were cross trained to sell both Nissans and Hyundais. Because of bonuses for selling Hyundais, the sales people had greater incentives to sell Hyundais than Nissans. At two or three unscheduled visits by Nissan NA's District Operations Manager for District 4, Scott Compton, no sales representatives were present at the Gentile Nissan's dealership facilities (testimony of Scott Compton).

30     Nissan NA required Gentile to have a dedicated executive manager for the Nissan dealership. Gentile repeatedly nominated Juanita Malkemes to be the executive manager for Nissan dealership. Ms. Malkemes may be qualified to be an executive manager, but she would not have been dedicated to Nissan. Ms. Malkemes is also the executive manager for Gentile Automotive Group other dealerships and her main office would have been at Gentile's dealership facilities at 6801 Washington Avenue facilities. Nissan required a dedicated executive manager for Gentile Nissan for most of the time that Gentile has been a Nissan dealer. This requirement was deleted from Amendment No. 2 to the term agreement.

31.     Gentile Nissan frequently replaced the sales managers for its Nissan dealership. This was done in an effort to improve the performance of the dealership. Several of the sales managers were recommended by various DOMs. No explanation was offered for Gentile

---

[2] The assumption that Gentile Nissan's sales would remain the same if its PMA was reduced is not necessarily realistic because if Kenosha County was unassigned, it is likely that Nissan would appoint a new dealer in that area adding more intrabrand competition to the market.

Nissan's inability to find and retain a qualified sales manager; however, the revolving door for sales managers likely was part of the reason for Gentile Nissan's poor sales performance.

32.   Nissan NA sets guidelines for the amount a dealer is expected to spend on advertising.  The amount a dealer is expected to spend on advertising is a function of the dealers planning volume (expected sales).  The amount spent on advertising for Nissan by Gentile Nissan is difficult to calculate because the Gentile Automotive Group prepares a combined financial statement for its Nissan and Hyundai franchises.  However, even accepting Gentile Nissan's testimony regarding how much it spends on advertising, its spending is still below what guidelines indicate it should have spent to achieve the number of sales it was expected to achieve.

33.   In 2005, Gentile Nissan spent $353,839 on advertising for Nissan and Hyundai (exh. 140).  Gentile Nissan's witnesses claimed the amount for advertising shown on the combined financial statement was all spent on new vehicle advertising (the witnesses testified that all the used vehicle advertising was paid for by the Toyota, Honda, and Subaru dealerships) and that it was equally divided between Nissan and Hyundai.[3]  This breaks down to $661 per new vehicle retailed (PNVR) (exh. 45).  Nissan NA's goal for Gentile Nissan advertising was $400 PNVR (exh. 22).  In 2006, Gentile spent $250,181 on advertising for Hyundai and Nissan. This breaks down to $497.40 PNVR (Tr. at 217).[4]  Although the amount Gentile Nissan spent on advertising PNVR exceeds Nissan NA's goals, its total advertising for Nissan falls short of Nissan NA's goal for Gentile Nissan.  For 2005, Nissan NA's goal for Gentile Nissan's advertising was $19,560 per month (exh. 22) and the amount Gentile Nissan spent was $15,071. It is also noteworthy that using the figures provided by Gentile Nissan, Gentile Nissan did not meet its own internal goals for Nissan advertising.

34.   The reason Gentile Nissan was above Nissan NA's goal on a PNVR basis but below the goal on a total basis is because the total is computed based on the expected sales for Gentile Nissan.  Since Gentile Nissan's sales in 2005 were 314 vehicles below its expected sales (587 expected sales less 273 actual sales), its PNVR amount spent on advertising exceeded Nissan NA's goal.  If Gentile Nissan had been attempting to sell the number of vehicles it was

---

[3] Nissan NA accepted Gentile Nissan's assertion that the amount spent on advertising listed on the combined financial statements was split fifty-fifty between Hyundai advertising and Nissan advertising.  However, this claim is suspect because the one instance that advertising is broken down by franchise, annual television advertising for the years 2005, 2006, and 2007, the amount spent on Nissan was substantially less than the amount spent on Hyundai or Subaru (testimony of Sharif Farhat and exh. 141).  In its initial posthearing brief, the respondent recalculated the complainant's advertising expenditures on Nissan for 2005 and 2006 based on statements made by Ralph Gentile and Juanita Malkemes at the hearing.  According to these recalculations, Gentile Nissan may have spent significantly less PNVR on Nissan advertising than it had reported to Nissan NA.  For purposes of this decision, the figures that Nissan NA had when it made its decision to terminate Gentile Nissan's Dealer Agreement will be used.

[4] The annual total for advertising was taken from exhibit 140, which is a summary of the advertising amounts listed in document identified as Hyundai-Nissan Gross Profit Summaries from 2005-2007 (exh. 92) prepared by Sharif Farhat, Nissan NA's expert witness, from exhibits 80, 81, and 92.  Exhibits 80 and 81 are financial statements for Gentile Nissan and Gentile Hyundai.  Exhibit 92 is Gentile's Hyundai-Nissan gross profits summaries for the time period from 2005 to 2007.  The PNVR figures are taken from other exhibits which do not use the same figures for annual advertising.  The PNVR figures are those used by the complainant in its post hearing brief and presumably are the most favorable to Gentile Nissan.

expected to sell, the amount it spent on advertising in 2005 and 2006 was inadequate. Advertising is only one component of actively and effectively promoting the sale of Nissan vehicles; however, there is evidence in the record of the direct effect of advertising on sales. Gentile Nissan reduced the amount it spent on advertising from 2005 to 2006. Its new Nissan sales decreased from 273 to 213 during the same time period.

35.     After receiving the notice of default on June 30, 2006, Gentile's Nissan' sales numbers continued to be significantly lower than what it needed to sell to achieve the regional average. On January 3, 2007, Nissan NA issued a Notice of Termination to Gentile NA (exh. 62). The reasons stated for the termination were Gentile Nissan's failure to actively and effectively promote the sale of Nissan vehicles in violation of Section 3 of the Term Agreement and the failure to consistently perform at or above the regional average with respect to customer satisfaction as measured by surveys. During the cure period, Gentile Nissan's sales effectiveness declined further. So, not only did Gentile Nissan not cure the breach, its performance worsened.

36.     Nissan NA also alleged that Gentile Nissan breached the Dealer Agreement by not achieving regional average on its customer satisfaction scores. Nissan NA surveys customers and calculates two customer satisfaction scores. One score attempts to measures customers satisfaction with the buying experience and is referred to as the Nissan Purchase Index (NPI). Gentile Nissan's NPI scores and the regional averages for the time period from 2003 to 2006 are:

|  | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|
| Gentile | 77.1 | 81.9 | 88.2 | 90.1 |
| Regional Average | 84.1 | 87.4 | 92.6 | 92.3 |

        (exhs. 52, 302)

Although Gentile Nissan's NPI score never reached or exceeded the regional average score, it has improved steadily during the time period Gentile Nissan has been a Nissan dealer and it was only slightly below the region average in 2006.

37.     The other customer satisfaction calculated by Nissan NA measures customer's satisfaction with the experience of having their Nissan vehicle serviced by the dealer. This score is referred to as the Nissan Service Index (NSI). Gentile Nissan's NSI scores and the regional averages for the time period from 2003 to 2006 are:

|  | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|
| Gentile | 72 | 76.2 | 91.5 | 87.4 |
| Region | 76.5 | 79.7 | 88.9 | 89.2 |

        (exhs. 52, 302)

Gentile Nissan's NSI scores do not appear to be significantly below Nissan's regional average and exceeded the regional average in 2005.

38.     At the hearing, the respondent presented some customer survey results referred to as "dashboard surveys" (exh. 68). The dashboard surveys indicate a more negative impression of the Gentile Nissan franchise by consumers. Nissan NA started using this survey in July 2007. The dashboard surveys seek different information than that used to commute the NPI and NSI scores, so the results of the dashboard survey can not be directly compared to those scores. Additionally, even if the dashboard surveys could be used to evaluate customer satisfaction, these surveys were not conducted until after the Notice of Termination was issued.

39.     In 2006, the year ending prior to the issuance of the Notice of Termination, Gentile Nissan ranked last out of seventeen Nissan dealers in Wisconsin. It also ranked 164 out of 184 Nissan dealers in the North Central region (exh 70, at A-32). Not only was Gentile Nissan not achieving sale effectiveness at the regional average, its sales in terms of numbers and sales effectiveness were declining at the time the Notice of Termination was issued. Although Nissan NA terminated Gentile Nissan's franchise after it had been in operation for only five full years, the termination was reasonable because Gentile Nissan's sales performance was declining for no apparent reason other than the Dealer's lack of effort. It was reasonable for Nissan NA to terminate Gentile Nissan's franchise before the situation deteriorated any further. Nissan NA's decision to terminate Gentile Nissan's Dealer Agreement was fair and equitable.

40.     The phrase "similarly situated dealers" is not defined in the statute. At a minimum, other Wisconsin single point Nissan dealers should be considered dealers similarly situated to Gentile Nissan. With respect to other Wisconsin dealers, Gentile Nissan is the lowest performing Nissan dealer in terms of sales performance. Nissan NA's termination of Gentile Nissan's franchise is not discriminatory compared to its treatment of other Wisconsin Nissan dealers. Since Gentile Nissan's sales performance is compared to the average of Nissan dealers in the North Central region, one could argue that all Nissan dealers in the North Central region could be considered similarly situated. However, there are too many variables such as market conditions and state regulations to compare Nissan NA's treatment of Gentile Nissan with respect to all the Nissan dealers in the North Central region. Nissan NA's termination of Gentile Nissan's franchise is not discriminatory with respect to other similarly situated dealers.

## Discussion

Nissan NA issued a Notice of Termination notifying Gentile Nissan that it was terminating its Nissan franchise based on Gentile Nissan's failure to meet performance standards with respect to new vehicle sales and customer satisfaction. There is no dispute that Gentile Nissan has not been achieving sales effectiveness based on the regional average for Nissan dealers and competitive registrations in Gentile Nissan's assigned PMA. The issue is whether this failure constitutes sufficient grounds to allow Nissan NA to terminate Gentile Nissan's Dealer Agreement. In order to terminate Gentile Nissan's franchise, Nissan NA must show the termination was fair, with just provocation, and with due regard to the equities (Wis. Stat. § 218.0114(7)(d).

To determine whether the termination is "with just provocation" the first question is whether Gentile Nissan's failure to achieve regional sales effectiveness constitutes a material

breach of the Dealer Agreement. The first step in answering this question is to determine what the Dealer Agreement requires. Article Second, paragraph (b) of the various Term Agreements entered into between Gentile Nissan and Nissan NA provides that it is the Dealer's responsibility to "actively and effectively promot[e] the sale at retail of Nissan Vehicles within Dealer's Primary Market Area in accordance with Section 3 of the Standard Provisions." The relevant provisions of Section 3 of the Nissan SSA provide:

A.   General Obligations of Dealer.

Dealer shall actively and effectively promote through its own advertising and sales promotion activities the sale at retail (and if Dealer elects, the leasing and rental) of Nissan Vehicles to customers located within Dealer's Primary Market Area. . . ..

B.   Sales of Nissan Cars and Nissan Trucks.

Dealer's performance of its sales responsibility for Nissan Cars and Nissan Trucks will be evaluated by Seller on the basis of such reasonable criteria as Seller may develop from time to time, including for example:

1.   Achievement of reasonable sales objectives which may be established from time to time by Seller for Dealer as standards for performance;

2.   Dealer's sales of Nissan Cars and Nissan Trucks in Dealer's Primary Market Area and/or the metropolitan area in which Dealer is located, as applicable, or Dealer's sales as a percentage of:

(i)   registrations of Nissan Cars and Nissan Trucks;

(ii)   registrations of Competitive Vehicles;

(iii)   registrations of Industry Cars;

(iv)   registrations of vehicles in the Competitive Truck Segment;

3.   A comparison of Dealer's sales and/or registrations to sales and/or registrations of all other Authorized Nissan Dealers combined in Seller's Sales Region and District in which Dealer is located and, where Section 3.C applies, for all other Authorized Nissan Dealers combined in the metropolitan area in which Dealer is located; and

4.   A comparison of sales and/or registrations achieved by Dealer to the sales or registrations of Dealer's competitors.

The sales and registration data referred to in this Section 3 shall be those utilized in Seller's records or in reports furnished to Seller by independent sources

selected by it and generally available for such purpose in the automotive industry. If such reports of registration and/or sales are not generally available, Seller may rely on such other registration and/or sales data as can be reasonably obtained by Seller.

Nissan NA asserts that the second part of section 3.B.2 refers to the sales effectiveness performance standard generally used in the motor vehicle sales industry. The quoted language can certainly be interpreted in that manner. Additionally, to the extent that Gentile Nissan could legitimately claim that the language in the SSA is ambiguous, it should be noted that the section 3.B states that Nissan NA will evaluate its dealers "on the basis of such reasonable criteria as Seller may develop from time to time." The listed sales performance standards are only intended to be examples of criteria that Nissan NA may use. Nissan NA made it abundantly clear to Gentile Nissan in a number of documents that it was evaluating its sales performance based on sales effectiveness.

Sales effectiveness is calculated by multiplying the total number of new vehicle registrations in a dealer's PMA by the manufacture's market penetration in a chosen area (e.g. region average, national average, or state average) to determine a dealer's expected sales. The dealer's actual sales (regardless of where the vehicle is registered) are compared to its expected sales. Expected sales are calculated as if all a dealer's sales were to residents of the dealer's PMA, but actual sales are counted regardless of where the vehicle is registered.

The complainant argues that the standard Gentile Nissan's sales performance should be judged by is registration effectiveness, not sales effectiveness. Registration effectiveness measures the market penetration of Nissan automobiles and trucks in the respective dealer's PMA. The manufacturer looks at how well its products are selling in that territory to evaluate the dealer's sales performance. The manufacturer gives a dealer credit for retail registrations in the dealer's assigned territory, regardless of which dealer sold a particular vehicle. The use of retail registration effectiveness has a certain logical appeal in that it attempts to measure how well a dealer is representing the brand. Arguably, comparing Nissan's regional sales penetration with Gentile Nissan's total sales is an apple to oranges comparison. However, doing so is actually a conservative standard for judging Gentile Nissan's sales performance because Nissan is giving Gentile Nissan credit for all it sales, not just those within its PMA. Because substantial areas are unassigned, all Nissan dealers theoretically could have sales effectiveness in excess of the regional average.[5]

---

[5] Nissan registrations for the Racine PMA were also below the regional average. Therefore, Gentile Nissan did not achieve registration effectiveness either. However, registration effectiveness for the Racine PMA is not as far below regional average as Gentile Nissan's sales effectiveness. In 2005 and 2007, the Nissan registrations in Racine County (a portion of the Racine PMA) exceeded the expected sales at regional average. This is the only incident during the time period that Gentile Nissan was a Nissan dealer that actual sales exceeded expected sales and it is only achieved by splitting the PMA in half. Additionally, it should be noted that the Nissan registrations in Racine County in 2007 (288) exceeded Gentile Nissan's total sales of new Nissans (206). Therefore, it is Nissan dealers other than Gentile Nissan that are responsible for the fact that Nissan was registration effective in Racine County in 2007.

Based on the language in the SSA, the appropriate performance standard is sales effectiveness. The next step is to determine whether the Dealer Agreement requires Gentile Nissan to achieve the regional average or merely use its best efforts to achieve it. Gentile Nissan cites Exhibit "A" of Article Twelfth of Amendment No. 2 of the Term Agreement which provides that Gentile is required to "use its best efforts to meet or exceed the North Central Region average sales penetration for the Nissan total competitive car and truck segments on or before **July 1, 2006** based on data available at that time and at all times thereafter." (emphasis in original)  Article Twelfth of the term agreement sets forth conditions that Gentile Nissan must meet in order to be offered a standard Nissan SSA.

The term agreement does not specify the consequences if Gentile does not meet the conditions. Arguably, if Gentile Nissan failed to use its best efforts, the term agreement would simply expire and its Nissan franchise would terminate. However, Wisconsin law gives motor vehicle dealers added protections. Nissan must still show a breach of the Dealer Agreement before it can involuntarily terminate Gentile Nissan's Nissan franchise. Gentile Nissan's responsibility under the Dealer Agreement is that it must actively and effectively promote Nissan products. Gentile Nissan has breached this provision of the Dealer Agreement. However, both the Dealer Agreement and the applicable Wisconsin Statute require consideration of any extenuating circumstances which may prevent a dealer from achieving sales effectiveness. Specifically, the relevant section of the dealer Agreement is Section 3, Paragraph "D" of the SSA This paragraph provides:

> D.    Additional Factors for Consideration.
>
> Where appropriate in evaluating Dealer's sales performance, Seller will take into account such reasonable criteria as Seller may determine from time to time, including, for example, the following:  the Dealership Location; the general shopping habits of the public in such market area; the availability of Nissan Vehicles to Dealer and to other Authorized Nissan Dealers; any special local marketing conditions that would affect Dealer's sales performance differently from the sales performance of other Authorized Nissan Dealers; the recent and long term trends in Dealer's sales performance; the manner in which Dealer has conducted its sales operations (including advertising, sales promotion, and treatment of customers); and the other factors; if any, directly affecting Dealer's sales opportunities and performance.

Similarly, the definition for "just provocation" found at Wis. Stat. § 218.0116(1)(i)1.b provides that the breach must be "due to matters within the dealer's . . . control." The final step in deciding whether just provocation for the termination exists is to determine whether Gentile Nissan's failure to achieve regional sales effectiveness was due to extenuating circumstances beyond its control.

Gentile Nissan's expert identified several factors that he alleges have made it difficult for Gentile Nissan to achieve regional sales effectiveness. These factors include the bi-modal population distribution of the Racine PMA, the commuting patterns of the population of the Racine PMA, the existence of a large Chrysler engine plant in Kenosha, and the existence of the

two Rosen Nissan dealerships on either side of the Racine PMA. The effect of these factors was addressed in detail by Nissan NA's expert in his rebuttal report. For the most part, Nissan NA successfully refuted the factors that Gentile Nissan alleged were the cause of its poor sales performance. It is also important to note that, with one exception, all the extenuating circumstances alleged by Gentile Nissan were faced by Kenosha Nissan and have existed throughout the period that Gentile has operated a Nissan dealership.

Kenosha Nissan, although only sales effective its last full year of operating a Nissan dealership, had steadily improving sales numbers. Gentile Nissan's argument that its poor sales performance was caused by extenuating circumstances is also undermined by the fact that its sales numbers have been declining at a time that Nissan's sales, as a brand, have been growing. It is possible that some of these factors identified by Professor Matthews may make selling Nissans in the Racine PMA more difficult than in other PMAs in Nissan's North Central region. However, Gentile Nissan's annual sales have never reached the number that Kenosha Nissan was achieving and have declined since 2005. Even if the factors that Gentile Nissan alleges make the Racine PMA a more difficult market to sell Nissans in were legitimate considerations, they do not explain why Gentile Nissan's sales would be declining during a period that Nissan's sales were increasing.

Nissan has asserted different reasons for Gentile Nissan's failure to achieve sales effectiveness. The primary reasons Nissan asserts include inadequate advertising, lack of a dedicated sales staff, a revolving door for sales managers, and a lack of a dedicated executive manager. The lack of a dedicated sales staff, a revolving door for sales managers, and a lack of a dedicated executive manager all contribute to an apparent lack of focus on Nissan by the complainant. These factors, however, are hard to quantify. Additionally, the inability of Gentile Nissan to retain a sales manager may be outside of its control. The remaining reason cited by Nissan NA is inadequate advertising.

Because of the use of combined financial statements one cannot determine how much Gentile Nissan actually spent on advertising for Nissan. If one accepts the testimony of Gentile Nissan's witnesses related to advertising, Gentile Nissan's advertising PNVR was at or slightly above the amount recommended by NADA and Nissan. However, this means that Gentile Nissan was only attempting to sell approximately the number of vehicles it actually sold, not the number it needed to sell to achieve the regional average. Even accepting Gentile Nissan numbers for advertising, Gentile Nissan was not spending the amount it was required to spend to effectively promote Nissan products.

In its posthearing brief, the complainant argues that motor vehicle dealers typically adjust their variable expenses, such as advertising, on the basis of past sales and that this is prudent business behavior. This may be rational behavior, but at a time that Gentile Nissan knew its sales performance was unsatisfactory, it does not make sense for it to adjust its advertising based on the unsatisfactory sales level. If in fact Gentile Nissan was adjusting its advertising expenditures in this manner, it means that it was content with its present levels of sales. Gentile Nissan knew that that level of sales was unacceptable to Nissan NA based on the numerous warning letters issued by Nissan and eventually by the Notice of Default.

The bottom line with respect to Gentile Nissan's sales performance is that there is no credible reason for Gentile Nissan's declining sales during a time period when Nissan as a brand had increasing sales. Nissan NA has shown that Gentile Nissan has breached the Dealer Agreement by not effectively promoting Nissan products. Gentile has suggested assorted circumstances beyond its control that have prevented it from achieving sales effectiveness. None of these extenuating circumstances explain the decline in sales. Additionally, with respect to the competition with the Rosen dealerships, the one area, if any, that Gentile Nissan should dominate is the area immediately surrounding its dealership. Gentile Nissan did not capture the majority of Nissan registrations in that area.

The other allegation in the Notice of Termination is that Gentile Nissan has failed to achieve the regional average in two measures of customer satisfaction. Customer satisfaction is an important consideration and it is reasonable for Nissan to require its dealers to achieve minimum customer satisfaction scores. Gentile Nissan only achieved the required minimum customer satisfaction score (regional average) once in a four year period. However, its scores the other years were not significantly below the regional average and do not constitute a material breach of the Dealer Agreement.

In conclusion, Gentile Nissan's ineffective sales performance constitutes a material breach of the Dealer Agreement. Gentile Nissan has not cured this breach despite being given notice and a reasonable opportunity to do so by Nissan NA. Nissan NA has established that it had just provocation to terminate the Dealer Agreement of Gentile Nissan and that it has done so with due regard to the equities.

## Conclusions of Law

The administrator concludes:

1. Wis. Stat. § 218.0116(1)(i) prohibits motor vehicle manufacturers terminating the franchises of motor vehicle dealers without "just provocation." For purposes of Wis. Stat. § 218.0116(1)(i), "just provocation" requires that the dealer engage in conduct that is a material breach of the Dealer Agreement and the dealer continues to engage in the conduct after receiving written notice of the breach and a reasonable opportunity to cure the breach. Nissan NA gave Gentile Nissan notice of two alleged breaches of the franchise agreement.

2. Nissan NA gave Gentile Nissan 180 days to cure the alleged material breaches of the Dealer Agreement. This is a reasonable time to cure the alleged breaches. Gentile Nissan did not cure the breach of its failure to actively and effectively promote the sale at retail of Nissan products.

3. The conduct of Gentile Nissan as described in the Findings of Fact with respect to its efforts to "actively and effectively promote the sale of Nissan products at retail" constitutes a material breach of the Dealer Agreement.

4.     Nissan NA termination of the Dealer Agreement with Gentile Nissan was fair, with due regard to the equities, and with just provocation.

5.     Pursuant to Wis. Stat. § 218.0114(7)(d), the Division of Hearings and Appeals has the authority to issue the following orders.

Order

The administrator orders:

Nissan North America, Inc., has not cancelled the Dealer Agreement it entered into with Ralph Gentile, Inc., d/b/a Gentile Nissan unfairly, without due regard to the equities, and without just provocation.  The complaint of Ralph Gentile, Inc., d/b/a Gentile Nissan, is hereby DISMISSED.

Dated at Madison, Wisconsin on February 4, 2010.

STATE OF WISCONSIN
DIVISION OF HEARINGS AND APPEALS
5005 University Avenue, Suite 201
Madison, Wisconsin  53705
Telephone:     (608) 266-7709
FAX:            (608) 267-2744

By: _____
David H. Schwarz
Administrator

## NOTICE

Set out below is a list of alternative methods available to persons who may wish to obtain review of the attached decision of the Division. This notice is provided to insure compliance with Wis. Stat. § 227.48 and sets out the rights of any party to this proceeding to petition for rehearing and administrative or judicial review of an adverse decision.

1.    Any person aggrieved by the attached order may within twenty (20) days after service of such order or decision file with the Division of Hearings and Appeals a written petition for rehearing pursuant to Wis. Stat. § 227.49. Rehearing may only be granted for those reasons set out in Wis. Stat. § 227.49(3). A petition under this section is not a prerequisite for judicial review under Wis. Stat. §§ 227.52 and 227.53.

2.    Any person aggrieved by the attached decision which adversely affects the substantial interests of such person by action or inaction, affirmative or negative in form is entitled to judicial review by filing a petition therefore in accordance with the provisions of Wis. Stat. §§ 227.52 and 227.53. Said petition must be filed within thirty (30) days after service of the agency decision sought to be reviewed. If a rehearing is requested as noted in paragraph (1) above, any party seeking judicial review shall serve and file a petition for review within thirty (30) days after service of the order disposing of the rehearing application or within thirty (30) days after final disposition by operation of law. Any petition for judicial review shall name the Division of Hearings and Appeals as the respondent. The Division of Hearings and Appeals shall be served with a copy of the petition either personally or by certified mail. The address for service is:

DIVISION OF HEARINGS AND APPEALS
5005 University Avenue, Suite 201
Madison, Wisconsin 53705-5400

Persons desiring to file for judicial review are advised to closely examine all provisions of Wis. Stat. § 227.52 and 227.53 to insure strict compliance with all its requirements.

G:\DOCS\GenDecisions\ralphgentileFinalDec.mjk.doc