# **<u>TAB 5</u>**

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, ss.                                  SUPERIOR COURT
                                             CIVIL ACTION NO. 2004-00010

INFINITI AUTOMOBILES OF NORWOOD, INC.

vs.

NISSAN NORTH AMERICA, INC. & another[1]

FINDINGS OF FACT, RULINGS OF LAW AND ORDER

## I. INTRODUCTION

Infiniti Automobiles of Norwood, Inc. (referred to herein as the plaintiff or Infiniti of

Norwood), brought this action under the Massachusetts New Motor Vehicle Dealer Franchise

Act, G.L. c. 93B, challenging what it calls a proposed two-step appointment by the defendant,

Nissan North America, Inc. (Nissan), of the defendant Quirk Infiniti to operate a car dealership

within the plaintiff's eight mile relevant market area[2] without good cause and in an arbitrary and

unconscionable manner.[3] The plaintiff further asserts that Nissan has violated G.L. c. 93B by

---

[1] Quirk Infiniti, Inc.

[2] The relevant market area of the plaintiff's dealership is the geographic area surrounding the boundary of the dealership "encompassed in a circle with a radius of 8 miles from any boundary of the dealership." See G.L. c. 93B, § 1 (1). RMAs are determined by state law.

[3] The claims set forth in the plaintiff's second amended complaint which survived the defendants' motion to dismiss are the following: the plaintiff seeks a declaratory judgment that it has standing to protest Quirk Infiniti's appointment as a dealer at 20 Granite Street in Braintree (Count I); seeks pursuant to G.L. c. 93B, §§ 6 (e) and 15(a), an injunction against the proposed appointment and relocation of Quirk Infiniti to 20 Granite Street (Count II); seeks a judgment declaring that the appointment or relocation of Quirk Infiniti to 20 Granite Street was not for good cause within the meaning of G.L. c. 93B, § 6 (Count III); seeks a judgment declaring that the appointment or relocation of Quirk Infiniti to 20 Granite Street in Braintree was in bad faith and done in an arbitrary and unconscionable manner in violation of G.L. c. 93B, § 6 (Count IV); seeks an order permanently enjoining Nissan's relocation of Quirk Infiniti to 20 Granite Street

retaliating against the plaintiff for protesting the appointment of Quirk Infiniti.  The defendants

argue that the appointment of Quirk Infiniti and its planned relocation to a site 7.62 miles from

the plaintiff are exempt from the relevant market area restriction as the relocation of an existing

motor vehicle dealer pursuant to G.L. c. 93B, § 6 (b)(1), and that even if the relocation

exemption were inapplicable, Nissan's appointment of Quirk Infiniti to the site within the

---

because the defendants' two step appointment and relocation plan was done in bad faith and/or in
an arbitrary and unconscionable manner in violation of G.L. c. 93B, §§ 4 (c)(12) (Count V);
seeks an award of damages pursuant to G.L. c. 93B, § 15, for damages sustained by the plaintiff
as a result of Nissan's appointment of Quirk Infiniti and the damages the plaintiff claims it will
continue to sustain if Quirk Infiniti does not cease operations as part of the planned two-step
appointment (Count VI); seeks an award of costs of suit and reasonable attorney's fees under
G.L. c. 93B, § 15(c), which authorizes the court to award a prevailing party which demonstrates
that the actions, claims, or defenses of the other party were asserted in bad faith (Count VII);
seeks a judgment declaring that Nissan's response to the plaintiff's proposed restructuring was
(a) in bad faith, retaliatory, unreasonable and arbitrary, (b) in violation of G.L. c. 93B, §§ 4(a),
4(c)(8), 4(c)(12), 5(a), 9(i), that Nissan's response to the proposed transaction between the
plaintiff's owners violates three contractual provisions between the parties; and that the Court
should enter a judgment declaring that Nissan is estopped from relying on: (a) the results of the
2003 market study to justify any request or demand that the plaintiff relocate or to withhold or
condition its consent to the plaintiff's proposed restructuring, (b) post-litigation dip in the
plaintiff's CSI scores as a basis to replace the plaintiff's perpetual agreement with a term
agreement or to withhold or condition its consent to the plaintiff's proposed restructuring, and (c)
the supposed deficiencies with the plaintiff's facilities as a basis to replace the plaintiff's
perpetual agreement with a term agreement or to withhold or condition its consent to the
plaintiff's proposed restructuring (Count VIII); seeks an order enjoining Nissan from failing to
consent, without condition, to the plaintiff's proposed restructuring, including Albrecht's
purchase of Wallace's interest in the dealership (Count IX); seeking an award of damages under
G.L. c. 93B, § 15, for damages sustained by the plaintiff as a result of Nissan's actions and
response to the plaintiff's restructuring proposals (Count X);  seeks an award of litigation costs
and reasonable attorney's fees pursuant to G.L. c. 93B, § 15 (c), for damages sustained by the
plaintiff as a result of both defendants' bad faith actions in response to the plaintiff's proposed
restructuring and related bad faith defenses in this action (Count XI).
    On January 28, 2005, I allowed the defendants' motion to dismiss the second amended
complaint only insofar as: (1) it sought relief for alleged damages arising out of Quirk's
operation of business at 444 Quincy Avenue, as that location is beyond the plaintiff's relevant
market area and therefore not protestable under c. 93B, and (2) the plaintiff's claims that the
defendant violated the notice requirements of c. 93B, which alleged violation is moot.

plaintiff's relevant market area was made in good faith and not in an arbitrary or unconscionable manner.

For 19 days between February 9, 2005, and April 25, 2005, this action was tried before me without a jury. Based upon the credible evidence introduced during trial and the reasonable inferences I have drawn therefrom, I make the following findings of fact and rulings of law.

## II. SUBSIDIARY FINDINGS OF FACT

### A. Infiniti

Since 1989, Nissan, through its Infiniti Division (Infiniti), has distributed Infiniti automobiles in the United States. Infiniti competes with manufacturers of luxury brand vehicles such as Acura, Lexus, BMW, Mercedes-Benz, Volvo, Saab, Jaguar, Audi, and Lincoln-Mercury, and it competes in some segments with manufacturers of vehicles in the luxury cross-over segment, the luxury utility segment, and the near luxury segment.

Infiniti operates three regional offices—east, central, and west—which oversee approximately 200 dealerships. Infiniti's east region currently administers approximately 70 dealerships between Maine and Florida. The east region is made up of districts, which are comprised of smaller areas, such as the Boston metropolitan area, which areas are, in turn, subdivided into market areas.

A primary market area (PMA) is a geographic area identified by census tracts to be served by each Infiniti dealer. Although a dealer is primarily responsible for sales and marketing in his or her PMA, PMAs are non-exclusive and dealers are not limited to selling or providing service only to customers residing within their PMA. Nissan uses PMAs to evaluate dealers'

3

performance, to establish dealers' vehicle sales responsibilities, and to establish or amend

dealership facilities guides, which dictate the minimum optimal size for each dealership facility

depending upon each market's planning volume.[4]

 Infiniti also monitors market areas deemed insufficient to support the appointment of an

Infiniti dealer, and continually evaluates market changes to see if and where additional dealer

representation is warranted.  Generally, Infiniti will not seek to add dealer representation in a

market if the planning volume for that market is below 300.  When considering whether or not to

add a new dealership, Infiniti takes into account the potential effects upon other dealers near the

monitored markets, as it is in Infiniti's best interest to add dealerships which do not jeopardize

the financial viability of existing dealerships.  Once Infiniti determines that a monitored market is

sufficient to support dealer representation, it upgrades the area from a monitored market to an

open point, then seeks to fill the open point by reviewing applications from potential dealers

relating to specific sites proposed.  Desirable factors considered when deciding where to appoint

new dealerships include proximity to competing brand dealerships and affluent communities as

well as access to major high traffic volume roadways.  Infiniti prefers that its dealers operate

exclusively Infiniti dealerships which conduct both sales and service at a single location for

customer convenience.

 To guide these dealer network decisions, Nissan's National Market Representation

Department (NMRD) conducts in-house market studies, which are based upon statistical data

---

 [4] Infiniti assigns to each market area or dealer a planning volume, which approximates the number of anticipated new Infiniti vehicle registrations within a PMA based upon Infiniti's expectations regarding the industry and its products.  Infiniti uses planning volumes not only to determine minimum guidelines for a dealership's facilities, but also to assess whether sufficient opportunity exists within a particular market to warrant additional dealer representation there.

including sales, registration, and demographic information, and in-field market studies, which combine statistical analysis with actual visits to the market areas, Infiniti's dealers, and competitive dealers. Infiniti uses NMRD studies to determine whether to add a dealership in a particular market and whether or not the location and facilities of existing and proposed dealerships are optimal for their markets. In addition to the NMRD studies, Infiniti regularly reviews market penetration information[5] and performance data of existing dealerships, including outsold[6] and insell reports, to detect underrepresentation in markets. Ultimately, Infiniti's national office considers this information and the recommendations of regional personnel in deciding whether to add dealership representation to a market.

### B. Infiniti of Norwood

In 1991, Infiniti conducted a market study of the Boston metropolitan area (the 1991 study) which recommended that Infiniti immediately establish dealership representation "on [Route] 1 between Dean Street and Coney Street in Norwood/Walpole." Exh. 351 (I 01626, I 01677). At that time, Acura, BMW, and Lexus had dealerships either already operating or under construction on Route 1 in Norwood and East Walpole. The portion of Route 1 in the Norwood area with a high concentration of automobile dealerships is known as the Automile.

In 1992, Infiniti awarded a letter of intent to George T. Albrecht, Sr. (Albrecht) for an

---

[5] Market penetration information refers to the number of Infiniti vehicle registrations in a market as a percentage of the registrations of all competitive makes in that market. In contrast, sales penetration data is the calculation of a dealer's new vehicle sales, regardless of registration location, as a percentage of the registrations of all competitive makes in the dealer's PMA. A dealer's sales penetration effectiveness is measured by comparing a dealer's sales penetration to a sales penetration average in the district, region, or nation.

[6] Outsold reports compare Infiniti performance in each of its markets against the performance of several of its key competitors, such as Mercedes-Benz, BMW, Acura and Lexus.

5

Infiniti dealership on the Automile.[7]  In the letter of intent, Infiniti reserved its right to "reassess

its requirement for dealership representation in this market," and provided that Albrecht agreed

not to file a protest action if Infiniti decided to award dealerships in Norwell, Burlington, or

Newton.

 The scarcity of available property to purchase on the Automile in 1992 and 1993 led

Albrecht and his business partner, Robert Wallace (Wallace) to lease premises at 340 Providence

Highway in Westwood, which is at the northern end of the Automile, and several miles northeast

on Route 1 of the site recommended in the 1991 study.  An advantage of 340 Providence

Highway is not only its location on the Automile, but its proximity to heavily travelled Route

128.  The disadvantage of this property, consisting of .9 acres, is that it has no room for

expansion and is not large enough to house consolidated sales and service facilities meeting

Infiniti's guidelines.  Due to the unavailability of suitable sites on the Automile at that time, with

Infiniti's approval, on January 25, 1994, Albrecht and Wallace entered an initial short term dealer

agreement with Infiniti that obligated Albrecht and Wallace to open subsequently a separate

service and parts facility.[8]

 In accordance with Infiniti's requirements, in 1994, Albrecht and Wallace spent

approximately $86,806 in renovating the Providence Highway facility, and in August of 1995,

---

 [7] By August of 2002, other luxury vehicle dealers on the Automile sold Cadillacs at 700
Providence Highway in Norwood, BMWs and Volkswagens at 918 Providence Highway in
Norwood, Saabs at 70 Providence Highway in Norwood, Lexus vehicles at 50 Providence
Highway in East Walpole, Acuras at 103 Providence Highway in East Walpole, and Volvos at
825 Providence Highway in Dedham.

 [8] The initial dealer agreement, dated January 25, 1994, and due to expire on March 31,
1995, required Wallace and Albrecht to open a service facility within ten months.  The parties
amended their agreement twice to extend, ultimately, the expiration date to August 31, 1996.

they purchased a 1.29 acre parcel of property at 363 Neponset Street in Canton, spent

approximately $52,417 in improving it, then moved the service facility there. The plaintiff's

service facility is approximately five miles south of its sales facility. In early 1996, the plaintiff

spent an additional $110,765 in remodeling the property at 340 Providence Highway in order to

transform its former service area into a new car showroom. At that time, some aspects of both

the plaintiff's sales and service facilities fell below Infiniti's size guidelines based upon its

planning volume of 585.[9]

On July 2, 1996, the plaintiff and Infiniti entered a Dealer Sales and Service Agreement

(the 1996 Dealer Agreement) which established the plaintiff as an authorized dealer of Infiniti

products and named Albrecht and Wallace as its owners, each with a 50% interest. Exh. 333 Nor

00350. By its terms, the 1996 Dealer Agreement does not expire until it is terminated by either

party; the parties thus refer to it as a perpetual dealer agreement. The 1996 Dealer Agreement

provides that

> "any change in the ownership of Dealer . . . requires the prior written consent of [Infiniti],
> excepting only changes in the record or beneficial ownership interests of Other Owners
> not effecting a change in majority control or interest . . . [Infiniti] shall not, however,
> unreasonably withhold its consent to any such change [in ownership]. [Infiniti] shall
> have no obligation to . . . give effect to any proposed sale or transfer of the ownership or

---

[9] As set forth in an addendum to the plaintiff's 1996 Dealership Agreement, based upon
the Norwood PMA's planning volume of 585 in 1996, the plaintiff's new vehicle sales building
of 6,240 square feet was 74% of the 8,400 square foot size building set by Infiniti's guide. Exh.
333 (Nor 00351). The 1996 Dealership Agreement states that the plaintiff's available land for
new vehicle sales at 340 Providence Highway was 32,878 square feet, but there is no information
identifying the square footage required by Infiniti's guide or whether the new vehicle sales land
is below the guide. Exh. 333 (Nor 00351). With respect to the plaintiff's servicing and parts
facility in Canton, the building square footage of 4,376 was 61% of the guide of 7,200 square
feet. It is not clear from the record whether the land at the service facility met Infiniti's guide for
the Norwood PMA in 1996. Exh. 333 (Nor 00351).

In 2004, the plaintiff's planning volume increased from 585 to 858.

> management of Dealer prior to having concluded the evaluation of such a proposal as
> provided in Section 14 of the Standard Provisions."

Exh. 333 Nor 00348.[10] The 1996 Dealer Agreement also contains a provision governing

management changes:

> "In view of the fact that this is a personal services Agreement and in view of its
> objectives and purposes, Dealer agrees that any change in the Executive Manager from
> that specified in . . . this Agreement requires the prior written consent of [Infiniti]. Dealer
> shall give [Infiniti] prior notice of any proposed change in Executive Manager . . . No
> change in Executive Manager shall be effective unless and until embodied in an
> appropriate amendment to this Agreement duly executed and delivered by [Infiniti] and
> by Dealer. Subject to the foregoing, Dealer shall make its own, independent decisions
> concerning the hiring and firing of its employees, including, without limitation, its
> Executive Manager."

Exh. 333 Nor 00348.

In November of 2000, the NMRD conducted but did not finalize an in-field market study

(the November 2000 study) in the Boston metropolitan area, which then had three Infiniti

dealerships: the plaintiff, Herb Chambers in Boston, and Kelly Infiniti in Danvers. The

November 2000 study concluded that the Norwood PMA still had a planning volume of 585, and

recommended that the plaintiff provide "exclusive sales, service and parts facility on US 1

(Providence Highway). The preferred location is south of 95, in the vicinity of other dealerships.

. . ." Because the November 2000 study was not finalized, Wallace and Albrecht were not

informed of its recommendations.

Despite the November 2000 study's recommendation, Infiniti expressed satisfaction with

the plaintiff's performance. In July of 2001, Ed Sherman, then the regional vice president of

Infiniti's east region, described the plaintiff as "a proven profitable operator who possesses a

---

[10] Section 14 of the Standard Provisions is not included in this exhibit.

8

strong commitment toward customer satisfaction at an acceptable facility." Exh. 383.

Meanwhile, the plaintiff continued to make improvements to its facilities. Between 1998 and

2002, the plaintiff expended $743,032.02 expanding its service and parts facility by over 4,000

square feet. I infer that this expansion brought the size of the service and parts building into

compliance with Infiniti's facility guide in effect at that time. See n. 9, *supra*. In 2003, as

directed by Infiniti, the plaintiff improved its sales facility at a cost of $235,956.

In 2001, Infiniti permitted the plaintiff to amend the 1996 Dealer Agreement to reflect

that Infiniti Automobiles of Norwood Business Trust owned 100% of Infiniti of Norwood, with

Wallace and Albrecht each trustees holding 50% interest as settlors of the trust, and that Wallace

was the executive manager of Infiniti of Norwood who oversaw the daily operations of the store.

### C. The Appointment of Quirk Infiniti

Beginning in the early 1990s, Infiniti viewed the South Shore, and specifically Norwell,

as a potential site for an additional Infiniti dealership due to the affluence of the nearby coastal

communities. Infiniti originally designated the area the Norwell monitored market. Although

the November 2000 study concluded that the Norwell monitored market had a planning volume

of 320, which is above that required by Infiniti to add dealership representation, it recommended

continued monitoring rather than declaration of an open point.

In the spring of 2002, Mark McDowell (McDowell), Infiniti's market representation

manager for the east region, received two letters from dealers proposing to represent Infiniti in

the South Shore, and calling McDowell's attention to the presence of other luxury make

dealerships and the market opportunity in the Norwell area.

In June of 2002, the NMRD completed an in-house market study of the Norwell

9

monitored market and noted that (1) the Norwell market population is the Boston metropolitan area's smallest but that it was projected to grow by 2.6% from 2001-2006; (2) the average household income is 96% of the Boston metropolitan area, and higher incomes are in the northern portion along the coast of the Norwell monitored market; (3) the Norwell competitive segment market penetration performance for 2001 was "well below the Boston Metro, state, region, and US levels"; and (4) "[o]pportunities per dealer in Norwell of 2,467 compare to 14,177 in the Boston PMA, 6,859 in the Danvers PMA and 6,073 in the Norwood PMA." The study recommended "no market action as the Norwell PMA is not of sufficient size to warrant exclusive Infiniti representation at this time."[11]

        In October of 2002, Gary Frigo (Frigo) became Infiniti's east region vice president, leaving his position at Nissan's national offices. Frigo's mandate was to improve the market performance of the east region, which lagged behind Infiniti's two other regions. Particularly weak within the east region was the Boston metropolitan area. In 2002, among the then 43 Infiniti dealers in the east region, the Boston metropolitan area ranked as the fifth most outsold by luxury make competitors Acura, BMW, Lexus, and Mercedes-Benz.[12]

        Against this backdrop and contrary to the recommendation of the June 2002 NMRD study, Frigo early on as regional vice president considered upgrading the Norwell monitored

---

        [11] The executive summary of the June 2002 market study states that the Norwell monitored market planning volume was 329 in 1995 and either 153 or 258 in 2002. (The 153 number appears in type and is scratched out, with the hand-written figure 258 appearing to replace it). It is not clear who altered the document or when.

        [12] The five most outsold metropolitan areas compared to these same four luxury vehicle manufacturers were New York/Long Island, Southeastern Florida, Washington D.C., Philadelphia, and Boston. Among the least outsold Infiniti areas was Portland, Maine.

10

market to an open point and appointing as a dealer there Daniel Quirk (Quirk). Quirk has been in

the new car business since 1974, and has owned automobile franchises representing Nissan, Kia,

Chevrolet, Ford, Volkswagen, and Mazda. In 2002, Quirk had two automotive dealerships in

Braintree: Quirk Nissan at 20 Granite Street and Quirk Chevrolet at 444 Quincy Avenue. Frigo

knew from his work with Nissan of the success of Quirk Nissan, which in 2002 had a prime

location near the intersection of I-93 and Route 3, both major roads with high traffic volumes,

and which provide access between Boston and the wealthy South Shore coastal towns.

Frigo was also aware of an obvious difficulty with appointing Quirk as an Infiniti dealer

at 20 Granite Street: because this site lies just 7.62 miles east of the plaintiff's sales facility,[13] it is

within the plaintiff's eight mile relevant market area and thus would be protestable by the

plaintiff under G.L. c. 93B. By contrast, Quirk's Chevrolet dealership on Quincy Avenue was

10.3 miles east of the plaintiff, and therefore not within the plaintiff's relevant market area.

Frigo promptly sought market analyses to determine whether the appointment of Quirk at 20

Granite Avenue would be warranted.

On October 30-31, 2002, the NMRD conducted "an evaluation of a proposed relocation

of the current Monitored Market site in Norwell to 20 Granite Street in Braintree." The October

2002 study noted that there was at that time no luxury representation in Quincy or Braintree, that

20 Granite Street "offers good access from Boston together with areas to the south." The study

summary emphasized the larger population and household base with significant income levels,

and concluded that (1) "market studies can support the location of the current Norwell PMA

---

[13] 20 Granite Street is approximately 7.9 air miles from the plaintiff's service and parts
facility in Canton. Exh. 3.

dealer site in Braintree; and (2) the current monitored market in the Norwell PMA can be

elevated to an open point in a Braintree/Norwell PMA" based upon a revised planning volume

474 vehicles and "Impact Analysis indicating a 63.5% capturing of the Boston Metro lost

opportunity, utilizing the penetration curve of the Boston Metro Infiniti dealers and the current

Boston Metro geography."

From December of 2002 to March of 2003, the NMRD conducted an in-field market

study of the Boston metropolitan area (the March 2003 study), which then consisted of three

dealers (the plaintiff, Herb Chambers Infiniti in Boston, and Kelly Infiniti in Danvers) and two

monitored markets (Norwell and Worcester).  The March 2003 study points out that Infiniti was

"outdealered" by most of the other luxury vehicles in South Shore with the exception of Lexus.[14]

Not surprisingly, the study revealed that for the years 2000-2002, Infiniti's market penetration in

the South Shore PMA was well below Infiniti's averages nationally, regionally, and in the Boston

metropolitan area.  Exh. 396 I 01077.  The study reiterates that the planning volume for cars in

that market was 474, well above the 300 minimum planning volume figure generally required for

declaring an open point.

The March 2003 study recommended that the Norwell monitored market be upgraded to

---

[14] For example, Infiniti had only one dealership in the city of Boston, whereas Acura,
Mercedes-Benz, BMW, Audi, had Volvo had at least two.  In the Norwell PMA, BMW, Audi
and Volvo each had one dealer, whereas in March of 2003 Infiniti had none.  See Exh. 396.  One
of the conclusions of the study was that

"Infiniti representation of three active dealerships [in the Boston metropolitan area] is
currently commensurate with Lexus (3) but below Acura (5), M-B (5), and BMW (6).
Infiniti has two 'monitored markets' in Norwell and Worcester, where Lexus is
constructing a fourth facility.  There is a dual Infiniti operation in the Boston PMA with
Honda.  The Norwood PMA facility service and parts operation is situated five miles east
of the sales site."

an open point and renamed the South Shore PMA, citing among its reasons for declaring the

South Shore Open Point that: (1) the highly travelled I-93 and Route 3 provide access to Boston,

its southern suburbs, the South Shore, and the regional South Shore Plaza mall; (2) the average

household income of $77,412 ranks third in the Boston metropolitan area; (3) there is a projected

population growth of 2.2% by 2007, with the largest population concentration in the northeast

region; (4) there are five luxury import dealers in the Hanover/Norwell area, plus others in the

South Shore; and (5) the South Shore PMA's retail competitive segment market penetration

performance was below that of the Boston metropolitan area, Massachusetts, Infiniti's east

region, and the nation.  The study described the preferred location for a new dealership "between

the Braintree area in the north and the Hanover area to the south, preferably in the vicinity of

competitive luxury representation."

The March 2003 study contained recommendations for the other markets in the Boston

metropolitan area, including that the plaintiff

> "provide consolidated exclusive stand alone Infiniti sales, service and parts facilities on
> US 1 (Providence Highway).  The preferred site would be southwest of the current sales
> facility, in the vicinity of existing competitive import luxury dealerships (e.g. Lexus and
> Acura) with access from both directions on US 1 . . . ."

The March 2003 study criticizes the plaintiff's facility, describing it as "below guide, congested,

offers no room for expansion and is non-competitive in appearance.  Sales site visibility and

access is difficult from the north."  These comments are consistent with Infiniti's longstanding,

well-known preferences and high standards as set forth in its 1991 and 2000 studies and Infiniti's

recommendations regarding other dealerships assessed in this study.[15]  The March 2003 study

---

[15] The March 2003 study also recommended that Herb Chambers' Boston store have
"Exclusivity/Explansion/Facility Upgrade" and that the Danvers store undergo a facility upgrade.

13

recommendations are supported by the fact that the size of some aspects of the plaintiff's sales

facility have always been below Infiniti's guidelines and are insufficient to handle the available

and increasing opportunity for the sale of Infiniti vehicles in the Norwood PMA. I find and rule,

therefore, that the March 2003 study recommendations concerning the plaintiff were supported

by legitimate business considerations and good faith judgment. Exhs. 333, 344.[16]

In March of 2003, Frigo and his assistant regional manager, Michael Fischer (Fischer),

and Mark McNabb (McNabb), the vice president of Infiniti, visited Infiniti of Norwood as well

as Quirk at his Chevrolet dealership which was then at 444 Quincy Avenue in Braintree, a 32,000

square foot newly renovated square foot facility. They also toured Quirk's adjacent property at

442 Quincy Avenue, a newly-renovated 35,000 square foot building used to house Quirk's

antique car collection, and a shipyard Quirk had just purchased to store new cars. Frigo, Fischer,

McNabb and Quirk discussed Quirk's interest in becoming an Infiniti dealer. Fischer, who had

previously worked for Nissan's northeast region, had already toured Quirk's Nissan dealership at

20 Granite Street in Braintree, a 15,000 square foot building. Fischer and Frigo preferred 20

Granite Street for an Infiniti dealership due to its location, despite the fact that it was not near

competitive luxury dealerships.

By early June of 2003, it had become common knowledge in the marketplace that Infiniti

---

[16] The plaintiff complains that although only the NMRD has the authority to make or
revise recommendations, after the March 2003 study was signed by NMRD personnel, Frigo
successfully requested that the study be revised to recommend that the plaintiff move southwest
on the Automile to be near other luxury make dealerships. See Exh. 119 and Exh. 396. I credit
Fischer's testimony that material changes to market studies can legitimately occur even after
Infiniti's national and regional personnel have signed off on the studies. The support for Frigo's
revisions belies any contention that the revisions were incorporated in bad faith or unauthorized.
Moreover, the NMRD ultimately approved of Frigo's recommended revision.

08/04/05  11:36 FAX 781 326 3871        NORFOLK SUP. COURT                   ☒016

was considering adding dealer representation in the South Shore market. Infiniti's management

received communications from several automotive dealers expressing their interest in being

appointed as Infiniti dealers if an open point were declared in the South Shore. Among these

communications was a letter dated June 17, 2003, from Quirk offering two Braintree sites for an

Infiniti dealership: 20 Granite Street, which was still housing Quirk Nissan, and 444 Quincy

Avenue. That summer, Quirk had decided to move Quirk Nissan from 20 Granite Street, which

it had outgrown, to a larger facility in Quincy.

Although in June of 2003, Frigo, McNabb, and Fischer preferred Quirk as the candidate

for the South Shore open point, Frigo remained interested in exploring other possible candidates,

and in early June of 2003 directed that the Boston dealer operations manager (DOM)[17] meet with

one candidate whose proposal Frigo characterized as "serious." Frigo also directed other

members of his staff to meet that candidate before deciding on who would receive the South

Shore/Norwell appointment. Exh. 400, 401. Moreover, another employee was told to "speak

with all candidates with the goal of whittling them down to a the [*sic*] short list of finalists and

conducting our due diligence." Exh. 406. I find that although by late 2002 Frigo had a clear

preference to appoint Quirk as an Infiniti dealer at 20 Granite Street, he continued to consider

other dealers and locations for the planned open point through at least part of June of 2003.[18]

In June of 2003, Infiniti retained an expert consulting firm, Urban Science Applications,

---

[17] Dealer operations managers are responsible for meeting regularly with dealers to discuss performance, management changes, and dealership deficiencies.

[18] In June of 2003, the South Shore open point, based upon a planning volume of 474, required a building with 16,035 square feet and a total land size of 63,729 square feet, or 1.46 acres. Exh. 406.

15

Inc. (Urban Science), which conducts automotive dealer network and market analysis, to assess

whether there was good cause to appoint a dealer to 20 Granite Street. Mr. Sharif Farhat

(Farhat), who has been the Director of Network Dealer Analysis in North America for Urban

Science for the past four years, conducted the study (the June 2003 Urban Science Study) and

also testified as an expert witness for the defense in this trial. Farhat has abundant experience as

both a non-litigation consultant and as an expert witness in legal disputes involving dealer

network planning analysis. Farhat has mostly conducted analysis for the benefit of automotive

manufacturers. The Court finds that the analytical methodology employed by Farhat and Urban

Science is reasonable for evaluating Infiniti's market performance and for assessing proposed

solutions for strengthening that performance. The Court finds Farhat's analysis and the June

2003 Urban Science Study to be credible and reliable evidence.[19]

The June 2003 Urban Science Study contains a map identifying optimal locations for

Infiniti dealerships in the Boston metropolitan area. Exh. 404 I 00663. According to the map,

the optimal location for an Infiniti dealership in the Norwood PMA is several miles south of the

plaintiff, and the optimal location for an Infiniti dealership in the South Shore PMA is several

miles southeast of 20 Granite Street.

Nonetheless, Farhat's data and analysis support Frigo's preference for appointing a dealer

in the South Shore and specifically at 20 Granite Street. The addition of a fourth Infiniti

dealership within the Boston metropolitan area brings this area only slightly below Infiniti's

national represented average. Exh. 404 I 00654. The plaintiff's sales effectiveness in 2002

---

[19] Accordingly, the Court denies the plaintiff's request in Count VIII of its second
amended complaint for a declaration that Nissan be estopped from relying upon the June 2003
Urban Science Study.

outside its eight mile relevant market area, as in the vast majority of the South Shore PMA, was

plainly inadequate.[20] The traffic volume in Braintree, and particularly at 20 Granite Street, is

several times greater than that in Norwell. Exh. 404 I 00665. The population of persons aged 16

and over in the Braintree relevant market area, like that of the plaintiff's relevant market area, is

projected to grow between 2002 and 2007.[21]

        In an effort to counter Farhat's conclusions, the plaintiff offered the opinion and studies

of its expert, Dr. Ernest Manuel, Jr. (Manuel), of the Fontana Group, which generally performs

studies and represents dealers who are protesting the addition or relocation of dealers. Manuel's

methodology assesses the impact upon existing dealers by additional same line-make dealers by

estimating the existing dealer's decline in new vehicle sales due to the loss of a distance

advantage. I find that Manuel's impact analysis methodology rests upon inconsistent standards

which distort the estimated effect upon the plaintiff and yield speculative results. I further find

that Manuel's conclusions rest, in part, upon unsupported assumptions which place an inordinate

amount of weight upon distance as a factor in a dealership's sales. Contrary to this assumption,

the data shows that successful Infiniti dealers such as Kelly Infiniti in Danvers have made

significant sales into other PMAs which have far closer Infiniti dealerships. Manuel's

methodology underestimates the effect of other factors, such as aggressive advertising and

---

[20] The plaintiff's sales effectiveness in areas 8-20 miles away ranged from 28% to 18.5%. Exh. 404  I 00656.

[21] The Braintree relevant market area population aged 16 and over is projected to grow from 607,261 in 2002 to 616,448 in 2007. Exh. 404 I 00641. The Braintree population aged 16 and over is projected to grow from 571,821 in 2002 to 588,642 in 2007. Exh. 404 I 00643. This is consistent with population changes anticipated closer to the plaintiff. The population aged 16 and over in Norwood is expected to grow from 525,002 in 2002 to 543,827 in 2007.

proximity and accessibility to highly travelled routes. Another defect in Manuel's analysis is that

it addresses only some of the factors relevant to this c. 93B action, and provides no meaningful

data or analysis addressing the critical question of whether or not there was good cause for

Infiniti to appoint or relocate a dealer to 20 Granite Street. Consequently, I do not credit the

opinions offered by Manuel in this case.

On August 5, 2003, Quirk sent Frigo a letter applying for the Infiniti South Shore open

point. The letter reads in relevant part:

> "I would like to propose the location of 20 Granite Street, Braintree, formerly Quirk
> Nissan. This property is located near South Shore Plaza, which is one of New England's
> busiest shopping malls. My proposal would be to demolish the current dealership
> building and construct an authorized state of the art Infiniti facility. In the meantime,
> perhaps for a period of less than one year, Infiniti could operate a full service dealership
> at 444 Quincy Avenue, Braintree. The building is a newly renovated 35,000 square foot,
> stand alone facility. This property is located adjacent to Quirk Chevrolet, New England's
> #1 volume dealer selling in excess of 350 new Chevrolet vehicles per month."

I find, based upon Quirk's testimony at trial, that he knew by some point in August of 2003 that

he would be awarded the South Shore open point.

It was not until August of 2003 that Infiniti shared the results of the March 2003 study

with dealers. On August 15, 2003, Bryan Dumais (Dumais), the new Boston DOM, visited

Infiniti of Norwood. Dumais told Wallace that key findings of the March 2003 study

recommended the establishment of an open point on the South Shore and that the plaintiff

consolidate and relocate its sales and service facilities southwest on the Automile closer to other

luxury dealerships such as Acura and Lexus. Dumais also reviewed with Wallace the March

2003 study's market effectiveness results, which calculated Infiniti's market share in the

plaintiff's primary market area to be at 82% of the national average through June of 2003, down

from 94% in 2001, and that Infiniti's market share in the South Shore PMA declined from 63%

of the national average in 2001 to 54% of the national average market penetration through June

2003. These figures contrast with Infiniti's awards to the plaintiff in the spring and summer of

2003 of additional earnings under an incentive program known as the Infiniti Brand fund due to

the plaintiff's strong performance in retail sales.

On August 25, 2003, Nissan sent the plaintiff a letter formally advising it that the March

2003 study recommended that the plaintiff consolidate and relocate to a site farther southwest on

Route 1, and that an open point was recommended for the South Shore market. Exh. 409.

Although Infiniti did not require its dealers to comply promptly with market studies'

recommendations, it told Wallace and Albrecht that if they decided to sell or transfer the

ownership of Infiniti of Norwood, Infiniti would be able to condition its approval of the transfer

upon the plaintiff's commitment to relocate the facilities and comply with other

recommendations of the March 2003 study.

On August 27, 2003, Infiniti sent Quirk a letter listing documents needed for an "Open

Point Close package," and noting that Infiniti might require additional documents from Quirk as

"the review process" moves forward. Exh. 410. On September 4, 2003, Quirk sent Infiniti what

was referred to as application paperwork, but which largely are documents signed by Quirk

agreeing to various conditions and payments to Infiniti.

On September 5, 2003, Dumais met with Wallace and Albrecht to discuss the June 2003

study. When asked by Albrecht whether Infiniti had someone in mind for the South Shore open

point, Dumais denied it. I find that Dumais was aware at that time that Quirk Infiniti would be

appointed but was not authorized to disclose it.[22]

On October 9, 2003, Frigo sent to Infiniti's national office a request for an Open Point Close for the South Shore market area. In the correspondence, Frigo referred to the proposed dealer, Quirk, as a highly successful Nissan dealer, and described the proposed facilities on Quincy Avenue as follows:

> "The 'interim' site is located at 442 Quincy Avenue . . . The total building land dedicated to Infiniti is approximately 194,604 square feet (4.47 acres) census guide of 68,219 (1.57 acres). The building is approximately 35,000 square feet versus guide of 17,585 square feet. A Term Agreement will be secured, conditional upon relocation to the 'permanent' site, located at 20 Granite Street . . . ."

Exh. 416. This document contains no description of the property at 20 Granite Street apart from its address, even though it is proposed as the permanent site for Quirk Infiniti. Exh. 416. Nonetheless, I find by reasonable inference that Infiniti will require Quirk Infiniti to construct a facility which will meet its guidelines. On October 17, 2003, Infiniti approved the proposed Open Point Close for Quirk Infiniti.

At some point in October of 2003, Dumais told Wallace and Albrecht that Quirk Infiniti would open at Quincy Avenue in Braintree within 30 days.

On October 20, 2003, Nissan and Quirk entered into a dealer agreement authorizing Quirk to operate an Infiniti dealership at 442 Quincy Avenue. Infiniti required Quirk to purchase approximately $200,000 in signs, lighting, furniture and other showroom facility fixtures. Exh. 412. Although the agreement does not expressly state that the new facilities were required to be

_____

[22] The NMRD Dealer Sales and Service Agreement Guide relating to market studies provides that "No individual PMA recommendations are to be . . . discussed with dealers outside of their own PMA . . . Any additional information must be reviewed by [NMRD] and Legal prior to review with a dealer." Exh. 166 (I 5688).

constructed at 20 Granite Street, Braintree, Quirk testified at trial that as part of the dealer

agreement, he understood he was obligated to construct new dealer facilities at 20 Granite Street.

(Quirk Test. 2/10/05 p. 73, lines 1-15).

On October 24, 2003, Quirk opened Quirk Infiniti at Quincy Avenue.[23]

In 2004, Quirk Infiniti spent approximately $217,250 in advertising its business

operations at Quincy Avenue. Exh. 324. In 2004, Quirk Infiniti sold 792 new Infiniti vehicles.

On February 16, 2004, Infiniti informed Albrecht that effective January 2, 2004, it had

revised the plaintiff's PMA to exclude 20 Granite Street in Braintree. On July 14, 2004, Frigo

notified Quirk by letter that Infiniti had updated and increased Quirk Infiniti's planning volume

from 474 to 548, and that although Infiniti revised its facility guides in 2003, it was again

reviewing them to determine future needs in light of growth of sales and service. Exh. 430 I

02751.[24]

On August 3, 2004, Frigo requested Infiniti's national offices to approve of Quirk's

request to relocate to 20 Granite Street, using the old facility while constructing a new building.

On September 16, 2004, Frigo advised Albrecht in a letter that Nissan intended to enter

into an amended Infiniti Dealer Term Sales and Service Agreement with Quirk approving the

---

[23] Although Quirk testified that he expended approximately $1,000,000 to convert the
Quincy Avenue site into an Infiniti dealership, Quirk's 2004 financial statement shows only that
he spent approximately $200,000 for showroom equipment for that site as required by an Infiniti
agreement. See Exh. 324. Quirk's testimony that the balance of approximately $800,000 spent
on plumbing, masonry, electrical work, heating and air conditioning is not supported by
documentation before the Court. Quirk Testimony 2/10/05 p. 31.

[24] Likewise, on July 14, 2004, Frigo advised Albrecht by letter that Infiniti raised the
plaintiff's PMA's planning volume to 858. The letter also stated that Infiniti's facility guides
were revised in 2003, and that due to Infiniti's growth, it was reviewing those guides again to
determine future needs.

21

relocation of its Infiniti dealership facilities from Quincy Avenue to 20 Granite Street. Exh. 436.

At the time of trial in this matter, Quirk had not made any changes to the building at 20 Granite

Street, nor had he sought building permits to reconstruct facilities at 20 Granite Street.

## III. ULTIMATE FINDINGS OF FACT AND RULINGS OF LAW

"General Laws c. 93B was enacted to protect existing car dealerships in Massachusetts

from 'destructive intrabrand competition and the unequal economic power of manufacturers.'"

*Richard Lundgren, Inc.* v. *American Honda Motor Co., Inc.*, 45 Mass. App. Ct. 410, 411 (1998),

quoting *Heritage Jeep-Eagle, Inc.* v. *Chrysler Corp.*, 39 Mass. App. Ct. 254, 259 (1995). The

statute is primarily directed at proscribing activities which constitute unfair methods of

competition or unfair and deceptive business acts and practices between motor vehicle

manufacturers, distributors and dealers. See *Richard Lundgren, Inc.* v. *American Honda Motor*

*Co., Inc.*, 45 Mass. App. Ct. at 411.

### A.    The Appointment and Planned Relocation of Quirk Infiniti

The plaintiff alleges that the appointment and planned relocation of Quirk Infiniti to 20

Granite Street in Braintree violates G.L. c. 93B, § 6, which reads in pertinent part:

"(a) Except as provided in subsection (b) of this section, it shall be a violation of
subsection (a) of section 3 for a manufacturer, distributor or franchisor representative
without good cause, in bad faith or in an arbitrary or unconscionable manner to:
(1) grant or enter into a franchise agreement with a person who would be
permitted under or required by the franchise agreement to conduct its dealership
operations from a site any boundary of which is situated within the relevant market area
of an existing motor vehicle dealer representing the same line make . . . .
(2) permit the relocation of an existing motor vehicle dealer representing the same
line make as another existing motor vehicle dealer to a site any boundary of which is
within the relevant market area of an existing motor vehicle dealer which is not relocating
. . . .
(b) Nothing contained in this section shall prohibit or prevent:

22

(1) the relocation of an existing motor vehicle dealer to a location within the existing dealer's own relevant market area; if the proposed new location is not within a 4 mile radius of any other same line make motor vehicle dealer unless the site of the proposed relocation is farther away from the protesting dealer than the existing location;[25] . . . ."

The plaintiff also contends that the two-step appointment and relocation plan was undertaken in an arbitrary and unconscionable manner in violation of G.L. c. 93B, § 4(c)(12), which proscribes manufacturers, distributors and franchisor representatives from "act[ing] to accomplish, either directly or indirectly through any parent company, subsidiary, or agent, what would otherwise be prohibited under this chapter on the part of the manufacturer or distributor."

## 1. Applicability of Relocation Exemption

The first question is whether the planned move of Quirk Infiniti to 20 Granite Street is permissible under G.L. c. 93B, § 6, as the relocation of an existing motor vehicle dealer. In order to come within the relocation exemption in the circumstances set forth above, (1) Quirk Infiniti must be an "existing motor vehicle dealer" at Quincy Avenue, (2) 20 Granite Street must be within the relevant market area of Quirk Infiniti's Quincy Avenue site, and (3) 20 Granite Street must be more than 4 miles from the plaintiff. G.L. c. 93B, § 6 (b) (1). There is no real dispute that the location of 20 Granite Street satisfies the second and third prongs of this inquiry, as it is within eight miles of Quincy Avenue and more than four miles from the plaintiff. Therefore, the dispositive question is whether or not Quirk Infiniti is an "existing motor vehicle dealer" at

---

[25]  The latter clause of § 6(b)(1) suffers from a typographical error insofar as it only would make sense if the semicolon were replaced with a comma. The legislative intent, despite the error, is discernible: the relocation of an existing motor vehicle dealer within its own original relevant market area (in this case, eight miles) does not violate Section 6(a) if the proposed relocation site is more than four miles from any other same line make motor vehicle dealer.

Quincy Avenue. Both the facts and the law favor the defendants on this point.

Although the defendants' plan was for Quirk Infiniti to operate for less than 12 months at Quincy Avenue, Quirk Infiniti has, for over 20 months, made substantial sales and conducted a high volume of business in its servicing and parts facility. Moreover, G.L. c. 93B does not define "existing motor vehicle dealer" nor does it require a dealership to operate at one site for any minimum period in order to qualify as an "existing motor vehicle dealer" and to relocate to another site within its own relevant market area. G.L. c. 93B, § 6 (b).[26] Absent a statutory directive setting a minimum time period for a dealership to operate at one site before relocating within its own relevant market area and at least four miles from another dealership selling the same line make vehicles, the Court finds and rules that Quirk Infiniti, with over 20 months in business, qualifies as an existing dealer at Quincy Avenue. Consequently, because the planned franchise move is to a site within 8 miles of the Quincy Avenue site, and 20 Granite Street is more than 4 miles from the plaintiff, I find and rule that the relocation exemption applies here to defeat the plaintiff's protest of Quirk Infiniti's appointment to 20 Granite Street.

### 2.    Whether Good Cause Existed for Appointment of Quirk Infiniti to Granite

---

[26] The Court assumes that the Legislature is aware of the loophole in this statute by not requiring a new dealer to operate at one site for a minimum period before being able to relocate into an existing dealer's relevant market area. At least one other state, North Carolina, has remedied this problem by requiring the relocating franchise to have operated on a regular basis for at least three years before the relocation. See N.C.G.S.A. § 20-305. This Court lacks authority to read requirements into G.L. c. 93B, § 6. See *Ocean Spray Cranberries, Inc.* v. *State Tax Comm'n*, 355 Mass. 592, 597 (1969) (any desired change in statute is for Legislature to make, not the court); *Larkin* v. *Charlestown Savings Bank*, 7 Mass. App. Ct. 178, 184 (1979) ("It is axiomatic that 'statutes must be construed as written and cannot be rewritten judicially'"), quoting *Commonwealth* v. *Brooks*, 366 Mass. 423, 427-428 (1974). Moreover, I find that Quirk Infiniti's operation at Quincy Avenue for over 20 months was sufficient to qualify it as an existing dealership.

Street

Underpinning the plaintiff's claims is the theory that Nissan in essence appointed Quirk
Infiniti as a dealer at 20 Granite Street rather than at Quincy Avenue, but set up the two-step
appointment to look like a relocation and thereby sidestep the provisions of G.L. c. 93B, § 6 (a).
Because the statute's relocation exemption can at least theoretically be abused to appoint
dealerships in a way which might otherwise violate G.L. c. 93B, § 6, the Court assumes for the
sake of argument that Nissan appointed Quirk Infiniti to 20 Granite Street, and considers whether
there was good cause for that appointment.

Nissan, as the distributor of Infiniti brand vehicles, bears the burden to establish that the
proposed appointment and/or relocation is for good cause. G.L. c. 93B, § 6(h). The plaintiff, as
protestor, bears the burden of establishing that the appointment and/or relocation is in bad faith
or is in an arbitrary or unconscionable manner. *Id.*

G.L. c. 93B, § 6 (g), reads

"In determining whether the proposed appointment or relocation is for good cause, the
court shall consider all pertinent circumstances, that include but are not limited to:
(1) whether the establishment of the additional franchise or relocation of the existing
motor vehicle dealer appeared to be warranted by economic and marketing conditions
including anticipated future changes;
(2) the retail sales and service business transacted by the protesting motor vehicle dealer
or dealers and other motor vehicle dealers of the same line make with a place of business
in the relevant market area to be served by the additional franchise or proposed new
location of an existing motor vehicle dealer during the 3 year period immediately
preceding the notice as compared to the business available to them;
(3) the investment necessarily made and obligations incurred by the protesting motor
vehicle dealer or dealers to perform their obligations under existing franchise agreements;
(4) the permanency of the investment of the protesting motor vehicle dealer or dealers;
(5) whether it is beneficial or injurious to the public welfare for an additional franchise to
be established or for the existing motor vehicle dealer to be relocated;
(6) whether the protesting motor vehicle dealer or dealers and other motor vehicle dealers
of the same line make with a place of business in the relevant market area to be served by

25

the additional franchise or proposed relocating motor vehicle dealer are providing
adequate competition and convenient consumer care for the motor vehicles of the same
line make owned or operated by residents and persons with places of business in the
relevant market area to be served by the additional franchise or proposed relocating motor
vehicle dealer;

7) whether the protesting motor vehicle dealer or dealers and other motor vehicle dealers
of the same line make with a place of business in the relevant market area to be served by
the additional franchise or proposed relocating motor vehicle dealer have adequate motor
vehicle sales and service facilities, equipment, vehicle parts and qualified personnel to
reasonably provide for the needs of the consumers in the relevant market area to be
served by the additional franchise or proposed relocating motor vehicle dealer; and,

(8) whether the establishment of an additional franchise or relocation of an existing motor
vehicle dealer would increase competition and therefore be in the public interest."

The Court turns to consider these factors.

### (a).   Economic and Marketing Conditions

The evidence of economic and marketing conditions presented at trial solidly supports the

addition of an Infiniti dealership in the South Shore and specifically at 20 Granite Street. As

detailed above, the data compiled in the March 2003 study shows that Infiniti (1) was outsold by

other luxury vehicle manufacturers in the Boston metropolitan area; (2) was outdealered by many

of its competitors and underrepresented in the Boston metropolitan area;  (3) had an adequate

planning volume in the South Shore PMA to support dealer representation there; and (4) was

generally outsold in the South Shore by most other luxury vehicle manufacturers.  These factors,

when viewed with the affluence of South Shore communities, the relatively high average

household income, the projected population increase, and the presence of other luxury vehicle

dealerships in the South Shore, compel the conclusion that Infiniti was underperforming in the

Braintree/South Shore market in 2002-2003.

Furthermore, the cross-sell reports, which indicate the number of new vehicle sales by

each dealer as reflected in new vehicle registrations,[27] disclose a dramatic rise in the number of

new Infiniti registrations in the South Shore PMA since Quirk Infiniti's appointment, from 91 in

2001, 102 in 2002, 110 in 2003, and to 314 in 2004. The cross-sell reports also reveal some

improvement between 2003 and 2004 in the Boston, Danvers, and Norwood PMAs, albeit on a

more modest scale than that experienced in the South Shore PMA. I find that these reports

confirm that Infiniti's market penetration in what is now the South Shore PMA was severely

underperforming prior to 2004, and that the addition of Quirk Infiniti significantly improved

Infiniti's market performance there. I find that Infiniti's sales performance throughout the

Boston metropolitan area in 2004 was also boosted by Infiniti's launch of an all wheel drive, near

luxury vehicle model, the G35x.[28]

---

[27] Cross-sell reports track where dealer sales are registered. For dealers in the Boston
metropolitan market, a cross-sell report reflects the number of sales each dealer makes into its
own PMA and into other Boston metropolitan markets, the percentage of each dealer's sales into
each market, and the percentage of sales each dealer made in each market. Exhs. 300-301. The
cross-sell figures for the years 2001-2004 are the following:

| PMA | 2001 | 2002 | 2003 | 2004 |
|-----|------|------|------|------|
| Boston | 537 | 575 | 618 | 665 |
| Danvers | 576 | 582 | 423 | 512 |
| Norwood | 335 | 337 | 368 | 376 |
| South Shore | 91 | 102 | 110 | 314 |

[28] On December 9, 2003, Infiniti introduced the all wheel drive (AWD) G35x, which has
improved Infiniti's Boston metropolitan area market performance overall. Previously, Infiniti's
rear wheel drive (RWD) near luxury models, including the popular G35 model launched in late
2002, generally sold much better in warmer climates than in snowy areas such as the northeast
and the Rocky Mountains. The exceptions to this trend in the Danvers PMA and in Portland,
Maine, both of which have a history of strong market performance, undercut the plaintiff's theory
that Infiniti's weak market penetration scores in 2002 in the Boston metropolitan area resulted
from its inability to compete with near luxury vehicle manufacturers selling all wheel drive
models.

The question becomes, then, whether the economic and marketing conditions, including anticipated future changes, warranted Infiniti's appointment of Quirk at 20 Granite Street. I find that Quirk, known to Nissan through his Nissan dealership at 20 Granite Street, his experience of successfully operating numerous dealerships in the Boston metropolitan area, and his reputation as an aggressive advertiser, was a competent candidate for an Infiniti dealership appointment. More importantly, Quirk offered Infiniti the unique ability to establish representation at 20 Granite Street. The proven success of 20 Granite Street as a Nisssan dealership, with its proximity to Routes I-93 and 3 as well as the South Shore Plaza, explains why Infiniti preferred Quirk's proposal at 20 Granite Street over other sites. Although 20 Granite Street is not near other South Shore luxury dealerships, which are clustered in the Norwell/Hanover area, and I infer that it is not as spacious as Quirk's properties on Quincy Avenue, the high traffic volume near 20 Granite Street gives this site a great advantage over other proposed sites for an Infiniti dealership. Accordingly, I find that the economic and marketing conditions, including anticipated future changes, warranted the establishment of Quirk Infiniti at 20 Granite Street in Braintree.

### (b)   Plaintiff's Sales and Service Business

The plaintiff's monthly Infiniti financial statements show a deep and largely sustained decline in net earnings throughout 2004 compared to the two previous years. In both 2002 and 2003, the plaintiff's net earnings in the first two months of each year were under $100,000, but by July of both years its net earnings rose to at least $400,000, and by December even higher, to

$654,890 in 2002 and $710,946 in 2003.  In July of 2004, however, the plaintiff's net earnings

reached only $173,815.  And in its most profitable month of 2004 (among the financial

statements in evidence), September, the plaintiff's net earnings were only $216,256, compared to

$701,640 in net earnings in September of 2003.[29]

The defendants predictably advance a long list of reasons other than the arrival of Quirk

Infiniti for the plaintiff's financial downturn in 2004.  The theory that Infiniti's 1.4% drop of the

---

[29]  The plaintiff reported the following net earnings in its Infiniti financial statements for
the following months:

|                 |         |
|-----------------|---------|
| January 2002    | $44,448 |
| February 2002   | 61,844  |
| March 2002      | 148,971 |
| April 2002      | 235,361 |
| May 2002        | 243,150 |
| July 2002       | 408,086 |
| August 2002     | 487,712 |
| December 2002   | 654,890 |
| January 2003    | 75,721  |
| February 2003   | 71,669  |
| March 2003      | 172,336 |
| April 2003      | 269,547 |
| June 2003       | 409,065 |
| July 2003       | 552,710 |
| August 2003     | 681,019 |
| September 2003  | 701,640 |
| October 2003    | 746,477 |
| December 2003   | 710,946 |
| January 2004    | 15,083  |
| February 2004   | 35,197  |
| April 2004      | 56,122  |
| May 2004        | 90,703  |
| June 2004       | 139,809 |
| July 2004       | 173,815 |
| August 2004     | 191,013 |
| September 2004  | 216,256 |

Exhs. 211 through 229.

dea.er net margin on new vehicles as of April 1, 2004, does not explain why the plaintiff's net earnings remained so low in March of 2004.  The defendants also point to the plaintiff's significant additional expenses in 2004, such as (1) $100,000 in legal costs; (2) the payment of Wallace's entire annual salary of $110,000 in March while also paying the unspecified salary of his replacement, George Albrecht, Jr.; (3) the payment of $9,000 to the plaintiff's business trust; (4) a rent expense increase of $10,000 in 2004; and (5) insurance and depreciation expenses totalling $30,000 more in 2004 than in 2003.  The defendants further cite the plaintiff's personnel changes and challenges in 2004 and the plaintiff's failure to earn all of the available Brand Fund monies.  I find that these factors fall far short of explaining the deep cut in the plaintiff's net earnings month after month in 2004.

The plaintiff has not shown, however, that the presence of Quirk Infiniti in Braintree is the cause of the plaintiff's economic troubles in 2004 or that its move to 20 Granite Street would, on balance, harm the plaintiff.  I find that the risk of an adverse impact on the plaintiff from Quirk Infiniti's planned move to 20 Granite Street is so low as to only have a minimal impact on the good cause analysis.

As indicated above, I credit the testimony of Infiniti's expert, Farhat, of Urban Science that competing dealers capture an increase in market penetration and sales from the expanded opportunity that results from a new appointment.  According to Farhat, the appointment of additional dealerships generally results in more advertising and greater brand awareness in a market, thereby increasing sales of that brand.  This is known as the "rising tide" theory, and it has been supported by Infiniti's experience in adding dealers in Miami and Philadelphia.

Consistent with this theory, Infiniti's market performance in the Boston metropolitan

30

area, including the Norwood PMA, has improved since Nissan appointed Quirk Infiniti at Quincy Avenue. Even the plaintiff's sales of new vehicles between 2000-2004 rose slightly to its highest level in 2004, Quirk Infiniti's first full year in business.[30] Moreover, the plaintiff's number of sales within the South Shore PMA remained fairly stable, within the 65-70 vehicles per year range in the years leading up to Quirk Infiniti's appointment.[31] That the plaintiff no longer has the largest proportionate share of sales in what had been the Norwell monitored market does not persuade me that it has been harmed by the appointment of Quirk Infiniti.

I find that the plaintiff's stable market performance in the Norwood PMA in 2004, despite the addition of an Infiniti dealer in the neighboring South Shore PMA, is attributable in part to the additional advertising, brand awareness, and increased competition with other luxury makes undertaken by Quirk Infiniti. I further find that Quirk Infiniti's planned move to 20 Granite Street would not alter the "rising tide" or otherwise harm, on balance, the plaintiff's business.

Moreover, the demographic data presented in the various reports submitted by Infiniti

---

[30] The plaintiff reported in its financial statements that it had sold the following numbers of new Infiniti vehicles in the years 2000 through 2004:

| Year | Number of vehicles sold |
|------|-------------------------|
| 2000 | 667 |
| 2001 | 694 |
| 2002 | 572 |
| 2003 | 623 |
| 2004 | 756 |

[31] According to Infiniti's cross-sell reports, in 2001, the plaintiff sold 65 of the 91 new Infinitis registered in the Norwell monitored market. In 2002, the plaintiff sold 67 of the 102 new Infinitis registered in that market. In 2003, the plaintiff sold 70 of the 110 new Infinitis registered in what was renamed the South Shore PMA. In 2004, the plaintiff sold 66 of the 314 new vehicles registered in the South Shore PMA. Exhibits 300-304.

show that the plaintiff primarily serves a different population than Quirk Infiniti would at Granite

Avenue. The largest tract of the wealthiest households (with an average income of $125,000 and

above) near the plaintiff lies to the west of the Automile, and thus is closer to the plaintiff than to

20 Granite Street. The largest wealthiest population in the South Shore PMA is east of 20

Granite, along and near the northern coast, an area in which the plaintiff's market penetration had

been weak. Although a smaller tract of the wealthiest households lies within the northwest

corner of what is now the South Shore PMA (and had previously been within the Norwood

PMA), this tract is geographically not significantly much closer to 20 Granite Street than to the

plaintiff.

　　　According to the most recent demographic data presented at trial, the second most

wealthy households (with average incomes of $100,000 to $125,000) are far more prevalent in

the Norwood PMA than in the South Shore PMA. The statistical studies project an increase in

the populations of both the Norwood PMA (1.99% by 2007), which comprises the second largest

population among the Boston metropolitan area PMAs, and the South Shore PMA (2.2%), with

comparable average household incomes in both ($77,205 in the plaintiff's PMA and $77,412 in

the South Shore PMA). Therefore, both the Norwood and the South Shore PMAs are likely to

benefit from an increased demand for luxury vehicles in the 2002-2005 period. This is consistent

with the increases in the planning volume figures assigned to the South Shore PMA and the

Norwood PMA.

　　　Therefore, I find and rule that the plaintiff's steady sales record for the years 2001

through 2004, the demographic trends in the Norwood and South Shore PMAs, and the

conclusions of the Urban Science study demonstrate that the appointment of Quirk Infiniti to 20

32

Granite Street is for good cause.

### (c)    The Plaintiff's Investment

It is uncontroverted that the plaintiff has spent significant sums between 1994 and 2002 in acquiring its sales facility under a lease, the service facility by purchase, and in renovating and upgrading both facilities, albeit not uniformly up to Infiniti's size guides.[32] I find that these expenditures are not excessive but rather a normal, expected cost of operating luxury vehicle dealership sales and services facilities in the Boston metropolitan area. I further find that to a large extent, the plaintiff's investment is not permanent, insofar as its lease of the Westwood property is for a limited term, and the plaintiff has not shown, much less argued, that it cannot sell its Canton property. Moreover, I find that the plaintiff's net earnings in the years up to and including 2003 more than compensated for the cost of the plaintiff's investments. Consequently, the permanency and obligatory nature of the plaintiff's investments do not undermine the conclusion that Infiniti's appointment of Quirk at 20 Granite Street is for good cause.

### (d)  Public Welfare, Adequacy of Competition and Customer Care

The dramatic turnaround of Infiniti sales in what is now the South Shore PMA in 2004 compared to the three previous years persuades me that there was in 2002-2003 a tremendous need for increased competition in the Boston metropolitan market, and particularly the South

---

[32] Between 1994 and 2002, the plaintiff spent nearly $450,000 in renovating its sales facility in Westwood and nearly $800,000 renovating and expanding its service and parts facility in Canton. Although the plaintiff's principals told Infiniti that they renewed the lease shortly before August of 2003, Infiniti's unsigned and undated dealership addendum states that the most recent lease was due to expire on November 1, 2004, and that the net monthly cost incurred by the plaintiff (for rent, taxes, and insurance) was at some unspecified point $16,300, with an estimated 6% increase for the years 6 through 9 of the lease. Exh. 344.

Shore, for luxury vehicle sales. Despite the fact that Infiniti continues to be outdealered by several other luxury vehicle distributors, Quirk Infiniti's operations in the South Shore PMA have provided greater competition across luxury makes and thereby benefitted the public. Infiniti's representation through Quirk Infiniti also benefits the public by providing an additional sales facility which produces greater competition among Infiniti dealers in the Boston metropolitan area.

The plaintiff's solid success in retail sales lends some support to its claim of having adequate sales facilities, but it also bolsters Infiniti's argument that the plaintiff's growing business and planning volume render its sales facility increasingly inadequate in size. I do not credit the testimony of George Albrecht, Jr., that the plaintiff's sales facility is large enough to accommodate increased growth, particularly in light of Infiniti's high standards. Moreover, although the plaintiff downplays any inconvenience to its customers due to the five mile distance between its split facilities, I find sound the opinion of Fischer that consolidated facilities are more convenient for Infiniti customers. That Infiniti approved of the plaintiff's split facilities in 1996 does not undercut Infiniti's unwavering preference for consolidated sales and service facilities or Infiniti's other criticisms of the site of Infiniti of Norwood, that it is congested and has poor access and visibility from one direction on Route 1. I find that these are legitimate criticisms, viewed in the context of Infiniti's recognized standards for customer care and service, and that they render the plaintiff's level of consumer care within its relevant market area inadequate.

I further find that an additional Infiniti franchise at 20 Granite Street, barely within the plaintiff's relevant market area but at a major intersection, in the Boston metropolitan area, will

34

offer Infiniti owners residing north and east of the Automile a more easily accessible and

convenient consolidated parts and service facility than what is currently available.

In sum, I find that in 2003, good cause existed for Infiniti to add dealer representation in

the South Shore, and that the best available opportunity to improve Infiniti's weak performance

in the South Shore and in the Boston metropolitan area was to appoint Quirk at 20 Granite Street.

I therefore find that there was good cause to appoint Quirk Infiniti to 20 Granite Street. The

plaintiff has not shown that the appointment Quirk Infiniti to 20 Granite Street was undertaken in

bad faith or in an unconscionable manner. Moreover, absent evidence that the operation of Quirk

Infiniti at 20 Granite Street would impinge economically in any significant way upon the

plaintiff's business, I further find and rule that this appointment was not arbitrary. See *Richard*

*Lundgren, Inc.* v. *American Honda Motor Co., Inc.*, 45 Mass. App. Ct. 410, 412 (1998)

("arbitrary" for purposes of c. 93B means that new dealership will economically impinge upon

existing dealership). Because the plaintiff has not shown that either of the defendants engaged

in an unfair method of competition or an unfair or deceptive act or practice as defined by G.L. c.

93B in connection with the appointment of Quirk Infiniti and which resulted in harm to the

plaintiff, the defendants are entitled to judgment on Counts I through VI of the plaintiff's second

amended complaint.

### B.   Infiniti's Response to Plaintiff's Restructuring Proposal

In January of 2004, the plaintiff filed its original complaint in this action asserting that

Nissan planned a two-step appointment, first at Quincy Avenue, then at Granite Street, so that the

appointment to Granite Street would look like the relocation of an existing dealership and thus

not be protestable by the plaintiff. Two months later, on March 11, 2004, Wallace and Albrecht

informed Frigo by telephone that they had decided that Wallace would retire, sell his ownership

interests in the plaintiff to Albrecht, and Albrecht would appoint his son, George Albrecht, Jr., as

the new executive manager of Infiniti of Norwood.[33] Frigo replied in the same telephonic

conversation that Infiniti's approval process of the restructuring proposal would be quick and a

mere formality, and that he would send them the minimal paperwork necessary once they sent a

letter explaining the proposed restructuring. On March 11, 2004, Albrecht sent Frigo the

requested letter outlining the proposed changes and asking Frigo to advise him of what additional

documentation was needed to support the ownership change application. In late March of 2004,

Wallace retired.

On April 2, 2004, Frigo sent Albrecht a letter stating that pursuant to Section 14B of the

Standard Provisions to the 1996 Dealer Agreement, any material change to the ownership or

management of the dealership would be treated by Infiniti as a new proposal. Exh. 423. Neither

Frigo's letter nor the defendants' copy of the 1996 Dealer Agreement in evidence includes the

text of Section 14B. In his letter, Frigo then states that Infiniti would not evaluate the

restructuring proposals until the plaintiff met three conditions, only two of which are at issue.

Exh. 423. Frigo explained the first in his letter as follows:

> "Based on the deficient customer satisfaction performance, Norwood will be required to
> execute an Infiniti Term Sales and Service Agreement conditioned upon achievement of
> regional average or greater CSI[34] scores."

---

[33] George Albrecht, Jr., had been a general manager of Nissan of Natick from May 2002
to April of 2004. From September of 1998 to May of 2002, he had been a sales manager at
Woburn Toyota.

[34] Infiniti calculates customer service performance by tracking each dealer's customer
satisfaction index (CSI) scores, which are calculated based on surveys completed by the dealer's
customers. The CSI scores are comprised of the Infiniti purchase index (IPI), which measures

36

The other condition is that Nissan retained the right to "condition its approval . . . on [the

plaintiff's] commitment to relocate the dealership facilities to a location and facilities acceptable

to Infiniti in accordance with the market study recommendations[,]" which are that the plaintiff

> "provide consolidated, exclusive, stand alone Infiniti sales, service and parts facilities on
> U.S. 1 . . . and the preferred site would be southwest of the current sales facility, in the
> vicinity of the existing competitive import luxury dealerships with access from both
> directions on U.S.1."

At the end of the letter, Frigo listed documents and attached an application form for Albrecht to

complete in order for Infiniti to evaluate the proposed restructuring.

In May of 2004, the plaintiff sent Frigo the completed forms for Infiniti's evaluation of

George Albrecht, Jr., as the proposed new executive manager and acknowledged that while

George Albrecht, Jr., is subject to evaluation for Infiniti's future approval, he is nonetheless

authorized to represent the plaintiff as its executive manager during the evaluation period.

The plaintiff contends in its second amended complaint that Nissan's response to the

plaintiff's proposed restructuring, specifically its imposition of the two conditions set forth

above, was in bad faith, retaliatory, unreasonable and arbitrary, in violation of G.L. c. 93B, §§

4(a),[35] 4(c)(8),[36] 4(c)(12),[37] 5(a), and 9(i), and in breach of three provisions in the parties'

_____

customers' satisfaction in the vehicle purchasing experience, and Infiniti service index (ISI),
which measures customers' satisfaction with repair work done by Infiniti facilities.

[35] General Laws c. 93B, §§ 4(a), proscribes as unfair methods of competition and unfair
or deceptive acts or practices conduct by any manufacturer, distributor, franchisor representative
or motor vehicle dealer to "engage in any action which is arbitrary, in bad faith, or
unconscionable and which causes damages to the manufacturer, distributor, franchisor
representative, motor vehicle dealer or to the public."

[36] G.L. c. 93B, § 4(c)(8), provides that it is a violation of the statute for a manufacturer,
distributor, or franchisor representative

37

contract. In its trial memoranda, however, the plaintiff only expressly presses its claims under

G.L c. 93B, §§ 5(a), and 9(i).

General Laws c. 93B, § 5(a), makes it unlawful for

"a manufacturer, distributor or franchisor representative without good cause, in bad faith

> "to impose upon any motor vehicle dealer . . . unreasonable restrictions upon the . . .
> structure of a dealership, . . . equipment and facilities or upon the ability of any
> individual, proprietor or stockholder to use, sell or transfer any interest in the dealership
> or to enter into and implement any testamentary arrangement with respect thereto. A . .
> .distributor may . . . establish reasonable standards concerning the . . . facilities needed for
> dealership operations and concerning continuity of dealership management. There shall
> be no . . . transfer of the franchise or management . . . without the written consent of the .
> . . distributor, which consent shall not unreasonably be withheld."

Section 4 (c)(8) also describes the process for applications to restructure a dealership's
ownership. First, the distributor must promptly mail a dealership application to the proposed
transferee following any request submitted by the transferring motor vehicle dealer. The
proposed transferee submits the application to the distributor "with all supporting documentation
as specified . . . by the distributor." *Id.* Then the distributor must

> "within 30 days of receiving the application and all supporting documentation as
> specified therein, review it and notify the . . . transferee . . . what additional information,
> data, or documents, if any, is needed . . . to complete its review. Upon the submission of
> all specified additional information, data or documents by the . . . transferee, said . . .
> distributor shall, within 30 days of receipt of all of the specified additional information,
> make its decision to approve or reject the proposed sale, assignment, or transfer. If the . .
> . distributor does not reject such application within 30 days after the submission of all of
> the requested additional information, data, or documents, the application shall be
> considered approved for all purposes . . . . If the manufacturer or distributor did not
> request any additional information, data, or documents, the . . . distributor shall, within 60
> days of the receipt of the application and all supporting documentation as specified
> therein, review the application and approve or reject it. If the . . . distributor does not
> reject the application within 60 days of the receipt of the application and all supporting
> documentation as specified therein, the application shall be considered approved for all
> purposes . . . ."

[37] G.L. c. 93B, § 4(c)(12), prohibits manufacturers, distributors and franchisor
representatives from "act[ing] to accomplish, either directly or indirectly through any parent
company, subsidiary, or agent, what would otherwise be prohibited under this chapter on the part
of the manufacturer or distributor."

38

or in an arbitrary or unconscionable manner: . . . (3) to offer a renewal, replacement or succeeding franchise agreement containing terms and conditions the effect of which is to substantially change the sales and service obligations, capital requirements or facilities requirements of a motor vehicle dealer. . . ."

The replacement dealership agreement contemplated in Frigo's letter would substantially change the plaintiff's sales and service obligations by erasing the plaintiff's established rights under a perpetual agreement and conditioning the plaintiff's acquisition of a perpetual dealership agreement upon acceptable customer satisfaction scores. The plaintiff has not shown that the replacement of its perpetual agreement with a term agreement is not authorized by the 1996 Dealership Agreement, which emphasizes that "this is a personal services Agreement" "entered into in reliance upon the personal qualifications, expertise, integrity, experience, ability and representations" by Wallace and Albrecht. Exh. 333. The rights and privileges conferred upon Wallace and Albrecht under the 1996 Dealership Agreement are not transferable, and the plaintiff does not have the right to restructure its ownership in the way proposed here.

The provision that the term agreement be "conditioned upon achievement of regional average or greater CSI scores," however, presents a closer question. On one hand, because imposition of this condition would not substantially alter the plaintiff's sales and service obligations, capital requirements or facility requirements, the plaintiff has not thereby established a violation of G.L. c. 93B, § 5(a). However, G.L. c. 93B, § 9(i), provides that it is an unfair or deceptive practice

"for any manufacturer or distributor to audit or examine any sales or service account or activity of a motor vehicle dealer as retribution because the motor vehicle dealer exercised any right or remedy under this chapter or exercised any right pursuant to its franchise agreement."

G.L. c. 93B, § 9(i).

Conditioning the proposed term agreement upon the plaintiff's achievement of regional or greater CSI scores is problematic because nothing before me demonstrates the reliability, objective weight, or value of CSI scores in the circumstances relevant to this case. Instead, the data discloses what appear to be almost erratic fluctuations in the CSI scores within the east region (and with the plaintiff, Quirk Infiniti, and other dealers) from quarter to quarter, and often wide disparities between a dealership's ranking in the two subparts of the CSI scores, the ISI and IPI scores. Quirk's testimony establishes that low CSI scores are sometimes attributable to causes which are not the fault of the dealership. Moreover, in both 2003 and 2004, many of the plaintiff's customer satisfaction ratings have been acclaimed by Nissan. Based upon the record before me, I find that Nissan's conditioning a term agreement with the plaintiff upon its achievement of regional or better CSI scores is arbitrary and without good cause. The arbitrariness of this condition is even more glaring in light of the fact that Frigo's description of the conditions fails to specify in any meaningful way a time period during which the plaintiff would have to achieve the targeted scores. I find, therefore, that Nissan, through Frigo, attempted to impose this arbitrary condition without good cause and audited the plaintiff's CSI scores in 2004 as retribution for the plaintiff filing this action. Accordingly, I find and rule that Nissan's conduct constitutes an unfair act as defined by G.L. c. 93B, § 9(i).

Finally, the Court assesses whether Nissan's conduct otherwise violated G.L. c. 93B by conditioning its approval of the plaintiff's proposed restructuring upon the plaintiff's commitment to relocate the dealership facilities to a location and facilities acceptable to Infiniti. That is, the plaintiff's acceptance of Frigo's terms would require it to move to a site further

40

southwest on the Automile, closer to other luxury vehicle dealerships, and to provide consolidated, exclusive Infiniti sales and service facilities.

Despite the obvious cost of this move and its downside, that the relocated facility be farther from the high density traffic of Route 128, I find that this condition is a reasonable restriction upon the structure of the plaintiff's dealership as required by G.L. c. 93B, § 4(c)(8). Wallace and Albrecht were on notice at all relevant times that Infiniti of Norwood did not satisfy Infiniti's long-standing preference for consolidated facilities and that the plaintiff's sales facility never met Infiniti's size guidelines. There is no dispute that the size of the sales facility has become even more deficient with the rise in the Norwood PMA's planning volume in 2003 and again in 2004.

The evidence squarely contradicts the plaintiff's argument that Nissan spawned this condition as retribution for the plaintiff's lawsuit. Infiniti's 1991 study recommended that Infiniti establish dealership representation near other luxury dealerships precisely where Nissan now asks the plaintiff to relocate. The NMRD's November 2000 study recommended that the plaintiff provide "exclusive sales, service and parts facility on US 1 (Providence Highway). The preferred location is south of 95, in the vicinity of other dealerships. . . ." Moreover, on August 25, 2003, over four months before the plaintiff filed this action, Frigo told Albrecht and Wallace that Infiniti could withhold its approval of any proposed ownership changes in the plaintiff pending the plaintiff's compliance with the March 2003 study relocation recommendations. These facts undermine the plaintiff's contention that Infiniti is, in an arbitrary or unconscionable manner, withholding its approval of the restructuring proposal by pressuring the plaintiff to relocate to a more appropriate site. In the absence of any evidence that this condition is arbitrary,

41

08/04/05   11:43 FAX 781 326 3871        NORFOLK SUP. COURT                    ☒043

in bad faith, unconscionable or that on balance it would damage the plaintiff or the public, the

plaintiff has not proven a violation of G.L. c. 93B, §§ 4 (a) or 4(c)(8).

### C. Requests for Damages

#### 1. Violation of G.L. c. 93B, § 9(i)

General Laws c. 93B, § 15 (a), provides that

> "Any . . . motor vehicle dealer who suffers any loss of money or property, real or
> personal, as a result of the use or employment by a manufacturer, distributor or motor
> vehicle dealer of an unfair method of competition or an unfair or deceptive act or practice
> as defined by this chapter, any act prohibited or declared unlawful by this chapter . . . may
> bring an action in the superior court . . . for damages and equitable relief, including
> injunctive relief, as described in the following sentence: The party filing suit may obtain
> equitable relief if it can be demonstrated: (1) that the unfair method of competition,
> deceptive act or practice, or violation if not enjoined would have a substantial likelihood
> of causing loss of money or property or of causing damage to the public, and (2) that all
> other customary standards governing the issuance of injunctive relief in accordance with
> Massachusetts . . . Rules of Civil Procedure . . . are met."

There is no evidence that the plaintiff has suffered a loss of real or personal property as a

result of Nissan's retaliatory and arbitrary conduct in violation of G.L. c. 93B, § 9(i). The

plaintiff has not accepted Frigo's offer to replace the 1996 Dealership Agreement with a term

agreement tied to CSI scores. In these circumstances, the plaintiff cannot obtain an award of

monetary damages. See G.L. c. 93B, § 15(a). Cf. *Cadillac/Olsmobile/Nissan Center, Inc.* v.

*General Motors Corp.*, 391 F.3d 304, 309 (1st Cir. 2004) (applying pre-2002 version of statute).

The plaintiff can only obtain equitable relief for this violation by, *inter alia*,

demonstrating that implementation of Nissan's condition "would have a substantial likelihood of

causing loss of money or property or of causing damage to the public." G.L. c. 93B, § 15 (a).

Because the plaintiff makes no effort to meet its burden on this point either through production of

evidence or argument, its requests for equitable relief fail. The Court remains concerned,

nonetheless, about the potential future harm to the plaintiff from Nissan's expressed intent to conditioning its evaluation of the plaintiff's restructuring proposal upon a term agreement which would depend upon the plaintiff's achievement of certain CSI scores for an indefinite period. For this reason, the Court retains jurisdiction over this action until it is satisfied that Nissan has complied with its obligations under G.L. c. 93B, § 9(i), in evaluating the plaintiff's proposed restructuring.

### 2. Requests for Legal Fees

All the parties in this action seek an order granting them their reasonable costs of suit on the grounds that the other side asserted claims or defenses in bad faith. Pursuant to G.L. c. 93B, § 15 (c):

> "If the prevailing party in any action or protest brought under this chapter successfully demonstrates to the court that the actions, claims or defenses of the other party were asserted in bad faith, then the court shall, in addition to the other relief provided for by this chapter and notwithstanding the amount in controversy and whether the prevailing party has sustained any actual damage, award to the prevailing party its reasonable costs of suit, including reasonable attorneys' fees."

The defendants, as the prevailing party on all counts of the second amended complaint, have not shown that the plaintiff asserted this action or claims in bad faith. Therefore, they are not entitled to the costs of suit.

## ORDER

For all the foregoing reasons, it is hereby **ORDERED** that judgment enter for the defendants on all counts of the plaintiff's second amended complaint.

The Court will retain jurisdiction to reopen the case in the event further proceedings are appropriate.

Isaac Borenstein
Justice of the Superior Court

**Dated:** August 4, 2005

44