# **<u>TAB 6</u>**

NEW MOTOR VEHICLE BOARD
1507 - 21st Street, Suite 330
Sacramento, California 95814
Telephone:  (916) 445-2080


STATE OF CALIFORNIA

NEW MOTOR VEHICLE BOARD


| | |
|---|---|
| In the Matter of the Protest of ) | |
| ) | |
| MICHAEL CADILLAC, INC. dba ) | **Protest No. PR-1819-02** |
| MICHAEL VOLKSWAGEN, ) | |
| ) | |
| Protestant, ) | |
| ) | |
| v. ) | |
| ) | |
| VOLKSWAGEN OF AMERICA, INC., ) | |
| ) | |
| Respondent. ) | |
| _____) | |

DECISION

At its regularly scheduled meeting of June 17, 2003, the

Public members of the Board met and considered the

administrative record and Proposed Decision in the above-

entitled matter.  After such consideration, the Board adopted

the Proposed Decision as its final Decision in this matter.

This Decision shall become effective forthwith.

IT IS SO ORDERED THIS 17th DAY OF JUNE 2003.

Signature on file

_____
GLENN E. STEVENS
President
New Motor Vehicle Board

```
NEW MOTOR VEHICLE BOARD
1507 - 21st Street, Suite 330
Sacramento, California 95814
Telephone: (916) 445-2080
```

STATE OF CALIFORNIA

NEW MOTOR VEHICLE BOARD

| | |
|---|---|
| In the Matter of the Protest of  ) | |
| ) | |
| MICHAEL CADILLAC, INC. dba  ) | **Protest No. PR-1819-02** |
| MICHAEL VOLKSWAGEN,  ) | |
| ) | |
| Protestant,  ) | |
| ) | **PROPOSED DECISION** |
| v.  ) | |
| ) | |
| VOLKSWAGEN OF AMERICA, INC.,  ) | |
| ) | |
| ) | |
| Respondent.  ) | |
| _____ ) | |

## <u>PROCEDURAL BACKGROUND</u>

.   By letter dated August 8, 2002, Respondent Volkswagen of America, Inc. ("VWoA" or "Respondent") notified Protestant Michael Cadillac, Inc. dba Michael Volkswagen ("Michael" or "Protestant") of its intention to establish an additional Volkswagen franchise in Clovis, California, which is within ten miles of Protestant.  The proposed new dealership would be owned and managed by Roberto Santos Zamora, a current Volkswagen dealer in Stockton, California (or his designee).

.   Protestant filed a Protest pursuant to California Vehicle Code

section 3062[1] on August 27, 2002.

.    VWoA is a distributor of new motor vehicles headquartered in Auburn Hills, Michigan, and is licensed by the California Department of Motor Vehicles.  Protestant is a licensed new motor vehicle dealer and a Volkswagen franchisee doing business at 6061 North Blackstone Avenue, Fresno, California.

.    A hearing on the merits of the Protest was held on January 21, 2003, through January 24, 2003, and January 27, 2003, through January 29, 2003, before the Honorable J. Keith McKeag, Administrative Law Judge.  Michael J. Flanagan of the Law Offices of Michael J. Flanagan, 2277 Fair Oaks Boulevard, Suite 450, Sacramento, California, appeared for Protestant, and Neil C. Erickson and Allen S. Resnick of Jeffer, Mangels, Butler & Marmaro LLP, 1900 Avenue of the Stars, Seventh Floor, Los Angeles, California, appeared on behalf of Respondent.

.    Michael Cadillac presented the testimony of six witnesses: Scott Sniffin, General Sales Manager for the Import Divisions of Protestant; Michael Rosvold, dealer principal of Protestant; Joseph F. Roesner, with The Fontana Group ("Fontana"), an automobile industry consulting firm; Ronald Friend, Service Director for Protestant; Jeffrey Moore, Controller for Protestant; and, as an adverse witness, Mal Domser, Fixed Operations Manager for Respondent.

.    VWoA presented the testimony of five witnesses:  Vincent S. Schardt, Area Executive for VWoA's Area 45; Roberto Santos Zamora, dealer principal of Zamora Auto Group and candidate for the proposed new dealership in Clovis, California; Randy Pressgrove, Dealer Franchise Manager for VWoA; Robert Michael Catanzarite, with Urban Science

---

[1]/   All statutory references are to the California Vehicle Code, unless noted otherwise.

Applications, Inc. ("Urban Science"), an automobile industry consulting firm; and John Frith, also with Urban Science.

.     Following the hearing, a briefing schedule was set, post-hearing briefs were filed and the matter was submitted for decision on April 18, 2003.

## ISSUES PRESENTED

.     Under section 3062(a)(1) a franchisor is not permitted to establish an additional motor vehicle dealership, where a timely protest has been filed, until there has been a finding of whether or not good cause exists for precluding the establishment.  Under section 3066(b), the franchisee has the burden of proof to establish that there is good cause not to enter into a franchise establishing an additional motor vehicle dealership.

.     In determining whether there is good cause for the establishment of an additional franchise, Section 3063 requires the Board to consider the existing circumstances, including but not limited to:

(a)  Permanency of investment.

(b)  Effect on the retail motor vehicle business and the consuming public in the relevant market area.

(c)  Whether it is injurious to the public welfare for an additional franchise to be established.

(d)  Whether the franchisees of the same line-make in that relevant market area are providing adequate competition and convenient consumer care for the motor vehicles of the line-make in the market area which shall include adequacy of motor vehicle sales and service facilities, equipment, supply of vehicle parts, and qualified service personnel.

(e)   Whether the establishment of an additional franchise would increase competition and therefore be in the public interest.

## FINDINGS OF FACT

### General Findings

.   VWoA divides its markets into "Regions" and then further subdivides the Regions into "Areas."  Each Area contains a number of Volkswagen dealers, and each dealer has a primary area of influence ("PAI").  VWoA's Western Region is comprised of eight Areas throughout California, and parts of Arizona, Nevada and Hawaii.  Protestant's dealership in Fresno is located within Area 45 of VWoA's Western Region. During the time involved herein, Area 45 included approximately 13 Volkswagen dealers located in the Central Valley.  Area 45 includes Protestant in Fresno, the proposed relocation site in Clovis, and the Stockton dealership owned by the proposed dealer candidate.

.   The relevant market area[2] ("RMA") involved in this proceeding is located in Fresno/Clovis, which is part of VWoA's Area 45. Presently, there is one authorized Volkswagen dealer within the RMA, which is Protestant.  Respondent's August 8, 2002, letter proposes the establishment of a second Volkswagen dealership within the RMA.

.   Protestant operates nine dealerships located on three contiguous parcels at North Blackstone and West Bullard in Fresno. Cadillac, Chevrolet, Oldsmobile, and Hummer are sited on approximately 8 acres.  Toyota sales and service, a body shop and service facilities for Volkswagen, Porsche, Audi, and Kia are sited on 8 ½ acres and sales facilities for Volkswagen, Porsche, Audi, and Kia are on a .65 acre parcel.

---

[2]/   The term "relevant market area" is defined at section 507 as "... any area within a radius of 10 miles from the site of a potential new dealership."

.    Michael Rosvold is the 100% owner of Michael Cadillac, Inc., which is the owner of all nine dealerships.  The corporation maintains consolidated financial records for the whole operation, with no separate financial statements or books maintained for the individual dealerships.

.    VWoA's principal measure of market performance is to look to its penetration rate within what it considers to be its primary competitive group of vehicles.  These are referred to as the "foreign make competitive group" or "foreign marque competitive group" ("FMCG"), and in particular it measures its performance against the "top group" of the FMCG with the highest penetration rates, consisting of Toyota, Honda, Nissan and Volkswagen.  Within the Fresno market area there are five Toyota dealers, three Honda dealers, three Nissan dealers and one Volkswagen dealer.

### Findings Relating to Permanency of Investment

.    Michael Rosvold first became involved with Protestant in October 1985 when he went into partnership with Larry Van Tuyl to purchase two corporations that operated Cadillac, Volkswagen, and Porsche-Audi franchises in Fresno.  Mr. Rosvold originally owned 15% of the stock and purchased an additional 30% over 10 years, at which time he purchased the remaining 55% ownership interest.  His initial stock investment was $142,500, with an ultimate total investment of approximately $7 million.

.    In 1996, Protestant constructed a new Volkswagen, Porsche-Audi and Kia facility.  The new Volkswagen, Porsche-Audi and Kia showroom facility is located at 6061 Blackstone Avenue, Fresno, California.  The cost of the real property was $531,100.07 while construction costs were $358,109.

.    A service and parts facility for Protestant's Volkswagen, Porsche-Audi, Kia and Toyota franchises was built in 1990 at a total cost of in excess of $6 million.  Protestant recently added square footage for additional parts storage at a cost of between $35,000 to $45,000.

.    Protestant has also recently built a reconditioning center in its domestic vehicle facility which freed up some space in the foreign vehicle service facility, and built a new body shop.  Both of these actions indirectly benefit the Volkswagen dealership.

.    Mr. Rosvold puts his total investment in the corporation at $6.9 million, and computes the VWoA portion of his investment at a little over $1.5 million.

.    Because of the consolidated accounting system maintained by the corporation, it is difficult to break out investments and expenses allocable to the individual dealerships with any certainty.  Respondent concedes, however, that Protestant appears to have made a substantial investment in the dealership.  Suffice it to say, the Volkswagen dealership is a part of a very substantial operation which is well capitalized, housed in substantial and modern facilities, and which has operated for many years with a substantial staff for both sales and service.  It is not a "fly-by-night" operation, but a long-term, successful business operation which has every appearance of continuing in operation for the foreseeable future.

### Findings Relating to the Effect of Establishing a New Dealership on the Retail Motor Vehicle Business and the Consuming Public

.    VWoA's dealer-candidate for the proposed new dealership in Clovis, Mr. Zamora, is the president of Zamora Auto Group.  Mr. Zamora is the current dealer principal of Hammer Lane Volkswagen in Stockton,

California, within VWoA's Area 45.  Zamora Auto Group owns and operates
12 franchises of various line-makes located in the Central Valley of
California.  Mr. Zamora and a partner also own four franchises in the
Los Angeles market and one in Reno, Nevada.

.   The proposed new Volkswagen dealership in Clovis would be
located at the junction of State Highway 168 and Herndon Avenue.  The
proposed location is 4.8 air miles from Protestant's existing Volkswagen
showroom on Blackstone Avenue, near Bullard Avenue in Fresno.  Driving
distance is approximately five miles in each direction between
Protestant's existing dealership and the proposed new location.  Weekend
drive time between the two locations is approximately 9 to 10 minutes in
one direction.

.   Protestant is located in an "auto row" with other line-make
franchises established along Blackstone Avenue.  There is another "auto
row" in the RMA just off of State Highway 168 on Shaw Avenue in Fresno.
Honda and Nissan have new dealership points on Herndon Avenue within
blocks of the proposed new Volkswagen dealership, which constitute the
beginnings of a new "auto row" in that area of Clovis.

.   Several competitive line-makes which VWoA considers to be its
primary competitors have multiple dealers within the RMA.  Specifically,
Honda, Toyota and Nissan are each represented by two dealerships in the
RMA.  The air distance and drive time between these competing pairs of
dealerships is shorter than the air distance and drive time between
Protestant and the proposed new Volkswagen dealership in Clovis.  Other
line-makes are likewise represented by multiple dealerships within the
RMA, including Chevrolet and Ford.  Protestant is the owner of Toyota
and Chevrolet dealerships located on Blackstone Avenue which compete
with other Toyota and Chevrolet dealerships located within the RMA.

.   Within VWoA's Western Region, six other pairs of Volkswagen dealers are located in proximity similar to that proposed here for Protestant and the Clovis site, albeit in larger markets.  These six pairs performed at from 89% to 149% of the average California Volkswagen penetration rate, with four of the six above the average.

.   Expert witnesses for both parties used essentially similar methodology to assess the performance which has been obtained by Protestant.  This is a comparison of the penetration rate in the dealer's  market, referred to as its Primary Area of Influence or PAI, to a reasonable standard, such as the average penetration rate achieved by some grouping of dealers, e.g., to a national, state, regional, or area average.  The penetration rate in each case is based on the number of vehicles of a certain type which are registered in that area, no matter who the selling dealer may have been, i.e., it is not a comparison of the local dealer's sales in its PAI to sales by a group of dealers, but of the registrations in that PAI to registrations in the PAIs of other dealers in a larger geographic area.  Of course, the local dealer will in almost every case sell the majority of the vehicles registered in its PAI because of its proximity to the buyers who are registering the vehicles, so the local dealer has a definite effect on the penetration rate in its own PAI, and the penetration rate in a dealer's PAI is a valid measurement of that dealer's sales performance.

.   Protestant's expert witness offered comparisons between the penetration rate in the Fresno market and average penetration rates for California, Area 45, the Western Region and the U.S.  His exhibit KK, tab 13 shows, for example, that in the Fresno market Volkswagen has the lowest penetration rate, as compared to the average California rate and the average U.S. rate of any vehicle in the FMCG for 2001 and 2002

through October.  In fact, every comparison made by the expert, comprising over one hundred penetration models, shows Volkswagen's penetration rate in the Fresno market to be lower than the measuring standard.  Exhibit KK at tab 11 reveals an equally important fact:  If the penetration rate in the Fresno market were to equal just average penetration rates (using any of the standards referred to above) the increase in Volkswagen registrations would provide Michael with an opportunity to increase its sales, even after the establishment of the proposed new dealer in Clovis.

.   The Michael PAI, in 2000, had the highest registration of FMCG vehicles of any PAI in Area 45.  In 2001, it had the second highest such registration.  This shows that the area is a fruitful market for that type of vehicle.  In those same years, however, Michael had the lowest penetration rate in its PAI of any of the 13 Volkswagen dealers in Area 45.  This means that Michael had a large market available to it, yet performed at the lowest level of penetration of any dealer in Area 45.  Again, this means that if Michael improves its performance and reaps a greater percentage of the sales available in the Fresno market, it will be able to increase its sales or at least hold its own even in the face of a new Volkswagen dealer in the market.  Michael contends that its low performance is due to the fact that the  Fresno median income level is lower than that of the typical Volkswagen buyer, i.e., around $35,000 per year versus $60,000 per year or higher.  The proposed new dealer, however, testified convincingly that his Stockton market has income levels in the $39,000-$40,000 range and his Volkswagen dealership has a penetration rate which is at the Area 45 average.  More important, however, is the fact that Protestant's argument assumes that only "average" or "median" buyers purchase cars of a certain type or price

range.  It totally ignores the fact that the average or median is made up of a whole range of income levels, and those at the high end can afford Volkswagens and even more expensive vehicles.  For example, in 2001, the median annual income was $35,000 and the average was $48,933 for Fresno, but those numbers included over 85,000 households with incomes greater than $50,000 and over 12,000 households with incomes of $100,000 to $150,000.  This is why Protestant's operation can sell expensive brands such as Cadillac, Hummer, Porsche and Audi, as well as lower priced lines such as Chevrolet, Oldsmobile, Toyota, and Kia.  It also can, and does, sell Volkswagens in that same market.  Protestant's argument erroneously tries to equate the "typical" Volkswagen buyer with the "median" Fresno household, and uses that as a justification for poor penetration and the basis for predicting "ruinous competition" if a new dealer enters the market.

.   Respondent's expert witness presented an analysis involving segment adjustment to account for demographic differences between markets, i.e., by adjusting the registration figures to take into account the types or segments of vehicles purchased within the brand or line of vehicle, the demographic variables which cause those preferences are taken into account.  For example, a market with a high percentage of young, low income buyers may show more of a preference to one segment of the models offered by manufacturers, while a market with a higher percentage of older, more affluent buyers may show a preference for another segment, but adjusting for the numbers of those types of models actually purchased takes those demographic differences into account.  Protestant argues that this adjustment is not fine enough, i.e., that the segments of vehicles are so big that they do not adequately account for demographic variables.  While it may be true that income levels, for

example, may influence buyers' decisions within a segment, as well as decisions as to which segment of vehicle should be considered at all, it remains the case that the buyers within a segment have a range of incomes, and other demographic characteristics, not just a "median" character.  The segment adjustment methodology does appear to adequately take demographic differences between markets into account when those markets are compared for the purpose of judging performance or estimating the future performance which could be obtained.

.  Through the use of segment adjustment, Respondent's expert compared the Fresno PAI to a market in the Concord-Walnut Creek area in which two Volkswagen dealers are located approximately five miles apart, following the addition of one of the dealers to the market, i.e., the distance which would exist here between the Protestant and the proposed Clovis site.  That study concluded that the market shortfall in the Fresno PAI, as had been the case in the study area, was due to under-representation because the market is simply too big for one Volkswagen dealer to adequately penetrate.  This conclusion was supported by the fact that Toyota, Honda and Nissan each have two dealers in the Fresno PAI, and the evidence produced by both sides showing growth trends in the area for population, households and employment.  The study also showed that when one of the two dealers in the study area was placed in the new, five-mile location, the overall market penetration for the two dealers improved, and insell from dealers outside the market was reduced.  This corresponded with other evidence presented by VWoA that other closely paired Volkswagen dealers in California all maintained profitable operations.

.  Protestant's expert conceded that the Fresno market had reached a size that would support two Volkswagen dealers, if located

correctly.  He then presented evidence which showed that, looking just to the distance (measured in air miles) which would be traveled by the average consumer in the greater Fresno market, covering the area from Merced to Visalia, the "optimum" location for a new Volkswagen dealer would be in Selma, California, almost twenty miles to the south of Protestant.  The problem with this analysis is that it does not take into consideration existing shopping patterns, the location of dealerships of inter-brand competitors, where the new dealer is willing to buy land, or any other element which might make up a part of the decision-making process for the location of a new dealership in the market.

.    Given that the Fresno market has grown to the point that it can support a second Volkswagen dealer, the question presented here is not where that dealership should be located for the optimum consumer convenience.  Rather, the question is whether good cause has been shown to disallow the opening of a dealership at the location chosen by Volkswagen and the potential new dealer.

.    Mr. Zamora, the proposed new dealer, is very experienced with the auto industry in the Central Valley.  He testified convincingly that from his experience and his analysis of the Fresno market, he is willing to commit the $4 to $5 million it will take to acquire and build the new facility in Clovis, but he would not do so in Selma.  He based this on his opinion that Selma was too far away from the center of the market and was somewhat "seedy", as well as his appreciation of the quality of the location in Clovis.  He also based his opinion on the long-term, successful competition which has gone on between the other same line-competitors in Fresno and Clovis, such as Toyota and Honda.

.   As discussed above, if the Fresno dealers can only achieve average penetration of the market, there will be sufficient business available for both dealers to be profitable, and even increase their sales.  It would, thus, appear that the effect on the retail motor vehicle business will be to increase competition, and the effect on these two dealers should be to increase Volkswagen's share of a market in which it has been under-represented, to the benefit of both dealers.

### Findings Relating to Whether it Will Be Injurious To the Public Welfare for an Additional Franchise to Be Established

.   Mr. Zamora, the proposed dealer principal of the new Volkswagen franchise in Clovis, has been in the automotive business since 1973.  From 1981 to the present, Mr. Zamora has acquired franchise rights and built (from the ground up) motor vehicle dealership facilities for Honda, Toyota, Acura, Hyundai and Volkswagen.

.   Mr. Zamora has entered into a contract binding him to purchase the five acre parcel in Clovis where the proposed new Volkswagen dealership would be built, and Mr. Zamora testified that his plan is to construct a state-of-the-art Volkswagen Marketplace Facility that provides easy access to consumers.  Development of the proposed new facility will generate revenues for the community consisting of the land purchase price of $2 million to $2.5 million, and construction costs of approximately the same amount.  In making his decision to pursue the proposed new dealership in Clovis, Mr. Zamora investigated the community by looking at demographic information, population, growth, income averages per household and other information provided to him by a local realtor.  Mr. Zamora also physically inspected the market and was astounded to see that there is only one Volkswagen dealership, given the development and population growth.  When compared to the roughly 400,000

residents in Mr. Zamora's existing market in Stockton and surrounding
areas, which has two competitive dealerships representing virtually
every major line-make approximately six miles apart, Mr. Zamora
testified that the 800,000 to 900,000 residents in the Fresno market
would easily support two Volkswagen dealers.

.     The initial Planning Volume for the proposed new dealership is
400 units.  Given the large FMCG registrations in the Fresno market, an
average penetration rate by the dealers should easily achieve this goal,
and allow Protestant to increase its past sales history.

.     As described above, several other brands have two dealers in
the same RMA, all closer together than the proposed location will be to
Protestant, and there has not been ruinous competition between them.

.     Protestant raised the concern that the new dealership would
not be able to hire adequately trained service technicians, and as a
result the Volkswagen image would be tarnished and consumers would
receive bad service.  However, Mr. Zamora has experience in establishing
new dealerships with sales and service departments, and he described his
plans for the proposed new dealership in Clovis.  Specifically, Mr.
Zamora has two employees who oversee his dealership parts and service
operations, who will be involved in hiring, training and developing the
service department in the proposed new dealership.  Mr. Zamora also
plans to hire service personnel from the pool of trained technicians
available from the "VASTT Program" through the UTI technician institute.
Respondent supports this program nationally, which provides student
technicians with a 43-week general course, and further specialized
training in individual franchises.  Respondent pays the additional cost
for UTI graduates to specialize as Volkswagen technicians.  When the
Volkswagen specialists graduate from UTI, a list of graduates goes out

to Volkswagen dealers.  The dealers can then interview graduates at the institute and hire them.  Respondent spends over $1 million per year to support this program so that new dealerships will have a sufficient pool of authorized Volkswagen technicians from which to hire.  Mr. Zamora testified that he has no intention of seeking to hire away Protestant's technicians, which he views as a way to inherit problems.   He has not done so in developing his other dealerships.

.   A new, state-of-the-art facility in a location with easy freeway access will be of benefit to the public in that it will provide increased availability for sales and service, and increased competition both inter- and intra-brand.  The market is sufficiently large to support two dealers, and the history of competition between other dealers in the same proximity does away with the fear that the competition will be ruinous.  The past experience of the proposed new dealer in obtaining trained technicians presents convincing evidence that the public will receive proper care.

### Findings Relating to Whether the Existing Franchise Is Providing Adequate Competition and Convenient Consumer Care for Volkswagen Vehicles in the Market, Including The Adequacy of Motor Vehicle Sales and Service Facilities, Equipment, Supply of Vehicle Parts and Qualified Service Personnel

.   Protestant has been a Volkswagen dealer in Fresno for 17 years.  The dealership is operated as a part of a large multi-line automotive facility.  Most other lines are represented in other dealerships in the vicinity.  The current sales facility was built in 1996, with VWoA's approval, and is clearly adequate.

.   Protestant's service facility is combined with other lines, but twelve service stalls and eight technicians are devoted to the Volkswagen line, which satisfies VWoA's guideline of 1-1/2 stalls per

technician.  Ninety-one percent (91%) of Protestant's service technicians are certified.  The service facility and staff are adequate, and could handle an additional 20-25% of work.  Protestant's Service Director acknowledged that an increase in new Volkswagen sales would increase work for the service department.

.   Protestant's parts department is housed in approximately 3,000 square feet.  VWoA has expressed no concerns to Protestant as to its parts department.

.   As described above, Protestant's penetration rate has been below average.  This means that Protestant has not been providing full competition against the other line-makes, to the detriment of consumers. Protestant asserts that it has not achieved higher penetration rates because of the nature of VWoA's allocation system.  Protestant does not contend, however, that the allocation system is not applied uniformly to all dealers.  Since the adequacy of penetration is measured against an average rate, and that average is set by a group of Volkswagen dealers all using the same allocation system, a failure to achieve the average rate does reflect an inadequate sales effort, and a less than full competitive effort.  If VWoA's allocation system is faulty, it may hurt the ability of all Volkswagen dealers to compete with other lines, but this is not the issue here.  Since it is applied uniformly to all Volkswagen dealers, it cannot furnish an explanation for the failure of any one dealer to achieve the average penetration rate of a group of Volkswagen dealers who are equally burdened by the allocation system.

**Findings Relating to Whether the Establishment of
An Additional Volkswagen Franchise Would Increase
Competition And, Thus, Be in the Public Interest**

.   There is no doubt that the establishment of the proposed new dealer will increase competition in the Fresno market, both inter- and

intra-brand.  In fact, Protestant's fear is that it will be increased to such an extent that the existing dealership will be damaged.

.    As described above, there is sufficient lost opportunity in the market to allow both dealers to have adequate sales through average penetration rates, i.e., by taking sales away from other lines, not by merely splitting the existing market between the two dealers.

.    Protestant's Volkswagen dealership financial statements, submitted by Protestant to Respondent for 1999, 2000, 2001, and November 2002 year-to-date, include Protestant's gross profit on new vehicle sales, both for Volkswagen vehicles and for all of Protestant's other brands combined.  During that period of time, from 1999 through November 2002, Protestant reported the following gross profit on new Volkswagen unit sales versus sales of all other brands of new vehicles sold by Protestant, expressed as a percentage of new vehicle sales dollars:

**Michael Volkswagen New Vehicle Department**

**Gross Profit Analysis: Volkswagen v. All Other Brands**

| Year | VWoA Gross Profit as % of VWoA Sales | Other Brand Gross Profit as % of Other Brand Sales | VWoA Gross Profit Per Vehicle ($) | Other Brand Gross Profit Per Vehicle ($) |
|------|--------------------------------------|----------------------------------------------------|-----------------------------------|------------------------------------------|
| 1999 | 9.73% | 4.56% | 2090 | 1074 |
| 2000 | 7.23% | 4.60% | 1552 | 1130 |
| 2001 | 7.15% | 4.47% | 1563 | 1164 |
| Nov. '02 | 7.20% | 4.69% | 1571 | 1450 |

.     Malcolm Randolph Pressgrove, Respondent's Dealer Franchise
Manager, testified that Protestant's gross profit on new Volkswagen
vehicles was considerably higher than other Volkswagen dealers, not only
in Area 45 but around the United States.  Mr. Pressgrove testified that
the high gross profits on Protestant's Volkswagen vehicle sales indicate
a strong, aggressive dealer oriented to gross profits, who is able to
command higher prices from consumers due to a lack of competitive
pricing in the market.  Mr. Pressgrove pointed out that many of the
other brands of new vehicles sold by Protestant have a second dealership
in the Fresno market or the RMA.  The lower gross profit margins on
Protestant's other vehicle sales reflect intra-brand competition,
resulting in an overall lower purchase price paid by consumers.  Mr.
Pressgrove testified that, based on his experience, if the proposed new
Volkswagen dealership in Clovis were to be established, he would expect
competitive pressure on Protestant's gross profit, with benefit to the
consuming public in the form of lower purchase prices.

.     Two Volkswagen dealers in Fresno will also create competition
within the Fresno metropolitan area for authorized service and warranty
work.  Presently, consumers have no choice for authorized Volkswagen
warranty service in Fresno because Protestant is the only Volkswagen
dealer authorized to perform warranty work.  Establishment of the
proposed new dealership in Clovis will generate competition for
authorized service and warranty work, which benefits the public.

### Facts Relating to Additional Issues Raised by Protestant

.     Issues raised as to the demographics of the Fresno area and
the VWoA allocation system are discussed above with regard to the
statutory issues to which they pertain.

.    Protestant presented testimony that prior to giving notice that it intended to establish a dealership in Clovis, Respondent tried to talk Protestant into constructing a stand-alone "marketplace" facility for the Volkswagen dealership, but that Protestant declined because it had built a new joint use facility in 1996 which is still very adequate.  Thereafter Protestant gave notice of the new Clovis dealer.  The proposed new dealer plans to build a stand-alone "marketplace" facility.  Respondent presented testimony that no such conversation occurred.

.    Based on Protestant's rendition of the facts, Protestant's owner, Mr. Rosvold, is "under the impression that the decision to propose a new dealership in Clovis was motivated by Volkswagen's desire for a stand-alone facility."  Protestant's Post-hearing Opening Brief, paragraph 142.    Protestant then argues that this "raises a strong inference that the decision was not motivated by market or public welfare considerations."  Protestant's Post-hearing Reply brief, page 20:1-4.

.    An "impression" and an "inference" do not constitute the sort of evidence which would support a finding that good cause exists to deny the establishment of a new franchise.  Even assuming that a request to build a stand-alone facility was made, no evidence was presented to support the claim that the rejection of the request had anything to do with the decision to establish a new dealer in Clovis, and it must be disregarded.

### DETERMINATION OF ISSUES

.    Protestant has made a substantial permanent investment in its dealership.

.    The establishment of an additional franchise in the relevant market area will not have an adverse effect on the retail motor vehicle business in the area, and will be to the benefit of the consuming public in the area.

.    It will not be injurious to the public welfare for an additional franchise to be established.

.    There is only one line-make dealer in the relevant market area, therefore there is no intra-brand competition between franchisees of the same line-make in the market area.  While the existing dealer has an adequate sales and service facility, equipment, supply of vehicle parts and qualified service personnel, the addition of another dealer having these same attributes will increase consumer convenience in the market.

.    The establishment of the additional franchise will increase competition and be in the public interest.

.    There was no showing made that there was any improper reason for establishing the additional dealership in the relevant market area.

## PROPOSED DECISION

Protestant has not met its burden of proof under Vehicle Code Section 3066(b) to establish that there is good cause not to enter into a franchise establishing an additional new motor vehicle dealership in the relevant market area.  The protest is overruled.  Respondent shall be permitted to establish the proposed Volkswagen franchise in Clovis, California.

I hereby submit the foregoing which constitutes my proposed decision in the above-entitled matter, as a result of a hearing before me on the above dates and recommend the adoption of this proposed decision as the decision of the New Motor Vehicle Board.

Dated: May 19, 2003


By_____
    J. KEITH MCKEAG
    Administrative Law Judge

Steven Gourley, Director, DMV
Terri Thurlow, Chief,
  Licensing Branch, DMV