# **<u>TAB 10</u>**

STATE OF NEW JERSEY
DEPARTMENT OF LAW AND PUBLIC SAFETY
MOTOR VEHICLE FRANCHISE COMMITTEE

CASE FILE NUMBER: MFC 10956-04

W & D IMPORTS, INC.                              :
d/b/a WILLIS HONDA,                              :
                                                 :
            Petitioner,                          :
                                                 :
v.                                               :          FINAL DECISION
                                                 :
AMERICAN HONDA MOTOR CO., INC.:
and ALL STAR MOTORS, LLC,                        :
                                                 :
                                                 :
            Respondents.                         :

The Motor Vehicle Franchise Committee (hereinafter "Committee") hereby determines the matter concerning petitioner's protest against respondent American Honda's proposed grant of a new Honda dealership franchise to respondent All Star Motors, LLC pursuant to N.J.S.A. 56:10-16 et seq. Prior to this final determination, the Committee has reviewed and considered Administrative Law Judge Douglas H. Hurd's Initial Decision, the exceptions thereto filed by counsel for petitioner, the replies to said exceptions filed by counsel for respondents, the hearing transcripts, exhibits, post-hearing briefs and responses thereto submitted by counsel for the respective parties. Based upon the record presented, the Committee concurs in the Administrative Law Judge's determination to dismiss petitioner's protest pursuant to N.J.S.A. 56:10-16 to -25 and shall therefore affirm the Administrative Law Judge's recommendation. The Administrative Law Judge's findings of fact and conclusions of law are

2

incorporated in this decision as if the same were set forth herein fully and at length.

The Administrative Law Judge dismissed petitioner's protest upon his determination that petitioner had failed to satisfy its burden of proof on the issue of whether the proposed grant of the new Honda dealership franchise would be injurious to petitioner or to the public interest. Initial Decision at 21-22 and 25-26.

The Committee is satisfied that the Administrative Law Judge's findings of fact and conclusions of law are supported by substantial credible evidence in the record and that his decision dismissing the petitioner's protest is correct.

The petitioner filed exceptions to the Administrative Law Judge's Initial Decision in which it raises the following issues:

(1) Exceptions to the Administrative Law Judge's Findings of Fact, including Findings of Fact as to American Honda's Bad Faith, as to All Star's Status as a Minority Franchisee, as to the Experts' Testimony Relating to Injury, and as to Petitioner's Proposed Additional Findings of Fact

(2) Exceptions to the Administrative Law Judge's Conclusions of Law as to American Honda's Bad Faith, as to All Star's Status as a Minority Franchisee, and as to Injury to the Petitioner

The Committee is satisfied that the issues raised in petitioner's exceptions were briefed at length in post-hearing submissions that were filed with the Administrative Law Judge and were properly considered and rejected by the Administrative Law Judge in his determination in this matter. (See Petitioner's Proposed Findings Of Fact, Legal Argument And Proposed Conclusions of Law

. 3

and Petitioner's Brief In Response to Respondents' Post-Hearing Submissions). The applicable legal standard relevant to petitioner's exceptions is "whether the findings made could reasonably have been reached on sufficient credible evidence present in the record, considering the proofs as a whole, with due regard to the opportunity of the one who heard the witnesses to judge of their credibility." Close v. Kordulak Bros., 44 N.J. 589, 599 (1965) (internal quotation marks omitted); Sager v. O.A. Peterson Const. Co., 182 N.J. 156, 163-164 (2004). Judging the record as a whole, the Committee finds sufficient credible evidence in the record to support the Administrative Law Judge's findings of fact and conclusions of law. The Committee is satisfied that the Administrative Law Judge correctly considered and applied the criteria set forth in N.J.S.A. 56:10-23 and Monmouth Chrysler-Plymouth v. Chrysler Corp., 102 N.J. 485, (1986) In finding that the proposed grant of a new Honda dealership franchise to All Star Motors would not be injurious to petitioner or to the public interest.

It is, therefore, on this 25th day of August, 2006, **ORDERED** that petitioner's protest against the proposed grant of a new Honda dealership franchise to All Star Motors be, and hereby is, dismissed, and the Administrative Law Judge's recommendation concerning same is hereby affirmed.

For the Committee

Sharon A. Harrington
Chair

SAH:JBD:sfb

**INITIAL DECISION**

OAL DKT. NO.  MFC  10956-04

AGENCY DKT. NO. –

**W&D IMPORTS, INC., D/B/A**

**WILLIS HONDA,**

    Petitioner,

        v.

**AMERICAN HONDA MOTOR CO., INC.**

**AND ALLSTAR MOTORS, LLC,**

    Respondents.

---

    **Eric Chase**, Esq. and **Joseph S. Aboyoun**, Esq., co counsel for petitioner (Bressler, Amery & Ross, attorneys) and (Aboyoun & Heller, attorneys)

    **Robert D. Cultice**, Esq., for American Honda Motor Co., Inc., respondent (Wilmer, Cutler, Pickering, Hale and Dorr, attorneys)

    **Francis X. Riley, III**, Esq., for Allstar Motors, LLC, respondent (Saul Ewing, attorneys)

Record Closed:  March 21, 2006        Decided:  April 12, 2006

BEFORE **DOUGLAS H. HURD**, ALJ:

### STATEMENT OF THE CASE AND PROCEDURAL HISTORY

    This case is a statutory protest pursuant to N.J.S.A. 56:10-16 to 25 (the "Act") in which Petitioner W&D Imports Inc, d/b/a Willis Honda ("Willis") contests the proposed establishment by Respondent American Honda Motor Co. ("Honda") of a new Honda dealership, Respondent All Star Motors ("All Star"), in Hamilton Township.

    By letter dated November 9, 2004, Honda purported to notify Willis of its intention to establish a new Honda franchise in Hamilton Township.  Willis filed an initial protest

on December 9, 2004, contesting the new dealership and alleging that the notice was legally deficient.  The protest was filed with the Motor Vehicle Franchise Committee, which transferred the matter to the Office of Administrative Law. Honda served another notice on December 21, 2004, to correct any deficiencies in the November 9 notice. Willis filed an amended and supplemented verified protest, which was received by the Motor Vehicle Franchise Committee on January 10, 2005.   The amended and supplemented protest was transferred to the Office of Administrative Law, where it was filed on January 19, 2005.

The filing date of the protest for purposes of the Act was deemed to be January 10, 2005.  Honda and All Star filed answers to the initial and amended protest. The first pre-hearing conference was held on February 17, 2005. Numerous pre-hearing conferences subsequently occurred to address discovery related issues and motions. Evidentiary hearings commenced on October 3, 2005 and concluded on December 7, 2005.   There were a total of 12 evidentiary hearings, over 200 exhibits and 10 witnesses.  Post-hearing briefs were filed on February 14, 2006. The record closed on March 21, 2006, with the filing of post-hearing reply and supplementary briefs.

## FINDINGS OF FACT

A.    **The Parties**

1.    Willis Honda, a franchisee of Honda, is located at 1201 North Route 130, Burlington, New Jersey.  Willis was formed in or about April 1977 and, until approximately January 2004, was owned by Roland Willis and David Davis. Mr. Willis died in January 2004, and in June 2004 Davis purchased Mr. Willis' shares from his estate.  Prior to Mr. Willis' death, Mr. Willis and Davis each owned 50% of Honda Willis' stock.

2.    American Honda, with its principal place of business in Torrance, California, is a distributor of Honda's vehicles to a nationwide network of dealers. American Honda is a motor vehicle franchisor and its franchise

with Willis Honda is based upon a Sales and Service Agreement dated May 23, 2001, as amended on May 25, 2004.

3.    All Star is a limited liability company that is owned jointly by Jesse Armstead (51% owner) and Michael Saporito (49% owner).  All Star seeks to build a new Honda dealership facility in Hamilton Township, Block 2712, Lot 138.02.

**B.    The Relevant Geographic Area**

4.    Willis and the proposed All Star site are located in the larger geographic area denoted by Honda as Zone 5, which consists of New Jersey, most of Pennsylvania, and parts of New York, Connecticut, Delaware, Maryland, Ohio and West Virginia.  Within each Zone, there are areas comprised of two or more dealers that Honda designates as Metro Markets.

5.    The South West New Jersey Multiple Point Market is located in southwest New Jersey and includes three existing Honda dealers: Willis, Honda of Turnersville and Burns Honda in Marlton. Honda has not established an additional dealer in the SW NJ Market for over 25 years.

6.    The relevant market area (RMA) is defined in N.J.S.A. 56:10-16(f).  There are no existing dealers within an eight-mile radius of the proposed All Star site.   Willis is the next closest existing Honda dealer within a 14-mile radius.   Willis is located approximately 12.2 air miles from All Star's proposed site.  Willis is the only dealer with standing to protest Honda's decision to establish an additional Honda dealer at the All Star site.

7.    Honda assigns a geographic area around each existing Honda dealer as that dealer's Area of Statistical Analysis ("ASA").  There is only one dealer in each ASA.

8.    Honda uses the term Open Point to designate a geographic area under study where it would like to establish a Honda dealer.  In or about 1990, Honda designated an area in and round Hamilton Square as the Hamilton Square Open Point.  This Open Point is located with the SW NJ Market.

9.    In the SW NJ Market, there are three existing dealers (Willis, Turnersville and Burns) and the Open Point in Hamilton Square.

### C.    1991 LOI for Hamilton Square

10.    Davis and Wayne Weaver (who at the time was Willis' General Manager) entered into a Letter of Intent ("LOI") with Honda, dated January 18, 1991, for the purpose of establishing a dealer in the Hamilton Square Open Point.  This would have been the fourth dealer in the SW NJ Market.

11.    To facilitate the establishment of this fourth dealership, Davis advised Honda that Willis would not protest the establishment of a new dealer in Hamilton Square, even though Willis' facility would be within 14 miles of the new dealership.

12.    Davis' plan in 1991 was to continue to own and operate Willis in Burlington (with his partner Mr. Willis), even after he and Weaver established a new Honda dealership in Hamilton Square.

13.    The evidence demonstrates that Davis believed there was enough opportunity for a new Honda facility to be established in Hamilton Square, without injuring the existing facility in Burlington he co-owned with Mr. Willis. Davis testified that seeking an LOI for Hamilton was a defensive strategy, to protect his business from what he perceived as bad faith on the part of Honda. Davis' desire to open the facility in Hamilton Square was not defensive as he testified. The documents from that time period indicate otherwise. Davis believed that Hamilton Square would one day

become a "powerhouse" for Honda.  Davis also requested two extensions of the LOI to enable him to "do this project right".

14.     The January 18, 1991, LOI, as extended, was terminated on or about March 3, 1994, according to its terms.


**D.     July 2000 Market Study**

15.     In the late 1990s, Davis approached Honda's then current Zone 5 Manager, Marc Cronin, about Willis' desire to relocate its dealership from Burlington to Hamilton Square. Cronin advised Davis that if a market study reconfirmed the need for a Honda dealer in Hamilton and Honda approved the relocation request, that Davis should not assume that Honda would abandon the Burlington ASA.

16.     Cronin requested a market study of Hamilton Square from Honda's Market Planning Department.

17.     In March of 2000, Honda began conducting a market study of the SW NJ Market, including the Hamilton Square Open Point and the locations of the three existing dealers.

18.     The Market Planning Department, headed by William Green, prepared and completed the study in July 2000.   The Department followed its standard procedure in performing the Study. The Market Study concluded that Honda was losing a substantial number of sales opportunities in the SW NJ Market, and that a principal cause of the loss was the absence of a Honda dealer in the Hamilton Square Open Point.  The Market Study concluded that the sales performance of Honda vehicles in the SW NJ Market was far below the Honda average.  The Study calculated that Honda's failure to achieve its market share resulted in a lost opportunity of 2838 vehicles in this market.

19.    The Market Study further stated that the current location of Willis was "poor" because its "location is removed from other automobile dealerships and in a declining retail area".

20.    In or about July 2000, Honda presented the Market Study findings to the three existing dealers in the SW NJ Market. To address the lost opportunity in the SW NJ Market, Honda recommended that Willis relocate its Honda dealership from Burlington to a mutually agreeable site near Hamilton Square.  This was a relocation from one ASA to another ASA. The Market Study also recommended the relocation of Turnersville and Burns, but those relocation recommendations kept them in their same ASAs and within very short distances.

21.    Green testified that the Market Planning Department could have recommended the establishment of a new, additional dealer in Hamilton Square or relocate an existing dealer.  Green testified that the data in the Market Study supported the establishment of an additional dealer in the SW NJ Market. The Planning Department did not recommend an additional dealer in the SW NJ Market, even though the data supported it, because it thought a relocation of Willis to Hamilton Square would address the immediate need of representation in Hamilton Square. In addition, a relocation would let Willis Honda relocate to Hamilton Square, where it wanted to go anyway. Green's testimony on this issue was highly credible.

22.    The Market Study says nothing regarding "backfill". Backfill would occur if, after relocation of Willis to Hamilton Square, Honda allowed a new dealer to open a facility near Willis's previous Burlington location.  The Market Study did not eliminate the Burlington ASA, even with its recommendation that Willis relocate to Hamilton Square.  The Burlington ASA would simply be an open point after the relocation.

23.   Willis was provided the option to relocate to Hamilton Square or it could remain at its existing location in Burlington. If Willis decided to stay in Burlington, then Honda would commence the open point process and take steps to put a new dealer in Hamilton Square. The open point process is open to all interested candidates and is the manner in which Honda selects a dealer candidate for the establishment of an additional dealer.

24.   Richard Colliver, Honda's Executive Vice-President of Sales, agreed with the Market Study. Colliver is essentially the top Honda official in the United States.

25.   At the Market Study meeting in July 2000, Honda representatives advised Davis that if he relocated to Hamilton Square, that Honda may backfill and place a dealer in Burlington. Davis was also advised at this time that the relocation option would remain open for a period of eighteen months. Davis disputes being told at the meeting about the 18 month time period. However, I find the evidence, through Honda's witnesses, supports a finding that Davis was advised regarding the 18 month time period. Documents show that he was eventually advised on the 18-month deadline. Honda also advised Davis at this meeting that if he did not relocate to Hamilton Square, that Honda would start the open point process and place a dealer in Hamilton Square. At this meeting, Honda also advised Davis that, based on Honda's policy prohibiting common ownership of Honda dealerships in contiguous markets like Burlington and Hamilton, Honda could not consider Davis a candidate for Hamilton if he remained an owner of the Burlington dealer.

26.   Davis was upset when he was told there would be a backfill if he relocated. Davis testified that it was a no-win situation:

> If I gave up my 45,000 sales and 29 years worth of business, that's what it is now, and just walked away from it and just handed it to somebody else, and move, and develop for millions of dollars north, I mean, you know, what they proposed really

didn't make any sense. As a businessman I never heard of such a thing, and apparently people in this courtroom haven't either from what I hear.

Davis was referring to the testimony of Honda's witnesses, including Colliver in which they consistently said they had never heard of a backfill situation before. However, it is unclear if there has ever been a relocation from one ASA to another ASA in a situation such as this one.

### E.   **Davis' Proposal**

27.   By late October 2000, Willis was formulating a strategy that included relocating.  On December 5, 2000, Sam Dolente, Assistant Zone 5 Sales Manager, was informed that "Davis has signed an agreement of sale to purchase 20 acres of property on Route 130 in Hamilton Square".  The property optioned by Davis was only about two miles from the Hamilton Square property where All Star wants to build its Honda facility.

28.   By letter dated December 11, 2000, Davis proposed that Honda issue him a letter of intent for an additional dealer in Hamilton and also approve his continued operation and ownership of Willis for up to five years so that he and Mr. Willis could sell their interests in Willis.  Davis stated that this plan "would be FANTASTIC!!!!" and Honda "would end up with 4 new IMAGE dealerships lined up from Hamilton all the way South to Turnersville." Davis testified that he thought this proposal worked for everybody.

29.   Honda Zone 5 personnel believed Davis' proposal was reasonable.  They strongly endorsed the proposal as a "win-win" situation, and forwarded it to the national office in California for approval.

30.   In or about February 2001, Colliver rejected Davis' proposal based on his belief that to accept it would have violated certain of Honda's policies. Colliver believed that Davis' proposal, if accepted, would have resulted in a violation of Honda's contiguous market policy by permitting Davis to

acquire an ownership interest in two contiguous dealerships; namely, Hamilton and Burlington. Colliver also rejected the proposal because he could only award Davis an additional open point if he went through the open point process and demonstrated his qualifications. Colliver wanted to avoid the appearance of favoritism. He testified that he gets proposals from dealers all the time in which they want an open point to be awarded without going through the competitive process. Colliver testified that he was put in charge to fix some of the cronyism and favoritism of the past and that he would not allow a breach of Honda's policies. Colliver was a highly credible witness. His testimony was forthright, passionate and detailed. He clearly did not act in bad faith towards Davis' proposal. Rather, he rejected Davis' proposal and the recommendation from Zone 5 in order to adhere to the policies of Honda. He also felt that allowing Davis to relocate to Hamilton or remain in Burlington were both fair options for him.

31.     The fact that Zone 5 initially endorsed Davis' proposal shows Honda's good faith in working with Davis. The Davis proposal was rejected based on a business judgment by Colliver in order to conform with Honda's policies. Under Davis' proposal, he would have had the right to select the next Honda dealer in the Burlington ASA when Willis decided on the buyer of its business. Honda then would have been precluded from choosing the next dealer for this ASA. In contrast, if Willis vacated Burlington and relocated to Hamilton, then Honda could have started the open point process for the Burlington open point and selected the next dealer based on its own policies. Davis and Colliver simply disagreed over a business decision. Colliver's reasonable decision was grounded in doing what he thought was best for Honda.

32.     Honda Zone 5 personnel communicated Colliver's decision to Davis on March 2, 2001. Davis was disappointed in the rejection by Colliver.

33.     In March 2001, Honda performed a follow-up study of the SW NJ Market. This is the mini-market study and was done to review the conclusions of the market study based on updated data. This mini-market study confirmed that Honda was losing opportunity in the market and that the opening up of a dealer in Hamilton was needed to address this loss. The data also reconfirmed that the SW NJ Market could handle 4 dealers.

34.     About a month after Honda's rejection, on April 6, 2001, Colliver wrote directly to Davis and reiterated Honda's position; namely, that Davis could either stay in Burlington or relocate to Hamilton Township, with the possibility of backfill. The letter also noted the 18-month deadline.

35.     Davis considers this April 6, 2001, letter coercive because it left him with two untenable choices. Davis contends that a relocated Willis Honda to Hamilton Square would lose its geographical advantage in the Burlington area that it nurtured over decades. I disagree with Davis' contention. First, as Davis notes many times, Hamilton Square is a highly desirable location with a fast-growing market and a relocation would allow Davis to take the good will from Burlington to Hamilton Square. Second, since the early 1990s Honda has had an open point in Hamilton Square, so the possibility of 4 dealers in the market has been a reasonable option to Honda. Third, if Davis did relocate to Hamilton Square, he would take the Honda name and the Willis name that would let him expand his existing base of customers. Finally, Davis could choose to stay in Burlington, upgrade his facility and compete against a new dealer in Hamilton Square. As noted above, Hamilton Square has been an open point and Davis was aware that a new dealer could go in there. Moreover, Davis's lawyer, Joseph Aboyoun, contended at that time that the Burlington market was a strong market with substantial household growth.

36.     Willis Honda did not make progress over the next several months in establishing a facility in Hamilton Square. Accordingly, on December 5, 2001, Honda advised Davis that it intended to initiate is open point

process to establish another Honda dealer in Hamilton Square if it did not hear back from Davis by January 2, 2002.

37.     Despite the passing of the 18-month deadline in January 2002, Honda agreed to meet with Davis to discuss a "new" proposal.  The meeting occurred on February 12, 2002, but Davis' proposal was substantially similar to his previous proposal.  Honda rejected Davis' proposal because it was not willing to award an additional dealership to Davis and permit him to own and operate Willis in Burlington until it was sold.  Honda did offer to Davis that if he relocated to Hamilton Square, that Honda would be willing to delay a backfill in Burlington to allow him to get Hamilton Square up and running.  Davis did not accept this offer.

### F.     Open Point Process Initiated

38.     Due to the expiration of the 18-month deadline and Davis' refusal to accept the relocation offer, Honda initiated the open point process to fill the Hamilton Square open point.  This process started in February 2003 after it was clear that Davis' was not going to alter his proposals and accept Honda's offer.  The open point process lasted about 18 months and ended in October 2004 with the execution of a letter of intent between Honda and All Star regarding the establishment of a Honda dealer in Hamilton Square.

39.     Willis Honda accuses Honda of not following proper protocols in choosing All Star for the open point.  These accusations, however, are not supported by any credible evidence outlining that Honda did not act appropriately.  In fact, Honda followed its standard open point process in the selection of All Star.  Honda sent application packages to many potential candidates that expressed an interest in becoming a dealer, including Armstead and Saporito.

40.     Honda reviewed all applicants' qualifications, business plans, and financial information.  Zone 5 Honda personnel interviewed the top candidates.  All Star was among the final candidates and, in March 2004, submitted detailed proposals and made a formal presentation to Honda representatives.  The materials and presentation by All Star was to locate a dealer at a site it located in East Windsor.

41.     On June 16, 2004, Zone 5 personnel made an open point presentation to Honda senior management and recommended Armstead and Saporito receive the open point.  In September 2004, Colliver and other senior managers granted conditional approval to Armstead and Saporito.  A letter of intent was finalized in October 2004 when Honda selected All Star to be the Honda dealer in Hamilton Square.

42.     In October 2004, Honda conducted a study of the site in Hamilton square proposed by All Star.  This study is called a Proposed Dealer Location Request (PDLR) study.  This study confirmed that Hamilton Square is a good location to locate an additional Honda dealer.  The PDLR study looked at market data through August 2004, including new vehicle registrations and sales, demographics and an optimal location assessment.

43.     Willis Honda contends that the changing of the proposed dealer site from East Windsor to Hamilton Square somehow shows bad faith by Honda.  On this issue, it is important to note that it was Saporito and Armstead that tried to convince Honda that East Windsor was the appropriate location.  Honda, through its open point process, chooses the candidates.  The PDLR was performed for the Hamilton Square location because Saporito, after he located this property, request such an evaluation.  Even if Honda had thought that East Windsor was appropriate and then changed its mind, it is hard to understand how this shows bad faith on the part of Honda.  The bottom line is that the evidence is clear and overwhelming that Honda acted properly in determining Saporito and Armstead should

be the dealer at the Hamilton Square open point.   Willis Honda's accusations to the contrary are specious and not supported by credible evidence.

44.   Willis Honda also contends that it was subject to more exacting reporting requirements regarding Davis purchasing Mr. Willis' shares after his death. This is another specious argument made in an attempt to show bad faith.  The fact is that the evidence shows that Honda acted appropriately in requesting information prior to approving the share purchase.  There is no way to conclude that Honda had any bad faith motivation in obtaining this information, especially in light of the fact that it approved Davis purchasing Mr. Willis' shares.

45.   Another red herring is Willis accusation that Don Lia was or is involved in the ownership or operation of All Star.  Lia is the owner of Huntington Honda in Long Island. Saporito is currently the general manager at Huntington Honda. Lia, according to Willis Honda, has a hidden interest in All Star.  Lia testified at a deposition, but was not called to testify at the hearing. After sifting through all of the claims by Willis regarding Lia, the evidence is clear and uncontradictory that Lia has net ownership interest in All Star, does not own the land upon which All Star is to be located, has not invested any monies in All Star and will not be involved in the operation of All Star.

## G.   <u>Armstead's Role</u>

46.   Armstead is a majority owner of All Star with a 51% interest. Saporito has a 49% interest. Armstead will make a substantial cash contribution to All Star in the amount of $1,015,000, if the protest is decided in its favor.  He will continue to finance the operation as needed.  Armstead also has significant control over All Star's business operations.

47.     Armstead, who has been successful in his other ventures (most notably as a professional football player), is attempting to learn as much as he can about the automotive business.  At this point, he clearly has a lot to learn about the business and industry.  He is working under the tutelage of Saporito, an experienced general manager who has had great success at Huntington Honda.  If the protest is dismissed and All Star is permitted to open in Hamilton Square, Armstead will move his family from Texas to Washington D.C. to work at a minority Honda dealership for approximately eight months.  During that time, he will receive full-time, on-site training in all operational and financial facets of Honda dealership operations.  Armstead also intends to receive training from the National Automobile Dealers Association.  Armstead will then move his family to New Jersey so that he can be involved with the planning and operation of the new dealership.

48.     Armstead is an African-American minority as defined by N.J.S.A. 56:10-23(c)(i).  His status as African-American and principal of All-Star, entitles All Star to the application of N.J.S.A. 56:10-23(c).  Although Armstead has a lot to learn about the business and industry, he is clearly a bona fide dealer who is entitled to the application of N.J.S.A 56:10-2(c).

## H.     **Expert Testimony**

49.     James A. Anderson is the president and 100% owner of Urban Science Applications, which has been in existence for about 30 years.  He was retained by Honda to provide expert testimony in connection with Honda's proposed establishment of a dealer in Hamilton Square.   Anderson submitted expert reports, marked as RH-76, 77 and 78.

50.     Urban Sciene's work concerns dealer network analysis in the automotive industry.   Dealer network analysis consists of determining the proper number and location of outlets necessary to adequately serve a market and evaluating sales performance of the existing dealers in the network.

Urban Sciene's automotive clients use these services in the ordinary course of managing their dealer networks. Urban Science represents many of the largest automotive manufacturers, including Honda. Anderson routinely consults many manufacturers, including Honda, on issues related to the day-to-day management of their dealer networks. Because Anderson consults with Honda and because Honda employs Urban Science's software for its dealer network, Willis Honda claims that Anderson is not an independent expert in this matter. Anderson's business relationship with Honda does raise legitimate questions regarding his independence as an expert. However, after extensively reviewing his reports and testimony, I conclude that his business relationship with Honda has not impeded his ability to be a true independent expert.

51.     Anderson's testimony was highly persuasive and credible because of his qualifications, use of a standard and accepted methodology underlying his expert opinion, and sound reasoning. I hereby accept and adopt the contents of Anderson's expert reports, including his analysis, findings and conclusions and rebuttal. His main conclusions are as follows:

(a) The existing Honda dealer network has failed to provide stable, reliable and adequate sales and service to purchasers of Honda vehicles in the RMA;

(b) The cause of the inadequate sales of Honda vehicles in the RMA is inadequate inter and intra-brand competition and lack of convenient consumer access to Honda products due to the absence of a Honda dealer in the Hamilton Square ASA;

(c) The addition of All Star in Hamilton Square is an appropriate response to the inadequacies in the RMA and will provide stability, reliability and adequacy of sales and service to purchasers of Honda vehicles in the RMA; and

(d) The impact of adding All Star will be positive as a result of stimulated competitive response and will not cause Willis to terminate its business or suffer the substantial harm necessary to result in the material deterioration of its ability to serve its customers.

52. Dr. Ernest H. Manuel, Jr., of the Fontana Group, was retained by Willis Honda to serve as its expert witness. He issued an expert report, a rebuttal report, a supplemental report and a second supplemental report. P-185, 186, 187 and 189. Dr. Manuel's resume is extensive and highly impressive.

53. While Manuel provided a comprehensive report and testimony, I find that Anderson's analysis was more persuasive and credible. Manuel did the best with what he had, but the data he had to work with was much more favorable to Anderson's position.

54. Anderson applied the data to his methodology. His eight-step methodology is used by manufacturers primarily for non-litigation purposes. This is significant and shows that the methodology is tailored to the real world and used by manufacturers in the normal course of their business. In other words, since this methodology is not used primarily for litigation, the methodology has more credibility. Manuel's methodology, on the other hand, was developed primarily for litigation and augmented to address the issues in this case.

55. I also agree with Anderson's definition of injury under the Act. Anderson's definition of injury is consistent with the plain language of the Act and the language of the Supreme Court in Monmouth Chrysler-Plymouth, Inc. v. Chrysler Corporation, 102 N.J. 485 (1986). Manuel improperly uses a "but/for" type of economic damages that he equates with injury. Manuel's definition of injury allows for an exaggeration of the losses that Willis may suffer because it assumes that Willis is entitled to any increase in sales opportunity in the RMA even though its own history demonstrates that it has failed consistently to reach 100% registration effectiveness.

56. Anderson also applied the data in the context of the RMA. Manuel did not use the RMA as his primary area for analysis. Rather, Manuel created a geographic area, which violates the plain language of the statute. There is

no question that the area for analysis pursuant to N.J.S.A. 56:10-23(a) is the RMA.

57.    Even when Manuel did use the RMA, his analysis confirmed Anderson's conclusions under N.J.S.A. 56:10-23(a)(1) that the provision of Honda sales and service to Honda purchasers in the RMA has been unstable, inadequate and unreliable for over three years.  It is uncontested that Honda failed to achieve even its average market penetration from January 1, 2002 through December 2004.  In addition, when the RMA is defined correctly per Anderson, Honda also failed to reach its average market penetration in the RMA from January 1, 2005 through June 30, 2005.  Anderson also correctly demonstrated that the Honda market penetration in the Hamilton Square ASA has been substantially worse than the average Honda market penetration achieved in New Jersey, Zone 5 or even the RMA.

58.    Anderson conclusively demonstrated that the Honda dealer network is not now, and has not been for a significant period of time, providing adequate Honda sales to consumers in the RMA, the Hamilton Square ASA or the Burlington ASA.  Below-average registration effectiveness is a prime indicator of inadequate competition and failure to capture adequate sales relative to the opportunities available.  The shortfalls in the RMA, and other local areas, against Honda averages in New Jersey and Zone 5 are substantial in absolute vehicle numbers and on a percentage basis.  Significantly, even in the local geographic area where Willis has enjoyed a geographic advantage for years relative to other Honda dealers, Honda's registration effectiveness is well below Honda average.

59.    Based on competitive vehicle registrations from 1998-2004, the RMA has shown tremendous growth in sales opportunities for Honda.  Indeed, during that time period, Honda's expected registrations in the RMA increased by 48%.  There is a similar pattern of growth for the Hamilton Square ASA and an even stronger pattern for the Burlington ASA.  The

current Honda dealer network does not have the capacity to adequately serve this large and dense area of competitive registrations. For example, in just the combined area covered by the Burlington ASA and the Hamilton Square ASA, Honda's competitors have 62 locations compared to Honda's one, which equates to a mere 1.6% share of franchises for Honda. In Zone 5, Honda enjoys a 3.2% share of franchises, approximately twice as many as in the combined area covered by the Hamilton Square and the Burlington ASAs. Honda would need at least one, and possibly two, additional dealers in the combined ASAs if there was to be Honda representation similar to Zone 5.

60.    I agree with Anderson that the data demonstrates conclusively that Willis does not have the ability to attract an adequate number of Honda buyers from the distances that would be required if Honda was to have any chance of achieving even its average sales performance in the RMA.

61.    When Manuel did use the RMA, he did not define it properly. Manuel inappropriately enlarged the RMA, which had the effect of increasing the number of new vehicle registrations. Anderson's definition of the RMA was scientific since it randomly distributed data within a small census tract via a computer program and relied only on that data that the computer placed inside the RMA boundary line. This is a statistically valid technique with an error of approximately 1.2%, compared to Manuel's method which is 12 time the error rate produced by Anderson's process.

62.    Manuel attempted to explain Honda's poor performance in the RMA on the low median household income in the RMA. Manuel's conclusion, however, is without merit. He ignores the fact that Anderson's credible segmentation analysis process automatically adjusts to socioeconomic factors like income. Moreover, based on the unreliable data he relied upon, Manuel had no basis to draw a connection between low median income and Honda's poor sales performance in the RMA.

OAL DKT. NO. MFC 10956-04

63.    I accept Anderson's analysis and conclusion that Willis will not lose any sales after All Star's establishment based on the substantial lost opportunity existing in the RMA, and the substantial projected growth in the RMA.   This analysis makes the reasonable assumption that Willis competes effectively.   The bottom line is that there is ample opportunity in the RMA and surrounding areas to allow both Willis and All Star to operate and make reasonable sales in the marketplace without taking any sales away from each other.

64.    Willis Honda's claim that it is marginally profitable is inconsistent with the evidence.   The year the protest was filed (in 2004), Davis placed a multi-million dollar value on Willis Honda.   Indeed, in 2004 Davis paid at least $2,000,000 for Mr. Willis' 50% interest.   If Davis truly believed that the new dealer in Hamilton Square would crush the Burlington facility, then why would he pay at least $2,000,000 to acquire the remaining 50% interest. Furthermore, the alleged marginal profitability as shown on the 13th month statements relied on by Manuel was caused not by operational losses, but by the substantial monies that Willis' shareholders were taking out of the company.

65.    Manuel's method of predicting impact on Willis Honda is not reliable because it is based on the unsupported assumption that All Star's establishment in Hamilton Square will cause Willis to lose sales to All Star solely because some customers in the RMA that previously were closer to Willis will now be closer to All Star.   Anderson credibly demonstrated that, while proximity of a customer to a dealership is a factor in the customer's decision where to buy his vehicle, as reflected by the percentage of sales that these dealers make in their own ASAs, there are many other factors that influence buying behavior including price, selection of vehicles, service and sales reputation, advertising and the quality of the facility.

66.    Even if All Star performs at the highest level (like Burns for example), and sells 1,233 vehicles in the RMA, Anderson credibly states that there would

still be 1,132 units of lost opportunity available just in the RMA, which would still be more than enough to allow All Star to go into business and not take any sales away from Willis.

67.    It is uncontested that Willis Honda alone is not providing adequate and convenient consumer service for Honda vehicles in the RMA.  Manuel counters this fact by noting that other Honda dealers outside the RMA, together with Willis, are providing such service in the RMA.  Once again, however, Manuel is not reading the statute properly.  N.J.S.A. 56:10-23(a)(3) only looks at whether the existing dealers in the RMA are providing adequate and convenient customer service. In this regard, Anderson's testimony and reports overwhelmingly establishes that All Star will increase customer convenience to those living in the RMA.  Anderson demonstrated that Honda has the worst customer convenience of all of its competitors based on 2004 retail competitive registrations in the Hamilton Square ASA.   Regarding customer convenience, it is undisputed that Willis' facility is below Honda's minimum guidelines.

## CONCLUSIONS OF LAW

This matter is governed by the New Jersey Automotive Dealer Statute, N.J.S.A. 56:10-16 through 25, which prohibits a motor vehicle franchisor from approving the opening a new dealership if the opening would be injurious to existing franchisees or the public.  This statute limits the right of protest to those existing dealers entitled to receive statutory notice of the proposed opening.  The right to written notice is limited to existing franchisees located in the RMA - which in this case is an "existing franchisee in the same line make within a 14-mile radius." N.J.S.A. 56:10-16(f). Willis is 12.2 miles from the proposed All Star site and, as such, has standing to file a protest. Honda provided Willis Honda with notice, as amended, of relocation in accordance with the statute.

Willis Honda bears the burden of proving that the establishment of All Star will be injurious to existing franchisees or the public interest. In determining whether the opening of a franchise will be injurious to existing franchisees or to the public interest, the committee may consider, but shall not be limited to considering the following:

(1) The effect that the proposed franchise or business would have on the provision of stable, adequate and reliable sales and service to purchasers of vehicles in the same line make in the relevant market area;

(2) The effect that the proposed franchise or business would have on the stability of existing franchisees in the same line make in the relevant market area;

(3) Whether the existing franchisees in the same line make in the relevant market area are providing adequate and convenient consumer service for motor vehicles of the line make in the relevant market area, which shall include the adequacy of motor vehicle sales and service facilities, equipment, supply of motor vehicle parts and qualified service personnel;

N.J.S.A. 56:10-23(a).

According to the Supreme Court, an appropriate standard for measuring injury under the Act, both to a franchisee and to the public interest, is (1) proof of inevitable termination of the existing dealer or (2) "proof that the effect of a new dealership would be to reduce the profitability of the protesting dealer to an extent sufficient to cause a substantial deterioration of that dealer's ability to provide adequate customer services." Monmouth Chrysler-Plymouth, Inc., 102 N.J. at 499. In other words, "unless the protesting dealer can demonstrate by a preponderance of the evidence that the anticipated loss of business will cause a substantial deterioration of its ability to provide customer services, loss of profits alone will not be sufficient to sustain a claim of injury to a franchisee under the Act." Id. This standard of injury "strikes a balance between evidence of inevitable termination due to business failure, a standard we find relevant but difficult to prove, and evidence merely of reduced profits." Id.

An additional factor to consider in determining if injury has been proved is the franchisor's motivation in attempting to establish a new dealership. Id. at 503. Indeed, "if the protesting dealer is able to prove that the manufacturer's decision to franchise a new dealer in the relevant market area was not made in good faith, but to coerce, intimidate, or retaliate against an existing dealer, then that proof, combined with some evidence of economic injury, would satisfy the statutory test of injury to the franchisee." Id.

## A.   Minority Proposed Franchisee

OAL DKT. NO. MFC 10956-04

The act provides that under certain circumstances there is a presumption of injury to the public or an existing franchisee if a new dealer is established. N.J.S.A. 56:10-23(b). However, this presumption does not apply if the proposed franchisee is a minority. N.J.S.A. 56:10-23(c).

Willis argues that the presumptions afforded under N.J.S.A. 56:10-23(b) apply even though Armstead is African-America because Armstead somehow is not a bona fide minority applicant in that he will not exercise sufficient control over All Star's operations. Willis also contends that the presumptions should apply because All Star is a business entity and, thus, is not entitled to minority franchisee status because the word "person" is used to describe a minority. For the reasons expressed below, Willis is wrong on both of these positions and, accordingly, Willis is not entitled to any presumption of injury under N.J.S.A. 56:10-23(b).

With respect to the definition of minority, the Statute provides that a minority is, among others, a "person who is: (1) Black, which is a person having origins in any of the black racial groups in Africa; or …." N.J.S.A. 56:10-23(c)(1). Willis concedes that Armstead is an African-American as defined in N.J.S.A. 56:10-23(c)(1) and is All Star's majority owner. The statute defines "Franchisee" as a "natural person, corporation, partnership or entity to whom a franchise is granted by a motor vehicle franchisor". N.J.S.A. 56:10-16(c). It is business entities, like All Star, that are typically granted the dealership franchise. Therefore, it is reasonable to conclude that the Dealer Act contemplates that such corporate franchisees like All Star can be a minority under N.J.S.A. 56:10-23(c). It is natural to rely upon the entity's majority owner(s)' national origin, render or race to determine if a corporate franchisee is a minority. In this case, N.J.S.A. 56:10-23(c) clearly is applicable since Armstead is an African-American and he is the majority owner of All Star.

Willis also contends that the presumptions in N.J.S.A. 56:10-23(b) should apply because Armstead does not exercise sufficient control over All Star's operations. Most importantly, however, the plain language of the statute imposes no requirement regarding control. Indeed, there are no prerequisites in the statute, besides being a minority or a woman. I will not and cannot write in an additional qualification to this statute. Nonetheless, the facts are clear that Armstead is a bona fide majority owner of

the franchisee – he will contribute significant capital, the Operating Agreement bestows significant control to Armstead and he was credible in explaining that he is learning the trade and, given his history of success and high character, it is likely that he will be successful as a dealer.

**B.      Allegation of Bad Faith**

As noted above, if Willis Honda is "able to prove that the manufacturer's decision to franchise a new dealer in the relevant market area was not made in good faith, but to coerce, intimidate, or retaliate against an existing dealer, then that proof, combined with some evidence of economic injury, would satisfy the statutory test of injury to the franchisee". Monmouth Chrysler-Plymouth, Inc., 102 N.J. at 503.  For the reasons stated in the Findings of Fact, there is absolutely no evidence that Honda acted in bad faith.  The evidence is to the contrary.  The evidence shows that Honda was motivated by economic considerations and acted fairly to Willis Honda throughout the process.

Colliver's decision to reject Davis' proposal was motivated by economic considerations. The three reasons Colliver cited for rejecting Davis' proposal are ground in economic considerations: (1) it would violate Honda's policy prohibiting single ownership of contiguous dealerships; (2) it would constitute favoritism and circumvent Honda's competitive open point process; and (3) it ran contrary to the recommendations of the Market Study.  In addition, the fact that Zone 5 initially recommended the proposal shows that Honda was acting in good faith and closely looked at the Davis proposal.  In fact, Colliver's good faith is demonstrated by the extensive negotiations with Willis, even after the 18-month deadline expired. Colliver's last proposal attempted to directly address Davis' concerns by having Honda agree to delay any backfill while Davis opened a dealership in Hamilton Square.

Willis offers no evidence of any improper motive by Honda, i.e. why would Honda want to injure Willis.  Willis simply points to red herrings such as Don Lia or the issue of East Windsor.  These are not relevant matters and, in any event, demonstrate no bad faith by Honda.  Honda acted appropriately in the open point process as well, by conducting a thorough review of all applicants and choosing All Star's proposal on its merits.

The evidence is clear that Davis simply wanted both Burlington and Hamilton Square for himself.  All the way dating back to the early 1990s, Davis made attempts to control both locations.   Since Hamilton Square was an open point and a growing market, Davis was on notice that this location could be filled by a new dealer.  Honda acted appropriately by offering him this location, if he relocated his existing business in Burlington.  The simple matter is that Davis did not like this proposal because it meant he could not control both sites.   His dislike of Honda's reasonable, economically motivated proposal, does not render such a proposal coercive.  In the end, Willis cannot prevail on a "bad faith" argument and is left to its proofs under N.J.S.A. 56:10-23 of the Act.

### C.      Injury under N.J.S.A. 56:10-23(a)

Willis Honda bears the burden of proving that the establishment of All Star will be injurious to existing franchisees or the public interest.   The factors allowing for a presumption in N.J.S.A. 56:10-23(b) are not applicable. Since Armstead is a minority and the majority owner of All Star, N.J.S.A. 56:10-23(c) applies and negates any possible presumption.   Nonetheless, based on the expert testimony and reports, Willis would not qualify for a presumption in N.J.S.A. 56:10-23(b), even if N.J.S.A. 56:10-23(c) did not apply.

For the reasons expressed in the Findings of Fact, I hereby conclude that Willis has failed to prove injury to the public interest or to itself under the factors listed under N.J.S.A. 56:10-23(a).[1]  Anderson's testimony and reports were highly credible, thorough and based on sound, logical, scientific reasoning.  His reports are hereby adopted in this Initial Decision. Manuel, who is highly credentialed, did the best he could with evidence that simply was not in his client's favor.  His attempt to create a study area inconsistent with the RMA, his method of predicting impact to Willis, and his definition of injury and the RMA are all faulty and lead to conclusions that are not credible.  His attempt to explain Honda's poor performance in the RMA due to low median household income likewise was not credible.

Anderson, on the other hand, through his credible segmentation analysis and eight-step methodology, conclusively demonstrated that there would be no injury to Willis or the public interest with the opening of All Star.  If fact, the evidence shows that the public will benefit from the increased competition and Willis's performance may even improve through competitive response.


### ORDER

In conclusion, the evidence supports dismissal of Willis Honda's protest.  The establishment of All Star should be allowed because it will not be injurious to Willis Honda or to the public interest.  Accordingly, I hereby **ORDER** that Willis Honda's protest be **DISMISSED**.


I hereby **FILE** my initial decision with the **MOTOR VEHICLE FRANCHISE COMMITTEE** for consideration.


This recommended decision may be adopted, modified or rejected by the **MOTOR VEHICLE FRANCHISE COMMITTEE,** which by law is authorized to make a final decision in this matter.  If the Motor Vehicle Franchise Committee does not adopt, modify or reject this decision within forty-five (45) days and unless such time limit is otherwise extended, this recommended decision shall become a final decision in accordance with N.J.S.A. 52:14B-10.

---

[1] The fourth factor in N.J.S.A. 56:10-23(a) is not relevant to this matter since it concerns a relocating dealer.  N.J.S.A. 56:10-23(a)(4).

Within thirteen (13) days from the date on which this recommended decision was mailed to the parties, any party may file written exceptions with the **CHAIRMAN OF THE MOTOR VEHICLE FRANCHISE COMMITTEE, 225 East State Street, PO Box 160, Trenton, New Jersey 08666-0160,** marked "Attention:  Exceptions."  A copy of any exceptions must be sent to the judge and to the other parties.

4-12-06

_____          _____
DATE                                          **DOUGLAS H. HURD**, ALJ

                                              Receipt Acknowledged:

_____          _____
DATE                                          MOTOR VEHICLE FRANCHISE
                                              COMMITTEE

                                              Mailed to Parties:

_____          _____
DATE                                          OFFICE OF ADMINISTRATIVE LAW

mh/lam

**WITNESSES**

William Green, Honda Manager

Richard Colliver, Honda Executive Vice-President

Sam Dolente, Honda Zone 5 Assistant Manager

James Burrell, Honda Zone 5 Sales Manager

Mark Cronin, former Honda Zone 5 Manager

Michael Saporito, All Star Principal

David Davis, Petitioner and Owner of Willis Honda

Jessie Armstead, All Star Principal

Dr. Ernest Manuel, Willis's Expert Witness

James Anderson, Honda's Expert Witness


**EXHIBIT LIST**

**For Petitioner[2]:**

| | |
|---|---|
| P-1 | Willis Honda Sales & Service Agreement with Amendment, dated 5/23/01 & 5/25/04 |
| P-2 | Ground Lease – Bench Realty & Flower Time, Inc., dated 1/21/87 |
| P-3 | Dealer Contact Report, dated 3/10/00 |
| P-4 | Dealer Contact Report, dated 3/14/00 |
| P-5 | Dealer Contact Report, 4/20/00 |
| P-6 | Dealer Contact Report, dated 6/2/00 |
| P-7 | Executive Summary, dated 6/27/00 |
| P-8 | Dealer Contact Report, dated 8/7/00 |

---

[2] In addition to the evidentiary exhibits listed herein, Petitioner had two demonstrative exhibits that are marked. The first demonstrative exhibit is entitled "Michael Saporito's Cash Expenditures".  The second is entitled "Don Lia's Direct Involvement in Hamilton Township".

| P-9 | Market Planning Memo and Market Study, dated 10/26/00 |
| P-10 | Letter from Weaver to Dolente, dated 10/30/00 |
| P-11 | Dealer Contact Report, dated 10/30/00 |
| P-12 | Letter from K. Weaver to Davis, dated 11/10/00 |
| P-13 | Dealer Contact Report, dated 11/22/00 |
| P-14 | Dealer Contact Report, dated 12/5/00 |
| P-15 | Letter from Dolente to Weaver, dated 12/6/00 |
| P-16 | Letter from Davis to Cronin, dated 12/11/00 |
| P-17 | Undated handwritten Honda memo regarding request to relocate, Undated |
| P-18 | Dealer Contact Report, dated 12/19/00 |
| P-19 | Internal Honda E-mails, dated 1/2/01 |
| P-20 | Memo from Price to Colliver, dated 1/15/01 |
| P-21 | Dealer Contact Report, dated 1/24/01 |
| P-22 | Dealer Contact Report, dated 3/2/01 |
| P-23 | Memo from Conrad to Colliver, dated 3/13/01 |
| P-24 | Memo from Hendley to Colliver, dated 3/22/01 |
| P-25 | Dealer Contact Report, dated 3/27/01 |
| P-26 | Letter from Colliver to Davis, dated 4/6/01 |
| P-27 | Dealer Contact Report, dated 4/13/01 |
| P-28 | Letter from Aboyoun to Colliver, dated 5/8/01 |
| P-29 | Letter from Green to Davis, dated 6/15/01 |
| P-30 | Letter from Aboyoun to Kiefer, dated 6/27/01 |
| P-31 | Letter from Kiefer to Aboyoun, dated 8/8/01 |
| P-32 | Letter from Aboyoun to Kiefer, dated 8/21/01 |
| P-33 | Dealer Contact Report, dated 8/23/01 |
| P-34 | Dealer Contact Report, dated 9/13/01 |
| P-35 | Dealer Contact Report dated 10/5/01 |
| P-36 | Dealer Contact Report, dated 10/24/01 |
| P-37 | Dealer Contact Report, dated 11/14/01 |
| P-38 | Letter from Cronin to Davis, dated 12/4/01 |
| P-39 | Letter from Aboyoun to Kiefer, dated 12/24/01 |
| P-40 | Letter from Otera to Aboyoun, dated 1/11/02 |
| P-41 | Letter from Aboyoun to Otera, dated 1/21/02 |

P-42        Letter from Aboyoun to Otera, dated 2/21/02

P-43        Memo from Green to Cronin, dated 3/4/02

P-44        Letter from Aboyoun to Otera, dated 3/28/02

P-45        Letter from Otera to Aboyoun, dated 4/10/02

P-46        Letter from Aboyoun to Otera, dated 4/16/02

P-47        Letter from Weaver to Cronin, dated 5/6/02

P-48        Memo from Dolente to Burt, dated 2/5/03

P-49        Letter from Cronin to Saporito, dated 4/14/03

P-50        Letter from Cronin to Armstead, dated 4/14/03

P-51        Highlights of and Amendment to Terranova-Saporito Contract, dated 5/16/03

P-52        East Windsor-Real Estate Option Agreement (Zydorski 130 Partnership &
            Saporito), dated 5/28/03

P-53        Application by All Star Motors of L.I., Inc. for Honda Dealership in East Windsor,
            dated 5/28/03

P-54        Letter from Aboyoun to Otera, dated 6/17/03

P-55        Dealer Contact Report, dated 6/18/03

P-56        Letter from Aboyoun to Otera, dated 7/3/03

P-57        Letter from Otera to Aboyoun, dated 7/16/03

P-58        Letter from Aboyoun to Otera, dated 7/21/03

P-59        Letter from Otera to Aboyoun, dated 7/29/03

P-60        Dealer Contact Report, dated 8/8/03

P-61        Letter from Aboyoun to Otera, dated 8/12/03

P-62        Letter from Otera to Aboyoun, dated 8/13/03

P-63        [in separate folder] Saul Ewing's cover letter to East Windsor Planning Board
            with Application attaching:
            - Kenderian-Zilinski site plans [dated 10/1/03]
            - Kenderian-Zilinski Tax Map [dated 10/1/03]
            - Floor Plan
            - Two Kenderian-Zilinski surveys attached to 10/8/03 Application's Stormwater
            Management Report (Grading Plan and Existing Drainage Area Map), dated
            10/8/03

P-64        Saporito checks to East Windsor ($12,470 and $1,150), dated 10/25/03 &
            10/26/03

P-65      [in separate folder] Kenderian-Zilinski submissions with revised Environmental Impact Statement and Stormwater Management Report attaching

- Revised Kenderian-Zilinski site plans submitted on 11/14/03

- Two Kenderian-Zilinski revised surveys attached to the Stormwater Management Report submitted on 11/14/03 (Existing Drainage Area Map and Proposed Drainage Area Map), dated 11/14/03

P-66      Delaware & Raritan Canal Commission Staff Report, dated 12/5/03

P-67      PDLR for Hamilton Square open point, dated 12/15/03

P-68      Letter from Lia to Burrell, dated 1/28/04

P-69      Letter from Otera to Aboyoun, dated 2/16/04

P-70      Handwritten meeting notes with Saporito, dated 2/18/04

P-71      Letter from Aboyoun to Otera, dated 2/18/04

P-72      Letter from Saporito to Dolente, dated 2/24/04

P-73      Letter from Dolente to Saporito, dated 2/27/04

P-74      Letter from Dolente to Armstead, dated 2/27/04

P-75      Article from Windsor-Hights Herald – "Honda eyeing Route 130 location", dated 2/27/04

P-76      Letter from Price to Burrell, dated 3/4/04

P-77      Letter from Otera to Aboyoun, dated 3/8/04

P-78      Minimum requirements for facilities and capital & Verification of sources of funds, dated 3/9/04

P-79      Letter from Saporito to Dolente, dated 3/10/04

P-80      Letter from O'Douherty to NY Zone of Honda, dated 3/10/04

P-81      Letter from Dolente to Armstead, dated 3/11/04

P-82      Letter from Dolente to Saporito, dated 3/15/04

P-83      Letter from Aboyoun to Otera, dated 3/15/04

P-84      Letter from Zoratti (Mercer County Chamber of Commerce) to Burrell, Undated

P-85      Letter from Saporito to Dolente with final documentation for East Windsor, dated 3/17/04

P-86      All Star Honda Marketing Packet for East Windsor, dated Spring 2004

P-87      Letter from Aboyoun to Otera, dated 3/18/04

P-88      Letter from Kent-Smith to East Windsor Planning Board, dated 3/24/04

P-89      Armstead Financial Statement, dated May 2004

| P-90 | Letter from Otera to Aboyoun, dated 5/26/04 |
|---|---|
| P-91 | Letter from Aboyoun to Otera, dated 5/28/04 |
| P-92 | Letter from Kent-Smith to East Windsor Planning Board, dated 6/11/04 |
| P-93 | Hamilton Square Open Point presentation, dated 6/16/04 |
| P-94 | Letter from Dolente to Saporito, dated 7/8/04 |
| P-95 | Verification of Sources of Funds & Indebtedness signed by Armstead and Saporito, dated 7/12/04 |
| P-96 | Exterior Identification Survey Request, dated 7/19/04 |
| P-97 | Memo from Burrell to Beniche regarding East Windsor, dated 7/19/04 |
| P-98 | Memo from Burrell to Beniche regarding minority ownership change, dated 7/19/04 |
| P-99 | Email from Fujiki to Dolente & Burrell, dated 8/4/04 |
| P-100 | Letter from O'Doherty to NY Zone with Pro Forma Balance Sheet, dated 8/5/04 |
| P-101 | Memo from Dolente to Fujiki, dated 8/6/04 |
| P-102 | Letter from Price to Burrell, dated 8/20/04 |
| P-103 | NAMAD/American Honda Dealership Opportunity Review Sheet, Undated |
| P-104 | Dealer Agreement Review Committee Summary, dated 8/31/04 |
| P-105 | Letter from Forrest to East Windsor Planning Board, dated 9/10/04 |
| P-106 | Article – "Honda Changes Plan for 130 Dealership", dated 9/10/04 |
| P-107 | Letter of Intent enclosed in letter from Beniche to Armstead and Saporito, dated 9/13/04 |
| P-108 | Dealer Contact Report, dated 9/16/04 |
| P-109 | E-mails between Green and Dolente, dated 9/16/04 |
| P-110 | Real Estate Contract of Sale (effective 9/23/04), dated 9/23/04 |
| P-111 | Check:  All Star to Pepper Hamilton for $150,000, dated 9/20/04 |
| P-112 | Wire transfer:  Saporito to All Star for $150,000, dated 9/20/04 |
| P-113 | All Star Motors, LLC Certification of Formation, dated 10/1/04 |
| P-114 | All Star Motors, LLC Operating Agreement, dated 10/15/04 |
| P-115 | Application for EIN, dated 10/18/04 |
| P-116 | Business Registration Certificate, dated 11/3/04 |
| P-117 | to Saporito, dated 10/7/04 Saul Ewing bill (*Not admitted into Evidence*) |
| P-118 | Dealer Contact Report, dated 10/11/04 |
| P-119 | Real Estate Contract of Sale (effective 10/12/04), dated 10/12/04 |

P-120     Letter from Sunell to Saporito with executed Letter of Intent, dated 10/13/04

P-121     Letter from Delany to East Windsor Township Planning Board with resubmission, dated 10/20/04

P-122     Sterling Title Work (Commitment No. MC 18208) – Lot 138.01, dated 10/24/04

P-123     Memo from Dolente to Cox regarding Hamilton Square Open Point, dated 10/25/04

P-124     Letter from Saporito to Dolente, dated 10/28/04

P-125     Notice from Green to DeAngelis, dated 11/9/04

P-126     Letter from Burrell to Armstead and Saporito, dated 11/9/04

P-127     Memo from Coppola & Coppola to East Windsor Township Planning Board, dated 11/11/04

P-128     Assignment and Assumption of Lease between Frank's Nursery and L&S Motors, dated 11/12/04

P-129     East Windsor Township Planning Board Minutes of Nov. 15, 2004, dated 11/15/04

P-130     Letter from Kent-Smith to East Windsor Township Planning Board, dated 11/24/04

P-131     Memo from Battin to Galente, dated 11/29/04

P-132     Letter from Kent-Smith to Mann, dated 12/14/04

P-133     Sterling Title Work (Commitment No. MC 18349) - Lot 138.02, dated 12/14/04

P-134     645 Route 130 HS LLC Certificate of Formation, dated 12/20/04

P-135     East Windsor Planning Board Minutes, dated 12/20/04

P-136     Notice from Green to Davis, dated 12/21/04

P-137     Article: "Auto dealer leases prime Hamilton site", dated 12/29/04

P-138     Deed between Zydorski and All Star Route 130 EW LLC (unfiled version), dated 12/30/04

P-139     Deed between Zydorski and All Star Route 130 EW LLC (filed version), dated 12/30/04

P-140     Deed between Terranova and All Star Route 130 EW LLC (filed version), dated 12/30/04

P-141     E-mails between Dolente and Beniche, dated 1/7/05

P-142     Letter from Kent-Smith to Mann, dated 1/10/05

P-143     Dealer Contact Report, dated 1/21/05

| P-144 | First Amendment to Real Estate Contract of Sale between Glodack and 645 Route 130 HS LLC and Saporito, dated 1/26/05 |
|---|---|
| P-145 | All Star Route 130 HS LLC Certificate of Formation, dated 1/28/05 |
| P-146 | Honda Dealership Image Program Documents, dated 2/16/05 |
| P-147 | [in separate folder] Tax Map of Lot 138.01 in Hamilton Township, dated 3/4/05 |
| P-148 | Bench Realty Memo regarding Glodack Settlement, dated 3/7/05 |
| P-149 | Partial Assignment and Assumption of Real Estate Contract of Sale between 645 Route 130 HS LLC/Saporito and All Star Route 130 HS LLC, dated 3/8/05 |
| P-150 | Deed between Glodack and DTL HS LLC, dated 3/10/05 |
| P-151 | Partial Assignment and Assumption of Real Estate Contract of Sale between 645 Route 130 HS LLC/Saporito and DTL HS Holdings, LLC, dated 3/10/05 |
| P-152 | Resolution by Written Consent of the Sole Shareholder and Sole Director of Glodack Consulting, Inc., dated 3/10/05 |
| P-153 | Unlimited Guaranty of Payment and Performance between Saporito and Glodack, dated 3/10/05 |
| P-154 | Mortgage Note by DTL HS Holdings LLC, dated 3/10/05 |
| P-155 | Purchase Money Mortgage & Security Agreement by DTL HS in favor of Glodack (unfiled copy, forwarded by Saul Ewing for filing under cover of 6/17/05), dated 3/10/05 |
| P-156 | Purchase Money Mortgage and Security Agreement by DTL HS LLC in favor of Glodack (filed copy), dated 3/10/05 |
| P-157 | Affidavit of Title by Glodack regarding Lot 138.01, dated 3/10/05 |
| P-158 | Notice of Settlement on Lot 138.01 (filed copy), dated 3/10/05 |
| P-159 | Survey Endorsement on Lot 138.01, dated 3/10/05 |
| P-160 | Sterling Title Agency – Closing Statement on Lots 138.01 & 138.02, dated 3/10/05 |
| P-161 | Deed between Glodack and Allstar Route 130 HS LLC, dated 3/10/05 |
| P-162 | Purchase Money Mortgage and Security Agreement by All Star Route 130 HS, LLC in favor of Glodack (unfiled copy), dated 3/10/05 |
| P-163 | Filed copy of Purchase Money Mortgage and Security Agreement by All Star Route 130 HS LLC in favor of Glodack, dated 3/10/05 |
| P-164 | Mortgage Note by Allstar Route 130 HS LLC to Glodack, dated 3/10/05 |
| P-165 | Affidavit of Title by Glodack for Lot 138.02, dated 3/10/05 |

P-166        Certificate of Nonforeign Status by Glodack, dated 3/10/05

P-167        Series of Saul Ewing checks, dated 3/10/05

P-168        Deposits – Saporito/DTL, dated 3/18/05

P-169        Letter from Kent-Smith to Readlinger, dated 6/17/05

P-170        Affidavit of Consideration for Use by Buyer (Lot 138.01), dated 7/5/05

P-171        Letter from Fugill (Saul Ewing) to Mercer County Clerk with Discharge of
             Mortgage, dated 7/15/05

P-172        [in separate folder]   Hamilton Township Application for Dealership and Surveys
             attached to 7/29/05 Hamilton Township Application, dated 7/29/05

P-173        Miscellaneous Sales Data, Undated

P-174        Initially filed Verified Protest, dated 12/3/04

P-175        Amended Protest, dated 1/7/05

P-176        Honda's Answer to Amended Protest, 1/27/05

P-177        All Star's Answer to Amended Protest, dated 1/21/05

P-178        All Star's Interrogatory Answers, dated 3/7/05

P-179        All Star's Answers to Request to Admit, dated 3/7/05

P-180        Honda's Interrogatory Answers, dated 3/17/05

P-181        Deposition Transcript – Armstead (non highly confidential portion), dated 8/5/05

P-182        Deposition Transcript – Armstead (highly confidential portion), dated 8/5/05

P-183        Deposition Transcript – Lia (non highly confidential portion), dated 8/29/05

P-184        Deposition Transcript – Lia (highly confidential portion), dated 8/29/05

P-185        Fontana Group Expert Report [clean copy provided on 11/17/05], dated August
             2005

P-186        Fontana Group Rebuttal Expert Report, dated September 2005

P-187        Fontana Group Supplemental Expert Report

P-188        All Star Honda's Application for Bay Shore Point, dated 9/30/02

P-189        Fontana Group Second Supplemental Expert Report

P-190        Willis Honda Advertising – Newspaper Excerpt, dated 11/12/05

P-191        New Jersey MAP Numbers

P192         Willis Honda Performance Award Poster


**For Respondent American Honda**:

OAL DKT. NO. MFC 10956-04

RH – 1      Davis letter to Novelly, dated 12/5/90

RH – 2      Davis letter to Novelly, dated 12/26/90

RH – 3      Letter of Intent to Davis/Weaver, dated 1/18/91

RH – 4      Elliott/Bengston letter to Davis/Weaver, dated 1/18/93

RH – 5      Davis letter to Colliver, dated 8/24/93

RH – 6      Colliver letter to Davis/Weaver, dated 3/3/94

RH – 7      (Blank Exhibit – not used)

RH – 8      Contact Report (Baeza), dated 3/10/00

RH – 9      Contact Report (Baeza), dated 3/14/00

RH – 10     Executive Summary Southwest New Jersey Market Study, dated 6/27/00

RH – 11     Southwest New Jersey Metro Market Study (Willis' copy), dated 7/2000

RH – 12     SW NJ Market Study (American Honda's copy), dated 7/2000

RH – 13     Weaver letter to Davis, dated 11/10/00

RH – 14     Cronin letter to Davis, dated 11/15/00

RH – 15     Contact Report (Dolente), dated 11/22/00

RH – 16     2000 Dealer Financial Statements, dated 12/2000

RH – 17     Contact Report (Dolente), dated 12/5/00

RH – 18     Dolente letter to Weaver, dated 12/6/00

RH – 19     Davis letter to Cronin, dated 12/11/00

RH – 20     Contact Report (Dolente), dated 12/19/00

RH – 21     Mini-Market Study for Southwest New Jersey Market, dated 3/20/01

RH – 22     Colliver letter to Davis, dated 4/6/01

RH – 23     Aboyoun letter to Colliver, dated 5/8/01

RH – 24     Honda Automobile Dealer Sales and Service Agreement, dated 5/23/01

RH - 25     Green letter to Davis, dated 6/15/01

RH – 26     Kiefer letter to Aboyoun, dated

RH – 27    2001 Dealer Financial Statements, dated 12/01

RH – 28    Cronin letter to Davis, dated 12/4/01

RH - 29    Otera letter to Aboyoun, dated 1/11/02

RH – 30    Otera letter to Aboyoun, dated 2/14/02

RH – 31    Green memo to Cronin, dated 3/4/02

RH – 32    Aboyoun letter to Otera, dated 3/28/02

RH – 33    Otera letter to Aboyoun, dated 4/10/02

RH – 34    Weaver letter to Cronin, dated 5/6/02

RH – 35    2002 Dealer Financial Statements, dated 12/02

RH – 36    Cronin letter to Saporito, dated 4/14/03

RH – 37    Contact Report, dated 4/16/03

RH – 38    Contact Report, dated 5/6/03

RH – 39    Armstead Application, dated 5/28/03

RH – 40    Saporito Application, dated

RH – 41    Aboyoun letter to Otera, dated 7/3/03

RH – 42    Otera letter to Aboyoun, dated 7/16/03

RH – 43    Otera letter to Aboyoun, dated 7/29/03

RH – 44    2003 Dealer Financial Statements, dated 12/03

RH – 45    Proposed Dealer Location Request (PDLR), dated 12/15/03

RH – 46    Aboyoun letter to Hardt, dated 1/30/04

RH – 47    Otera letter to Aboyoun, dated 2/16/04

RH – 48    Aboyoun letter to Otera, dated 2/18/04

RH - 49    Aboyoun letter to Hardt, dated 2/18/04

RH – 50    Aboyoun letter to Otera, dated 2/18/04

RH – 51    Hardt letter to Aboyoun, dated 2/21/04

RH – 52    Aboyoun letter to Hardt, dated 2/26/04

RH – 53     Otera letter to Aboyoun, dated 3/8/04

RH – 54     Aboyoun letter to Otera, dated 3/18/04

RH – 55     Otera letter to Aboyoun, dated 3/29/04

RH – 56     Aboyoun letter to Otera, dated 4/6/04

RH – 57     Otera letter to Aboyoun dated 4/15/04

RH – 58     Aboyoun letter to Singer, dated 5/10/04

RH – 59     Open Point Presentation, dated 6/16/04

RH – 60     Burrell memo to Beniche, dated 7/19/04

RH – 61     Dealership Location and Dealership Premises Statement, dated 7/23/04

RH – 62     Dealer Agreement Review Committee Summary, dated 8/31/04

RH – 63     Letter of Intent, dated 10/12/04

RH – 64     Proposed Dealer Location Request (PDLR), dated 10/25/04

RH – 65     Market Planning Department Open Point Executive Summary, dated 10/26/04

RH – 66     Notice of Motion, dated 11/09/04

RH – 67     2004 Dealer Financial Statement, dated 12/04

RH – 68     Green letter to Davis, dated 12/21/04

RH – 69     Otera letter to Aboyoun, dated 1/28/02

RH – 70     Aboyoun letter to Hardt, dated 2/27/04

RH – 71     Deposition transcript of Jessie Armstead, dated 8/5/05

RH – 72     First Amendment to Honda Automobile Dealer Sales and Service Agreement

RH – 73     Honda Automobile Dealer Sales and Service Agreement Standard Provisions

RH – 74     Honda Automobile Dealer Sales and Service Agreement

RH – 75     Deposition transcript of Donald Lia

RH – 76     (Blank Exhibit – Not Used)

RH – 77     Proposed Dealer Location Request (PDLR) for Bordentown, dated 04/06/04

RH – 78     Revised expert report of James A. Anderson

OAL DKT. NO. MFC 10956-04

RH – 79     Appendices to expert report of James A. Anderson

RH – 80     Hearing Book prepared by James A. Anderson

RH – 81     Monthly financial statements for Willis Honda from January 2002 to October 2005


**For Respondent Allstar Motors:**

RA-1   Letter dated November 17, 2005, from Alan G. Frank, Jr., Esq.

RA-2   Letter dated November 28, 2005, from Henry L. Kent-Smith, Esq.

RA-3   Letter dated November 28, 2005, from Henry L. Kent-Smith, Esq.