# **TAB 11**



**State of Wisconsin\DIVISION OF HEARINGS AND APPEALS**

David H. Schwarz, Administrator
5005 University Avenue, Suite 201
P.O. Box 7875
Madison, Wisconsin 53707-7875

Telephone: (608) 266-7709
TTY: (608) 264-9853
FAX: (608) 264-9885
E-mail: dha.mail@dha.state.wi.us
Internet: http://dha.state.wi.us

May 25, 2010

Attorney Paul R. Norman
Boardman Law Firm
P. O. Box 927
Madison, WI 53707-0927

Attorney Steven J. Wells
Dorsey & Whitney, LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402

Re:   Zimbrick Inc., Complainant v. American Honda Motor Co., Inc., Respondent
      Case Nos. TR-08-0007 and TR-08-0039

Dear Parties:

Pursuant to the procedure described in Wis. Stat. § 227.46(2m), there is enclosed a Proposed
Decision in the above-captioned proceeding, including Proposed Findings of Fact, Conclusions
of Law, and Order.

This is a proposed decision and not the decision of the Administrator of the Division of Hearings
and Appeals. The Administrator will not issue his decision until after each party adversely
affected by the proposed decision has had an opportunity to file objections and present briefs to
the Division of Hearings and Appeals. Objections and Briefs, if any, must be filed in writing in
time to reach the Division of Hearings and Appeals not later than 15 days from the date of this
letter. Statements or briefs in support of the Proposed Decision may be filed within the same 15
day period of time. A copy of the objections, statements and briefs must also be served upon
each party of record.

The Proposed Decision does not become effective unless adopted by the Administrator of the
Division of Hearings and Appeals.

Sincerely,

*Mark Kaiser*

Mark J. Kaiser
Administrative Law Judge

MJK:lam

Enclosure
G:\DOCS\GenOrders\Zimbrick.ltr.doc



**Before The**
# State Of Wisconsin
## DIVISION OF HEARINGS AND APPEALS

Zimbrick Inc., Complainant

v.                                                    Case Nos.: TR-08-0007 and TR-08-0039

American Honda Motor Co., Inc., Respondent

### PROPOSED DECISION

On December 20, 2007, American Honda Motor Co., Inc., (Honda) notified Zimbrick Inc., d/b/a Zimbrick Honda (Zimbrick Honda) that it intended to modify Zimbrick Honda's Dealer Agreement by amending its area of assigned sales responsibility. On February 13, 2008, Zimbrick Honda filed a complaint with the Wisconsin Division of Hearings and Appeals (DHA) against Honda pursuant to Wis. Stat. § 218.0116(8). In the complaint Zimbrick Honda protested the proposed modification of its Dealer Agreement. This complaint was assigned DHA case number TR-08-0007.

On June 12, 2008, Honda notified Zimbrick Honda that it proposed to establish another Honda dealer within area of sales responsibility assigned to Zimbrick Honda. On July 3, 2008, Zimbrick Honda filed a complaint against Honda pursuant to Wis. Stat. § 218.0116(7) protesting the proposed establishment of another Honda dealer within Zimbrick Honda's relevant market area. This complaint was assigned DHA case number TR-08-0039. Zimbrick also demanded mediation pursuant to Wis. Stat. § 218.0136 in both protests. On February 14, 2008 and July 7, 2008, the Division of Hearings and Appeals issued orders suspending the respective proceedings until after mediation occurred.

By letter dated September 24, 2008, Attorney Steven J. Wells advised DHA that the parties had completed mediation without resolution and requested that a prehearing conference be scheduled. Mr. Wells also requested that these matters be consolidated for purposes of scheduling and hearing. In response to this request, both orders suspending proceedings were vacated and the matters were consolidated for hearing. A prehearing conference was conducted on Octobers 9, 2008, and an evidentiary hearing was scheduled. Pursuant to due notice, the DHA held a hearing on June 23, 24, 25, 29, and 30, 2009, in Madison, Wisconsin. Mark J. Kaiser, Administrative Law Judge, presided. After completion of the hearing, the parties filed post-hearing briefs. The respondent filed its initial brief on August 11, 2009; the complainant filed its response brief on September 14, 2009; and, the respondent filed a reply brief on October 7, 2009.

Case Nos.: TR-08-0007 and TR-08-0039
Page 2

In accordance with Wis. Stat. §§ 227.47 and 227.53(1)(c), the PARTIES to this proceeding are certified as follows:

Zimbrick, Inc., d/b/a Zimbrick Honda, by

> Attorney Paul R. Norman
> Boardman Law Firm
> P. O. Box 927
> Madison, WI  53707-0927

American Honda Motor Co., Inc., by

> Attorney Steven J. Wells
> Attorney John Rock
> Dorsey & Whitney, LLP
> 50 South Sixth Street, Suite 1500
> Minneapolis, MN  55402

### Issues to be decided

With respect to case number TR-08-0007, Honda has proposed modifying the area of sales responsibility it assigned to Zimbrick Honda in Zimbrick Honda's Dealer Agreement. The issue to be decided is whether good cause exists for permitting the proposed modification of Zimbrick Honda's Dealer Agreement. With respect to case number TR-08-0036, Honda notified Zimbrick Honda of its intention to establish another Honda dealer within Zimbrick Honda's relevant market area. The issue to be decided is whether there is not good cause for permitting the proposed establishment of a new dealer within the relevant market area of Zimbrick.

At the outset of the hearing, the parties agreed that issue in case number TR-08-0007 has been subsumed by the disputed issues in case number TR-08-0036. If good cause is found for permitting the proposed establishment of a new dealer within the relevant market area of Zimbrick Honda, the area of sales responsibility for Zimbrick Honda will necessarily be modified in the course of establishing the new dealer. Honda did not present any evidence to independently support the proposed modification the area of sales responsibility assigned to Zimbrick Honda. If no good cause is found for permitting the establishment of the proposed new dealer within the relevant market area of Zimbrick Honda, Honda did not carry its burden of proof to show good cause for permitting the modification of Zimbrick Honda's Dealer Agreement.

Case Nos.: TR-08-0007 and TR-08-0039
Page 3

## Applicable law

Wisconsin Stat. § 218.0116(7) provides in relevant part:

(7)(a)1. A manufacturer, importer or distributor who seeks to enter into a franchise agreement establishing or relocating a motor vehicle dealership, parts outlet or service outlet within the relevant market area of an existing enfranchised dealer of the line make of motor vehicle shall first notify, in writing, the department of transportation and that existing enfranchised dealer of its intention to establish or relocate a dealership or outlet. Within 30 days of receiving the notice or within 30 days after the end of any appeal procedure provided by the manufacturer, importer or distributor, whichever is later, any existing enfranchised dealer of the same line make to whom the manufacturer, importer or distributor is required to give notice under this paragraph may file with the department of transportation and the division of hearings and appeals a complaint protesting the proposed establishment or relocation of the dealership or outlet within the relevant market area of the existing enfranchised dealer.

2. If a complaint is filed under subd. 1., the department of transportation shall inform the manufacturer, importer or distributor that a timely complaint has been filed, that a hearing is required, and that the proposed franchise agreement may not be entered into until the division of hearings and appeals has held a hearing, nor thereafter, if the division of hearings and appeals determines that there is not good cause for permitting the proposed establishment or relocation of the dealership or outlet. In the event of multiple complaints, hearings shall be consolidated to expedite the disposition of the issue.

(b) In determining whether good cause exists for permitting the proposed establishment or relocation of a dealership or outlet, the burden of proof for showing good cause shall be on the manufacturer, importer, or distributor, and the division of hearings and appeals shall take into consideration the existing circumstances, including, but not limited to:

> 1. The amount of business transacted by existing enfranchised dealers of the line make of motor vehicle when compared with the amount of business available to them.

> 2. The permanency of the investment necessarily made and the obligations incurred by existing enfranchised dealers in the performance of their franchise agreements.

> 3. The effect on the retail motor vehicle business in the relevant market area.

> 4. Whether it is injurious to the public welfare for the proposed dealership or outlet to be established or relocated.

> 5. Whether the establishment or relocation of the proposed dealership or outlet would increase competition and therefore be in the public interest.

6. Whether the existing enfranchised dealers of the line make of motor vehicle are providing adequate consumer care for the motor vehicles of that line make, including the adequacy of motor vehicle service facilities, equipment, supply of parts and qualified personnel.

7. Whether the existing enfranchised dealers of the line make of motor vehicle are receiving vehicles and parts in quantities promised by the manufacturer, factory branch or distributor and on which promised quantities existing enfranchised dealers based their investment and scope of operations.

8. The effect the denial of the proposed establishment or relocation would have on the license applicant, dealer or outlet operator who is seeking to establish or relocate a dealership or outlet.

(c) The decision of the division of hearings and appeals shall be in writing and shall contain findings of fact and a determination of whether there is good cause for not permitting the proposed establishment or relocation of the dealership or outlet. The division of hearings and appeals shall deliver copies of the decision to the parties personally or by registered mail. The decision is final upon its delivery or mailing and no reconsideration or rehearing by the division of hearings and appeals is permitted.

## Proposed Findings of Fact

1.      Zimbrick, Inc., d/b/a Zimbrick Honda, (Zimbrick Honda or the complainant) is a motor vehicle dealer licensed by the Wisconsin Department of Transportation (WisDOT). Zimbrick Honda holds a franchise from American Honda Motor Co., Inc., (Honda or the respondent) granting Zimbrick Honda the right to buy, sell, and service Honda automobiles and light duty trucks.

2.      Honda is a California corporation with principal offices located at 1919 Torrance Boulevard, Torrance, California.  Honda is licensed by WisDOT to engage in business as a motor vehicle manufacturer or distributor in Wisconsin.  Honda distributes Honda automobiles and light duty trucks and parts through a network of dealers in the United States.

3.      Zimbrick Honda is part of the Zimbrick motor vehicle dealership group.  The Zimbrick motor vehicle dealership group consists of Zimbrick, Inc., the Zimbrick Automotive Group, Cars of Brookfield, MJZ, Inc., and MJZII, Inc.  Each of these corporations operates motor vehicle dealerships in Wisconsin (exh. 11).  Zimbrick, Inc., operates sixteen new motor vehicle franchises in the Madison area.  The franchises Zimbrick, Inc., currently operates in addition to Honda include Buick (east and west side locations), Infiniti, Saab, Isuzu, Acura, Volkswagen, BMW, Mercedes-Benz, Porsche, Audi, Saturn, Hyundai (east and west side locations), Nissan, Pontiac, and GMC, (testimony of Thomas Zimbrick, tr. p. 796).  Thomas Zimbrick is the chief executive officer of Zimbrick, Inc., and an officer of the other corporations that are part of the Zimbrick motor vehicle dealership group.  The other principals for the Zimbrick motor vehicle dealership group are John Zimbrick, Michael Zimbrick, and Patricia Zimbrick.

4.      Zimbrick Honda has been the Honda dealer in Madison since 1973. Zimbrick Honda operates a sales and service facility at 1601 West Beltline Highway in Madison (the 1601 campus) and a Honda Dealer Service Center (HDSC) providing service only at 430 Grand Canyon Drive in Madison. At the 1601 campus Zimbrick, Inc., also operates its Buick, Infinity, and Saab franchises and Isuzu service. Zimbrick Honda's sales and service facility consists of a 33,328 square foot sales and service building, a 6,650 square foot car prep building, a 900 square foot Honda Certified Used Car building, and a leased parking area for new Honda vehicle storage (exh. 299, tab 17).

5.      Zimbrick Honda has operated the HDSC since 1991. The HDSC is located about five miles west of the main sales and service facility and consists of a 26,486 square foot building. The HDSC performs all service work required by Honda owners.

6.      Honda assigns an Area of Statistical Analysis (ASA) to each of its dealers. An ASA is designated as a set of census tracts. Zimbrick Honda's ASA consists of all of Dane County and parts of Columbia, Green, Jefferson, Rock, and Sauk Counties (exh. 216). Honda evaluates its dealer's sales performance based on how well the dealer does in its ASA.

7.      Zimbrick Honda is geographically located in what Honda has delineated as Zone 8 of the United States. Zone 8 consists of all of Wisconsin, most of Minnesota, Iowa, Missouri, and Illinois, and parts of Kansas, Michigan, Kentucky, Indiana, and Oklahoma (exh. 299, tab 12).

8.      The automotive industry commonly uses two alternative methods for evaluating the sales performance of dealers. One alternative is referred to as "retail registration effectiveness." Retail registration effectiveness compares how a particular brand, *e.g.* Honda, is doing in a specific area based on some standard. The other method for evaluating sale performance is referred to as "sales effectiveness." Sales effectiveness compares how a particular dealer's sales compares to the number of vehicles the dealer is expected to sell. To calculate a dealer's sales effectiveness one multiplies the number of industry registrations in the dealer's assigned market by a comparison market share for a particular brand to determine an expected sales number for a dealer. The dealer's actual sales, regardless of whether the sold vehicles are registered within the dealer's assigned market, are then compared to the expected sales number. Both retail registration effectiveness and sales effectiveness are expressed as percentages.

9.      Honda uses sales effectiveness based a segment adjusted state average as the sales performance standard it uses to evaluate its dealers and to determine whether its dealers are meeting their contractual obligation for minimum sales performance. Using the Wisconsin

segment adjusted average for Honda the expected sales, actual sales, and sales effectiveness for the time period 2006 – 2008 for Zimbrick Honda are:

| Year | expected sales | actual sales | sales effectiveness |
|------|----------------|--------------|---------------------|
| 2006 | 1,225 | 2,273 | 185.55% |
| 2007 | 2,219 | 2,642 | 119.06% |
| 2008 | 2,082 | 2,502 | 120.17% |

exhs. 212, 213, and 215

For each of these years, Zimbrick Honda exceeded its contractual responsibility for minimum sales.

10.    Honda also sets a sales objective for Zimbrick Honda for each year.  The sales objective Honda set for Zimbrick Honda is greater than its expected sales at the Wisconsin average.  During the time period from 2001 to 2007 and the first half of 2008, Zimbrick Honda exceeded the sales objective in all but three years, 2001, 2005, and 2006.  (exh. 217).

11.    Although Zimbrick Honda has satisfied its contractual obligation for minimum sales performance based on the sales potential of its ASA, it has been more successful selling new vehicles on the west side of its ASA than on the east side.  Honda's market penetration is significantly higher on the west side of the Madison market than on the east side.  Using Honda's state average, in 2007 the registration effectiveness on the west side of the Madison market was 141.3% and 87.4% on the east side.  In 2008, the registration effectiveness was 128.5% on the west side and 90.2% on the east side (exh. 88, at A-20U).  However, it should be noted that Zimbrick Honda takes all vehicles offered to it by Honda and buys additional vehicles from other Honda dealers.  There is little doubt that Honda's registration effectiveness would improve on the east side of the Madison market if Honda provided Zimbrick Honda with more vehicles to sell.

12.    Honda also periodically calculates a Market Area Potential (MAP) number for each of its dealers.  A dealer's MAP is a number of annual sales.  A dealer's MAP is calculated based on Honda's national penetration levels.  A dealer's MAP is not an expected number of sales, but rather a statistical tool Honda uses to analyze the dealer's sales opportunities for the purpose of establishing minimum facility and capital requirements for each dealer.  The most recent MAP for Zimbrick Honda was calculated by Honda in 2006 and is 2,587 vehicles.  Based on this MAP, the minimum facility guideline for Zimbrick Honda is 37,312 square feet (exh. 20).  The combined main sales and service facility and HDSC exceed the minimum required facility guidelines by 77.9% (exh. 299, tab 17)

13.    Zimbrick, Inc., is the actual dealer under the Honda Sales and Service Agreement.  Many of the fixed assets necessary to operate the Honda franchise are owned by corporations or partnerships owned and controlled by members of the Zimbrick family.  No Honda only balance sheet is prepared by the Zimbrick motor vehicle dealer group from which the investment in fixed assets for the Honda franchise can be readily discerned.  The most appropriate figure for the

Case Nos.: TR-08-0007 and TR-08-0039
Page 7

permanent investment in the Zimbrick Honda franchise was calculated by Herbert Walter, one of Honda's expert witnesses. This figure, as of the December 31, 2002, is $8,080,314 (exh. 87, tab 44). Mr. Walter's figure includes all the investment in land, buildings and improvements, machinery and equipment and Honda's minimum working capital requirement ($2,650,000) regardless of whether the asset is owned by Zimbrick, Inc., or another Zimbrick family entity.

14.     The complainant's financial expert, Ernest Manuel, seeks to also include training costs, advertising, and other selling expenses as part of Zimbrick Honda's permanent investment for purposes of Wis. Stat. § 218.0116(7)(b)2. These costs are more appropriately treated as expenses, not a permanent investment. Another item that Dr. Manuel contends should be considered part of its investment is the dealership's blue sky. Zimbrick, Inc., was awarded a Honda franchise in 1973 by Honda. It did not have to pay any blue sky at the time it was awarded a Honda dealership. In this case, Zimbrick Honda's blue sky is a return on its investment, not an investment.

15.     Mr. Walter also computed Zimbrick, Inc.'s average annual profit from its Honda franchise for the time period from 2003 to 2008. From the investment of $8,080,314, Zimbrick Honda has been earning average annual profits of $3,863,781 (exh. 87, tab 44).[1]

16.     In 2004, at the request of Brian Mixon, Honda's zone manager, Honda's market planning department conducted a Single Under or Unrepresented Market Area (SUMMA) study of the Madison ASA. The recommendation of the study was that an open point be established on the east side of Madison. Despite the recommendation, Honda chose not to establish an open point in the Madison ASA at that time.

17.     In 2006, Brian Mixon requested a second SUMMA study of the Madison ASA. The conclusion of this study was again that potential exists for a Honda dealer on the east side of Madison. Based on its analysis, Honda notified Zimbrick that it intended to divide the Madison ASA into two ASA, Madison East and Madison West. Zimbrick is located in what would become Madison West. Zimbrick protested the proposed modification of its ASA.

---

[1] Zimbrick Honda's witnesses testified to lower annual net profits for the Honda franchise. Like the figures for Zimbrick, Inc.'s investment in its Honda franchise, a precise number for Zimbrick Honda's net profit is difficult to calculate because of the complexity of the operations of various Zimbrick entities. Mr. Walter's analysis appears to be the most objective and reasonable. For example, Mr. Walter counted the investment in land and buildings used by Zimbrick Honda, but owned by other Zimbrick family entities as part of the dealership's permanent investment. However, he then added back rent paid by Zimbrick Honda to the owner of the land and buildings to Zimbrick Honda's net profit. Overall, Mr. Walter's approach to calculating an accurate net profit for Zimbrick Honda appears to be the most consistent and logical.

At the hearing, Zimbrick Honda also attempted to further reduce its net profit by introducing the testimony of Catherine McTavish, the corporate controller for the Zimbrick motor vehicle dealer group. Ms. McTavish testified regarding additional corporate allocation adjustments that should be deducted from Zimbrick Honda's net profits. Honda objected to this testimony and moved to have it stricken from the record because these adjustments do not appear in any of the financial statements prepared by Zimbrick Honda nor were they disclosed during discovery in this matter. The motion to strike is granted. The parties conducted extensive discovery in this matter and their respective experts relied on the material produced during discovery to perform exhaustive analysis. It would beunfairly prejudice Honda to allow, Zimbrick Honda to impeach Mr. Walter's calculation of Zimbrick Honda's net profit with alleged expenses that had not been disclosed prior to the hearing.

18.    Honda then began looking for a candidate for a dealer for the proposed Madison east ASA. Honda proposed to appoint the Wilde Automotive Group as the new dealer for the Madison East ASA. Jorge Hidalgo was partnered with the Wilde Automotive Group as the dealer principal. Hidalgo/Wilde has purchased a parcel at 5555 High Crossing Boulevard in Madison for the proposed dealership. This location is within Zimbrick Honda's relevant market area. Honda notified Zimbrick of its intention to establish Hidalgo/Wilde as a new Honda dealer. Zimbrick protested the establishment of a new dealer within its relevant market area.

19.    The Wilde Automotive Group currently operates a Honda franchise in Waukesha, approximately fifty miles from the site of the proposed new dealership. If appointed as a Honda dealer Hidalgo/Wilde will do business as Wilde East Towne Honda.

20.    Prior to Honda's proposal to appoint Hidalgo/Wilde as new dealer in the Madison ASA, Thomas Zimbrick approached Honda about Zimbrick, Inc., operating a Honda dealership on the east side of Madison (testimony of Brian Mixon, tr. pp. 248-52). Honda has a policy against the same dealer operating dealerships in contiguous ASAs. Mr. Mixon informed Mr. Zimbrick that appointing Zimbrick as the Honda dealer on the east side of Madison would violate its policy of prohibiting the same dealer from operating dealerships in contiguous ASAs.[2]

21.    Sharif Farhat, one of Honda's expert witnesses, used a gross loss calculation to identify the lost opportunity for Honda in the Madison ASA. Mr. Farhat calculates gross loss by looking at every census tract in the ASA individually. For every census tract that is below Honda's national penetration ratio, Mr. Farhat calculates the number of sales needed to bring that census tract up to the national standard. Mr. Farhat then adds up the amounts it would take to bring each census tract up to the national standard without subtracting anything for the census tracts that are exceeding the national standard. To the sum for the underperforming census tracts, Mr. Farhat adds the total insell into the Madison ASA. Mr. Farhat considers the number of sales needed to bring each census tract up to the national standard plus the total insell to represent Honda's lost opportunity for the ASA. For 2007, Honda's lost opportunity in the Madison ASA was 1,017 vehicles and 928 vehicles in 2008. Based on this calculation, Mr. Farhat concluded that there sufficient opportunity exists for a second Honda dealer in the Madison metropolitan market, with minimal impact on Zimbrick Honda's profitability.

22.    Ernest Manuel, one of Zimbrick Honda's expert, attempted to calculate the number of sales Zimbrick Honda would lose if the proposed dealer was established. Based on his assumptions, Dr. Manuel predicted that the most likely result would be that Zimbrick Honda annual sales will be reduced by 40% per year. Based on Zimbrick Honda's current sales level of

---

[2] Zimbrick, Inc., could open a satellite Honda dealership on the east side of Madison without violating Honda prohibition of the same dealer operating dealerships in contiguous ASAs because at this point an east side location would still be in Zimbrick Honda's ASA. Honda did seek to modify Zimbrick Honda's ASA before appointing Hidalgo/Wilde as a Honda dealer in the proposed Madison East ASA. However, Zimbrick Honda protested the modification of its ASA and no decision was made in that matter prior to the proposed establishment of Hidalgo/Wilde as a Honda dealer. Honda apparently prefers a different dealer on the east side of Madison which is obviously its prerogative; however, the policy cited does not appear to preclude Zimbrick, Inc., from opening a Honda dealership on the east side of Madison.

2500 vehicles per year, a 40% reduction means a loss of approximately 1000 sales per year (exh. 300, tab 35, page 3 R).

23.    Using the estimate of 1000 lost sales per year, Carl Woodward, another of Zimbrick Honda's experts, calculated a reduction in Zimbrick Honda's annual net profits for both its main sales and service facility and the HDSC.  For 2007, Zimbrick Honda's net income would be reduced by $1,704,000 and by $1,504,000 for 2008.  Although these are significant reductions, Zimbrick Honda would still be a highly profitable motor vehicle dealer.  It should also be noted that these losses are based on a worst case scenario and should be short term.  As the population of the Madison area grows, one would expect Zimbrick Honda sales to increase proportionately.  The establishment of the proposed dealer will not jeopardize the permanent investment made by Zimbrick, Inc. in its Honda franchise.

24.    Honda allocates vehicles among it dealers on a turn and earn system.  Honda refers to its allocation system as MOVE (exh. 7).  Inventories in the retail motor vehicle business measured on a days supply basis.  Zimbrick Honda sells Honda at a rate that results in a days supply below the industry average.

25.    If Zimbrick Honda sold Hondas at a faster pace, it could earn additional vehicles to sell.  The implication is that as a business decision, Zimbrick Honda has chosen to compete less aggressively on price and instead obtain additional vehicles to sell from other dealers.  Zimbrick Honda contends that it does sell vehicles to customers at lower than average prices.  It supports this contention by demonstrating that its gross profit per vehicle is below the average of its comparable group.  Lower gross profits could be based on accounting systems or higher than average costs and does not necessarily mean that Zimbrick Honda's retail prices are low compared to other Honda dealers.

26.    It is probable that if Honda supplied more vehicles to Zimbrick Honda, the registration effectiveness for Honda on the east side would improve.  However, Honda is supplying Zimbrick Honda with the number of vehicles it is earning under Honda's allocation system.  Zimbrick Honda could earn more allocation if it sold vehicles at a faster rate.  This would require more aggressive sales practices and probably lower prices.  Zimbrick Honda is undoubtedly employing sales practices and pricing to maximize its profits which is what it should be doing.  A second Honda dealer would capture the lost sales and interpose additional intrabrand and interbrand competition into the Madison market.

27.    There is little guidance in how the factor related to the impact on the proposed new dealer should be considered.  Hidalgo/Wilde has already made a significant investment in the proposed new dealership facility.  However, this investment was made with no assurance that it would be awarded a Honda franchise.  Consideration of investments made in anticipation of being awarded a franchise would allow a prospective dealer to skew the balancing process by investing heavily in facilities before a decision has been made whether to permit the establishment of the proposed dealership.  This consideration should primarily be applicable to a situation where an existing dealer finds itself in a situation where the dealer has excess capacity in its facilities due to a change in market conditions and proposes to use that excess capacity by adding another line-make.  That situation does not apply in this case

28.    There is evidence in the record that a convenient dealer location plays a role in consumers' choice of which brand of motor vehicle to purchase. Although this is only one of many factors that influence consumer decisions, to the extent that it is a factor, Honda is at a disadvantage to line-makes that have representation on both the west and east side of Madison.

29.    Honda considers its primary competitors to be Toyota and Nissan. Other competitors include Hyundai, Kia, and Volkswagen. All of these line-makes have two dealerships in the Madison metropolitan market, one on the west side and one on the east side. It is not unreasonable for Honda to also seek representation on the east side of Madison, in addition to Zimbrick Honda on the west side. Other manufacturers that produce vehicles that compete with Honda in at least some segments include Mazda, Subaru, and Mitsubishi. These line-makes, like Honda, have only representation on the west side of Madison. However, these line-makes sell significantly fewer vehicles than does Honda. In 2008, Honda's national sales were 1,284,261 vehicles. For the same year Mazda's national sales were 263,949, Subaru's national sales were 187,699, and Mitsubishi's national sales were 97,257 (exh. 88, page A-7). Honda is by far the largest volume manufacturer with representation on only the west side of Madison. Even after the proposed of its ASA to accommodate the establishment of the proposed dealer, Zimbrick Honda's ASA will still represent one of the largest Honda sales opportunities in Wisconsin (Farhat expert report, exh. 88, p. 11, and tab A-40).

30.    The complainant contends that the establishment of the proposed new dealer will replace one strong interbrand competitor with two weak competitors. There is no evidence to support this contention. Both Zimbrick Honda and Hidalgo/Wilde are part of large, well capitalized motor vehicle groups. The establishment of the proposed new dealer will inject additional interbrand and intrabrand competition into the Madison metropolitan market. The additional competition will benefit consumers in the Madison area.

31.    Between it main dealership facilities at the 1601 campus and the HDSC on Grand Canyon Drive, Zimbrick Honda has a higher than average service penetration ratio. There is no evidence that Zimbrick Honda is not providing adequate consumer care to Honda owners in the Madison metropolitan market. Because both Zimbrick Honda's main facilities and the HDSC are located on the west side of the market, Zimbrick Honda is not convenient to Honda owners living in the northeast quadrant of the market. However, Thomas Zimbrick indicated a willingness to construct and operate a second Honda service center in the vicinity of the proposed new dealer. There is no reason to doubt that Zimbrick is financially able to do so. It is not necessary to establish another Honda dealer in the Madison market in order to provide adequate consumer service for Honda owners.

33.    Honda surveys its dealers' service customers and uses the results of those surveys to calculate a Customer Service Experience (CSE) score. Zimbrick Honda's CSE scores exceeded the Honda's district, zone, and national averages in 2005, 2006, 2007, and 2008 (Manuel testimony, tr. 1117-18 exhs. 222, 223, 299, tab 18 p. 2). Based on these CSE scores, Zimbrick Honda is providing more than adequate customer service. as shown by survey numbers. This conclusion can also be inferred by Zimbrick Honda's above average penetration

for customer pay service work (as opposed to warranty work) in its ASA (exhs. 228, 229, and 299, tab 24).

      34.    Zimbrick Honda may have excess capacity in its dealership facilities if the proposed new dealer is established based on Honda's guidelines because its MAP will be reduced. However, based on the testimony of Honda's expert this will not jeopardize its investment because Zimbrick, Inc., has paid off the debt on the facilities. Zimbrick Honda will continue to be profitable even if the number of new vehicles it sells is reduced by 1,000 vehicles per year. Additionally, there was little testimony about the operation of the other franchises Zimbrick, Inc., operates from its 1601 campus. It is likely that any excess capacity created by the reduction in new Honda sales can be used by one of the other franchises operated from the 1601 campus.

Discussion

      The issue that needs to be decided in this matter is whether good cause exists for permitting the proposed establishment of a new dealer within the relevant market area of Zimbrick Honda. Honda has the burden of proving that good cause exists. Wis. Stat. § 218.0116(7) list eight factors that can be considered in determining whether good cause exists. The statute does not provide that the eight statutory factors are exclusive or that all eight factors must favor the establishment of the proposed new dealer in order for good cause to be found.

      Of the eight statutory factors, two are not favorable to establishing a second Honda dealer in the Madison metropolitan market. These are the factors that deal with the question of whether the existing dealer is adequately penetrating its assigned area (factor number one) and providing adequate service to Honda owners (factor number six). Zimbrick Honda is meeting the sales performance standard set forth in its Dealer Agreement and the sales objectives established by Honda. Accordingly, it is adequately representing Honda in the Madison metropolitan market. Zimbrick Honda is also selling all the product that Honda provides it. If Honda merely wanted to increase its sales penetration on the east side of Madison, it could do so by giving Zimbrick Honda more vehicles to sell. Additionally, based on the customer surveys and the above average service penetration for Zimbrick Honda, Zimbrick Honda is apparently providing adequate service to Honda owners.

      Two of the statutory factors are ultimately neutral. These factors are the effect of the denial on the proposed dealer (factor number eight) and the whether the establishment of a second dealer will adversely impact the permanent investment made by the complainant (factor number two). With respect to the effect on the proposed new dealer, Hidalgo/Wilde has already invested significant amounts in the proposed dealership. However, these investments were made with no assurance that it would be appointed a Honda dealer. It is inappropriate to consider such speculative investments as part of the consideration of whether good cause exists. A potential dealer can not be allowed to skew the balancing of the good consideration factors by making a substantial investment in a proposed dealership and then claiming that that investment is at risk if good cause is not found for establishing the proposed dealership.

With respect to the factor related to a threat to Zimbrick Honda's investment in its Honda dealership, this is the closest question presented in this matter. The two facts that are the most seriously disputed in this case are the amount of Zimbrick, Inc.'s investment in its Honda franchise and the impact the establishment of the proposed dealer will have on Zimbrick Honda's sales and consequently its profits. Despite the voluminous record developed in this matter, the record is noteworthy for what has not been proven. The reason for this is lies primarily with the complexity of the Zimbrick motor vehicle group's structure. Due to the complexity, one can not definitively determine the amount of Zimbrick, Inc.'s permanent investment in its Honda franchise or Zimbrick Honda's net profitability.

Honda's expert spent a great deal of effort combing through the records of the Zimbrick motor vehicle dealer group to come up with a reasonable figure for Zimbrick, Inc.'s, permanent investment in its Honda franchise. That figure, $8,080,314, cannot be disputed by Zimbrick Honda because it uses values for the various fixed assets provided by Zimbrick Honda. The only dispute is what items should be included as part of Zimbrick Honda's permanent investment. The complainant contends that it has an investment in excess of $20 million in its Honda franchise (Zimbrick Honda brief, page 6). As discussed above, this amount of investment is suspect. The complainant seeks to include items such as blue sky which is more appropriately considered a return on investment, rather than an investment, and items such as training, advertising, and selling expenses, which are usually considered expenses, not investment.

Zimbrick Honda also claims that it has reinvested much of its profits back into the dealership and has a significantly more substantial investment in its Honda dealership than required by Honda. With respect to this claim, it is unfair to the proposed dealer and adverse to the public interest to consider the amount of investment that exceeds the amount required by the manufacturer. This is true for the same reason that it is inappropriate to consider the proposed dealer's speculative investment. Considering any investment in excess of that required by the manufacturer would allow the existing dealer to skew the balancing of the good cause factors in its favor by investing an inordinate amount in its dealership and then contending that that investment is in jeopardy.

The intent of the statute is to protect dealers from unfair actions from manufacturers, not to provide a guaranteed profit or return on the dealer's investment. The amount of investment that should be considered is the minimum required by the manufacturer. Any additional investment may or may not be a prudent business decision, but deserve no special consideration. Thomas Zimbrick also testified that Honda is the franchise that drives the Zimbrick motor vehicle dealer bus. No evidence was offered to support this statement, but assuming it is true, it is adverse to the public interest to allow the complainant to earn above competitive profits from its Honda franchise in order to subsidize unprofitable franchises.

Once a figure is established for Zimbrick, Inc.'s permanent investment in its Honda franchise, the next step in evaluating this good cause factor is to determine what effect the establishment of the proposed new dealer will have on that investment. Honda's expert performed a gross loss calculation and concluded that there are around 1,000 additional new Honda sales available in the Madison metropolitan market. Based on this calculation, there is sufficient opportunity for a second Honda dealer to be established without impacting Zimbrick

Honda's sales or profits. Zimbrick Honda's expert predicted only a small increase in new Honda sales in the Madison metropolitan market resulting from the establishment of a second dealer and then attempted to project how the total sales would be divided between two dealers. Dr. Manuel set forth various scenarios based on different assumptions. He testified that, in his opinion, the most likely outcome is that Zimbrick Honda's new Honda sales would be reduced by approximately 1,000 vehicles per year if the proposed new dealer were established.

Sharif Farhat's gross loss analysis calculating the availability of about 1,000 additional Honda sales in the Madison metropolitan market seems overly optimistic. On the other hand Dr. Manuel's prediction of a reduction of 1,000 new Honda sales for Zimbrick Honda seems overly pessimistic. Most likely the number of new Honda sales Zimbrick Honda will lose if the proposed new dealer is established is somewhere between these two numbers.[3] For his calculation, Dr. Manuel assumes that the total sales for Honda will increase by 183 annually in the Madison metropolitan market in what he termed was "the most likely estimate" (exh. 300, tab 35, page 3-R). This number seems low. It is likely that the establishment of a proposed new dealer will result in some number of conquest sales from competitors particularly on the east side of Madison due to the increased convenience of the location of the new dealer. Additionally, there is significant insell in the Madison ASA. Undoubtedly there are some Honda customers who, for whatever reason, will simply not buy from Zimbrick Honda but will buy from the new dealer. A reasonable assumption is that insell will be reduced if the proposed new dealer is established.

Between the increased number of conquest sales and reduced insell, the total number of new Honda sales should increase by more than the 183, the number projected by Dr. Manuel, in the Madison metropolitan market after the new dealership is established. However, even if one uses Dr. Manuel's overly pessimistic prediction, Zimbrick Honda's permanent investment will not be threatened by the establishment of the proposed new dealer. Zimbrick Honda, even after losing 1000 sales per year, will still be one of the largest volume Honda dealers in Wisconsin. As testified to by Mr. Walter, Zimbrick, Inc., has earned sufficient profits to pay for its total investment in its Honda franchise many times over. A forty percent reduction in sales will still leave Zimbrick Honda as a profitable motor vehicle dealer. The reduction in sales resulting from the establishment of the proposed new dealer will not constitute a threat to the investment made by Zimbrick, Inc., in its Honda dealership.

Finally, on the issue of the impact on Zimbrick Honda, one needs to keep in mind that Dr. Manuel's projections are for 2008. As the Madison area grows additional sales will be available. Honda sales increased nationally from 375,388 to 1,284,261 between 1980 and 2008 (expert report of Sharif Farhat, exh. 88, unnumbered page following A-5). As the population in the Madison metropolitan market grows, Honda sales will be expected to grow proportionately. The establishment of a second Honda dealer will likely reduce Zimbrick Honda's profitability

---

[3] Sharif Farhart's did not actually predict that Zimbrick Honda would not lose any sales if the proposed new dealer were established. His testimony more accurately should be summarized as there are sufficient lost sales opportunities in the Madison metropolitan market for a second Honda dealer to be established without any impact on Zimbrick Honda. Mr. Farhat's model does not predict who will capture those lost sales opportunities or even that either dealer will. His opinion is merely that the opportunity exist for two profitable Honda dealers in the Madison metropolitan market.

Case Nos.: TR-08-0007 and TR-08-0039
Page 14

initially. However, the sales opportunities for Honda on the west side of Madison should approach that of the current Madison ASA in the future.

The remaining three factors (factors three, four, and five) all relate to whether the establishment of a second dealer in the market will impact the level of competition in the market and will, therefore, benefit the public. These factors overwhelmingly favor the establishment of the proposed new dealer. Hidalgo/Wilde will be part of a large, well-run motor vehicle dealer group. Hidalgo/Wilde, as part of the Wilde motor vehicle dealer group will enjoy significant economies of scale. The establishment of Hidalgo/Wilde as a Honda dealer in the Madison metropolitan market will introduce another strong competitor into the Madison metropolitan market and will add to both interbrand and intrabrand competition into the local market. The additional competition will be a benefit to the public interest.

In summary, Wis. Stat. § 218.0116(7) requires a balancing of eight listed factors and any other relevant factors to determine whether good cause exists to permit the establishment of the proposed new dealer within the relevant market area of Zimbrick Honda. In this case, the complainant is providing adequate representation in its assigned market. There is no need to appoint a second dealer because Zimbrick Honda is not providing adequate customer service or not adequately penetrating its assigned market. Similarly, the Wilde automotive group does not need to be appointed as a Honda dealer to be successful. The Wilde automotive group has been successful and will continue to be a very profitable business regardless of whether it adds a Honda dealership in the Madison market to its group.

What Honda has clearly shown is that there is more than enough additional business available in the Madison metropolitan market to support a second Honda dealership. And, in terms of the statutory factors, the establishment of another dealer will add significant intrabrand and interbrand competition into the Madison market. This additional competition will be in the public interest. There is no evidence that the addition of proposed dealer will be injurious to the public welfare in any manner.

Proposed Conclusions of Law

1.    The location of the proposed Hidalgo/Wilde Honda dealership is within the existing relevant market area of Zimbrick Inc., d/b/a/ Zimbrick Honda.

2.    Good cause does not exist to deny the establishment of the proposed dealership within the relevant market area of Zimbrick Inc., d/b/a/ Zimbrick Honda.

3.    Based on the finding that no good cause exists to deny the establishment of the proposed dealership within the relevant market area of Zimbrick Inc., d/b/a/ Zimbrick Honda, the issue of whether good cause exists to permit the proposed modification of the area sales responsibility assigned to Zimbrick Inc., d/b/a/ Zimbrick Honda, is moot.

4.    Pursuant to Wis. Stat. §§ 227.43(bg) and 218.01116(7) and (8), the Division of Hearings and Appeals has the authority to issue the following orders.

Case Nos.:  TR-08-0007 and TR-08-0039
Page 15

Proposed Order

The complaints of Zimbrick Inc., d/b/a/ Zimbrick Honda, protesting the modification of ASA of Zimbrick Inc., d/b/a/ Zimbrick Honda (TR-08-0007) and protesting the establishment of a new Honda dealership within its relevant market area by Honda (TR-08-0039) are dismissed.

Dated at Madison, Wisconsin on May 25, 2010.

> STATE OF WISCONSIN
> DIVISION OF HEARINGS AND APPEALS
> 5005 University Avenue, Suite 201
> Madison, Wisconsin  53705
> Telephone:      (608) 266-7709
> FAX:            (608) 264-9885
>
> By:_____
>           Mark J. Kaiser
>      Administrative Law Judge

G:\DOCS\GenHgnotice\zimbrick.lam.doc