James C. McGrath *(admitted pro hac vice)*
james.mcgrath@bingham.com
**Bingham McCutchen LLP**
One Federal Street
Boston, Massachusetts 02110-1726
Telephone: 617-951-8000
Facsimile: 617-951-8736

and

Trevor C. Wilmot
**Bingham McCutchen LLP**
399 Park Avenue
New York, New York 10022-4689
(212) 705-7000
trevor.wilmot@bingham.com

*Attorneys for Defendant*
General Motors LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BECK CHEVROLET CO., INC., <br><br> Plaintiff, <br><br> -against- <br><br> GENERAL MOTORS LLC, <br><br> Defendant. | Case Number 11-CV-2856 (AKH) |

### DECLARATION OF ALVON P. GIGUERE

Alvon P. Giguere, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct:

1. I am currently the Manager of Dealer Network Planning & Analysis for General Motors LLC ("GM"). My current responsibilities include overseeing GM's dealer network

A/75067079

analysis which consists of determining the proper number and location of dealers in a network and evaluating their sales effectiveness, both individually and collectively. I have a Bachelor's degree from the General Motors Institute and M.B.A. from the University of Michigan. I have been employed by GM or General Motors Corporation ("Old GM") since 1974. During my tenure, I have held various field and central office positions for GM's various vehicle brands, and many of these positions involved various levels of dealer network analysis and the evaluation of dealer sales effectiveness. Since 1999, dealer network analysis has been one of my primary responsibilities.

2. I submit this declaration in opposition to the claim of Beck Chevrolet Co., Inc. ("Beck") that GM is using "an unreasonable, arbitrary, or unfair sales or other performance standard in determining a franchised motor vehicle dealer's compliance with a franchise agreement." For the reasons set forth below, GM's adjusted state-average Retail Sales Index ("RSI") is a fair and reasonable standard to assess Chevrolet sales performance. GM uses this standard not only to assess dealer performance but also to conduct dealer network analysis generally, including assessing the adequacy of representation and making decisions regarding whether dealers should be added, relocated or discontinued. Indeed, my understanding is that the vast majority of GM's competitors in the United States employ a substantially similar approach to the one utilized by GM in conducting dealer network analysis and measuring dealer sales effectiveness.

3. GM evaluates the sales effectiveness of its Chevrolet dealers in accordance with Article 9 of the Standard Provisions to the GM Dealer Sales and Service Agreement, a copy of which are attached hereto as Exhibit A. Under Article 9, GM determines a dealer's RSI by dividing its retail sales anywhere by the number of expected retail sales opportunities (adjusted

by vehicle segment) in the dealer's Area of Primary Responsibility ("APR") or Area of Geographic Sales and Service Advantage ("AGSSA"), whichever is applicable. As discussed further below, the number of expected retail sales opportunities in a dealer's market area is determined using average Chevrolet market share achieved in a larger geographic area adjusted for local preferences.

4.	RSI is a numerical index, calculated by dividing a dealer's actual retail sales by the retail registrations required to equal segment adjusted state average market share in the dealer's APR or AGSSA, and then multiplying that figure by 100. Statistical analyses have demonstrated a positive correlation between the retail sales opportunities in a dealer's APR or AGSSA and the dealer's actual number of sales. Article 9 requires a dealer to achieve a RSI equal or greater to 100:

> General Motors willingness to enter into this Agreement is based in part on Dealer's commitment to effectively sell and promote the purchase, lease and use of Products in Dealer's Area of Primary Responsibility. The success of General Motors and Dealer depends to a substantial degree on Dealer taking advantage of available sales opportunities.
>
> Given this Dealer commitment, General Motors will provide Dealer with a written report at least annually pursuant to the procedures then in effect evaluating Dealer's sales performance. The report will compare Dealer's retail sales to retail sales opportunities by segment in Dealer's Area of Primary Responsibility or Area of Geographical Sales and Service Advantage, whichever is applicable. General Motors will provide a written explanation of the sales review process to Dealer. Satisfactory performance of Dealer's sale obligations under Article 5.1 requires Dealer to achieve a Retail Sales Index equal or greater than 100. If Dealer's Retail Sales Index is less than 100, Dealer's sales performance will be rated as provided in the General Motors Sales Evaluation process. General Motors expects Dealer to pursue available sales opportunities exceeding this standard. Additionally, General Motors expectations of its sales and registration performance for a Line-Make in a particular area may exceed this standard for individual dealer compliance.

5.	Simply because a dealer fails to achieve a RSI of 100 does not necessarily mean that GM will declare the dealer in breach of the Dealer Agreement. Article 9 specifically

provides that "General Motors will only pursue its rights under Article 13.2 to address any failure by Dealer to adequately perform its sales responsibilities if General Motors determines that Dealer has materially breached its sales performance obligations under this Dealer Agreement." In the event that GM decides to proceed under Article 13.2, that provision provides that "General Motors will notify Dealer in writing of the nature of Dealer's failure and of the period of time (which shall not be less than six months) during with Dealer will have the opportunity to correct the failure."

6. GM's RSI process provides a standard, uniform and consistent methodology to assess dealer performance under Article 9. Initially, GM identifies the geographic area assigned to the dealer. In a Multiple Dealer Area ("MDA"), where more than one Chevrolet dealer serves the same APR, GM assigns each dealer an AGSSA. A dealer's AGSSA is designed to represent the area in which the dealer has a competitive advantage over all other Chevrolet dealers based solely on geography. A dealer's AGSSA is typically comprised of those census tracts that are closer to the dealer than any other Chevrolet dealer based on driving or air distance, but also takes into account other factors, including natural or man-made barriers, major road patterns, and buyer behavior.

7. Based on reports of sales submitted by its authorized dealers and customer registration information collected from state departments of motor vehicles, GM is able to determine, for every vehicle sold, the identity of the selling dealer and the address at which the customer registers the vehicle. GM is also able to obtain registration information for all vehicle sales of competitive brands. This information allows GM, like all manufacturers, to calculate market share on a national, regional, state and local basis.

8. Using this information, GM then calculates the number of expected Chevrolet

A/75067079

registrations within each dealer's AGSSA or APR based on a segment-adjusted market share standard and the number of all competitive vehicle registrations, including Chevrolet, within that area. Prior to 1999, Chevrolet and all other GM vehicle lines used a national market share standard to determine the expected registrations in a particular AGSSA or APR. In 1999, GM began utilizing a state market share standard. While GM believed that national market share was a valid benchmark, the switch to state average was designed to address certain dealers' concerns regarding perceived regional differences in market share achieved throughout the country. A copy of the dealer bulletin provided to all GM dealers explaining the sales evaluation process in effect since 1999 is attached hereto as Exhibit B. GM continues to use national market share as part of its dealer network analysis and also continues to include an RSI calculation based on national average as a reference point in each dealer's sales evaluation.

9. GM has had independent expert professional assistance in developing and administering its dealer network analysis. Specifically, GM has relied on the services of Urban Science Applications, Inc., and its affiliate, Channel Vantage, Inc. (collectively, "USAI") since approximately 1978 to assist GM in performing these functions. USAI is a global consulting company that specializes in data and dealer network analysis within the automotive industry. It is my understanding that nearly every automobile manufacturer and distributor operating in the United States relies on USAI for dealer network analysis. GM routinely utilizes USAI's services in the ordinary course of managing GM's dealer networks. Among other things, USAI assists GM in preparing the periodic Retail Sales Performance Reviews that measure sales effectiveness under Article 9 of the Deale Agreement.

10. Under Article 9 of the Dealer Agreement, GM agreed to provide its dealers with a written sales evaluation on an annual basis. In fact, GM makes these reports available to its

A/75067079

dealers quarterly via their dealer computer systems. In addition to reflecting the dealer's overall RSI scores, the report also reflects sales performance by vehicle model and includes the dealer's ranking among all Chevrolet dealers in the state and its resulting rating (i.e., superior, satisfactory, needs improvement, needs significant improvement, unsatisfactory).

11. In addition to the commitment it made under Article 9 of Dealer Agreement that all dealers make, Beck made specific additional commitments to meet state average RSI in order to induce GM to maintain Beck as an authorized Chevrolet dealer after the bankruptcy proceedings of Old GM. As part of that proceeding, Old GM undertook a radical overhaul of its operations, including rationalizing and modernizing its dealer network to increase dealer through-put and profitability, and ultimately GM's market share. This consolidation was designed to increase sales opportunities per dealer and dealer profitability so that dealers could invest more in their operations and capture the increased sales opportunities. Although Old GM had worked on restructuring its dealer network for years, state franchise law and other factors made that a slow, difficult and expensive process. Old GM was able to use its bankruptcy court proceedings to modernize its dealer network rapidly, efficiently and cost-effectively. Those dealers that Old GM wished to retain were offered Participation Agreements and the remaining dealers were offered Wind-Down Agreements wherein GM would provide cash payments for dealers to wind-down their operations until their Dealer Agreements expired on October 31, 2010.

12. Between year-end 2008 (the last full year before Old GM filed for bankruptcy) through June 2012, the Chevrolet dealer network in the State of New York was reduced as follows:

| Area | 2008 YE | June 2012 | Net Change | % Change |
|---|---|---|---|---|
| State of New York | 178 | 135 | (43) | -23% |
| Long Island, NY City, and Westchester MDAs | 33 | 23 | (10) | -26% |
| Westchester MDA | 8 | 4 | (4) | -50% |

13. Due to its historically low RSI, Beck was offered and executed a Wind-Down Agreement pursuant to which it would be paid approximately $388,000. That agreement was assigned to GM as part of the bankruptcy. A true and accurate copy of Beck's Wind-Down Agreement is attached hereto as Exhibit C. Following further discussions with GM, however, Beck was offered a Participation Agreement, which it executed on September 11, 2009. A true and accurate copy of Beck's Participation Agreement is attached hereto as Exhibit D. Consistent with GM's overall plan to improve its dealer network, Beck agreed to meet a number of specific minimum performance standards over a three year period in order to induce GM to enter into the Participation Agreement. With respect to RSI, Beck agreed to achieve an RSI equal to or greater than 70 in 2010, 85 in 2011, and 100 in 2012. In that Agreement, Beck specifically agreed that its RSI would be determined based on Chevrolet's average market share in the State of New York.

14. Beck's Retail Sales Performance Reviews for the years 2009-2011 and the first quarter 2012 are attached here to as Exhibits E - H, respectively. In response to concerns expressed by Beck, I personally travelled to New York and met with representatives of Beck on

March 1, 2011 to explain the sales evaluation methodology to them.

15. I understand that Beck now asserts that the state average market share to which it specifically agreed is an inappropriate benchmark because it is unreasonable, unfair or arbitrary to compare dealers in certain downstate counties of New York to state average. I disagree with Beck's position for numerous reasons.

16. Utilizing state average market share provides a uniform, objective and consistent approach to measuring sales effectiveness. It applies equally to all Chevrolet dealers in the State of New York. If Chevrolet were to hold dealers in the downstate counties to a lower standard than the remaining New York Chevrolet dealers, then those dealers could claim that the higher standard is unfair to them. A state average market share approach also avoids the need to make the subjective decisions that would be required to develop more localized market share standards in each of the hundreds of markets across the country in which Chevrolet is represented.

17. In order to account for any unique characteristics that might differentiate a dealer's specific AGSSA from state average in a way that might affect expected market share, Chevrolet utilizes a process called "segmentation analysis" that is common in the motor vehicle industry. This segmentation process adjusts expected market share to account for consumer preferences in particular markets. For instance, if pick-up trucks are less popular in Yonkers than they are in the State of New York as a whole, this process adjusts the expected market share downward for that vehicle "segment" in the Yonkers AGSSA.

18. Utilizing state average market share also provides a sufficient number of dealers to evaluate sales effectiveness and rank relative performance. If the number of dealers is too few, then the analysis will involve simply comparing those dealers to themselves and will not provide a sufficient sample to evaluate sales effectiveness. Under Beck's approach, its proposed

A/75067079

sales standard would include less than 25 Chevrolet dealers, while New York state average includes over 130 Chevrolet dealers. Under Beck's proposed approach, Chevrolet and its downstate dealers would be resigning themselves to a situation where their performance was deemed acceptable even though it was well below a reasonably expected level. Such complacency would not result in the type of market share gains that were envisioned when GM consolidated its dealer network to enable it to compete effectively.

19. Beck's criticisms also ignore potential operational issues that are within the control of dealers and typically explain poor performance. These issues include outdated facilities, inadequate advertising, too few or poorly trained sales personnel, poor customer service, disproportionally high expenses, and inadequate inventory. GM has instituted various programs to assist dealers in updating and modernizing their facilities, increasing the training of their sales staff, improving their CSI, and better managing their inventory. Without a detailed analysis of these variables, it is not possible to conclude that Chevrolet's sales standard is unreasonable, arbitrary or unfair. Beck has not identified any analysis or data from which one could conclude that operational issues have not contributed to poor sales performance.

20. I also understand that Beck has objected to a proposed revision to its assigned AGSSA, claiming that the addition of certain census tracts will unfairly increase its sales expectations. In 2011, as part of the post-bankruptcy consolidation of market territories and closing of outstanding open points, GM undertook a nationwide study of all of its assigned market areas. This study involved a multi-step process. First, GM's consultant, USAI, assigned the census tracts to the closest dealer based on drive distance through an automated process. Second, a USAI analyst then conducted a further review to take into account various additional factors such as proximity, access, natural or man-made barriers, and buyer behavior patterns.

Third, the proposed configuration was reviewed by regional field staff to take into account any relevant local factors. Finally, GM sent the proposed configuration to each dealer for its review and input. In instances where a dealer expressed concerns regarding the proposed AGSSA, GM would conduct further analysis. This further analysis initially involved generating a report evaluating the proposed changes to which the dealer objected. The report would contain one of only two "Preliminary Findings" -- either it would state that "Preliminary analysis indicates that there may be insufficient evidence to support dealer's concern" or "Preliminary analysis indicates that there may be sufficient evidence to support dealer's concern." The latter designation did not mean that the GM proposed revisions were not warranted, but simply indicated that further review and consideration was recommended. GM's central office and regional teams would then discuss the proposed changes and reach a final determination.

21. Consistent with GM's goal of providing increased sales opportunities through a consolidated dealer network, this process resulted in many dealers being assigned significantly larger AGSSAs and, because of the larger geographic territories, larger sales opportunities and hence higher sales expectations. The definition of a dealer's AGSSA, however, does not affect where it can sell vehicles and data establishes that customers in one AGSSA often purchase vehicles from dealers in other AGSSAs based on factors other than geography. GM followed the same process for Beck as it did for every other dealer. In Beck's case, however, the proposed revisions were much more modest than its surrounding dealers. They consist of the removal of 7 census tracts to the south and the addition of 2 census tracts to the north and 2 to the east. For 2011, this revision would have resulted in a net increase in expected sales of only 37 units from 686 units to 723 units.

22. In accordance with the Dealer Agreement, Beck was notified of the proposed

A/75067079

changes by letter dated December 17, 2010 (a copy of which is attached hereto as <u>Exhibit</u> I) and invited to submit any relevant information for GM's consideration within 30 days. Beck responded by letter dated January 17, 2011, a copy of which is attached hereto as <u>Exhibit</u> J. At that time, Beck did not specifically object to the addition of the census tracts to the north and east, but only to the elimination of the census tracts in the Bronx. In response to Beck's concerns, GM undertook a reevaluation of the proposed revisions to its AGSSA in their entirety. As is often the case with fringe census tracts, the analysis was not entirely definitive. While the preliminary analysis suggested that some factors might support Beck's position and warrant further discussion, GM ultimately concluded, after reviewing and considering the relevant factors and data (including proximity, access, and buyer behavior data) that the proposed revisions were appropriate and the net effect on Beck's expected sales was not material.

23.    With respect to the tracts that were eliminated in the Bronx, most (but not all) of those tracts were closer to the Bronx dealer based on driving distance and the historical sales patterns did not reflect a clear dominance by any dealer. GM's further review reflected that 1 of the 4 tracts to the north and east were closer to Beck based on drive distance and the data on dealer dominance was mixed. In its letter, however, Beck had not objected to the addition of those 4 tracts. Ultimately, GM decided to maintain the proposed revision based on the relevant factors and data. During my March 1, 2011 meeting with the principals of Beck in New York, I provided an overview of GM's APR and AGSSA reconfiguration process and criteria, and reviewed the proposed changes to Beck Chevrolet's AGSSA. The principals of Beck did not express any objections to the proposed AGSSA configuration during the meeting.

A/75067079

-12-

24. GM confirmed its final decision regarding Beck's AGSSA in a letter dated April 22, 2011, a copy of which is attached hereto as Exhibit K. Once Beck filed this litigation, GM deferred implementing its reconfigured AGSSA. Further, GM has also agreed, for purposes of assessing compliance with Participation Agreements that include minimum sales performance standards, to evaluate the sales performance of those dealers based on their previously-assigned APRs or AGSSAs since that geography was in effect when those dealers signed their agreements. In Beck's case, the proposed revisions to its AGSSA are so modest that it does not make a material difference in calculating its sales effectiveness.

Sworn under penalties of perjury this 14th day of August, 2012.

*[signature]*
Alvon P. Giguere

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on August 17, 2012, he electronically filed the foregoing Declaration of Alvon P. Giguere using the CM/ECF system, which will send notification of such filing to the following parties:

Russell McRory
**Robinson Brog Leinwand Greene
Genovese & Gluck, P.C.**
875 Third Avenue
New York, New York  10022

/s/ James C. McGrath

A/75067079