D9odbect                         Decision

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    BECK CHEVROLET CO., INC.,

4                    Plaintiff,              New York, N.Y.

5            v.                              11 Civ. 2856 (AKH)

6    GENERAL MOTORS, LLC,

7                    Defendant.

8    ------------------------------x

9                                            September 24, 2013
                                             10:40 a.m.
10
     Before:
11
                         HON. ALVIN K. HELLERSTEIN,
12
                                             District Judge
13
                              APPEARANCES
14
     ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.
15        Attorneys for Plaintiff
     BY:  RUSSELL P. McRORY
16        JOHN D. D'ERCOLE

17   BINGHAM McCUTCHEN LLP
          Attorneys for Defendant
18   BY:  JAMES C. McGRATH
          TREVOR C. WILMOT
19            -and-
          D'Arcy Thomson, Paralegal
20

21

22

23

24

25

D9odbect                    Decision

1             (Trial resumed)

2             THE COURT:  Good morning, everyone.  Please be seated.

3             ALL COUNSEL:  Good morning, your Honor.

4             THE COURT:  I just need a few minutes.

5             (Pause)

6             What follows are my findings of fact and conclusions

7     of law following a bench trial conducted on September 16, 17,

8     18 and 23, 2013.

9             There is a narrow issue that's tendered -- whether

10    under Section 469(2)(1) of the New York Vehicle and Traffic Law

11    and Section 463(2)(gg) of that law General Motors has been

12    using an unreasonable, arbitrary or unfair sales or other

13    performance standard in determining a franchise motor vehicle

14    dealer's compliance with a franchise agreement.  That is the

15    only issue left before me in this case.

16            As will appear from my findings of fact and

17    conclusions of law, I hold that the methodology used by General

18    Motors is not unreasonable, arbitrary or unfair in measuring

19    sales performance by Beck Chevrolet Co., Inc.

20            The parties in the Pretrial Order have defined this

21    issue and raised various preliminary issues, which I believe

22    have been the subject of previous rulings, but to make things

23    clear and to make it clear that I am incorporating those

24    previous rulings into this decision, I will make the following

25    rulings now.

1          First, I have jurisdiction over the parties; there is

2    no issue on that.  And I have subject matter jurisdiction; beck

3    does raise an issue with respect to that.

4          This case was originally begun in the Supreme Court of

5    New York State, County of Westchester.  General Motors timely

6    removed the case to this court on the ground of diversity of

7    citizenship, which is not contested, and which I find.

8          During the course of pretrial proceedings, I dismissed

9    the damage elements of the claim as premature and academic, and

10   Beck urged after those rulings that there no longer was a

11   requisite threshold of $75,000, exclusive of interest and

12   costs.  However, the threshold of subject matter jurisdiction

13   is determined at the time the case is removed, and,

14   unquestionably, there was that much of threshold jurisdiction,

15   and more, in the damage claims of Beck.  For that holding, see

16   Powerex Corp. v Reliant Energy Services, Inc., 551 U.S. 224,

17   decided 2007, and Price v. J&H Marsh & McLennan, Inc., 493 F.3d

18   55 (2d Cir. 2007).  In addition, there clearly is at least that

19   much value in determining the measure of performance by Beck,

20   for if Beck does not comply with its requirements in the

21   operative agreements with General Motors and for that reason

22   loses its franchise, the value is considerably more than

23   $75,000.

24         Thus, I hold that there is subject matter jurisdiction

25   under 28 U.S.C. Section 1332(a)(1), and the Court is properly

1   seized with subject matter jurisdiction of this case.

2           Beck also argues that there is no case or controversy,

3   another aspect of subject matter jurisdiction, because it has

4   not been terminated and because the issue of termination will

5   be one for an administrative board under New York State Vehicle

6   and Traffic Law.  However, the dispute has been tendered to me.

7           Beck has argued, and I accept the argument, that under

8   the operative law of the Vehicle and Traffic Law, particularly

9   Section 469(2)(1), Beck has the right to bring suit.  That

10  provision provides that a franchised motor vehicle dealer who

11  is or may be aggrieved by a violation of this article shall be

12  entitled to sue for and have injunctive relief and damages in

13  any court of the state having jurisdiction over the parties.

14  In any such judicial action, the court may award necessary

15  costs and disbursements plus a reasonable attorney's fee to any

16  party.

17          Beck feels aggrieved by being measured for its

18  compliance with indices based on statewide jurisdiction, by

19  statewide sales calculations and averaging, and brings its

20  lawsuit under that section of the law.  Hence, there is a real

21  case and controversy, I so hold, and I deny Beck's arguments

22  with respect to these threshold matters.

23          The parties have also set out as agreed statements of

24  facts, which I appreciate very much, and let me put these into

25  the record:

D9odbect                         Decision

1          Beck Chevrolet Co., Inc., the plaintiff, is a New York

2     corporation with its principal place of business in Yonkers,

3     New York.

4          Beck has operated a Chevrolet dealership in Yonkers,

5     New York, on Central Avenue, close to the New York State

6     Throughway since 1977.  It has been operating under various

7     dealer sales and service agreements with General Motors

8     Corporation and, since General Motors emerged from bankruptcy

9     with the defendant, General Motors LLC.

10         General Motors LLC is a limited liability company

11    organized under the laws of the State of Delaware, with a

12    principal place of business in the State of Michigan.  Its only

13    partner is also an LLC, and its sole member is General Motors

14    Company.  And each of the defendant entities was organized and

15    exists under the laws of the State of Delaware and maintains a

16    principal place of business in the State of Michigan.

17         Hence, I have looked through the LLC for its

18    constituent members, and I find that there is complete

19    diversity of citizenship between the plaintiff and the

20    defendant, looking through the defendant until one finds a

21    jural entity which satisfies the diversity requirement.

22         General Motors manufactures and distributes new motor

23    vehicles and related products in the United States through a

24    network of authorized franchised dealers.

25         And I'm continuing to read from the agreed statements

D9odbect                          Decision

1    of fact.

2            In June 2009, the former entity, General Motors

3    Corporation, which I'll called "Old GM," sought bankruptcy

4    protection.  Old GM eventually sold substantially all of its

5    assets to General Motors LLC, the defendant in this lawsuit.

6    Prior to the sale, Old GM undertook a process in bankruptcy to

7    consolidate its dealer network.  As part of this consolidation

8    process, Old GM offered certain dealers participation

9    agreements to continue their franchises and offered other

10   dealers wind down agreements to terminate their franchise

11   relationship in exchange for cash payments.

12           As part of this process within bankruptcy, Beck

13   executed a Wind-Down Agreement to discontinue its operations by

14   October 2010, in exchange for an agreed cash payment of

15   approximately $390,000.  After this process was complete, Old

16   GM sold substantially all its assets to new GM, including an

17   assignment of all participation and wind-down agreements.

18           Beck then approached GM to reconsider its wind-down

19   decision, and in September 2009 GM agreed to offer Beck a

20   Participation Agreement, and Beck executed that Agreement on

21   September 9, 2009.

22           A bit later I will discuss in more detail some of the

23   agreements and understandings made by Beck in connection with

24   that Participation Agreement, but for the moment let me

25   continue reading the agreed statements of facts.

D9odbect                          Decision

1           Under these participation agreements, GM measures its

2    dealers' sales performance by a measure called Retail Sales

3    Index, or "RSI."  RSI is a numerical index calculated by

4    dividing a dealer's actual retail sales anywhere in the United

5    States according to segments.  Each segment reflects a

6    different type of motor vehicle.  For example, a compact sedan

7    is one segment.  A pick-up vehicle is another segment.  An SUV

8    is another segment.  And there are many such segments in which

9    various manufacturers' makes compete.

10          To obtain the RSI, the automobile dealers and

11   manufacturers take a state average market share in the dealer's

12   market area, which is called an Area of Geographic Sales and

13   Service Advantage, or "AGSSA," and then multiply the resulting

14   figure by 100.  To express it in a fraction how this is

15   derived -- and I'll ask counsel to comment immediately if I

16   have it wrong -- a fraction is taken of all the Chevrolet sales

17   in a particular state -- here in New York State -- by segment;

18   that becomes the numerator.  The denominator are total vehicle

19   sales of all makes of vehicle in New York State also by

20   segment.  And each segment is then expressed in a percentage.

21   That percentage, which I'll call "X," is then multiplied by the

22   total vehicles of all makes registered in a dealer's AGSSA, and

23   that percentage then becomes the quota for that dealer.

24          Another fraction is taken, the numerator of which are

25   all sales of vehicles of all segments by the dealer anywhere in

D9odbect                    Decision

1    the United States over the percentage of total vehicles of all

2    makes registered in an AGSSA, and that becomes the performance

3    of the dealer in relation to the quota.

4              Do I have it right, Mr. McRory?

5              (Pause)

6              MR. McRORY:  Your Honor, I'm not sure we've expressed

7    it in that way, but I think you have the gist of it.

8              THE COURT:  Mr. McGrath?

9              MR. McGRATH:  I agree.  I don't think we've expressed

10   it exactly in that way.

11             THE COURT:  I've done it this way because I think it

12   expresses it in terms of an arithmetical function that is

13   clear.  I have had trouble trying to figure it out from the

14   testimony and the like.  We could illustrate it by an exhibit,

15   but I think unless there is objection I would like to go by

16   this standard.

17             MR. McGRATH:  That is fine, your Honor.

18             MR. McRORY:  That is fine.

19             MR. McGRATH:  I think the exhibits will support that.

20             THE COURT:  Thank you, both.

21             I will continue with the agreed facts.

22             Since at least 1999, General Motors has measured its

23   Chevrolet dealers' RSI using Chevrolet's state average market

24   share in each dealer's assigned market area -- that is the

25   AGSSA -- adjusted for segment popularity.

D9odbect                          Decision

1              Now, let me take a word on this adjustment because it

2      figured in a good deal of the testimony and is also a concept

3      that is a little bit elusive.

4              I said before that the fractions that I used to

5      express the index measures all vehicle sales of all segments.

6      In that way, by measuring all a dealer's sales, General Motors

7      believes -- and I find -- that the RSI adjusts for different

8      popularity of vehicles and different biases of consumers under

9      normal business circumstances.

10             For example, if in a particular AGSSA consumers like

11     pick-up trucks, more of those pick-up trucks may be sold

12     relative to sedans, while in another AGSSA the reverse might be

13     true.  By taking the arithmetical function in relationship to

14     all vehicle sales, each sale becomes the same as a sale of any

15     other vehicle, and in that fashion there is an adjustment.  The

16     intent of the RSI is to measure a dealer's total performance,

17     and it doesn't make a difference in that measurement what

18     segments are performed to good number and what performed to

19     lesser numbers, as long as the total of sales measures up to

20     the index.

21             Beck takes exception to the adequacy of that overall

22     index and General Motors defends it.  There is a question as to

23     the adequacy of the adjustment feature of the segment -- it's

24     called segmented adjustments -- to take in all different

25     variables, and there was testimony that in some areas where

D9odbect                           Decision

there is a GM office or a GM manufacturing plant, there is,

because of discounts and other preferences, such an overload of

preference for a particular type of vehicle of some

manufacturer or other, that additional allowances have to be

made.  And I think there is in that way an implied admission

that the segment adjustments are not adequate to cover that

relationship.  But short of that, General Motors adamantly

expresses the view that the segments adjust for different kinds

of consumer biases, while Beck disagrees.

        I find that the segments expressed an adequate

adjustment for business transactions and/or business

measurements, and I therefore rule in favor of General Motors

on that particular point.

        In any event, since at least -- these are two more of

the last agreed facts.  Since at least 1999, General Motors has

measured its Chevrolet dealers' RSI using Chevrolet state

average market share in each dealer's assigned market area,

adjusted for segment popularity.  Accordingly, since at least

1999, GM has measured Beck's RSI using Chevrolet's New York

State average market share in Beck's AGSSA, adjusted for

segment popularity.

        Next I'm going to discuss the Participation Agreement.

        Beck operates a Chevrolet dealership in Yonkers

pursuant to a series of agreements, called the Dealer

Agreements, with the manufacturer of Chevrolet automobiles, the

D9odbect                          Decision

defendant, General Motors LLC, and its predecessor companies.

          The dealer agreements incorporate certain standard

provisions pursuant to which all Chevrolet car dealerships

agree that they will be evaluated by a Retail Sales Index (the

"RSI"), and they agree further that their goal is to achieve an

RSI equal to or greater than 100.  The standard provisions

provide also that, "If dealer's Retail Sales Index is less than

100, dealer's sales performance will be rated as provided in

the General Motors sales evaluation process."  That's Article 9

of the standard provisions.

          "Further, that when deciding whether to begin the

process for terminating a dealer, GM will consider not only the

RSI but, 'any other relevant factors.'"

          That's all Article 9.

          I mentioned before from the agreed statement of facts

the wind-down agreements.  Through this process, GM reduced the

number of Chevrolet dealers nationally and in the New York City

metropolitan area.  Of that area, the Downstate area,

stretching from Westchester County, including all of New York

City, the five counties in New York City, and Westchester and

Suffolk Counties -- those are nine counties -- there used to be

nine dealers.  Now there are five.  Four of those dealers were

terminated as part of the bankruptcy.

          I mentioned before that Beck originally also was to

have been terminated -- it had accepted a Wind-Down

D9odbect                          Decision

Agreement -- but it persuaded General Motors to let it enter

into a Participation Agreement in lieu of the Wind-Down

Agreement, and General Motors agreed to do that.  In the

context, there was specific discussion between representatives

of General Motors and the Gellers -- the principals of Beck --

concerning how Beck's performance would be measured.  There was

explanation made by General Motors' representatives that

explained how the RSI was derived and how Beck would be

expected to work its way up to perform to satisfy the RSI, that

is, improve its performance from the 30s, that had existed

before and during the bankruptcy, to reach 100, and it was to

be accomplished in stages, which I'll mention in just a moment.

        The point I want to stress here is that the Gellers

expressed their understanding of this performance and their

desire to satisfy it, indicating their acceptance of the

standard, their understanding of the standard, and they

expressly commented that although they considered that their

relatively weaker performance in the past was based on improper

gauges of performance, they ultimately conceded that there was

nothing unfair in using average sales indices of sales across

the state to measure the Beck performance.

        The Participation Agreement between Beck and General

Motors contained a series of performance requirements,

including a sales requirement that Beck achieve an RSI of at

least 70 in 2010, 85 in 2011, and 100 in 2012.  Specifically,

1   Section 9(a) of the Participation Agreement provided:

2   "Performance standard shall mean dealer's Aggregate Retail

3   Sales Index (or "RSI") for the existing model line in dealer's

4   Year-End Retail Sales Performance Report prepared by GM, shall

5   be equal to or greater than:

6            "1.  70 for the calendar year 2010.

7            "2.  85 for the calendar year 2011; and

8            "3.  100 for the calendar year 2012.

9            "Further, dealer's failure to achieve the RSI required

10   in the previous sentence for any of the calendar years

11   identified shall constitute a default under the terms of this

12   letter agreement."

13           Section 9(a) of the Participation Agreement also

14   defined how RSI should be calculated.  The provision stated

15   that it was to be determined by dividing the sum of the total

16   of dealer's reported retail sales by unit for the existing

17   model line as set forth on the Retail Sales Performance Review

18   Report prepared by General Motors for each applicable calendar

19   year.  And this total of the dealer's reported retail sales was

20   then to be divided by the total of the sales by the units that

21   dealer needs to equal the State of New York average, segment

22   adjusted, for the existing model line, as set forth on the

23   Retail Sales Performance Review Report prepared by GM for the

24   applicable calendar year.

25           This Retail Sales Performance Review Report was the

1    subject of discussion at least at the time that Beck signed the

2    Participation Agreement, and it was part of the understanding

3    given to Beck how the RSI was to be calculated, how Beck was

4    expected to live by it, and it led to the expression of

5    understanding by the elder Geller of this report in his

6    statement that he did not consider it unfair.

7            When a dealer's total sales anywhere equal the

8    expected sales, the dealer's score, using the RSI index, is

9    100.  100 is not a perfect score; it is an average score.  It

10   reflects the average of sales by dealers throughout New York

11   State.

12           GM uses the dealer's score to evaluate the performance

13   of the dealers, ranking them in five categories, as follows:

14           A score of "superior" is the characterization given

15   when the dealer achieves 100 or better, provided that the

16   dealer is then in the top 15 percent in sales of all dealers in

17   the state.

18           A characterization of "satisfactory" is for dealers

19   who achieve 100 or more but are not in the top 15 percent of

20   the dealers.

21           A dealer who scores 85 to 99 is given a

22   characterization "needs improvement."

23           A dealer whose score is less than 85, but not in the

24   bottom 15 percent of dealers, is given a characterization of

25   "needs significant improvement."

1          A dealer whose score is below 85, and has a

2     performance which places him in the bottom 15 percent of

3     dealers in the state, is given a rating of "unsatisfactory."

4          GM communicates these ratings to its Chevrolet dealers

5     and uses them as a exhortatory tool to get these dealers to

6     improve sales.

7          With regard to dealers not rated as superior or

8     satisfactory, and sometimes even with these dealers, GM has

9     programs, including one called the Dealer Performance Process,

10    designed to improve dealers' sales by offering assistance and

11    advice.  Although these programs focus on dealers who are

12    ranked unsatisfactory, or dealers needing significant

13    improvement, the consultation is available to other dealers as

14    well.

15         Generally, according to GM's testimony, it will not

16    seek to terminate a dealer simply because the dealer did not

17    achieve an RSI of 100.  GM prefers to work with the dealers to

18    get them to improve their performance, reserving termination

19    for dealers who are not able to improve their performance.

20         Before terminating a dealer, GM will consider not only

21    the dealer's RSI but also other mitigating factors which might

22    explain failures to meet the sales targets.  These, for

23    example, could be major activity within the AGSSA that tie up

24    roads or make it difficult for people to get to the dealer, or

25    other kinds of considerations which might explain a dealer's

D9odbect                        Decision

1    relatively weaker performance in a particular year.

2              The issue in this case raises the question whether it

3    is arbitrary for GM to average sales for the AGSSAs in the

4    Downstate market with total sales that average across New York

5    State.

6              Beck argues that the Downstate market is unique

7    because of the popularity of imports, the concentration of

8    populations, the number of dealers, and other such factors.

9    Beck insists that its performance should be compared and rated

10   not against statewide averages, which place too much effect to

11   Upstate dealers' performances, but only to like dealers in the

12   Downstate market.  Beck argues that significantly more Upstate

13   dealers are able to achieve RSIs of 100 than are the Downstate

14   dealers.  Beck argues that in the Downstate area only four

15   dealers out of 23 achieved a score of 100.  Of those four,

16   three were in Suffolk County, the Downstate county, where there

17   is greatest resemblance to many Upstate counties.

18             Chevrolet and General Motors argues that using

19   mediocrity as a performance index dooms the entire make of

20   Chevrolet vehicles to mediocrity.  Unless steps are taken to

21   raise the performance levels of the mediocre dealers that Beck

22   is talking about, Chevrolet will give up its metropolitan

23   markets to import vehicles and those of other makes, and the

24   very process that gave rise to General Motors' bankruptcy will

25   be repeated.

D9odbect                              Decision

1          So the issue really is whether it is appropriate,

2     whether it is reasonable, whether it is fair, whether it is not

3     arbitrary to use a statewide standard.

4          A standard to be a standard must be objective.  It

5     cannot give rise to unique arguments of exceptions if the

6     standard is to be generally applicable and not arbitrary as to

7     particular dealers.  It has to be made to fit all sizes in all

8     categories that can be said or reasonably be said to be within

9     a local market.

10         General Motors points out that all manufacturers use a

11     standard that is state-wide or greater.  Indeed, General Motors

12     used to use national markets as an index and regional markets

13     that overlap many different states, but it went down to the

14     state markets because many of the dealers complained that they

15     were being measured by too great a geographical area and too

16     great a set of dissimilarities.

17         In choosing states as the index of measurement,

18     General Motors used an administratively convenient index.

19     States, since the birth of our nation, have been the

20     territorial demarcation of administrative and governing areas.

21     States are an entity of government.  State taxation and state

22     policies cross a state area.  Using a state's statistical

23     information is known in many different fields of operation and

24     is understandably appropriated by nationwide and international

25     manufacturers to measure performance.

1          Beck points out that General Motors does not use a

2     state standard to measure its own manufacturing performance,

3     but that is irrelevant, how General Motors evaluates itself.

4     Where it is based on state operations and dealer operations

5     within the states and laws that are passed by particular states

6     and taxations and various kinds of economic regulatory measures

7     used by particular states, the states become a measure of

8     convenience, and using a state standard enables General Motors

9     to be evenhanded with respect to all its dealers and measure

10    them against the state performance.

11         The segmented nature of the calculations allows for

12    adjustments as to popularity within brands, and General Motors

13    uses other indices to check the reasonableness of its

14    performances, comparing, for example, a local dealer like Beck

15    to local dealers selling Fords and local dealers selling

16    Chryslers, and ascertains from those standards that a weak

17    performer, like Beck, compares poorly against the greater sales

18    performance of the Ford dealer and the Chrysler dealer.  If

19    imports are, as Beck argues, a major impediment to measuring

20    its performance, that should be true equally to the Ford dealer

21    and the Chrysler dealer, but General Motors shows statistically

22    that that is not so and it is outperformed by Ford and Chrysler

23    in its AGSSA.

24         Another check is to use Beck's performance against

25    neighboring dealers, and those statistics show that at least

1    one of them sells more cars, more vehicles, in Beck's AGSSA

2    than Beck does itself.  The dealer to the north, Curry,

3    operating in Scarsdale, sells more cars, more vehicles, in the

4    Beck AGSSA of Yonkers and surrounding areas than does Beck, and

5    that also is an index that can be used to confirm the

6    reasonableness of using statewide standards.

7           Beck argues for other indices where it would come out

8    with a much better score.  Its score in statewide standards is

9    between 50 and 51 percent -- not much movement from year to

10   year, counting 2010, 2011 and 2012.  And it points out that

11   using different standards, its scores go up into the 80s and

12   even into the 90s, and Beck argues that there could be a

13   comparison against what is called the New York Zone.  The New

14   York Zone extends into Connecticut and as far as the Poconos

15   Mountains, taking in counties like Delaware County in New

16   Jersey, the Pocono Mountains, which are sparsely populated, and

17   taking into consideration areas in the western fringe of

18   Connecticut that are probably the most affluent in the United

19   States, thus comprising as dissimilar an area as the area it

20   complains about.

21          Beck also argues to score it against a Downstate

22   population, Downstate dealers in the area of the nine counties

23   that we are talking about, Westchester coming down south and

24   east into Long Island, but those areas also are dissimilar.

25   Beck is outperformed by many others, and its score of 85 to 90

D9odbect                        Decision

1   in an area that it has jerrymandered to be its indicated area

2   shows that it's not performing as well as the average, because

3   it's under 100, and would force General Motors to take an index

4   of sales expectations that's nothing better than mediocre.  If

5   the Downstate area is mediocre and General Motors adopts a

6   standard that is mediocre, it is downgrading its quotas for all

7   dealers and would be forced to create a policy that would risk

8   another entry into bankruptcy.

9          Beck's expert, Joseph F. Roesner, of the Fontana

10  Group, testified that the disparity between Chevrolet's sales

11  performance Downstate and its performance Upstate is

12  attributable, in part, to Downstate consumers' preference for

13  imported cars.  GM's witnesses testified that this supposed

14  consumer preference is already adjusted by the use of

15  segmentation in calculating RSI.  These imported vehicles

16  comprise some segments but not the totality of segments, and

17  they don't express an overall preference or overall bias for

18  all segments.  The adjustments allow Beck to sell more of other

19  vehicles in non-import-influenced areas.  In any event, as the

20  experts pointed out, this supposed disparity reflects

21  aggressive tactics by imports to take over markets from

22  Chevrolet and other domestic vehicles that the slowness and

23  laxity of American manufacturers and dealers allowed General

24  Motors to lose.

25          This surrender of markets need not be inevitable.  A

D9odbect                    Decision

1    proper sales quota will require American dealers to be

2    aggressive in resisting this supposed bias towards imports and

3    take back markets.  And to indicate that that can be done, the

4    more effective sales performances by Ford was shown by the

5    experts in the very same area, in the very same AGSSA, as Beck.

6    So if Ford can perform and get a much better score in an RSI

7    calculation, why can't Beck?  That's a question that suggests

8    that there is an adequate adjustment and that there is no

9    unreasonableness or arbitrariness or unfairness in expecting

10   Beck to improve its standards up to state average.

11           The fact that all automobile manufacturers in the

12   United States evaluate their dealers using measures similar to

13   statewide RSIs in even more dispersed geographical areas is an

14   indication of the reasonableness in using state average.  The

15   fact that it's administratively convenient and objective and

16   gives rise to undisputable information, equally applicable to

17   every dealer, is a point in favor of its reasonableness.  The

18   fact that General Motors uses it to cause dealers selling below

19   state average to improve their performance and checks

20   reasonableness against other kinds of standards is another

21   point in favor of the reasonableness of statewide measurement.

22           And the fact that it identifies dealers who have

23   missed opportunities to increase their sales against

24   competition, intra-brand competition, for example, typifying

25   the great improvement of a Chevrolet dealer named Major in Long

D9odbect                    Decision

Island City, is another indication of fairness.  The fact that

sales within AGSSA are reflected in substantial selling by

Beck's competitors much more so than Beck is able to show in

other areas is another indication of fairness.  And the fact

that Beck has not been able to improve its RSI year to year --

scoring 50.1 in 2010, 50.9 in 2011, and 50.6 in 2012 -- is an

indication of fairness.

One would think that if the measure is used, Beck

would take steps to increase its sales, because it can use

sales anywhere in the country against the portions in its

AGSSA.  Surely there is opportunity elsewhere.  If Major can

find it, such opportunity, if Curry can find such opportunity,

if the Suffolk dealers can find such opportunity, so can Beck,

or at least it's reasonable for General Motors to expect that

of Beck.

Just to illustrate, with the sales performance of

Major, it had an RSI of 47.2 in 2011 -- worse than Beck.  It

had an RSI of 54.5 in 2011 -- slightly better than Beck.  Its

RSI in 2012 was 124.8, showing what can happen if there's

concerted effort to improve.

Beck's sales ineffectiveness is shown also relevant to

others, indicating also the reasonableness of the state

standards.  It sells fewer vehicles than other domestic dealers

located within a few miles.  Beck sold 335 vehicles in 2012.

The local Ford dealer sold 1,205 vehicles.  The local Chrysler

D9odbect                          Decision

1    dealer sold 1,579 vehicles.  And the local Ford and Chrysler

2    dealers achieved RSIs that are again 100.

3          Now, one must express a reservation about comparisons

4    based on inadequate statistical development, but it was open to

5    Beck to challenge the statistical information.  One would think

6    that there is a comparability between the product line of GM

7    and the product line of Ford.  The product line of Chrysler

8    might be different, but the comparative score of Beck's

9    50 percent RSI, and better than 100 RSIs at Ford and Chrysler

10   in the same area, indicate there is something wrong with Beck's

11   performance and supports the findings used by state average.

12         Beck is the only Chevrolet dealer in the Yonkers area.

13   In 2012 it sold only 27.3 percent of the Chevrolets registered

14   in its AGSSA.  Curry, the Chevrolet dealer in Scarsdale, sold

15   33.5 percent of the Chevrolets registered in the Yonkers area.

16   Now, Curry is also on Central Avenue, probably ten miles to the

17   north, on the same roads, where consumers can travel northward

18   as easily as southward.  The fact that Curry sells more

19   vehicles in Beck's AGSSA suggests also that the standards used

20   by Chevrolet to measure Beck's relative performance are

21   reasonable.

22         Beck argues that just because the terms are in the

23   statute of unreasonable, arbitrary or unfair does not mean that

24   they are bound by those terms because the statute, Section

25   463(2)(gg) of New York Vehicle and Traffic Law, states that

1    "notwithstanding the terms of any franchise contract."  So Beck

2    argues that the existence of these terms, to which it agreed,

3    does not bind it and it is right in that respect.  But I have

4    to examine these terms in relationship to community standards

5    and business standards of unreasonable, arbitrary and unfair,

6    and I find that the average statewide measurements used by

7    Chevrolet are not unreasonable, arbitrary or unfair.  They are

8    administratively convenient.  They are objective.  They don't

9    give rise to arguments.  They don't require a manufacturer and

10   dealer to agree to a standard of measurement which adds many

11   subjective elements.  They are uniformly applied.  They are

12   easily understood.  They give rise to adjustments within the

13   formula.  They are compared to other standards that all come

14   out with the same kind of conclusion.  They are the subject of

15   efforts of improvement on the part of manufacturer and dealer.

16   So whatever argument can be made by Beck that something is

17   unreasonable or arbitrary or unfair is more than met by the

18   various ways that the standard is set and administered by

19   Chevrolet.

20        Beck argues on the basis of a number of cases which it

21   cites for the proposition that comparing Downstate and Upstate

22   dealers is inherently unfair, and it focuses on two cases,

23   which I'll mention.  North Shore, Inc. v. General Motors Corp.,

24   an administrative decision in 2003, is one decision that Beck

25   relies on.

1            In that case there were a number of dealers in an

2    area.  Under Illinois law, General Motors, in order to bring in

3    another dealer in the area, had to show cause.  In other words,

4    the existing dealers were allowed to protest administratively

5    the right of a manufacturer to establish another dealer in the

6    community.  The administrative board stated as follows.  This

7    is at page 6 of the decision:

8            "The Franchise Act is remedial in purpose, reflecting

9    the need to preserve and protect the substantial investments of

10   local automobile dealers."

11           And that sentiment exists in the New York law as well.

12           "Consistently, the Act places the burden of proving

13   good cause to add a local franchise on the manufacturer."

14           There is no comparable provision in the New York law.

15           "Moreover, the Act specifically requires that good

16   cause be shown to support the manufacturer's desire for further

17   market penetration."

18           There is no such requirement in New York law.

19           After a long analysis, the administrative board in

20   Illinois ruled that General Motors --

21           That wasn't General Motors, it was a Nissan dealer

22   wanting to -- I'm sorry, it is General Motors.  I'm confusing

23   two cases.  It was General Motors.

24           -- cannot do so, but it said that the circumstances of

25   the case before it was unique.  This discussion is at page 90

D9odbect                         Decision

 1    of the board opinion.

 2              First and foremost, the experts' analysis seems

 3    inappropriate to this multiple-dealer network.  These are very

 4    crowded and very well-represented markets.  In addition, the

 5    issue of product shortfall is a barrier that the experts and GM

 6    cannot overcome.

 7              What was shown in that case is that one of the reasons

 8    for relatively weaker performance by the municipal markets, and

 9    dealers in the municipal markets, was because they were not

10    being given enough of a particular vehicle, and because they

11    felt that they could sell those vehicles -- here they were

12    SUVs -- but were not given product, the segmentation adjustment

13    didn't work, and the board agreed to that.  They said -- the

14    board said we do not mean that GM's analysis was flatout always

15    inappropriate but, the board held, it was inappropriate in the

16    unique circumstances of the case before it.

17              At page 91 some additional reasons are given:

18              There are already three General Motors dealers within

19    a radius of less than ten miles of the new one and there are

20    seven dealers within eleven miles.  Thus, this area is

21    substantially represented by General Motors at this time.

22              That was one reason.

23              Second, there is little, if any, projected growth

24    around that dealership.

25              Third, there is insufficient evidence that the dealers

D9odbect                          Decision

surrounding the new one were underperforming, and there was no

evidence that the answer to any perceived underperformance was

to add a dealer.

There is competent evidence, the board held, that

dealers surrounding Jacobs suffer from a lack of product

allocation and adding a new dealer will only exacerbate that

problem.

The board held that the public is not served by a

dealer network where the individual dealers are small and lack

adequate product on their lots.  The benefit of being a mile or

two closer to the nearest GMC dealer is incremental, at best.

Given that already scarce inventory levels will be stretched

further, the public will not be served by this expansion of the

dealer network into an area where there are already seven

dealers.

In many respects we are dealing with the converse of

this situation, and this makes this particular precedent an

ill-fitting one for this case.  We are not dealing with

shortages of product.  We are not dealing with a need by the

manufacturer to show cause for putting in a dealer.  Indeed,

the manufacturer feels that there are too many dealers and has

an incentive to reduce the number of dealers and to work on

dealerships that are larger, have more money to spend, and are

more effective competitors.

Beck points out this case was affirmed, but the issue

1    of affirmance by the Illinois Supreme Court was only on the

2    issue whether attorney's fees could be shifted, and the Court

3    held that it could not be.  I found nothing in the Supreme

4    Court decision that spoke to the issue of this case.

5            There were indications in the opinion by the

6    administrative board that the board thought it was not

7    appropriate to compare Upstate and Downstate areas, and it's

8    this argument that Beck uses.  I disagree with the

9    administrative board.  I disagree that there is an

10   applicability of the statute of Illinois with the current

11   statute in New York.

12           The second opinion that Beck relied on was a decision

13   by my colleague Lewis Kaplan in the case Bronx Auto Inc. v.

14   American Honda Motor Co., Inc.  There is a miscite.  I believe

15   the correct cite is 934 F.Supp. -- it is cited correctly.  It

16   is my error.  934 F.Supp. 596 (S.D.N.Y. 1996), affirmed 113

17   F.3d 329 (2d Cir. 1997).

18           In Judge Kaplan's case we were dealing with an Acura

19   dealership in the Bronx.  For a number of reasons, Honda, the

20   manufacturer, wanted to terminate that dealership, feeling that

21   the neighborhoods had changed, that there was not effective

22   salesmanship going on and that, all in all, its overall state

23   performance would be better if that Acura dealer was

24   terminated.  However, it didn't state that.  It talked about

25   other kinds of reasons that just weren't so, and Judge Kaplan

D9odbect                          Decision

 1   found that they weren't so.  Judge Kaplan expressly ruled that

 2   had Honda been candid in its reasons for termination, they

 3   might have been accepted.

 4          And the Second Circuit specifically picked up and

 5   incorporated that same reservation.  But because there was

 6   deception, the Second Circuit affirmed Judge Kaplan, and the

 7   termination was not permitted under the statute.

 8          There is no deception in this case.  That case is not

 9   a precedent, and there is no reason that that case should be

10   considered an appropriate precedent for me to follow.

11          And there are a number of other cases that support the

12   use of the standard, and let me mention those.

13          In Coady Corp. v. Toyota Motor Distribution, 361 F.3d

14   50, (1st Cir. 2004), the Massachusetts Dealer Act use of the

15   terms of "arbitrary" or "unfair" came into play.  The dealer

16   had argued that Toyota's method of distributing cars between

17   dealers, based on self-reported sales, was arbitrary or unfair

18   because it was known that the system was manipulated by various

19   dealers who made false reports.  And that was a dealer's

20   argument.  The First Circuit rejected the argument, holding

21   that the Massachusetts Dealer Act does not warrant a

22   substitution of judicial for business judgment.  A distributor,

23   acting honestly, is entitled to latitude in making commercial

24   judgments.  In this context, it is only the egregious decision

25   that should be labeled arbitrary or unfair.

1          In my opinion, the First Circuit got it right, and I

2     find this to be a case that is soundly reasoned and therefore

3     applicable to support General Motors' proposition in this case.

4          In Milos v. Ford Motor Company, 317 F.2d 712 (3d Cir.

5     1963), a dealer argued that Ford had not acted in good faith in

6     declining to renew a franchise based on the dealer's failure to

7     meet sales targets.  The Court rejected the argument, ruling

8     that "Assignment of a market potential in the course of honest

9     business judgment by a manufacturer to a dealer as a measure of

10    expected performance within an area is not inherently unfair or

11    arbitrary."  I agree.

12         There is nothing in the case to indicate that a

13    failure of a dealer to achieve an RSI of 100 will automatically

14    lead to the termination of that dealer.  General Motors takes

15    steps to explain the deficiencies and to work with a dealer to

16    obtain an improvement of performance, and that is another

17    support of reasonableness.

18         I think I've covered all the other areas.

19         There is one other aspect in this case -- a few

20    more -- that I want to deal with.

21         One of the grounds of reliance by Beck in bringing

22    this action is Section 463(2)(c) of the New York Vehicle and

23    Traffic Law, which deals with "conditioning the renewal or

24    extension of a franchise on a franchised motor vehicle dealer's

25    substantial renovation of the dealer's place of business unless

D9odbect                        Decision

1    the franchisor demonstrates the need for such change in the

2    place of business," and so on.  There has been no showing that

3    that is applicable in the case, and that argument, having been

4    abandoned, is dismissed as academic.

5           Accordingly, I deny Beck's petition for a declaratory

6    judgment that the state measures used by General Motors are

7    unfair, unreasonable or arbitrary.  I deny the availability of

8    injunctive relief, as well.

9           There is also under the law a request for attorney's

10   fees.  I don't think they are appropriate in this case, and I

11   decline to order them.

12          I think that covers everything.  Mr. McGrath, have I

13   missed anything?

14          MR. McGRATH:  I don't think you did, your Honor.

15          There was one issue I think the Court may have

16   misspoke on.  I just want to bring it to your attention.  At

17   one point you said that General Motors reduced the number of

18   Chevrolet dealers from nine to five in the nine Downstate

19   counties, and I think the record on that was that they reduced

20   their number of dealers from nine to five in Westchester and

21   the Bronx.

22          THE COURT:  You are right, Mr. McGrath.  I misspoke.

23          MR. McGRATH:  I just wanted to bring it to your

24   attention.

25          THE COURT:  Thank you.

D9odbect                           Decision

1               (Pause)

2               I want to make one more comment, also.

3               Mr. McGrath has asserted a counterclaim on the part of

4    General Motors, claiming that the only reason it gave up the

5    Participation Agreement was on the basis of oral

6    representations made by the principals of Beck.  In light of my

7    ruling, that counterclaim is academic and it is dismissed.  It

8    also violates the rule of Bridgestone/Firestone because it

9    covers nothing more than the contract issues which are alleged

10   as a breach of contract.  So that counterclaim lacks merit and

11   is academic, and I dismiss it.  That makes for a final judgment

12   here, allowing Mr. McRory to appeal, if he wishes to do so.

13              Mr. McRory, have I missed anything?  I know you are

14   disappointed by the ruling but --

15              MR. McRORY:  No, your Honor, in that aspect, no.  You

16   have missed nothing.

17              THE COURT:  Thank you very much.  Thank you for an

18   excellent trial, both of you.

19              These findings and conclusions, extemporaneously

20   issued, will constitute my findings and conclusions.  A summary

21   order will follow but it won't be more than a page.  You now

22   have finality in this case.

23              Thank you very much.

24              MR. McGRATH:  Thank you, your Honor.

25                                 -   -   -